MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
MATTHEW I. KREEGER (CA SBN 153793)
MKreeger@mofo.com
MATTHEW A. CHIVVIS (CA SBN 251325)
MChivvis@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

Attorneys for Defendant
GENENTECH, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PHIGENIX, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GENENTECH, INC.,<br><br>Defendant. | Case No.    C 15-01238 BLF<br><br>**GENENTECH'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT AND INVALIDITY BASED ON LACK OF UTILITY AND ENABLEMENT**<br><br>Date:      August 3, 2017<br>Time:      9:00 am<br>Ctrm:      Courtroom 3 – 5th Floor |

1

## TABLE OF CONTENTS

2

Page

3     TABLE OF AUTHORITIES ................................................................................................ii

4     NOTICE OF MOTION ..................................................................................................... 1

5     MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

6     I.      INTRODUCTION ................................................................................................ 1

7     II.     STATEMENT OF ISSUES TO BE DECIDED ................................................... 3

8     III.    ARGUMENT ........................................................................................................ 3

9             A.      Phigenix Cannot Prove Induced Infringement Because Phigenix
                      Lacks Evidence of Direct Infringement and Intent. ............................... 3
10
                      1.      Phigenix Cannot Prove Direct Infringement............................... 4
11
                      2.      Phigenix Has No Evidence Showing Genentech Specifically
12                            Intends to Cause Direct Infringement. ........................................ 8

13                    3.      The Court Should Strike Dr. Pestell's Infringement Opinion,
                              Leaving Phigenix with No Evidence of Infringement ............... 10
14
              B.      The Asserted Claims Are Invalid for Lack of Utility. ........................... 11
15
                      1.      The Patent Lacks Substantiating Data in Breast Cancer. .......... 11
16
                      2.      One of Skill in the Art Would Not Have Viewed the
17                            Patent's Claimed  Treatment of Breast Cancer by Inhibiting
                              PAX2 as "Obviously Correct." ................................................. 13
18
              C.      The Asserted Claims Are Invalid for Lack of Enablement.................... 16

19    IV.     CONCLUSION.................................................................................................... 19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re '318 Patent Infringement Litig.*,
    583 F.3d 1317 (Fed. Cir. 2009)........................................................................................11, 12

*Adobe Sys. Inc. v. Wowza Media Sys.*,
    No. 11-cv-2243-JST, 2014 WL 709865 (N.D. Cal. Feb. 23, 2014)....................................10, 11

*Asus Computer Int'l v. Round Rock Research, LLC*,
    No. 12-cv-2099-JST, 2014 WL 1463609 (N.D. Cal. Apr. 11, 2014) ......................................10

*Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*,
    501 F.3d 1274 (Fed. Cir. 2007)...............................................................................................17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).................................................................................................................4

*Corales v. Bennett*,
    567 F.3d 554 (9th Cir. 2009).....................................................................................................4

*CreAgri, Inc. v. Pinnaclife, Inc.*,
    No. 11-CV-6635-LHK, 2013 WL 6673676 (N.D. Cal. Dec. 18, 2013) ...................................11

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).................................................................................................................4

*DSU Med. Corp. v. JMS Co.*,
    471 F.3d 1293 (Fed. Cir. 2006).................................................................................................8

*Durel Corp. v. Osram Sylvania, Inc.*,
    256 F.3d 1298 (Fed. Cir. 2001)...............................................................................................16

*Dzung Chu v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)*,
    627 F.3d 376 (9th Cir. 2010).....................................................................................................4

*Enzo Biochem, Inc. v. Calgene, Inc.*,
    188 F.3d 1362 (Fed. Cir. 1999)...............................................................................................16

*Exigent Tech., Inc. v. Atrana Solutions, Inc.*,
    442 F.3d 1301 (Fed. Cir. 2006).................................................................................................4

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    No. 13-cv-3999-BF, 2015 WL 3640694 (N.D. Cal. June 11, 2015)........................................10

*Fitness Anywhere LLC v. Woss Enter. LLC*,
    No. 14-CV-01725-BLF, 2016 WL 4440234 (N.D. Cal. Aug. 23, 2016)....................................4

*Gilead Sciences, Inc. v. Merck & Co., Inc., et al.*,
   13-CV-04057-BLF, ECF 164-4, 167 (N.D. Cal. Feb. 1, 2016) .................................................11

*Informatica Corp. v. Bus. Objects Data Integration, Inc.*,
   No. C 02-3378 JSW, 2006 WL 2917580 (N.D. Cal. Oct. 11, 2006) .........................................6

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*,
   687 F.3d 1377 (Fed. Cir. 2012)..........................................................................................16, 17

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).............................................................................................................4

*Medtronic, Inc. v. AGA Medical Corp.*,
   No. C-07-0567 MMC, 2009 WL 1163934 (N.D. Cal. Apr. 28, 2009) .....................................6

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
   420 F.3d 1369 (Fed. Cir. 2005).............................................................................................3

*Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*,
   803 F.2d 684 (Fed. Cir. 1986)..............................................................................................4

*MGM v. Grokster, Ltd.*,
   545 U.S. 913 (2005)..........................................................................................................8, 9

*Moore U.S.A. Inc. v. Standard Register Co.*,
   229 F.3d 1091 (Fed. Cir. 2000)............................................................................................15

*Novartis Corp. v. Ben Venue Labs., Inc.*,
   271 F.3d 1043 (Fed. Cir. 2001)............................................................................................4

*Petito v. Puritan's Pride, Inc.*,
   35 F. Supp. 3d 494 (S.D.N.Y. 2014).....................................................................................15

*Rasmusson v. SmithKline Beecham Corp.*,
   413 F.3d 1318 (Fed. Cir. 2005).................................................................................11, 15, 16

*Rohm & Haas Co. v. Brotech Corp.*,
   127 F.3d 1089 (Fed. Cir. 1997)............................................................................................3

*Sitrick v. Dreamworks, LLC*,
   516 F.3d 993 (Fed. Cir. 2008)..............................................................................................16

*Vita-Mix Corp. v. Basic Holding, Inc.*,
   581 F.3d 1317 (Fed. Cir. 2006)............................................................................................8

*Warner-Lambert Co. v. Apotex Corp.*,
   316 F.3d 1348 (Fed. Cir. 2003)............................................................................................8

*Wyeth & Cordis Corp. v. Abbott Labs.*,
   720 F.3d 1380 (Fed. Cir. 2013)............................................................................................17

1

2

*In re Ziegler*,
   992 F.2d 1197 (Fed. Cir. 1993) ............................................................................................... 11

3

**Statutes**

4

35 U.S.C. § 101 .............................................................................................................................. 11

5

35 U.S.C. § 112 ........................................................................................................................... 1, 11

6

35 U.S.C. § 271(b) ........................................................................................................................ 3, 8

7

35 U.S.C. § 271(c) ........................................................................................................................... 8

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                            **NOTICE OF MOTION**

2        PLEASE TAKE NOTICE that on August 3, 2017 at 9:00 a.m., in Courtroom 3 of the

3 United States District Court for the Northern District of California, 280 South First Street,

4 San Jose, California, defendant Genentech shall and hereby does move for summary judgment of

5 non-infringement of asserted claims 1 and 2[1] of U.S. Patent No. 8,080,534 (the "'534 patent") and

6 of invalidity under 35 U.S.C. § 112 for lack of utility and enablement.

7               **MEMORANDUM OF POINTS AND AUTHORITIES**

8 **I.     INTRODUCTION**

9        Having lost its priority date and consequently facing anticipatory intervening prior art,

10 Phigenix has now morphed its infringement theory past any semblance of plausibility.

11        When it first contacted Genentech, Phigenix contended that administering an

12 immunoconjugate containing trastuzumab and DM1, such as Kadcyla, necessarily resulted in

13 PAX2 inhibition and thus infringed the patent.  Genentech responded by pointing to Genentech's

14 own prior art patent application, which disclosed treatment of breast cancer (i.e., a breast

15 condition) with immunoconjugates like Kadcyla.  Thus, if administering Kadcyla to treat breast

16 conditions infringes, the '534 patent must be invalid by anticipation.  Faced with this anticipatory

17 prior art, Phigenix narrowed its infringement theory, maintaining that infringement occurs only

18 when Kadcyla is administered according to its label, which requires pre-treatment of patients with

19 trastuzumab and a taxane.  But without a 2005 priority date, the claims are also anticipated under

20 this infringement theory.  Genentech established that a 2009 publication of the results of its

21 Kadcyla Phase II clinical trial disclosed administering Kadcyla to patients who had been pre-

22 treated with trastuzumab and a taxane (among other drugs, as is common in cancer treatment).

23 Thus, this publication, too, would necessarily anticipate the asserted claims if, as Phigenix

24 contends, administering Kadcyla according to its label infringes.

25        Confronted with this clear evidence of anticipation, Phigenix has now contorted its

26 infringement theory to the breaking point.  Phigenix contends that infringement occurs only

27

28         [1] Counsel for Phigenix confirmed on June 1, 2017 that Phigenix is no longer asserting claim 8 of the '534 patent in this action.  (Kreeger Decl. Ex.1.)

where Kadcyla is administered to patients pre-treated with trastuzumab, a taxane, *and nothing else*.  This new position narrows Phigenix's infringement theory so far that it has no evidence of an underlying direct infringement, let alone of Genentech's inducement.  Phigenix can point to no Kadcyla recipient who has been treated with trastuzumab, a taxane, *and nothing else*.  The target population for Kadcyla is patients who have been treated with, and grown resistant to, other cancer therapies.  These patients typically have received many cancer treatments—not just trastuzumab and a taxane—and the Kadcyla label places no limits on the number and type of treatments beyond these two therapies.

Phigenix also cannot prove that Genentech has the requisite specific intent to induce infringement, as there is no evidence that Genentech specifically intends that health care professionals administer Kadcyla to a population of breast condition patients pre-treated with trastuzumab and a taxane *and nothing else*.  Phigenix's new infringement theory, offered for the first time at its expert's deposition, deviates from Phigenix's disclosed contentions and should be stricken as violating the Patent Local Rules.  Summary judgment is therefore appropriate on infringement.

Phigenix's patent claims are also invalid as a matter of law for lack of utility.  Where it claims a method of treatment, a patent must include evidence substantiating its usefulness unless one of ordinary skill in the art would accept the claimed utility as obviously correct.  Here the patent plainly lacks substantiating evidence, as all of the data in the patent pertains to prostate cancer, not breast conditions.  Moreover, there is no genuine dispute that one of ordinary skill would not accept Phigenix's patent as "obviously correct" when it claims to have discovered a method of treating a breast condition.  The claims therefore lack utility.

Finally, the asserted claims fail to satisfy the enablement requirement.  The patent claims are indisputably broad, covering any composition that inhibits PAX2 or enhances DEFB1.  As admitted by both the named inventor, Carlton Donald, and Phigenix's expert, Dr. Robert Pestell, the specification offers only prophetic examples of experiments that could be conducted on breast cancer cell lines, and no working examples of tests with breast cancer cells that might be used to identify compounds that could inhibit PAX2 or enhance DEFB1.  The specification offers no

direction for how one should test candidate compounds for their ability to actually treat breast conditions by inhibition of PAX2 or enhancement of DEFB1.  Other than a few prophetic functional nucleic acids that were not tested in breast cancer cells, the specification contains no data about the structure of any of the claimed compositions, and ultimately no basis to identify compounds within the scope of the claims by any means other than herculean efforts and brute force experimentation.  The specification is thus insufficient to enable the vast scope of asserted claims 1 and 2, and the claims are invalid for lack of enablement.

## II.     STATEMENT OF ISSUES TO BE DECIDED

i.     Whether Genentech is entitled to summary judgment that claims 1 and 2 of the '534 patent are not infringed by inducement.

ii.     Whether Genentech is entitled to summary judgment that claims 1 and 2 of the '534 patent are invalid because they lack utility.

iii.     Whether Genentech is entitled to summary judgment that claims 1 and 2 of the '534 patent are invalid because they fail to satisfy the enablement requirement.

## III.     ARGUMENT

### A.     Phigenix Cannot Prove Induced Infringement Because Phigenix Lacks Evidence of Direct Infringement and Intent

Phigenix's sole infringement theory in this case is that Genentech "actively induces infringement" under 35 U.S.C. § 271(b).  (ECF No. 21 (Am. Compl.) ¶¶ 8-14.)  To prove inducement, Phigenix must show, "first that there has been direct infringement, and second, that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."  *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005) (internal quotation marks omitted).  Here, Phigenix lacks evidence to support either requirement.

To show infringement, Phigenix "must supply sufficient evidence to prove that the accused product or process meets every element or limitation of a claim."  *Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997).  Because the patentee has the "ultimate burden of proving infringement," the accused infringer may establish that summary judgment is

1  proper (a) by providing evidence that would preclude a finding of infringement; or (b) by

2  showing that the evidence on file fails to establish a material issue of fact with respect to the

3  patentee's case. *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001).

4  Such a showing does not require that the movant "'produce evidence' showing the absence of a

5  genuine issue of material fact." *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1307

6  (Fed. Cir. 2006).  Rather, "the burden on the moving party may be discharged by 'showing'—that

7  is, pointing out to the district court—that there is an absence of evidence to support the

8  nonmoving party's case." *Id.* at 1308 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

9  (1986)).  "For a court to find that a genuine dispute of material fact exists, 'there must be enough

10  doubt for a reasonable trier of fact to find for the [non-moving party].'" *Fitness Anywhere LLC v.*

11  *Woss Enter. LLC*, No. 14-CV-01725-BLF, 2016 WL 4440234, at *2 (N.D. Cal. Aug. 23, 2016)

12  (quoting *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009)).  "The non-moving party must do

13  more than show there is some 'metaphysical doubt' as to the material facts at issue." *Dzung Chu*

14  *v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)*, 627 F.3d 376, 387 (9th Cir. 2010) (citing

15  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "In fact, the

16  non-moving party must come forth with evidence from which a jury could reasonably render a

17  verdict in the non-moving party's favor." *Id.*

18  ### 1.     Phigenix Cannot Prove Direct Infringement

19       Inducement requires an underlying act of direct infringement.  *Met-Coil Sys. Corp. v.*

20  *Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986) ("Absent direct infringement of the

21  patent claims, there can be neither contributory infringement, nor inducement of infringement.")

22  (internal citations omitted).  Here, Phigenix's only evidence of infringement—Dr. Richard

23  Pestell's expert opinion—is expressly limited to a narrow class of breast cancer patients who have

24  received Kadcyla after previous treatment with trastuzumab, a taxane, *and nothing else*.[2]

---

25       [2] Genentech intends to move under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579
26  (1993) to exclude Dr. Pestell's testimony—including his recently disclosed infringement opinion
   as to patients pretreated with trastuzumab, a taxane, and nothing else—because his opinions are
27  based on experimental data and assumptions that suffer from numerous methodological flaws.
   Given the Court's guidance (ECF 344), Genentech will raise those issues in a separate motion,
28  not in connection with this summary judgment motion.

Phigenix has offered no evidence of an actual instance of direct infringement with that class of patients.  Nor is there any of record.

Although Phigenix's complaint asserts that Genentech induces infringement by encouraging the administration of Kadcyla according to its label, (ECF No. 21 (Am. Compl.) ¶ 13) (alleging Genentech "actively induc[es] healthcare professionals to prescribe and administer KADCYLA® to treat patients with HER2-positive, metastatic breast cancer . . . ."), Phigenix narrowed this theory recently in a transparent attempt to avoid anticipation by Phase II clinical trials with Kadcyla.  At his deposition, Dr. Richard Pestell, Phigenix's only expert offering an opinion on infringement, testified that his infringement opinion was limited to patients who had previously been treated with Herceptin and a taxane *and nothing else*:

> Q:  . . . Do you have a view about patients who have been treated with Herceptin, a taxane and other agents, whether such a patient—administering Kadcyla to that patient would infringe the patent?
>
> A:  I don't have an opinion on that.

(Pestell Dep. Tr., Kreeger Decl. Ex. 2, at 53:14-19.)

When asked to clarify, Dr. Pestell confirmed he was offering no expert testimony about the broader population:

> Q.  [D]o you have an opinion as to whether a patient who had previously been treated with anthracycline, and otherwise met the requirements of the Kadcyla label, whether administering Kadcyla to that patient infringes the '534 patent.
>
> A.  Yeah, I'm sorry, I don't know the answer to that question, yeah.
>
> * * *
>
> Q. So that's true of all the therapies mentioned in the Phase 2 trial; if a patient had previously been treated with any of those agents, you don't have an opinion on infringement for that patient?
>
> A.  Correct.

(*Id.* at 51:5-12; 53:20-25.)  Thus, Phigenix's expert support for its theory of infringement is expressly limited to patients who receive Kadcyla after being pre-treated with Herceptin, a taxane, and no other agents.  Counsel for Phigenix subsequently confirmed that its current theory

of infringement is limited to this narrow class:  patients who have been pre-treated with

trastuzumab, a taxane, and nothing else.  (Kreeger Decl. Ex. 1.)

Phigenix has no evidence that such a narrow class of patients exists. Phigenix's infringement contentions have been amended three times, but cite to no evidence of Kadcyla being administered to a patient who had been pre-treated with trastuzumab, a taxane, and nothing else.  Phigenix has produced no evidence otherwise that such patients exist.  (Kreeger Decl. ¶ 10.) Dr. Pestell pointed to no evidence that such patients exist in his expert reports (or at his deposition), and he admitted at his deposition that he has not determined how many patients meet his narrow requirement of having received Kadcyla after being pre-treated *only* with trastuzumab and a taxane.  (*See* Pestell Dep. Tr., Kreeger Decl. Ex. 2, at 54:2-5 ("Q.  And did you make any effort to quantify how many patients were excluded by this? A.  No.").)  Phigenix has thus failed to proffer any evidence of an actual instance of direct infringement.  Its inducement claim founders on this failure of proof alone.  *See Medtronic, Inc. v. AGA Medical Corp.*, No. C-07-0567 MMC, 2009 WL 1163934, *3 (N.D. Cal. Apr. 28, 2009) (granting summary judgment of no infringement for claims directed to method of removing medical implant where patentee "presented no evidence . . . of any instance in which any accused product actually was removed from a patient"); *Informatica Corp. v. Bus. Objects Data Integration, Inc.*, No. C 02-3378 JSW, 2006 WL 2917580, at *3 (N.D. Cal. Oct. 11, 2006) (granting summary judgment of non-infringement despite "evidence demonstrating that the second database **can** include both the local repository and data mart" for failure to show "any evidence that any of BODI's customers actually created a database which contains both a local repository and a data mart.") (emphasis in original).

Not only did Phigenix not carry its burden of showing such a narrow class of patients exists—the available evidence points in the opposite direction.  In order to receive Kadcyla according to its label, a patient must have metastatic breast cancer and have previously been treated with trastuzumab and a taxane.  Kadcyla's label includes, however, no limitation on other treatments patients may have received.  (Kadcyla label, GENE-00875575–875598, Kreeger Decl. Ex. 3.)  By the time patients receive Kadcyla, they will typically have received cancer treatments

1    in addition to trastuzumab and a taxane.  As Dr. Weiner explains, the American Society of

2    Clinical Oncology's (ASCO) guidelines for treating HER2-positive breast cancer contemplate

3    that patients receiving Kadcyla have previously received trastuzumab, a taxane, and a third agent,

4    pertuzumab (Perjeta).  (Weiner Decl. Ex. 2 ¶ 53.)  In the Biologics License Application (BLA)

5    Genentech submitted to the FDA to obtain approval for Kadcyla, the "pivotal" phase III trial

6    TDM4370g ("EMILIA") involved "a broad patient population" with patients who had received

7    many types of prior treatment.  (Weiner Decl. Ex. 2 ¶ 52; Kreeger Decl. Ex. 4 at GENE-

8    00003730, 3770.)

9         The Herceptin (trastuzumab) label also evidences what treatments many Kadcyla patients

10   would have received before starting Kadcyla, because all patients receiving Kadcyla according to

11   its label would have previously been treated with Herceptin.  Herceptin is indicated for adjuvant

12   breast cancer for administration with several other agents:

13        Herceptin is indicated for adjuvant treatment of HER2
          overexpressing . . . breast cancer

14

15        •    as part of a treatment regimen consisting of doxorubicin,
               cyclophosphamide, and either paclitaxel [a taxane] or docetaxel
               [a taxane];

16

17        •    with docetaxel [a taxane] and carboplatin;

18        •    as a single agent following multi-modality anthracycline based
               therapy.

19   (Herceptin label, Kreeger Decl. Ex. 5, at 2.)  Patients who have received trastuzumab for adjuvant

20   therapy (i.e., early-stage cancer therapy after surgery or radiation) will thus typically have also

21   received at least one of doxorubicin, cyclophosphamide, carboplatin, and anthracycline, in

22   addition to trastuzumab and a taxane.  If these patients progress to metastatic cancer, they are then

23   eligible for Kadcyla.  And, again, nothing in the Kadcyla label excludes patients who have

24   previously received other therapeutic agents.  (*See* Weiner May 16, 2017 Dep. Tr., Kreeger Decl.

25   Ex. 9, at 112:25-114:6; Pestell Dep. Tr., Kreeger Decl. Ex. 2, at 36:22-37:8.)

26        In sum, Phigenix cannot carry its burden of proving direct infringement.

27

28

1

2

### 2.     Phigenix Has No Evidence Showing Genentech Specifically Intends to Cause Direct Infringement

3

Phigenix's inducement claim also fails as a matter of law for lack of any proof that

4     Genentech intends to induce infringement.  Phigenix's infringement theory is limited to patients

5     who receive Herceptin and a taxane but nothing else.  Phigenix must therefore prove that

6     Genentech sells Kadcyla with the intent that health care professionals who read the Kadcyla label

7     will treat that specific population.  Phigenix cannot do so.

8

To show inducement under 35 U.S.C. § 271(b), the patent holder must prove "that the

9     alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a

10    *specific intent* to encourage another's infringement of the patent." *Vita-Mix Corp. v. Basic*

11    *Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2006); *DSU Med. Corp. v. JMS Co.*, 471 F.3d

12    1293, 1304 (Fed. Cir. 2006) (en banc in relevant part) (emphasis added).  Specific intent requires

13    more than just knowledge that the induced acts might constitute patent infringement; it requires

14    that "the inducer . . . have an *affirmative intent to cause* direct infringement." *DSU*, 471 F.3d at

15    1306 (citing *MGM v. Grokster, Ltd.*, 545 U.S. 913 (2005)) (emphasis added).  While "[i]ntent can

16    be shown by circumstantial evidence,  . . . the mere knowledge of possible infringement will not

17    suffice." *Vita-Mix*, 581 F.3d at 1328.

18

The existence of substantial non-infringing uses heightens the patentee's challenge in

19    showing specific intent.  "Especially where a product has substantial noninfringing uses, intent to

20    induce infringement cannot be inferred even when the defendant has actual knowledge that some

21    users of its product may be infringing the patent." *Warner-Lambert Co. v. Apotex Corp.*, 316

22    F.3d 1348, 1365 (Fed. Cir. 2003).  "[N]on-infringing uses are substantial when they are not

23    unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix*,

24    581 F.3d at 1327 (defining "substantial non-infringing use" in the context of contributory

25    infringement under 35 U.S.C. § 271(c)); *see also Grokster*, 545 U.S. at 915 ("[T]he doctrine

26    absolves the equivocal conduct of selling an item with lawful and unlawful uses . . . .").

27

Here, there can be no question that there are substantial non-infringing uses of Kadcyla.

28    As an initial matter, all patients treated with Kadcyla who had previously received adjuvant

therapy according to the Herceptin label would not infringe, because, as noted above, such therapy requires administration of agents other than Herceptin and a taxane.  (Herceptin label, Kreeger Decl. Ex. 5, at 2.)  Patients treated with Kadcyla who previously received treatment according to the ASCO standard of care for metastatic breast cancer (Herceptin, a taxane, and Perjeta) would not infringe, because of the additional administration of Perjeta.  (Weiner Decl. Ex. 2 ¶ 53.)  Indeed, there is no evidence of record that physicians prescribe Kadcyla to patients who have not been previously treated with agents in addition to trastuzumab and a taxane. Kadcyla's approval was certainly not based on treatment of such patients.  (*Id*. ¶ 52.)  And, as established above, Phigenix's infringement contentions and expert reports are devoid of evidence that *any* Kadcyla patients meet the narrow requirements of Phigenix's current infringement theory (pre-treatment with trastuzumab, a taxane, *and nothing else*).

Even if Phigenix could show that there is some small population of Kadcyla patients that satisfies its expert's requirements—and, again, it has provided no evidence for this to date—there would still be no evidence that Genentech has encouraged the treatment of that specific population.  To the contrary, Kadcyla's label and marketing make clear that Kadcyla is indicated for *all* metastatic breast cancer patients who have been previously treated with trastuzumab and a taxane.  (*See* Kreeger Decl. Ex. 3 at GENE-00875575, 00875577.)  Phigenix has provided no evidence of any actions by Genentech encouraging treatment of that specific population of patients who have been treated *only* with trastuzumab and a taxane.

Phigenix hoped to prove inducement by relying solely on the Kadcyla label.  But Phigenix's expert's testimony limits infringement not to the population served according to the label, but to a potential sliver of that population that may not even exist.  Since there is no evidence Genentech intended to induce this very narrow use alleged to infringe, as compared to all of the other non-infringing uses for which Kadcyla may be administered according to its label, Phigenix cannot prove specific intent to cause direct infringement.  As a result, Phigenix's claim for infringement by inducement cannot survive summary judgment.

### 3.     The Court Should Strike Dr. Pestell's Infringement Opinion, Leaving Phigenix with No Evidence of Infringement

Genentech objects to Dr. Pestell's infringement opinion as impermissibly deviating from the theory disclosed in Phigenix's infringement contentions.  The Court should therefore strike the opinion.  If this request is granted, Phigenix will lack any expert testimony of infringement, and summary judgment would be appropriate for that additional reason.

Phigenix's infringement contentions did not limit infringement to Kadcyla's administration to patients who had received *only* trastuzumab and a taxane.   Phigenix's counsel acknowledged in a recent meet-and-confer email that its "infringement contentions repeatedly refer[red] to patients who have previously received trastuzumab and a taxane."  Phigenix's counsel then admitted that its contentions "*do not say the words 'and nothing else*' . . . ." (Kreeger Decl. Ex. 6 (May 31, 2017 Email from Paul Ackerman to Matthew Kreeger) (emphasis added).)

Because Phigenix did not raise its "trastuzumab and a taxane and nothing else" theory in its infringement contentions, the Court should strike this belated theory.  *See, e.g.*, *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-cv-3999-BF, 2015 WL 3640694, at *4 (N.D. Cal. June 11, 2015) (striking various infringement theories that plaintiff had not disclosed in its infringement contentions); *Adobe Sys. Inc. v. Wowza Media Sys.*, No. 11-cv-2243-JST, 2014 WL 709865, at *12-16 (N.D. Cal. Feb. 23, 2014) (same); *Asus Computer Int'l v. Round Rock Research, LLC*, No. 12-cv-2099-JST, 2014 WL 1463609, at *1-4 (N.D. Cal. Apr. 11, 2014) (same).  It was inappropriate for Phigenix to try to "clarify its theory at this late stage of the litigation through an expert report." *Asus*, 2014 WL 1463609, at *4.  Moreover, to the extent that Phigenix's contentions were ambiguous as to its "only trastuzumab and a taxane" theory, "th[at] ambiguity must be construed against [Phigenix] in light of the purpose of the patent local rules, which is to establish the universe of infringement theories that will be litigated in any given case." *Adobe*, 2014 WL 709865, at *14.

The Court should sustain Genentech's objection and strike Dr. Pestell's infringement opinion.  Genentech will then be entitled to summary judgment as Phigenix will lack any expert

1    testimony of infringement.

2         **B.      The Asserted Claims Are Invalid for Lack of Utility**

3         In order to satisfy the "how to use" prong of Section 112, the patent must as a matter of

4    law establish a practical utility for the claimed invention.  *In re Ziegler*, 992 F.2d 1197, 1200

5    (Fed. Cir. 1993) ("The how to use prong of section 112 incorporates as a matter of law the

6    requirement of 35 U.S.C. § 101 that the specification disclose as a matter of fact a practical utility

7    for the invention.").  "If a patent claim fails to meet the utility requirement because it is not useful

8    or operative, then it also fails to meet the how-to-use aspect of the enablement requirement."  *In*

9    *re '318 Patent Infringement Litig.*, 583 F.3d 1317, 1324 (Fed. Cir. 2009) (emphasis omitted).

10        "In the context of determining whether sufficient utility as a drug, medicant, and the like

11   in human therapy has been alleged, it is proper . . . to ask for substantiating evidence unless one

12   with ordinary skill in the art would accept the allegations as obviously correct."  *CreAgri , Inc. v.*

13   *Pinnaclife, Inc.*, No. 11-CV-6635-LHK, 2013 WL 6673676, at *16 (N.D. Cal. Dec. 18, 2013)

14   (quoting *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1323 (Fed. Cir. 2005)); *see*

15   *also Gilead Sciences, Inc. v. Merck & Co., Inc., et al.*, 13-CV-04057-BLF, ECF 164-4, 167 (N.D.

16   Cal. Feb. 1, 2016) (same).  Thus, "where there is 'no indication that one skilled in [the] art would

17   accept without question statements [as to the effects of the claimed drug products] and no

18   evidence has been presented to demonstrate that the claimed products do have those effects,' an

19   applicant has failed to demonstrate sufficient utility and therefore cannot establish enablement."

20   *Rasmusson*, 413 F.3d at 1323.  On summary judgment, where the challenger has "has put forth

21   evidence, through the testimony of its experts, that show a skilled artisan would have questioned

22   the alleged utility of the asserted patents . . . the burden shifts to [the patent holder] to present

23   evidence that indicates there is a disputed issue of material fact."  *Gilead*, 2016 WL 7839104, at

24   *4.

25        **1.      The Patent Lacks Substantiating Data in Breast Cancer**

26        Instead of providing "substantiating" evidence required for utility, the '534 patent

27   provides no data involving even a single type of breast cancer cell.  At bottom, the '534 patent

28   specification "does no more than state a hypothesis and propose testing to determine the accuracy

of that hypothesis.  That is not sufficient."  *In re '318 Patent*, 583 F.3d at 1327 (affirming no utility where patent on using galantamine to treat Alzheimer's disease disclosed no testing).

The patent specification's data all involves purported effects on prostate cancer cells through inhibition of PAX2.  (*See* '534 patent at Examples 2, 3, 8, 9, and 11.)  There is no dispute that the patent contains no actual data pertaining to breast conditions.  (Pestell Dep. Tr., Kreeger Decl. Ex. 2, at 195:14–16; 196:13–20.)  The patent's discussion of breast conditions is limited to prophetic examples of experiments (Examples 12 to 17) that *could* be conducted in breast cancer cell lines in the future.  (*Id.* at 197:6–10.)  And in fact, these "prophetic" breast cancer examples fail to even predict that inhibition of PAX2 will have any effect on breast cancer cells; none includes any language to indicate an effect is actually expected.  Each merely expresses an intent to experiment.  Such proposed experiments, without even an expectation that such experiments would succeed in demonstrating that PAX2 inhibition affects breast cancer cells, do not constitute "substantiating data" confirming the usefulness of the claimed method of treatment.

The '534 patent also fails to show that breast cancer is an appropriate target for PAX2 therapy.  As the patent explains, in order to treat a condition by inhibiting PAX2 expression, one would first need to establish that PAX2 is overexpressed in the cancer at issue.  *See* '534 patent at 43:22–26 ("The significance of aberrant PAX2 expression and its abrogation of apoptosis, with subsequent contribution to tumor formation, suggest that it may be a suitable target for prostate cancer treatment.").  There is no evidence in the '534 patent specification to support the suggestion that breast cancer cells overexpress PAX2. As a result, one of ordinary skill in the art would not have accepted the allegations that PAX2 was a suitable treatment for breast cancer without substantiating testing.

Phigenix does not dispute that the '534 patent specification provides *no data* showing that PAX2 is expressed, much less overexpressed, in even a single type of breast cancer cell.[3]  (*See* Dressler Invalidity Rpt., Dressler Decl. Ex. 1 ¶¶ 22, 74 ("[I]n order to treat a breast condition by

---

[3] While Table 1 in the specification purports to list the number of "new cases" and deaths allegedly due to "PAX2-expressing cancers," and includes breast cancer in a long list with other cancers, Table 1 provides no supporting data that any of those cancers in fact expresses PAX2. Phigenix's expert never addresses Table 1 in any of his reports.

1  inhibiting PAX2 expression, one would first need to establish that PAX2 is overexpressed in

2  breast cancer tissues.  There is no data to support such a conclusion in the '534 specification.").)

3  This evidentiary deficiency is fatal to any claim that PAX2 inhibition must work *in a patient* to

4  treat a breast condition as required by claims 1 and 2.  Given the complete lack of evidence in the

5  specification that PAX2 is present in breast cancer cells even *in vitro*, no scientist in this

6  unpredictable field would have viewed the methods of treatment recited in the asserted claims as

7  facially correct.

8            **2.**      **One of Skill in the Art Would Not Have Viewed the Patent's Claimed**

                           **Treatment of Breast Cancer by Inhibiting PAX2 as "Obviously**

9                             **Correct"**

10       Phigenix is also unable to show that one of skill in the art would have considered the '534

11  patent's claimed method to be "obviously correct."   "Cancer" is a catch-all term referring to a

12  vast and complex set of conditions, caused by the abnormal, unregulated growth of cells.

13  (Weiner Invalidity Rpt., Weiner Decl. Ex. 1 ¶ 20.)  There are many different categories of

14  cancers, including carcinomas, sarcomas, lymphomas and leukemias, germ cell tumors, and

15  blastomas.  (*Id.*)  "Even within each tissue type—whether it be breast, lung, or prostate—there are

16  many different cancerous conditions that can occur, each displaying a different morphology,

17  treatment plan, and prognosis."  (*Id.*)

18       Different kinds of cancers are driven by specific features, which "include the fundamental

19  tissue properties where the cancer originates and the particular molecular drivers and

20  abnormalities that are responsible for the expression of a particular malignancy."  (*Id.* ¶ 21.)  For

21  example, the primary molecular drivers of certain prostate cancers are male hormones called

22  androgens.  (*Id.*)  Androgen expression can increase cell proliferation, and can lead to

23  uncontrolled cell growth in the prostate.  (*Id.*)  By contrast, the most common driver of breast

24  cancer is the estrogen receptor system, which is responsible for roughly 70 percent of female

25  breast cancers.  (*Id.* ¶ 22.)  HER2/neu (also known as the erbB2 receptor) is another dominant

26  driver of breast cancer when overexpressed, appearing in 20 to 25 percent of breast cancers.  (*Id.*)

27       In light of these disease-specific conditions, developing a cancer therapy is a "very

28  difficult and complicated process because . . . there are many different cancers, each with

distinctive biology and molecular drivers, and there are many different kinds of cancer treatments." (*Id.* ¶ 35.)  Though treatments may work well in tissue culture (*in vitro*), no more than "a tiny handful of positive early-stage preclinical experiments" ever lead to a therapeutically effective treatment in humans or animals (*in vivo*).  (*Id.*)  "Identifying a *potentially* relevant target is an important early research step on the long road to developing a cancer treatment, but it comes nowhere close to demonstrating an actual treatment in a particular context." (*Id.* ¶ 36.)

The '534 patent's non-prophetic examples address *in vitro* prostate cell line studies and do not establish that the reported results would occur in breast cancer cells.  As Genentech's expert Dr. Dressler explained after reviewing the '534 patent specification, "cancer cell lines express hundreds of transcription factors, and just because an effect is seen in one type of cancer cell, that does not indicate that the same effect would have a similar effect in a totally different cell." (Dressler Invalidity Rpt., Dressler Decl. Ex. 1 ¶ 75.)  In addition, "the effect of an inhibition or expression of a gene on a cancer cell *in vitro* does not necessarily translate to the same, or even a similar, effect in the clinical context." (*Id.*)  Rather than viewing the claimed treatment as "obviously correct," a researcher or clinician of ordinary skill would have fundamentally doubted that one could apply *in vitro* cell data for prostate cancer to establish a treatment effect in breast cancer patients unless there was substantiating data.

Above all, the claims would have required one of ordinary skill to take a great *causal* leap: reducing the levels of PAX2 will inhibit growth of breast cancer cells.  Based on the '534 patent's limited disclosure, one of ordinary skill would have rejected this essential assumption:

> There is no credible data to suggest that reduced levels of PAX2 would inhibit growth of mammary tumor cells—let alone cause cell death as the '534 patent claims.  The prostate cancer cells in Dr. Donald's studies express hundreds of transcription factors and other growth control proteins.  Dr. Donald looked at only three of these: PAX2, ERK, and JNK.  He provides no data establishing that changes in these three, even if they do occur, are responsible for cell death.  One of ordinary skill in the art would not, by reading the '534 patent's disclosure, have accepted that a reduction in PAX2 levels inhibits breast cancer and can be used as a treatment for breast cancer or any other breast conditions.

(*Id.* ¶ 74.)

Phigenix has no evidence to the contrary.  Phigenix's only expert on this issue, Dr. Pestell,

1    fails to point to any part of the specification that confirms one of ordinary skill would have

2    accepted such causation without any supporting evidence.  He agreed at deposition that, even

3    today, he has seen no evidence that an inhibition of PAX2 *causes* breast cancer cell death.

4    Dr. Pestell admitted that he has "evidence of correlation, but *not causation*." (Pestell Dep. Tr.,

5    Kreeger Decl. Ex. 2, at 309:2-17 (emphasis added).)  For this reason alone, no person of ordinary

6    skill would have viewed the claimed PAX2 treatment of a breast condition as "obviously correct."

7         Dr. Pestell asserts that "[t]he molecular mechanisms governing signal transduction and

8    cellular proliferation are often conserved between different cancer types," including in prostate

9    and cancer cells.  (Pestell Response, Kreeger Decl. Ex. 7 ¶ 45.)  But he provides no support for

10   this proposition other than his conclusory statement, which is insufficient.  *Moore U.S.A. Inc. v.*

11   *Standard Register Co.*, 229 F.3d 1091, 1112 (Fed. Cir. 2000) ("A party may not overcome a grant

12   of summary judgment by merely offering conclusory statements").  Even after Genentech's

13   expert, Dr. Weiner, identified this glaring lack of evidence in his opening report (Weiner

14   Invalidity Report, Weiner Decl. Ex. 1 ¶ 97), Dr. Pestell did not identify a single publication or

15   other evidence to substantiate this bald assumption in either his responsive report or his

16   deposition.  (*See* Pestell Response, Kreeger Decl. Ex. 7; Pestell Dep. Tr., Kreeger Decl. Ex. 2, at

17   309:18-311:8 (repeating his opinion that a signaling pathway in prostate could be conserved in

18   breast without identifying any specific example); Weiner Reply, Weiner Decl. Ex. 2 ¶ 40.)

19        Unsurprisingly, nothing in the specification substantiates such conservation between

20   prostate cancer cells and breast cancer cells.  Accordingly, claims 1 and 2 of the '534 patent lack

21   utility.  *Petito v. Puritan's Pride, Inc.*, 35 F. Supp. 3d 494, 507-08 (S.D.N.Y. 2014) (granting

22   summary judgment for lack of utility because a "medical patent whose utility is not immediately

23   apparent to a person of ordinary skill in the art demands a measure of proof" supported by

24   experimental results—"whether human, animal, or in vitro").

25        In this case, as in *Rasmusson*, one of skill in the art would not have accepted

26   unsubstantiated claims of utility.  In *Rasmusson*, the Federal Circuit considered a method of

27   treating cancer using finasteride as a selective 5αR inhibitor.  413 F.3d at 1322, 1323.  There, the

28   parties agreed that one of ordinary skill would have "recognized that finasteride was a selective

1   5αR inhibitor," but disagreed as to "whether a person of ordinary skill in the art would have

2   believed, before June 27, 1990, that finasteride would be effective in treating prostate cancer."

3   *Id.* The Federal Circuit concluded that a person of ordinary skill "would not know that 5αR

4   inhibition contributed to any anti-tumor effects, because it was not clear whether DHT or

5   testosterone caused prostate cancer." *Id.* at 1324. ("If testosterone, and not DHT, caused the

6   disease, then the anti-tumor effects resulting from multi-active 5αR inhibitors were not due to

7   5αR inhibition, but rather to anti-testosterone mechanism.")  Rasmusson therefore "needed to

8   provide experimental proof that his invention could be effective in treat cancer" and having failed

9   to do so, its applications were not enabled.  *Id.*

10      Likewise here, it is not clear from the '534 patent specification whether PAX2 expression

11  causes any form of breast cancer or even whether PAX2 is present in any breast tissue.  It

12  therefore would not have been "obviously correct" to one of ordinary skill that the claimed

13  method of inhibiting PAX2 could treat a breast condition.  As in *Rasmusson*, experimental proof

14  is needed.  Because the '534 patent provides no such substantiating evidence that inhibiting

15  PAX2 in breast cells can treat a breast condition, the claims lack utility and are invalid.

16      **C.    The Asserted Claims Are Invalid for Lack of Enablement**

17      To satisfy Section 112, the specification must teach a person of skill in the art "how to

18  make and use the full scope of the claimed invention without 'undue experimentation.'" *MagSil*

19  *Corp. v. Hitachi Glob. Storage Techs.*, *Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012).  Importantly,

20  to fulfill the enablement requirement, the full scope of each claim must be enabled. *Sitrick v.*

21  *Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008).  "This important doctrine prevents both

22  inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to

23  cover more than was actually invented.  Thus, a patentee chooses broad claim language at the

24  peril of losing any claim that cannot be enabled across its full scope of coverage." *MagSil*,

25  687 F.3d at 1381.  "Enablement is a question of law, based on underlying factual inquiries . . . ."

26  *Durel Corp. v. Osram Sylvania, Inc.*, 256 F.3d 1298, 1303 (Fed. Cir. 2001) (citing *Enzo Biochem,*

27  *Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1369 (Fed. Cir. 1999)).

28      The '534 patent specification "discloses only a starting point for further iterative research

1   in an unpredictable and poorly understood field." *Wyeth & Cordis Corp. v. Abbott Labs.*,

2   720 F.3d 1380, 1386 (Fed. Cir. 2013).  The patent fails to enable the full scope of the claims, for

3   several reasons.

4         First, there is inadequate disclosure of how to locate "compositions" that could be used to

5   treat breast conditions.  It is undisputed that the '534 patent specification does not provide even

6   one working example in breast cancer.  As Dr. Pestell concedes, "the actual examples were

7   performed on prostate cancer cell lines."  (Pestell Response, Kreeger Decl. Ex. 7 ¶ 44.)  And

8   other than a single conclusory assertion that "these examples are still informative to the

9   [POSITA] in practicing the claimed invention of a method of treating a breast condition" (*id.*),

10  Dr. Pestell offers no explanation for how exactly one of skill would link *in vitro* prostate cancer

11  studies to a treatment of breast cancer in an actual patient.  *Auto. Techs. Int'l, Inc. v. BMW of N.*

12  *Am., Inc.*, 501 F.3d 1274, 1284-85 (Fed. Cir. 2007) ("[H]aving failed to provide any detail

13  regarding why no experimentation was necessary, the declaration does not create a genuine issue

14  of material fact as to enablement").

15        Second, the patent specification fails to teach how to identify compositions that inhibit

16  PAX2, enhance DEFB1, or both, in order to treat a breast condition.  It is undisputed that the

17  claims cover a broad spectrum of potential compounds defined only by their ability to inhibit

18  PAX2 or enhance DEFB1.  The specification provides a laundry list of types of compounds for

19  purportedly inhibiting PAX2.  These compositions range from large molecules, such as functional

20  nucleic acids, all the way to "any small molecule that interferes with the binding of PAX2."

21  ('534 patent at 12:2–5 (emphasis added).)  As Dr. Weiner opined, the "number of such

22  compounds is enormous."  (Weiner Invalidity Rpt., Weiner Decl. Ex. 1 ¶ 99.)  The '534 patent's

23  prophetic descriptions of experiments that could be conducted on breast cancer cells address only

24  two means of inhibiting PAX2:  siRNA (Examples 14 and 16) and inhibitory oligonucleotides

25  (example 17).  As Dr. Weiner explained: "These prophetic descriptions are a mere invitation to

26  solve a problem—treating breast conditions—while leaving it to the pharmaceutical industry to

27  develop solutions that fall within the broad boundaries of the asserted claims, which cover far

28  more than the nucleotide-based inhibitors described in these examples."  (*Id.* ¶ 98.)

1    But the '534 patent specification gives a person of ordinary skill no direction as to what

2    compounds actually lead to PAX2 inhibition or how to select them for treating a breast condition.

3    Indeed, "no testing of molecules in all of these various classes was conducted to determine which

4    (if any) might work at treating breast cancer, MIN, or other breast conditions."  Such testing

5    "would require an incredible investment of human resources, time, and money, as well as

6    extensive experimentation."  (*Id.* ¶ 99.)  Thus, Phigenix left for others undue experimentation to

7    determine whether any compounds treat breast conditions through PAX2 inhibition.

8    Phigenix had the opportunity to present evidence to the contrary, but failed to do so.

9    Dr. Weiner identified this issue in his opening report.  (Weiner Invalidity Rpt., Weiner Decl.

10    Ex. 1 ¶ 99.)  In response, Dr. Pestell agreed the subject matter is "complex" and offered the

11    opinion that "the testing needed to determine whether a particular composition inhibits PAX2

12    expression" was well known.  (Pestell Response, Kreeger Decl. Ex. 7 ¶ 46.)  But Dr. Pestell did

13    not evaluate the actual quantity of testing that would be required to practice the full scope of the

14    claims, and did not consider the sheer number of molecules within the various compound classes

15    proposed in the specification to inhibit PAX2.  In fact, Dr. Pestell admitted that it was

16    unknowable whether any compound would inhibit PAX2 in breast cells absent testing, even

17    compounds specifically described in the specification as being PAX2 inhibitors, such as Losartan

18    and other Angiotensin II antagonists.  (*See* Pestell Dep. Tr., Kreeger Decl. Ex. 2, at 269:5-23; *see*

19    *generally id.* 184:24-188:21; 188:16-18 ("The only way to know with certainty would be to

20    conduct…an experiment.").)  Dr. Pestell could not even confirm that enalapril, an ACE inhibitor

21    compound recited in claim 7 as one of the compositions of claim 1, would inhibit PAX2.  (*See id.*

22    262:11-24.)  Similarly, the named inventor, Dr. Donald, has repeatedly acknowledged that

23    determining whether a particular composition affects a particular target *requires testing that*

24    *individual compound.*  (*See, e.g.*, Donald Aug. 4, 2015 Dep. Tr., Kreeger Decl. Ex. 8, at 33:12-

25    34:24 ("it would have to be tested to see, in fact, does the same phenomenon [the inhibition of

26    PAX2 expression] occur in patients as a first-line therapy using T-DM1"); 83:15-85:15 ("it would

27    be difficult to—to make that statement [that paclitaxel, by inhibiting STAT3, would inhibit

28    PAX2] without doing that experiment").)  Given that every molecule within the claim limitation

1   "composition" must be tested for its ability to treat a breast condition by inhibiting PAX2 or

2   enhancing DEFB1 expression, the '534 patent requires undue experimentation to enable its full

3   scope.

4          Finally, even if one of skill in the art could identify a particular composition to inhibit

5   PAX2, the specification fails to teach how to isolate the effect on PAX2 as the cause of any

6   therapeutic effect in a breast tissue.[4]  As Dr. Weiner opines, "signaling pathways within the cell

7   are very interconnected and complicated, and it is difficult to identify and isolate the particular

8   genes or proteins responsible for a particular cellular effect."  (Weiner Invalidity Rpt., Weiner

9   Decl. Ex. 1 ¶ 34.)  "When experts in the field attempt to visualize the complexity of cellular

10  signaling pathways, the vast number of dense interconnections is best represented either by

11  incomprehensibly impenetrable circuit diagrams, or more commonly by what has been termed,

12  colloquially, as a hairball."  (*Id.*)  Dr. Pestell makes no attempt to explain how the '534 patent

13  avoids undue experimentation when it requires one of ordinary skill to unravel the "hairball" for

14  each individual compound.

15         In view of the uncertainty of mechanisms of action and the diversity of breast conditions,

16  a POSA would have no certainty that any selected compound would inhibit PAX2 and treat the

17  breast condition without undue experimentation—namely, testing every such compound.

18  Accordingly, the '534 patent is invalid for lack of enablement.

19  **IV.    CONCLUSION**

20         Phigenix is left with no path forward in this case.  Its narrowed infringement theory lacks

21  evidence of direct infringement or intent to induce.  Its broad claims founder for lack of utility

22  and enablement.  Summary judgment is appropriate.

23

24

25

26

27         [4] Even though under the Court's claim construction neither party can argue that the claims
    require a *particular* level of therapeutic effectiveness, that level cannot be zero; a causal
    relationship between PAX2 inhibition and some therapeutic effect is necessary.  (Weiner Dep.
28  Tr., Kreeger Decl. Ex. 9, at 71:17–72:23.)

1    Dated: June 9, 2017                    MORRISON & FOERSTER LLP

2

3                                           By:   /s/ Michael A. Jacobs
                                                  MICHAEL A. JACOBS
4
                                           Attorneys for Defendant
5                                          GENENTECH, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28