# Exhibit 1

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
MATTHEW I. KREEGER (CA SBN 153793)
MKreeger@mofo.com
MATTHEW A. CHIVVIS (CA SBN 251325)
MChivvis@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

MATTHEW M. D'AMORE *(pro hac vice)*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019-9601
Telephone: 212.468.8000
Facsimile: 212.468.7900

Attorneys for Defendant
GENENTECH, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PHIGENIX, INC., | Case No.    C 15-01238 BLF |
| Plaintiff, | **EXPERT REPORT OF MARK S. ROBBINS PH.D, J.D. REGARDING PHIGENIX'S ALLEGED HYPOTHETICAL NEGOTIATION** |
| v. | |
| GENENTHCH, INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | Trial Date:  November 27, 2017 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND RETENTION .................................................................. 1

II.   QUALIFICATIONS ........................................................................................... 1

III.  PREVIOUS TESTIMONY ................................................................................ 3

IV.   MATERIALS CONSIDERED IN FORMING OPINIONS ................................. 3

V.    OVERVIEW OF PHARMACEUTICAL DEVELOPMENT AND LICENSING ............ 3

    A.   In House Development .............................................................................. 3

    B.   University and Startup Licensing .............................................................. 4

    C.   Collaboration and Development Arrangements ......................................... 8

    D.   Adversarial Licensing ............................................................................. 10

VI.   THE PARTIES & THEIR BUSINESS ............................................................ 12

    A.   Genentech Is A Leading Biotechnology and Oncology Company .................... 12

    B.   Genentech's Kadcyla Product .................................................................. 12

    C.   Phigenix Is Effectively a Licensing Company Seeking to Monetize Its IP Portfolio .................................................................................................. 13

    D.   The Licensing Communications Between the Parties Indicate that Phigenix Was Presenting an Infringement Claim and an Opportunity for an Exclusive License, Not A Scientific Collaboration ............................................. 15

VII.  THE '534 PATENT AND PHIGENIX'S ASSERTION OF INFRINGEMENT ............ 18

    A.   Overview ................................................................................................ 18

    B.   Asserted Claims ..................................................................................... 20

    C.   Phigenix's Contentions .......................................................................... 21

    D.   Assumptions and Inferences From Dr. Pestell's Report ............................ 22

VIII. THE '534 PATENT WOULD HAVE LITTLE VALUE TO GENENTECH ................ 24

    A.   Dr. Wyse Incorrectly Concludes that Genentech Would Want an Exclusive License to the '534 Patent ............................................................... 24

        1.   Genentech Has FDA Exclusivity for Kadcyla .......................................... 25

        2.   Genentech Has Significant Patent Coverage for Kadcyla .......................... 25

        3.   The Weaknesses in the '534 Patent Make an Exclusive License Undesirable for the Licensee .......................................................... 27

    B.   Additional Protection Provided by '534 Patent is Unclear ........................ 27

        1.   Efforts to Expand Kadcyla's Indications Involve Significant Exposure and Risk Unrelated to the '534 Patent .......................................... 27

        2.   Phigenix Has Not Established That Future Approved Uses Would Infringe Its Patents ................................................................. 28

**TABLE OF CONTENTS**
(continued)

Page

C. Scientific Uncertainty Surrounding the Role of PAX2 in Breast Cancer Diminishes The Value of The '534 Patent to Genentech ................................... 29

   1. The Role of PAX2 in the Treatment of Breast Cancer is Not Validated Based on the Scientific Literature ............................................. 29

   2. Phigenix Acknowledges That There is Uncertainty in Determining the Percentage of Patients With PAX2 Inhibition After Kadcyla Administration ................................................................................. 29

D. The '534 Patent Does Not Describe Foundational Technology .......................... 31

E. The '534 Patent Does Not Teach Genentech How To Make, Use or Improve Kadcyla ............................................................................................... 31

F. Genentech Could Not Market the Alleged Advantage of the '534 Patent ........... 32

G. Agreeing to Pay More than a Nominal Royalty for the '534 Patent Would Raise Significant Concerns About Setting a Precedent ....................................... 32

H. Phigenix's Development and Licensing Efforts Do Not Show Significant Value Attributable to The '534 Patent ............................................................... 33

I. The Parties Would Recognize that a Small Payment Would Provide Phigenix Meaningful Return on Investment ...................................................... 35

IX. THE GENENTECH-IMMUNOGEN LICENSE ........................................................ 36

A. Overview: The Genentech-ImmunoGen License Is the Key License for the Development of Kadcyla ................................................................................... 36

B. ImmunoGen Granted Genentech A Broad License for Patents and Know-How ................................................................................................................. 37

C. ImmunoGen Had Further Supply and Assistance Responsibilities ..................... 37

D. The Agreement Provided for Royalty Payments That Adjusted for Market Conditions ....................................................................................................... 37

X. THE LICENSES & TECHNOLOGIES COMPARED BY DR. WYSE ......................... 38

A. The Genentech-Regeneron License is Not Comparable to the Issues in this Case ................................................................................................................. 38

   1. The Genentech-Regeneron License is a Worldwide Multi-Patent License Providing Complete Freedom to Operate for Zaltrap ................. 38

   2. Dr. Wyse's Recitation of the Royalty Rate is Incorrect and Misleading ..................................................................................... 39

B. The Genentech-Celtrix License is Not Comparable to a Hypothetical License in this Case ........................................................................................... 41

   1. Dr. Wyse Misunderstands the Genentech-Celtrix License ..................... 41

C. The Immune Response Corp. / Urogen License Is Not Comparable to a Hypothetical License in this Case ..................................................................... 42

**TABLE OF CONTENTS**
(continued)

|  |  |  | **Page** |
|---|---|---|---|
|  | 1. | U.S. 6,051,218 Claims a Specific Method of Treatment | 42 |
|  | 2. | Exclusivity Over the Claimed Method Would be Essential for the Licensee | 43 |
| D. |  | The Genentech-Connetics License is Not Comparable to a Hypothetical License Between Phigenix and Genentech | 44 |
|  | 1. | The Genentech-Connetics License is for an Approved and Marketed Product | 44 |
|  | 2. | The Genentech-Connetics License Provides an Extensive Assignment of Marketing, Commercialization and Intellectual Property Rights | 44 |
|  | 3. | The Royalty Rates Connetics Paid to Genentech Would be Intended to Compensate Genentech for Its Substantial Investment in the Product | 45 |
| E. |  | The City of Hope License Covers Foundational Antibody Technology | 46 |
| F. |  | The PDL License Covers Foundational Antibody Technology | 47 |
| XI. |  | CONCLUSION | 47 |

## I.    INTRODUCTION AND RETENTION

1.      My name is Mark Robbins.  I am the President and CEO of Kodiak Strategic Consultants, LLC.  My business address is 2875 Deer Run Trail, Orono, Minnesota 55356.  A copy of my Curriculum Vitae is attached as Exhibit A.

2.      I have been retained by legal counsel for Genentech, Morrison & Foerster LLP, as an expert with respect to the proceedings currently before this Court in the above-captioned matter.  I have been retained through Gerson Lehrman Group, Inc., at a rate of $695 per hour, and am being reimbursed for my travel and out of pocket expenses that I have incurred in connection with my work on this case.  My compensation in connection with this matter has not impacted my conclusion and is not contingent on the outcome of this matter.

3.      For purposes of this report, I have been asked to provide an expert analysis and opinion regarding various factors relevant to a hypothetical negotiation between the parties for a license to U.S. Patent No. 8,080,534 ("the '534 patent") at the time of Genentech's alleged first infringement, assuming that the '534 patent is valid and infringed.

4.      As discussed more fully below, it is my opinion that (a) the hypothetical license would not be exclusive; (b) the royalty rates cited by Dr. Wyse are not comparable to the hypothetical license; and (c) the outcome of the negotiations would not be a royalty anywhere close to that proposed by Dr. Wyse.  Rather, I believe that a reasonable royalty rate for the '534 patent would be significantly less than 0.5% of net sales of Kadcyla for a non-exclusive license.

## II.    QUALIFICATIONS

5.      I received my Ph.D. in Pharmacology from the University of Minnesota Medical School in 1980.  In 1991, I received my J.D. from the St. Louis University School of Law.

6.      I have over thirty years of experience in the pharmaceutical and biotechnology industries.  Since 2011, I have been the President and CEO of Kodiak Strategic Consultants, and provide strategic clinical, regulatory and business development consultation to pharmaceutical and biotechnology companies, including several in the oncology and immuno-oncology space.  I serve as the Chief Operating Officer and Corporate Secretary for Bullet Biotechnology, a cancer

1  immunotherapy development stage company.  I also serve as the President and CEO of Tansna

2  Therapeutics, a research stage pharmaceutical company focused on the central nervous system

3  (CNS), refractory epilepsy, and chronic pain.   I am the Vice President of Quality and Regulatory

4  Affairs and Legal Counsel at Tapemark, a transdermal and oral thin-film drug delivery company.

5  I serve as the Head of Regulatory and Strategic Business Consultant for GigaGen, a

6  biotechnology oncology and autoimmune development stage company.   I am a Board Member of

7  Clipse Therapeutics, a start-up drug delivery company.  I consult on preclinical, clinical, and

8  regulatory development for Certus International, a contract research organization (CRO) that

9  specializes in human diagnostics medicine, including biotechnology diagnostic

10  radiopharmaceuticals for the detection of breast and prostate cancer.  I consult on regulatory,

11  clinical and legal matters for Hennepin Life Sciences, an infectious disease clinical research

12  based company.

13       7.     I have negotiated over a dozen licenses for pharmaceutical patents and/or products,

14  on behalf of both licensors and licensees, including several licenses for patents owned by

15  universities.  I have provided strategic oversight for the development of therapeutics in numerous

16  fields, including oncology, neurology, cardiology, and women's health.  I have led drug

17  development programs that have resulted in NDA and BLA approvals and commercialization.  I

18  also advise startups and venture capital firms on drug development.

19       8.     From 2011 to 2012, I served as a CEO in Residence in the Office of Technology

20  and Commercialization at the University of Minnesota, during which time I co-founded Tychon

21  Biosciences, an oncology biotechnology company.

22       9.     From 2006 to 2011, I served as Chief Scientific Officer and Executive Vice

23  President of Legal, Scientific and Technical Operations at Upsher-Smith Laboratories, a global

24  pharmaceutical company.  During that time, I led Upsher-Smith's FDA clinical and regulatory

25  strategy and handled negotiations with the FDA, which resulted in NDA and ANDA approvals

26  for several therapeutics.  From 1998 to 2006, I served as General Counsel and Vice President of

27  Legal and Regulatory Affairs at Upsher-Smith, and provided strategic and direct oversight of the

28  regulatory, clinical, quality, and legal groups.

## III.   PREVIOUS TESTIMONY

10.     In the last four years, I have testified as an expert in trial or by deposition in one case: *Mylan Pharmaceuticals Inc. v. Warner Chilcott PLC*, No. 2:12-cv-03824, United States District Court for the Eastern District of Pennsylvania.

## IV.   MATERIALS CONSIDERED IN FORMING OPINIONS

11.     In performing the analysis that is the subject of this Report, I have reviewed a number of materials, including the '534 patent, the FDA-approved label for Kadcyla, Genentech's licenses covering Kadcyla, communications between Phigenix and Genentech, the declarations and expert reports of Dr. Joseph Wyse, Dr. Joseph Pestell, Dr. Louis Weiner, Dr. Joel Parker, and Dr. Gregory Dressler, and the deposition transcripts of Dr. Carlton Donald and Tim Schwartz.

12.     A detailed list of all the documents I have considered is attached as Exhibit B.

## V.   OVERVIEW OF PHARMACEUTICAL DEVELOPMENT AND LICENSING

### A.   In House Development

13.     Pharmaceutical companies have internal Research and Development teams looking for innovative treatments for unmet clinical needs.  This is a highly expensive and risky proposition.  A recent study by the Tufts Center for the Study of Drug Development estimated the cost per approved new drug at $2.558 billion dollars, of which $1.395 billion is out-of-pocket costs.[1]  The new drug development process is also a high-risk proposition with only approximately 8% of new drug candidates obtaining FDA approval and reaching commercialization.  The majority of the costs and risks are borne by the pharmaceutical company prior to receiving any income from the new drug.  After the new drug receives regulatory approval, the pharmaceutical company incurs substantial additional costs and risks, including post approval study requirements, commercial risk, and the cost of sales and marketing.  In order to justify such a large investment in a high-risk enterprise, pharmaceutical companies require the potential for a high return on the investment.  In the case of in-house development, the

---

[1] DiMasi JA et al., "Innovation in the pharmaceutical industry: new estimates of R&D costs," J. Health Econ. 47:20-33 (2016).

1   pharmaceutical company typically exclusively owns the intellectual property that it developed

2   and the company reaps all of the financial rewards from the in-house development success.

3       14.    The development process for drug or biologics consists of the following stages:

4   basic research, drug development, preclinical safety and efficacy studies, clinical development

5   including Phase 1 safety studies, Phase 2 safety and efficacy studies, and pivotal Phase 3 safety

6   and efficacy studies.  This process typically spans at least a decade for new drug discovery

7   programs.  Basic research often focuses on finding new targets for improving disease treatments

8   and greatly contributes to the overall understanding of the molecular basis for a particular disease.

9   For example, prior to Genentech's development of Herceptin, scientists at Genentech spent

10  substantial research time identifying and characterizing the HER2 receptor and its role in breast

11  cancer.  (Herceptin (Trastuzumab) Development Timeline (GENE-00869702-10).)  Drug

12  development and preclinical studies include identifying the lead drug for clinical development,

13  refining the manufacture and formulation of the drug candidate to meet current Good

14  Manufacturing Practices required for clinical trials, preclinical safety studies conducted in

15  compliance with Good Laboratory Practices (GLP) regulations, and additional preclinical efficacy

16  studies.  This culminates in filing an Investigational New Drug (IND) application to allow for the

17  initiation of rigorous human clinical trials conducted in accordance with Good Clinical Practices

18  (GCP) regulations.  Even with in-house capabilities for conducting this work, pharmaceutical and

19  biotechnology companies frequently will outsource a significant portion of this work to Contract

20  Research Organizations (CROs) on a fee-for-service basis.  Pharmaceutical companies and CROs

21  use the fee-for-service arrangement to establish a relationship whereby the pharmaceutical

22  company maintains complete ownership over all of the intellectual property that it generated.

23  This is a critical aspect of in-house development work to ensure that the pharmaceutical or

24  biotechnology company can earn a return on their substantial investment.

25  **B.**    **University and Startup Licensing**

26      15.    Commercial pharmaceutical companies will sometimes license technology from

27  universities or startups spun out of universities.  Most research-based universities have

28  established Technology Transfer Offices (TTOs) whereby the TTO actively attempts to license

1   out the intellectual property developed by the university under government-funded grants.

2   Universities typically encourage commercial development of inventions for the public use and

3   benefit.  This requires universities to grant licenses to further develop, use, or sell those

4   inventions.  As noted above, I had the pleasure of serving as a CEO in Residence in the Office of

5   Technology and Commercialization at the University of Minnesota throughout 2012, during

6   which time I co-founded Tychon Biosciences.

7          16.     University TTOs look for potential licensees to develop and commercialize their

8   intellectual property.  Since university research is often focused on basic research early in the

9   development cycle,[2] these licensing opportunities sometimes lead to the formation of a startup

10  company to further develop the technology to a point at which it would be an attractive asset to a

11  pharmaceutical or biotechnology company.

12         17.     I am currently involved with three university startup companies – Tychon

13  Biosciences and Hennepin Life Sciences, which were startup companies out of the University of

14  Minnesota; and Bullet Biotechnology, a start-up company out of Stanford University.  The

15  business goal of these companies at this stage is essentially the same:  develop the technology to

16  an inflection point whereby the company or technology is of licensing or acquisition interest to a

17  well-established pharmaceutical or biotechnology company with the wherewithal to complete the

18  highly expensive pivotal clinical trials and to commercialize the products.  To accomplish this

19  goal, startup companies often do one or more of the following: perform research and development

20  activities to refine their products; establish Scientific Advisory Boards (SAB) to help guide

21  development and gain thought leader expertise and validation; demonstrate proof of concept in

22  preclinical efficacy models by setting up academic collaborations, conducting preclinical safety

23  screens, beginning product development, and/or conducting IND-enabling pre-clinical studies;

24  engage with the FDA through pre-IND meetings; complete IND studies; file an IND application;

25  and initiate early clinical studies (Phase 1/2) to demonstrate clinical safety and clinical proof

26  concept.

27

28  [2] *See* Spilker B., *Guide to Drug Development: A Comprehensive Review and Assessment*, Wolters Kluwer (2009) ("Spilker") at 1087.

18.     When universities execute licenses with startup companies, the startup company typically has very low market capitalization and limited financial resources.  In addition, the assets that the university licenses out or that the startup acquires are typically at a very early research stage.  Although the technology appears promising, developing the technology at this stage is highly risky and many of these startup companies fail in their first few years.  For these reasons, a typical license between a startup and a university will consist of transferring to the university some percent of equity in the company, payment for past patent prosecution activities, and a relatively small upfront licensing fee, with ongoing fees and royalties that remain relatively small but are paid out to the university as the company reaches milestones that are likely to lead to revenue or investment.  The equity universities retain is in recognition of the startup's low market capitalization and allows the university to share with the startup the gains in market capitalization as the startup reaches milestones that de-risk the technology.  Primary milestones typically include filing an IND and completing different phases of clinical development, filing an NDA or BLA, and obtaining regulatory approval.

19.     Such licenses typically involve exclusive worldwide patent rights for covering a very specific product that can be commercialized.  For the three university startups I am currently involved with, below is a summary of each license the startup obtained from the university:

| Startup Company | License from | Technology |
|---|---|---|
| Tychon Bioscience | University of Minnesota | Chemically Self Assembled Nanostructures for Oncology indications |
| Hennepin Life Sciences | University of Minnesota | Antimicrobial formulations and uses of Monolaurin |
| Bullet Biotechnology | Stanford University | Virus like particles for Oncology, Autoimmune and Infectious Diseases |

20.     Early stage technology is usually not of great value to potential investors or collaborators such as venture capitalists and established pharmaceutical and biotechnology companies.  At the early research stage, a company often lacks the definitive proof of concept that could lead to human clinical trials, and the risks are too high to attract the required level of

1    investment necessary to commercialize the opportunity and obtain a positive return on

2    investment.  In addition, many university startups begin with a management team inexperienced

3    in developing products and without a substantial track record of success, which makes it difficult

4    to attract institutional investors.  In this case, angel investors serve a critical role at the startup

5    stage.  Startup companies also typically apply for government grants such as Small Business

6    Innovation Research (SBIR) grants or similar grants to help fund the startup's research and

7    development efforts.  These grants are critical in that they enable peer review of the startup

8    technology to validate the science behind the technology and provide an excellent source of non-

9    dilutive capital.  Going through the SBIR process can be hugely valuable to startup companies,

10   even if funding is denied, because it provides a critique of the startup company's innovation and

11   the management team driving the company.

12        21.    The business goal of the startup company is typically to demonstrate the

13   management team's ability to develop the technology, de-risk the asset by completing critical

14   development milestones, and establish the safety and proof of concept for the technology; that is,

15   to make it viable for clinical study and commercial development.  Successfully completing these

16   steps enhances a startup company's market valuation and is critical to obtaining institutional

17   investment and pharmaceutical/biotechnology collaborative development partnerships.  Failing to

18   successfully achieve these milestones reduces the perceived value of the technology,

19   demonstrates the management team's inability to drive successful development, and reduces the

20   startup company's market valuation.

21        22.    From the perspective of an established pharmaceutical or biotechnology company

22   considering in-licensing a technology or product, the general rule is that the earlier the stage of

23   the technology to be licensed, the less expensive the licensing terms will be.[3]  The startup

24   company bears the burden of demonstrating the value of its technology at this early stage, and

25

26        [3] *See* Spilker at 1082 ("The earlier in development the compound is, the less expensive it
     will generally be to acquire, but the more uncertain its future will be.  Licensing compounds at a
27   later stage of development is usually more expensive, but there is greater assurance that the drug
     will be safe and effective and eventually reach the market.").

28

1    that there is an unmet need for its technology.  Thus, developing an "elevator pitch" is essential to

2    obtaining the interest of potential investors and collaborative licensing partners.  But even if there

3    is significant unmet need and a highly promising innovative technology, at an early stage such as

4    a research stage, the technology's value is very low because the development and

5    commercialization risks are great.  Established pharmaceutical and biotechnology companies will

6    typically consider licensing in preclinical compounds only if the compound is extremely novel

7    and shows significant promise based on preclinical data.[4]  Pharmaceutical and biotechnology

8    companies typically will perform a risk adjusted Return on Investment analysis (ROI).  At the

9    early research stage, the risk adjusted ROI computes to a low valuation for a license such that

10   most companies pass on these early stage opportunities.  After a drug goes through Phase 2

11   clinical trials that include the first true demonstration of clinical efficacy and the safety profile of

12   the new drug, the risk adjusted ROI is much more favorable to both the startup and to established

13   companies, which results in significantly greater valuation for the licensing deal to be successful

14   for all parties.[5]  In addition, from an in-licensing perspective, the pharmaceutical or

15   biotechnology company will conduct due diligence on the startup company's technology and

16   management team to ensure that the technology merits development and that the management

17   team has the experience to develop it.

18       **C.**       **Collaboration and Development Arrangements**

19           23.     Collaboration agreements are very typical in the pharmaceutical and biotechnology

20   industry especially between established companies with good technical and scientific capabilities,

21   and a wealth of intellectual property, including patents and know-how.  Such arrangements take

22

23           [4] *See* Spilker at 1083 ("Most large pharmaceutical companies should only consider
     licensing-in preclinical compounds if they are extremely novel, meet an unmet medical need and
24   have great promise based on the preclinical data generated.  The number of hurdles for preclinical
     compounds to jump is extremely large.").
25

26           [5] See Donald Dec. 2, 2016 Dep. Tr. at 168:1-4 ("Of course, something being taken on in
     its early stage, preclinical product is going to be a different set of terms compared to something
27   that's late phase trial or something."); Spilker at 1082 ("Licensing compounds at a later stage of
     development is usually more expensive, but there is greater assurance that the drug will be safe
28   and effective and eventually reach the market.").

1  many forms.  They may, for example, combine the technical expertise of both partners, or may

2  rely on one partner for technology development and the other for clinical tools, regulatory

3  approvals, and commercialization.[6]  The Genentech-ImmunoGen license agreement is a good

4  example of a typical collaboration and development agreement.  (*See generally* Genentech-

5  ImmunoGen Agreement, GENE-00856333-90.)

6  24.  ImmunoGen and Genentech entered into their license agreement, which has many

7  hallmarks of a collaboration agreement, in 2000.  (*Id.* at GENE-00856333.)  By the time

8  ImmunoGen and Genentech entered into their license agreement, ImmunoGen had already

9  developed a conjugation technique and focused on a class of maytansinoid compounds, including

10  DM1 (emtansine), for its conjugation technology.  (*Id.* at GENE-00856339.)  DM1 inhibits the

11  microtubule formation by binding to tubulin leading to cellular apoptosis.[7]  Genentech had

12  developed the first antibody targeted against the HER2 antigen in breast cancer patients –

13  trastuzumab.  The first clinical trials on Herceptin were initiated in 1992 and Herceptin obtained

14  fast track approval by the FDA in September 1998.  (Herceptin (Trastuzumab) Development

15  Timeline at GENE-00869703.)  The collaborating companies leveraged their technology to yield

16  a clear therapeutic advantage, creating an antibody drug conjugate (ADC) whereby an anti-HER2

17  antibody conjugated to a cytotoxin can target HER2-overexpressing breast cancer cells.

18  25.  The Genentech-ImmunoGen license agreement had a joint steering committee to

19  oversee development.  (Genentech-ImmunoGen Agreement at GENE-00856349.)  The agreement

20  specifies clear responsibilities for both ImmunoGen (provide the DM1 for use in both preclinical

21  and clinical studies, provide reasonable assistance) and Genentech (conduct the required studies

22  leading up to regulatory approval and commercialize Kadcyla).  (*See id.* at GENE-00856345-52.)

23

24  [6] *See* Spilker at 1088 ("Opportunities flow from large to small companies and vice versa,
25  as well as between similar-sized companies.  In addition, two or more companies may share
expertise and capital to form a joint venture or to cross-license two (or more) products.").

26  [7] Dumontet C. et al., "Microtubule-binding agents: a dynamic field of cancer therapeutics,"
27  Nat. Rev. Drug Discov. 9(10), 790 (2010) ("Dumontet"); Poon et al., "Preclinical safety profile of
trastuzumab emtansine (T-DM1): Mechanism of action of its cytotoxic component retained with
improved tolerability," Toxicol. & Appl. Pharmacol. 273(2), 298–303 (2013) ("Poon").

28

1   Genentech and ImmunoGen also included milestones in the license agreement (*id.* at GENE-

2   00856352-53) and the Joint Steering Committee oversaw development and commercialization

3   activities to maximize the success of the program (*id.* at GENE-00856349-50.).

**D.     Adversarial Licensing**

26.     Pharmaceutical and biotechnology companies may at times in-license patents that allegedly cover a commercialized product in part to avoid the expense and uncertainty of litigation.  Typically, patent owners assert these patents against a company after the company has commercialized its product.  There is very little if any commercial benefit to the pharmaceutical company if the adversarial patent does not provide new or expanded uses of the commercialized drug.  Otherwise, these patents do not add commercial value to the product in that they do not provide new clinical indications or uses, exclude others from competition, broaden the market, or provide any other readily definable commercial value.  Thus, licensees view these patents like a tax on their product with no additional benefit.  Such licenses are frequently non-exclusive, which preserves the licensor's freedom to pursue other licensees.  In some cases, the low license fee represents nuisance value to the licensee but still a fair compensation to the licensor in view of its more limited contribution and investment.  In other cases, a licensee may take an exclusive license or buy the patent, where the licensor wishes to exit the business and where the patent may have some value to the licensee/acquirer if asserted against others.  In that latter case, however, the licensee/acquirer bears the risk of a future finding that the patent is narrow in scope or invalid, and this risk would be reflected in the price or royalty the licensee/acquirer pays to the licensor.

27.     I have been involved twice at Upsher-Smith with licensing or acquiring an adversarial patent under similar circumstances.

28.     In one case, we marketed a product, AmLactin, a moisturizer.  We negotiated a nominal upfront payment with no continuing royalty for a non-exclusive license. We preferred the nominal upfront payment from a commercial standpoint since paying a royalty on a patent with no perceived commercial benefit was an unacceptable tax on future sales.

29.     Similarly, we marketed a product called Folgard RX.  Dr. Victor Herbert contacted us and claimed we were infringing the claims of his patent.  We acquired his patent for a nominal

upfront payment and no ongoing royalties.  In this instance, once again, we considered an ongoing royalty for a patent with no ongoing commercial benefit to be commercially unreasonable.[8]

30.    In my experience, determining a reasonable payment for adversarially-asserted patents with no commercial benefit to the licensee involves a look at the relative risks borne by the licensee relative to the investment by the licensor in the intellectual property.  While the adversarial licensor typically has invested very little in the development of the intellectual property beyond patent acquisition and prosecution costs, the prospective licensee has borne substantial risk, at substantial cost.  (*See* ¶ 13, *supra*.)  This imbalance in risk and investment greatly skews the ROI in favor of the licensor and reduces the ROI to the licensee that bore all the financial and development risk.  For this reason, assuming the patent is valid and infringed, a reasonable royalty rate may consist of a nominal upfront payment for the license or a nominal royalty on net sales recognizing there is no direct commercial value obtained by the licensee.

31.    Typically, a pharmaceutical company considering an in-license performs its ROI analysis by looking at the incremental value of the patent to the company and the ROI on investment to the licensor.  In cases where there is no perceived commercial value to the licensee, as stated above, any payment to the licensor is a tax on the sales of the licensee's product and results in a negative incremental ROI for the value of the license.  Similarly, any payment to the licensor would be a net positive to the licensor resulting in a positive ROI for the licensor.  This type of disparity is more justifiable where the licensor and licensee are close competitors in business (for example, when they have competing products on the market).  In that circumstance, if the licensor grants a license to its patent, the license is detrimental to the licensor because it allows a competitor (the licensee) to remain on the market, making the disparity in ROI less profound.  When the two parties are not close competitors, there is no perceived detriment to the licensor granting a license because the parties are not competing in the marketplace.

---

[8] The Herbert patent was later found invalid.  *See Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005).

## VI.   THE PARTIES & THEIR BUSINESS

### A.   Genentech Is A Leading Biotechnology and Oncology Company

32.   In any negotiation, the position and status of the bargaining parties informs the process and the outcome.

33.   Genentech is a 40-year-old biotechnology company, now part of the Roche Group. Genentech was founded 40 years ago to develop recombinant DNA technology, and since then has launched many branded biologic pharmaceuticals, including Nutropin (human growth hormone, 1993), Rituxan (rituximab, 1997), Herceptin (trastuzumab, 1998), Xolair (omalizumab, 2003), Avastin (bevacizumab, 2004), Tarceva (erlotinib, 2004), Perjeta (pertuzumab, 2012), and Kadcyla (ado-trastuzumab emtansine, 2013).  (Genentech: Chronology, https://www.gene.com/media/company-information/chronology.)

34.   Genentech received FDA approval for Herceptin in 1998, which today is a leading treatment for HER2-positive breast cancer with over $2 billion in annual U.S. sales in 2015. (2015 Roche Finance Report at GENE-00868825.)

### B.   Genentech's Kadcyla Product

35.   Kadcyla (ado-trastuzumab emtansine, also known as T-DM1) is a HER2-targeted antibody-drug conjugate (ADC) which contains the humanized anti-HER2 IgG1, trastuzumab, covalently linked to the microtubule inhibitory drug DM1 (a maytansine derivative) via the stable thioether linker MCC (4-[N-maleimidomethyl] cyclohexane-1-carboxylate).  Emtansine refers to the MCC-DM1 complex.

36.   As one reference explained:

Ado-trastuzumab emtansine is described as an antibody drug conjugate (ADC). It contains trastuzumab attached to a chemotherapy molecule (DM1) by a stable linker molecule. Trastuzumab is a humanized, anti-HER2 IgG1 antibody. The DM1 chemotherapy molecule is a maytansine derivative that was studied in the 1970s at the National Cancer Institute. Development was halted at that time due to unacceptable toxicity in human trials. However, in ado- trastuzumab emtansine, a thioether linker (MCC) stabilizes the compound so that the DM1 chemotherapy molecule is targeted to the HER2+ cancer cell. The chemotherapy is internalized and released into that cell only after it is attached to the HER2+ cell. Therefore, the cancer cells are destroyed, and surrounding normal tissue is spared the toxicity of the chemotherapy.

Ado-trastuzumab emtansine demonstrates mechanisms of action of both trastuzumab and DM1. In vitro, similar to trastuzumab, it inhibits HER2 receptor signaling and enhances antibody-dependent cell-mediated cytotoxicity. Ado- trastuzumab emtansine, like trastuzumab, inhibits shedding of the HER2 extracellular domain, which is a known mechanism of resistance to trastuzumab. The DM1 chemotherapy molecule, upon internalization and release into the cancer cell, inhibits microtubule function, thereby interfering with progression through the cell cycle (Baselga et al., 2012).

(Callahan R. "Ado-Trastuzumab Emtansine in Metastatic HER2-Positive Breast Cancer." J. Adv. Pract. Oncol. 5(2):134-139 (2014) ("Callahan").)

37.     Nothing in the above-described mechanism of action or in the prescribing label links the effectiveness of Kadcyla to PAX2, DEFB1, or STAT3.  (Kadcyla Prescribing Information, GENE-00003130-3151.)

38.     I have reviewed the expert reports of Dr. Louis Weiner, dated January 27, 2017 ("Weiner Jan. 27, 2017 Rpt.") and April 3, 2017 ("Weiner Apr. 3, 2017 Rpt."), and rely on them for their descriptions of Kadcyla.

**C.    Phigenix Is Effectively a Licensing Company Seeking to Monetize Its IP Portfolio**

39.     Dr. Carlton Donald founded Phigenix between 2005 and 2007, receiving an interest in PAX2-related intellectual property from the Medical University of South Carolina (MUSC) in 2008.  (Donald Dep. Exh. 17, 18; Donald Dec. 2, 2016 Dep. Tr. at 29:3-9, 43:3-19**.)** Phigenix had two employees – Dr. Donald and his wife – and has largely stayed the same size through to today.  (Donald Aug. 4, 2015 Tr. at 11:16-12:14.)  Dr. Donald describes his company as proceeding through two phases of maturation:  in the first phase, "we wanted to focus on getting our intellectual property solid first and get those initial patent applications issued."  (*Id.* at 14:15-24.)  After that, the "next phase" would include "validation of our diagnostic tests" and other "in-house research."  (*Id.* at 14:25-15:12.)  As of August 2015, Phigenix was "transitioning

1    into the second phase," including seeking space to begin additional studies, but had not performed

2    any in-house research work.  (*Id.* at 15:13-22.)  To date, Phigenix has not made any significant

3    transition to that second phase in that, to my knowledge, they have not conducted any human

4    clinical testing of any composition described in the '534 patent.  (PHI Response to RFA No. 293.)

5    In addition, to the best of my knowledge, Phigenix has not published any studies validating PAX2

6    as a target for breast cancer, thereby de-risking the investment opportunity and enhancing its

7    market valuation.

8            40.     Phigenix's investment in its development is relatively low for a company

9    purporting to do biopharmaceutical research.  For example, Phigenix entered into a licensing

10   agreement with MUSC for an upfront license fee of $25,000, plus equity, and an agreement to

11   make additional milestone and royalty payments.  (MUSC-FRD01810-1844 at Article V.)  I

12   understand that MUSC and Phigenix subsequently adjusted some of the milestone and minimum

13   royalty obligations due to Phigenix's slower-than-anticipated development.  (*Id.*; Donald Dec. 2,

14   2016 Dep. Tr. at 224:22-225:11.)

15           41.     I understand that in 2014, Phigenix procured an assignment of the '534 patent and

16   a related patent from MUSC for no additional consideration.  (Donald Dep. Ex. 36; Donald Dec.

17   2, 2016 Dep. Tr. at 175:8-179:24.)  Moreover, as Donald explained, "I believe this assignment

18   releases the '534 patent and the '577 patent from the license agreement, which, again, establishes

19   no expectation of any payment or royalty whatsoever to MUSC that results from any monetary

20   consideration of these two patents."  (Donald Dec. 2, 2016 Dep. Tr. at 175:23-176:2.)  Dr. Donald

21   testified that Phigenix paid "[n]othing" for this assignment.  (*Id.* at 176:17-19.)  MUSC's

22   assignment of these patents to Phigenix without receiving any payment demonstrates that

23   Phigenix did not perform activities to enhance the value of this intellectual property and that

24   MUSC considered the intellectual property of de minimis value.

25           42.     As discussed further below, in the five years between its startup and the

26   hypothetical license, Phigenix has done none of the work typical of a startup company.  There has

27   been limited if any work done on preclinical proof of concept of PAX2-inhibition in breast cancer

28   or R&D on diagnostic or therapeutic PAX2-related products, I have seen no evidence of the

1   establishment of a Scientific Advisory Board to guide their development efforts and validate

2   Phigenix technology through peer review.  Phigenix has not had interactions with the FDA on

3   development plans and the like.

      **D.**    **The Licensing Communications Between the Parties Indicate that Phigenix Was Presenting an Infringement Claim and an Opportunity for an Exclusive License, Not A Scientific Collaboration**

6       43.    Dr. Donald attempted to outlicense the '534 patent to Genentech in February 2011.

7   (PHIG00007639-7640.)  When he contacted Genentech about licensing the '534 patent in 2011,

8   Dr. Donald made only a preliminary inquiry to see if Genentech would have interest in licensing

9   his patent and intellectual property portfolio.  (*Id.*)  It does not appear that he shared any

10  confidential information with Genentech at this early stage under a Non-Disclosure Agreement.

11  In August 2011, Genentech notified Dr. Donald that Genentech did not have a current interest in

12  PAX2 therapies.  (PHIG00007641.)  Dr. Donald responded in August 2011 to Genentech stating

13  as follows:

14      Thank you for your consideration. We have a wide range of technology ranging from therapeutic drugs to companion

15      diagnostics. If Genentech have any future interested in learning more about our additional technology platforms, please don't

16      hesitate to contact me.

17  (PHIG00007642-7643.)

18      44.    Dr. Donald's response clearly misstates what Phigenix had available to license at

19  that time or at any time.  Based on Dr. Donald's deposition testimony and the Phigenix website,

20  Phigenix has patents and patent applications.  Phigenix does not have "a wide range of

21  technology from therapeutic drugs to companion diagnostics" even today.

22      45.    By its next contact in 2013, Phigenix still would not have appeared to Genentech

23  as a company offering significant research and development expertise or know-how, as many

24  early-stage companies can offer.  In the five years of its existence up to that point, it had not

25  advanced its development or validated its research; it was focused on procuring intellectual

26  property and licensing.  (*See* ¶ 39, *supra*.)  And Dr. Donald admitted that he was approaching

27  Genentech at this time because of his belief that Kadcyla infringed the '534 patent.  (Donald Dec.

28  2, 2016 Dep. Tr. at 168:7-169:17.)

46.     Although Dr. Donald testified that he was interested in a collaboration (*id.*), the licensing negotiations between Phigenix and Genentech reflect Phigenix's 2013 positioning as a licensing company, not a collaborator.

47.     On June 10, 2013, Phigenix advised Genentech that:

> I am writing to you regarding Roche/Genentech's efforts to obtain patent protection for KADCYLA. I am the President and CEO of PHIGENIX, Inc., a pharmaceutical and biomedical research company based in Atlanta that I founded in 2007, which focuses on the use of novel molecular therapeutics that target PAX2 for the treatment of cancer. I have reviewed certain publicly available information about your work with KADCYLA. I believe that portions of PHIGENIX's patent portfolio would be of assistance, by offering patent protection that Roche/Genentech may currently be lacking for KADCYLA. I have enclosed copies of relevant PHIGENIX patents and applications for your review and consideration.
>
> PHIGENIX is open to consideration of all options for partnering with Roche/Genentech. PHIGENIX would welcome the opportunity to begin a dialog with you to see if we can be of assistance to your efforts. We would be pleased to provide additional information or answer any questions that you may have regarding the above. I look forward to talking with you.

(Schwartz Dep. Exh. 5.)

48.     Phigenix offered Genentech the opportunity to exclusively license its patents to provide "patent protection" for Kadcyla – in other words, patents that Phigenix believes that Genentech could assert against others to protect Genentech's market position.

49.     However, shortly thereafter, Phigenix made plain its belief that certain uses of trastuzumab and maytansinoid conjugates could be covered by (and therefore infringe) Phigenix's patents:

> Our patented technology includes compositions and methods that (1) inhibits PAX2 expression or PAX2 activity, (2) expresses DEFB1 or (3) inhibits PAX2 expression or PAX2 activity, and expresses DEFB1 via blocking the kinase signaling pathways. Our patented technology also covers certain specific uses of Trastuzumab, anti-STAT3 agents (e.g. Maytansinoids), and antibody conjugates consisting of the same. I have enclosed copies of the PHIGENIX patents for your review and consideration.

(Schwartz Dep. Ex. 6.)

50.     Phigenix supported this assertion with a diagram purporting to show how an anti-HER2 antibody conjugated to a maytansinoid could inhibit PAX2.  (*Id.*)

51.     Phigenix's correspondence did not stress its development expertise, offer any preclinical or clinical results in breast cancer (or any breast cancer studies at all), or offer more than the vaguest attempts at a research collaboration. (*See, e.g.,* Schwartz Dep. Exh. 5, 6,

1    PHIG00007685-7686.)  Genentech's response, accordingly, was to present concerns over the

2    validity of the '534 patent:

3           Further to our telephone conversation of July 22, 2013, and in response to your letters of June 10, July 17,
            and July 31, 2013, we have considered your offer for a license to the Phigenix patent portfolio as
4           described in those letters, and we have decided to decline your offer.  Accordingly, we suggest that the
            telephone conference currently scheduled for Tuesday, September 17, 2013 is not needed.

5           One factor in this decision is PCT publication WO 01/00244, published January 4, 2001.  This publication
            describes anti-HER2-maytansinoid conjugates, including trastuzumab-DM1 conjugates, for the treatment
6           of breast cancer.  As you can see, the publication date is over four years before the priority date of the
            earliest-filed application in the Phigenix portfolio.

7

8    (PHIG00007711.)

9           52.     Phigenix responded with an express claim that the '534 patent was valid and

10   infringed by Kadcyla:

11          Thank you for your letter, dated September 13, 2013.  We have been requested by our client, Phigenix to
            respond to your letter.  It appears that we have misinterpreted the claims of Phigenix's patent portfolio.  The
12          patent application referenced  in your letter, PCT WO 01/00244 (hereinafter 'the 244 publication), only narrowly
            describe the use of an anti-her2 antibody.  The '244 publication neither mentions anything about targeting PAX2
13          nor describes utilizing DEFB1 as a therapy for breast cancer.  Therefore, the '244 publication clearly does not
            anticipate Phigenix's patent claims.
14
            Phigenix's data, which is supported by a numerous of recent studies and publications, demonstrates that the
15          PAX2 oncogene contributes to breast cancer by up-regulating certain genes that increase cancer cell growth and
            survival pathways.  Genentech's KADCYLA exhibits its anti-cancer effect through two mechanisms: 1) targeting
16          and inhibiting her2 receptor signaling and activity, and 2) the use of maytansinoid to suppress STAT3 expression
            and activity, which is critical for tumor growth.  The claims in the Phigenix patent portfolio cover certain of these
17          mechanisms.

18          Therefore, Phigenix would like to offer Genentech an opportunity to obtain a license for KADCYLA.  Further,
            acquiring a license of Phigenix's patent portfolio would provide Genentech with additional patent coverage in
19          the oncology space.  In addition, Phigenix expressed that they are willing to establish a research collaboration
            with Genetech for the development of additional technology that involve the direct or indirect inhibition of PAX2
20          for the treatment of cancer (i.e. the inhibition of PAX2 results in DEFB1-mediated tumor immunity).  Again, PCT
            WO 01/00244 does not disclose inhibition of PAX2 results in DEFB1-mediated tumor immunity.

21

22   (PHIG00007685-7686.)

23          53.     Genentech responded by explaining its validity concerns in further detail:

24

25

26

27

28

Ms. Wang, in her email, suggests a broad scope for the Phigenix patent claims, including the purported "direct or indirect inhibition of PAX2 for the treatment of cancer", and she attempts to characterize mechanisms through which she apparently believes anti-HER2-maytansinoid conjugates exhibit an anti-cancer effect, for example in breast cancer.   Ms. Wang states that "claims in the Phigenix patent portfolio cover certain of these mechanisms." We do not comment on that assessment here.

Nonetheless, I would like to emphasize the following, as one example of the points we have raised.   As noted previously, PCT publication WO 01/00244, published January 4, 2001 (the "244 publication"), describes, inter alia, anti-HER2-maytansinoid conjugates for the treatment of breast cancer.   Accordingly, the 244 publication is material prior art to the patent applications and patents in the Phigenix portfolio.   That publication's specification, including one or more examples, describes, among other things, the administration of anti-HER2-maytansinoid conjugates to a mammal to treat breast cancer.   Thus, whether or not the mechanism was identified at the time of the 244 publication, the prior art 244 publication is necessarily within at least the broad claims of the patent applications and patents in the Phigenix portfolio.   In other words, if what Ms. Wang states is correct, then Phigenix's patent claims are anticipated, expressly, inherently or otherwise, by the prior art 244 publication, and are, at a minimum, unpatentable or invalid.   We assume that no further elaboration on this point is needed, but we can do so, for example by telephone, if you wish.

For at least those reasons, we are declining your offer for a license, as previously stated in our letter of September 13, 2013.   We remain open to the opportunity to pursue common interests at a future time.

(PHIG00007812.)

54.     Phigenix filed suit two months after this communication.

55.     Accordingly, the actual licensing negotiations between the parties show that the primary drivers of Phigenix's offer were freedom from litigation and, from Phigenix's perspective, the possible benefit of an exclusive license to augment Genentech's Kadcyla patent coverage.   However, it is clear from Genentech's expressed concerns over the validity of the patent that Genentech did not believe that it would obtain any benefit from an exclusive license.

## VII.    THE '534 PATENT AND PHIGENIX'S ASSERTION OF INFRINGEMENT

### A.    Overview

56.     The '534 patent, titled "Targeting PAX2 for the Treatment of Breast Cancer," purports to provide a method of treating breast cancer by administering a composition that inhibits PAX2 expression or enhances DEFB1 expression.  ('534 patent at 5:7-12.)  The '534 patent application was filed on February 18, 2010 but claims priority to a provisional application filed on October 14, 2005.  Its earliest non-provisional filing date of October 16, 2006 ('534 patent, Related U.S. Application Data) and I understand that it expires 20 years from that date, October 16, 2026.  (*See* 35 U.S.C. § 154(a)(2).)  Dr. Wyse incorrectly reports its expiration as October 2025.  (Wyse Feb. 17, 2017 Rpt. ¶12.)

57.    Paired box protein 2, or PAX2, is a protein encoded by the PAX2 gene.  (*Id*. at 6:25-28; 6:33-47.)  The patent posits that PAX2 is overexpressed in certain cancers, including prostate, breast, ovarian, and renal cancers.  (*Id*. at 6:56-7:15)   The '534 patent further posits that beta-defensin-1 (DEFB1), a protein encoded by the DEFB1 gene is cytotoxic to cancer cells.  (*Id*. at 30:10-23.)

58.    The '534 patent claims that inhibiting PAX2 expression in prostate cancer can lead to cell death, and provides the results of various experiments in prostate cancer cell lines to support this claim.  The '534 patent also claims that inhibiting PAX2 enhances DEFB1 activity, thereby killing cancer cells.  (*Id*. at 36:32-45.)

59.    The '534 patent proposes that a variety of agents can inhibit PAX2 expression or activity.  The first category of proposed PAX2 inhibitors, "functional nucleic acids," includes antisense molecules, aptamers, ribozymes, and short interfering RNA (siRNA).  (*Id*. at 8:38-10:65.)  According to the '534 patent, functional nucleic acid molecules can "interact with any macromolecule, such as DNA, RNA, polypeptides, or carbohydrate chains," and thus directly interact and target the mrNA or DNA of PAX2.  (*Id*. at 8:54-58.)  For example, the '534 patent explains that siRNA can inhibit PAX2 gene expression by binding to and triggering degradation of PAX2 mrNA.  (*Id*. at 10:29-40.)

60.    The '534 patent also proposes that "inhibitors of PAX2 expression or PAX2 activity can be any small molecule that interferes or inhibits binding of PAX2 to the DEFB1 promoter" (*id*. at 12:1-5) as well as antibody conjugates (*id*. at 12:42-44).  According to the '534 patent, examples of possible small molecule PAX2 inhibitors include antibody conjugates, as well as antagonists of various proteins, including angiotensin II, angiotensin-converting enzyme (ACE), MEK, ERK1, ERK2, or STATS.  (*Id*. at 12:1-52.)  However, the only compounds tested for PAX2 inhibiting effects are siRNAs.

61.    Example 2 describes experiments that tested for PAX2 inhibition in prostate cancer cells using RNA interference.  (*Id*. at 30:25-37.)  The experiments reported in Example 2 used anti-PAX2 siRNAs to knock down PAX2 gene expression in prostate cancer cell lines.  The results of these experiments, according to the '534 patent, "demonstrate that the inhibition of

1    PAX2 results in cell death" (*id.* at 30:33-35; 32:31-44) and "demonstrate dependency of prostate

2    cancer cell survival on PAX2 expression" (*id.* at 33:21-22).

3        62.    Examples 3 and 11 also tested the effect of anti-PAX2 siRNA in prostate cancer

4    cells.  (*Id.* at 33:40-35:36; 50:57-53:57.)  The experiments in Example 3 purported to show that

5    anti-PAX2 siRNA increased DEFB1 expression, and resulted in prostate cancer cell death.  (*Id.* at

6    36:32-45.)  The experiments in Example 11 found that PAX2 inhibition caused prostate cancer

7    cell death.  (*Id.* at 50:57-53:57.)

8        63.    Example 8 tested the effects of Angiotensin II, AT1R inhibitor losartan,

9    MEK/ERK inhibitor PD98059, MEK inhibitor U0126, and AMP Kinase activator AICAR on

10   PAX2 expression in prostate cancer cell lines.  (*Id.* at 40:14-34.)  The experiments purported to

11   show that these compounds caused decreased levels of PAX2 protein in prostate cancer cells. (*Id.*

12   at 42:49-43:67.)

13       64.    The '534 patent does not disclose any experiments that tested PAX2 expression or

14   inhibition in breast cancer cell lines.  The only examples involving breast cancer cell lines are

15   prophetic.  Examples 12 and 14 describe experiments that *could* be performed to measure PAX2

16   expression and inhibition in breast cancer cells in vitro, and example 17 proposes a study to test

17   the effect of inhibitory oligonucleotides.  (*Id.* at 53:59-54:31; 54:40-49; 56:1-26.)  Example 16

18   describes an in vivo experiment that *could* be conducted in breast cancer cell lines.  (*Id.* at 55:16-

19   26.)

20       **B.    Asserted Claims**

21       65.    I understand that Phigenix is asserting claims 1 and 2 of the '534 patent.  Claims 1

22   and 2 read as follows:

23           1.    A method for treating a breast condition in a subject, comprising

24       administering to a breast tissue of the subject, a composition that (1) inhibits PAX2

25       expression or PAX2 activity, (2) expresses DEFB1 or (3) inhibits PAX2 expression or

26       PAX2 activity and expresses DEFB1.

27           2.    The method of claim 1, wherein the breast condition is breast cancer or

28       mammary intraepithelial neoplasia (MIN).

66.     I understand that the Court found that the term "inhibit PAX2 expression or PAX2 activity" is to be given its plain and ordinary meaning, and that this term does not exclude indirect inhibition of PAX2 expression or PAX2 activity.

67.     I understand that the Court found that the term "enhancing expression of DEFB1" is to be given its plain and ordinary meaning, and that this term does not exclude indirect enhancement of DEFB1.

**C.      Phigenix's Contentions**

68.     According to Phigenix's expert, Dr. Pestell, "the dispute between Genentech and Phigenix largely concerns what happens next in the tumor cell after the microtubules have been disrupted and whether there is PAX2 inhibition resulting from the administration of Kadcyla." (Pestell Jan. 27, 2017 Rpt. ¶ 39.)

69.     Dr. Pestell asserts that "Phigenix alleges that when Kadcyla$^{TM}$ is administered for the FDA-approved treatment of patients with HER2-positive, metastatic breast cancer who have previously received trastuzumab and a taxane, disruption of microtubule networks results in inhibition of the activity of a transcription factor (a protein that tells certain genes to start working) called Signal Transducer and Activator of Transcription 3 (STAT3)." (*Id.* ¶ 40.)

70.     Dr. Pestell then seeks to link the disruption of the microtubule networks to PAX2. As he asserts:

> As illustrated in the simplified diagram in Figure 28 of the '534 patent, PAX2 expression is impacted by multiple signaling pathways. As a result, an alteration in one of these pathways may not necessarily result in a change in PAX2 expression or activity. However, in view of the impact of pretreatment with trastuzumab and paclitaxel in the relevant patient population, and the expected impact on downstream signaling resulting from the binding of Kadcyla to the HER2 receptor, it is reasonable to expect that the STAT3 inhibition resulting from the release of DM1 in combination with these other factors, would result in an inhibition of PAX2 expression or activity, as alleged by Phigenix."

(*Id.* ¶ 45.)

71.     He concludes that "STAT3 phosphorylation would be expected in about 50-60% of HER2+ breast cancers, and given that approximately 92% of this population is expected to

1    express PAX2, the effect of inhibiting PAX2 expression would be expected in about 45-54% of

2    HER2+ breast cancers following the administration of Kadcyla$^{TM}$." (*Id.* ¶ 57.)

3          **D.    Assumptions and Inferences From Dr. Pestell's Report**

4          72.    For the purposes of my analysis, I have assumed the '534 patent to be valid and

5    infringed. However, even with that assumption, Dr. Pestell's report leads to several inferences

6    that would affect how a hypothetical licensor and licensee would view the '534 patent and its

7    claimed mechanism of action.

8          73.    First, Dr. Pestell does not show that inhibition of PAX2 is responsible for

9    Kadcyla's therapeutic effect. Instead, he acknowledges that the cytotoxic component of Kadcyla,

10   DM1, disrupts microtubule activity *prior to* any effect on PAX2. (*Id.* ¶ 39.) As noted above, the

11   disruption of microtubule activity by DM1 itself leads to cell death.[9]

12         74.    Second, on a per patient level, Dr. Pestell's contention that the alleged PAX2

13   inhibition occurs in only 45-54% of Kadcyla recipients (Pestell Rpt. ¶ 57) underscores the

14   absence of a link between PAX2 inhibition and efficacy of Kadcyla. For example, Dr. Pestell

15   offers no evidence (a) that patients with inhibited PAX2 expression perform better after Kadcyla

16   treatment than those without PAX2 inhibition; (b) that patients with PAX2 inhibition perform

17   worse on a control treatment or placebo than a similar population treated with Kadcyla; or (c) that

18   patients without PAX2 inhibition perform the same on Kadcyla as on a control treatment or

19   placebo.

20         75.    Third, Dr. Pestell offers no clinical data to support his contention that PAX2

21   inhibition occurs in 45-54% of patients receiving Kadcyla. This contention relies on the

22   assumptions that STAT3 phosphorylation occurs in 50-60% of HER2+ breast cancers and that

23   PAX2 is expressed in 92% of breast cancers. (*Id.* ¶¶ 55-57.) However, the article that Dr. Pestell

24   relies on to support this assumption, Chung et al., states that STAT3 activation occurs in "50-60%

25

26

27   _____
          [9] Callahan; Dumontet; Poon.
28

of the primary breast tumors," referring to *all* breast cancers, not HER2-positive breast cancers.[10] Chung et al. further states that HER2-positive cancers constitute only 25-30% of all breast cancers,[11] which Dr. Pestell admits.  (Pestell Jan. 27, 2017 Rpt. ¶ 23.)  Moreover, Chung et al., which examined STAT3 activation in HER2-positive cell lines in vitro, does not provide a percentage of HER2-positive tumors that show this activation.   In addition, Dr. Pestell relies on the results from a 16-hour in vitro pretreatment of a cell culture to support his contention that STAT3 activation occurs in a portion of patients who receive Kadcyla treatment after previously receiving treatment with Herceptin and taxanes.  (Pestell Jan. 27, 2017 Rpt. ¶¶ 42-43.)  However, he does not specify a time window during which such pretreatment would have to occur.  It is impossible to extrapolate the results from a 16-hour in vitro pretreatment of a cell culture to a clinical therapeutic regimen.

76.     Dr. Pestell's contention that PAX2 is expressed in 92% of breast cancers also lacks reliable support.  Dr. Pestell bases this contention on the work of Dr. Adam Ertel, a bioinformation who Dr. Pestell asked to analyze PAX2 expression in human breast cancers using data available in The Cancer Genome Atlas (TCGA) database.[12]  I understand based on the analysis of Genentech's expert Dr. Joel Parker, a bioinformatician who helped develop the TCGA database, that Dr. Pestell's 92% figure is likely too high because Dr. Ertel failed to account for numerous factors that contribute to false detection in TCGA experiments.[13]  I understand that while Dr. Parker disagrees that HER2-positive breast cancers have any meaningful PAX2 expression, he concludes that if there is any such expression, (1) PAX2 expression occurs in far less than 92% of HER2-positive breast cancers and (2) the level of PAX2 expression would be far

---

[10] Chung, S., et al. "STAT3 activation in HER2-overexpressing breast cancer promotes epithelial-mesenchymal transition and cancer stem cell traits." Int. J. Oncol. 44, 403-411 (2014) ("Chung et al.").

[11] Chung et al. at 403.

[12] Pestell Jan. 27, 2017 Rpt. ¶ 55.

[13] Parker Rpt.¶¶16-20.

1   lower than the levels Dr. Pestell reports.[14]  When Dr. Parker performed his own PAX2 detection

2   analysis using the TCGA database, he observed detectable levels of PAX2 expression in 71%

3   (rather than 92%) of HER2-positive breast cancer samples.[15]  At the very least, because of the

4   complexity of the signaling pathways, the heterogeneity of patients and patient treatments, and

5   the low levels of PAX2 expression, I would expect that there would be significant uncertainty

6   regarding the actual rate of PAX2 inhibition and any clinical significance of PAX2 inhibition in

7   patients with HER2-positive breast cancer.  Even assuming Kadcyla causes some PAX2

8   inhibition and infringes the '534 patent, it is impossible to determine the percentage of patients

9   receiving therapy with Kadcyla in which that inhibition occurs.

10   **VIII.   THE '534 PATENT WOULD HAVE LITTLE VALUE TO GENENTECH**

11           **A.     Dr. Wyse Incorrectly Concludes that Genentech Would Want an Exclusive**
12                   **License to the '534 Patent**

13           77.     There is no rational basis for Dr. Wyse's conclusion that Genentech would want an

14   exclusive license to the '534 patent.  The '534 patent provides no further competitive advantage

15   to Genentech; nor does it improve Genentech's FDA exclusivity for Kadcyla.  The patent does

16   not specifically cover any of the labeled indications, the composition of matter, or method of

17   manufacture of Kadcyla.  There is no evidence demonstrating that Kadcyla's efficacy is linked to

18   PAX2 inhibition.  (*See* Weiner Jan. 27, 2017 Rpt. ¶¶ 45, 70, 100.)  In addition, the actual potential

19   treatments that could be covered under the '534 patent are uncertain.  There is no clinical

20   validation from adequate and well-controlled studies demonstrating that Kadcyla acts via the

21   mechanism purported in the '534 patent, and the clear preponderance of data to date indicates that

22   PAX2 is not a target for breast cancer.  (*Id.* ¶¶ 70, 100; Dressler Jan. 27, 2017 Rpt. ¶¶ 36, 70.)

23   Kadcyla's mechanism of action has been extensively studied and reported by the scientific

24   community for more than a decade without any published finding that Kadcyla's mechanism of

25

26   _____

27     [14] Parker Rpt. ¶¶ 21-22.

28     [15] *Id.*

1  action involves STAT3 or PAX2 inhibition in any way.[16]  In addition, while the parties to the

2  hypothetical arms-length negotiation assume that the patent is infringed and valid, they would

3  expect a vigorous challenge from third parties outside of this litigation.  A third party could argue

4  that its products do not infringe the '534 patent and/or the '534 patent is invalid.  In light of

5  Genentech's current strong patent position with Kadcyla, the weakness in the '534 patent, and the

6  impossibility of ascertaining with any degree of certainty the patients in which infringement

7  would occur, it is my opinion that the parties would not negotiate to or enter into an exclusive

8  license for the '534 patent.

9         **1.**       ***Genentech Has FDA Exclusivity for Kadcyla***

10        78.      Section 351 of the Public Health Service Act provides for FDA exclusivity for a

11  12-year period after the date of first licensure of Kadcyla.  The FDA granted Genentech's

12  Biologic License Application (BLA) for Kadcyla on February 22, 2013.  Thus under Section

13  351(k) of the PHS Act, a biosimilar product to Kadcyla cannot be approved prior to February 22,

14  2025.

15         **2.**       ***Genentech Has Significant Patent Coverage for Kadcyla***

16        79.      Genentech has the right to several patents relating to Kadcyla, which provide

17  broad protection against generic competitors, and include coverage for T-DM1, methods of using

18  T-DM1 as approved by the FDA, methods of treatment with immunoconjugates, and methods of

19  producing immunoconjugates, including T-DM1.  For example, U.S. Patent No. 7,601,354 ('354

20  patent), which expires on October 12, 2021, is directed to compositions and methods for treating

21  a variety of cancers, including breast cancer, using immunoconjugates and chemotherapeutic

22  agents.  U.S. Patent No. 7,575,748 ('748 patent), which expires on March 16, 2021, claims

23  methods of treatment using anti-ErbB antibody-maytansinoid conjugates, and covers a method of

24  using T-DM1 per Kadcyla's FDA-approved label.  U.S. Patent 7,097,840 ('840 patent) broadly

25  covers methods of treatment with HER2/maytansinoid conjugates, and expires January 27, 2023

---

[16]Weiner Apr. 3, 2017 Rpt. ¶¶34, 40.

(including 682 days of Patent Term Adjustment).   U.S. Patent No. 8,337,856 ('856 patent), which expires on September 30, 2023, covers the Kadcyla product, i.e., an immunoconjugate comprising an anti-ErbB2 antibody (trastuzumab) conjugated to a maytansinoid (DM1), conjugated by an SMCC linker.  U.S. Patent No. 7,811,572, ('572 patent), which expires on June 26, 2027, and U.S. Patent No. 8,383,122 ('122 patent), which expires on September 8, 2026, are directed to processes for preparing purified drug conjugates and cover methods of producing Kadcyla.

80.    In addition, it is my understanding that Genentech has filed for a Patent Term Extension on the '856 patent and the '840 patents.  My understanding is that Genentech has the right to elect one of these two patents for PTE, but is not yet required to make that election.  Genentech has sought extension to November 28, 2023, for the '856 patent, and July 27, 2026, for the '840 patent.[17]

81.    I note further that the '856 patent recently survived an Inter Partes Review (IPR) challenge brought by Phigenix.  Although the PTAB instituted a review of the patent, it concluded that Phigenix had "not shown by a preponderance of the evidence that claims 1-8 of the '856 patent were unpatentable."  (Final Written Decision, IPR2014-00676, October 27, 2015, at 3.)  The '748 patent also survived an IPR challenge brought by Phigenix.  In that case, the PTAB concluded that Phigenix had "not established a reasonable likelihood of prevailing on any of the claims challenged in [Phigenix's] Petition."  (Decision, IPR2014-00842, December 9, 2014, at 2.)  These developments underscore the strength of Genentech's existing patent coverage.

---

[17] I understand that Genentech has received 928 days of Patent Term Adjustment for the '856 Patent, extending its expiration from March 16, 2021 to September 30, 2023.  *See* '856 Patent January 10, 2017 Petition Decision (PTA).  I understand that Genentech could receive an additional 59 days of Patent Term Extension for the '856 patent, which, if elected, would make its expiration Tuesday, November 28, 2023.  *See* '856 Patent December 20, 2016 Notice of Final Determination (PTE).  I understand that Genentech has sought 1277 days of Patent Term Extension for the '840 patent; because no decision has been reached on the PTE application for the '840 patent, I am relying on the date sought by Genentech.  ('840 patent PTE application at 11-13.)

3.     *The Weaknesses in the '534 Patent Make an Exclusive License Undesirable for the Licensee*

82.     The '534 patent does not include any composition of matter claims, does not provide validated methods to test and demonstrate potential infringement, and the purported inhibition of PAX2 occurs, if at all, in only a subset of patients receiving Kadcyla therapy. Nothing in the '534 patent suggests that any other second-line breast cancer treatments would infringe its claims. Thus, a competitor with a different post-Herceptin and taxane treatment could obtain a directly competitive label to Kadcyla without infringing the '534 patent. All of these factors increase the risk that a future infringement suit against a competitor based on the '534 patent could fail.

83.     Even if we assume that Kadcyla and therefore a Kadcyla biosimilar would infringe the '534 patent, the significant validity and enforceability defenses raised in this case are evidence of what a future biosimilar competitor could assert. As shown, for example, by Genentech's 2013 correspondence to Phigenix and the Court's summary judgment opinion, the patent is vulnerable at least to anticipation and written description defenses. (PHIG00007812; Order (ECF No. 327) at 7-10, 12-19, 23-24.) These vulnerabilities reduce the desirability of an exclusive license to the '534 patent against a potential third party infringer.

**B.     Additional Protection Provided by '534 Patent is Unclear**

84.     ████████████████████████████████████████████ )
( ████████████████████████████████████████ )
( ██████████████████████████████████████████ )
████████████████████     The '534 patent does not provide Genentech with any clear guidance or additional protection for future indications.

1.     *Efforts to Expand Kadcyla's Indications Involve Significant Exposure and Risk Unrelated to the '534 Patent.*

85.     ( ██████████████████████████████     Indication expansion involves additional high risk investment dollars to support adequate and well controlled studies. Genentech conducted the Phase 2/3 GATSBY clinical trial to demonstrate the

safety and efficacy of Kadcyla in HER2-positive advanced gastric cancer and support a new indication for Kadcyla in second-line treatment of HER2-positive advanced gastric cancer.  The trial was a multicenter, randomized study comparing the efficacy and safety of Kadcyla to standard treatment with docetaxel or paclitaxel in patients with HER2-positive advanced gastric cancer.  A total of 412 patients already treated with first-line therapy participated in the study. Unfortunately, the GASTBY trial did not successfully achieve its primary endpoint of improvement in overall survival (OS) over a time frame of approximately 3 years.[18]

86.    [REDACTED]

87.    The '534 patent has no perceived value as part of this continued investment in Kadcyla to expand its therapeutic use.  Nothing in its specification or claims teaches the use of Kadcyla for expanded indications or suggests that Kadcyla's efficacy for these indications would be due to PAX2 inhibition.

2.    ***Phigenix Has Not Established That Future Approved Uses Would Infringe Its Patents***

88.    There is no evidence to suggest that these future indications would infringe the '534 patent.  Phigenix's contention, as I understand it, is that in a subset of patients that were previously treated with trastuzumab and taxanes, PAX2 inhibition may occur.  Genentech's indication expansion plans appear to include first line therapy for eBC and mBC.  If Kadcyla

_____

[18] ADO-Trastuzumab Emtasine Fails Phase II/III Gatsby Trial, ADC Review, October 22, 2015.

1 receives FDA approval as a first line therapy, there may not be prior treatment with trastuzumab

2 and taxanes in patients who receive Kadcyla under the new indication.  In addition, Phigenix has

3 not shown that the clinical time course for prior therapy with trastuzumab and taxanes prior to

4 receiving Kadcycla demonstrates inhibition of PAX2 expression.  As far as I am aware, PAX2

5 expression is not a clinical measurement in any ongoing studies, there is currently no validated

6 method for measuring PAX2, and therefore there is no scientifically rigorous way to determine

7 which patients receiving Kadcyla currently or under future expanded indications might have

8 PAX2 inhibition resulting from Kadcyla administration.

9     **C.**    **Scientific Uncertainty Surrounding the Role of PAX2 in Breast Cancer**

10            **Diminishes The Value of The '534 Patent to Genentech**

11         **1.**    *The Role of PAX2 in the Treatment of Breast Cancer is Not Validated Based on the Scientific Literature.*

12     89.    At the time of the hypothetical negotiation (February 2013), any role of PAX2 in

13 breast cancer was highly uncertain.  For example, one study from 2010 reported less than 2%

14 PAX2 expression in metastatic breast cancer, and then only in the metastases rather than the

15 primary tumor.[19]  Additionally, Dr. Parker's analysis shows PAX2 expression to rank well

16 outside the set of genes known to be validated targets for the treatment of breast cancer.[20]

17     90.    The lack of any working examples of breast cancer treatments in the '534 patent

18 underscores this concern.[21]  This state of uncertainty suggests a low value for Phigenix's concept,

19 particularly when other validation targets were known.

20         **2.**    *Phigenix Acknowledges That There is Uncertainty in Determining the*

21            *Percentage of Patients With PAX2 Inhibition After Kadcyla Administration*

22     91.    Dr. Pestell's expert report makes it clear that there is uncertainty in determining

23 the percentage of patients with PAX2 inhibition following Kadcyla administration.  His

---

24

25     [19] See Zhai et al., "PAX-2 Expression in Non-neoplastic, Primary Neoplastic, and Metastatic Neoplastic Tissue," Appl. Immunohistochem. Mol. Morphol. 18(4), 323–332 (2010).

26     [20] Parker Rpt. at ¶23.

27     [21] See section VIII, supra; Weiner Jan. 27, 2017 Report ¶¶58-85; Dressler Jan. 27, 2017

28 Report ¶¶ 30-31.

1    hypothesis is not that Kadcyla directly inhibits PAX2, but that PAX2 inhibition is a downstream

2    effect of the disruption of microtubule networks.  (*Id.* ¶¶ 40-47.)    Disruption of microtubule

3    networks within the cancer cell potentially affects multiple signaling pathways.  Dr. Pestell

4    focuses primarily on the "inhibition of the activity of a transcription factor (a protein that tells

5    certain genes to start working) called Signal Transducer and Activator of Transcription 3

6    (STAT3)."  (*Id.* ¶ 40.)  He cites evidence that purportedly shows that STAT3 is activated in

7    HER2-positive breast cancer cells, and claims that pre-treating cells with trastuzumab and taxanes

8    further activates STAT3.  (*Id.* ¶¶ 41-43.)  Dr. Pestell goes on to state "[t]his means that those

9    genes being modulated by the STAT3 cell signaling pathway will experience changes in their

10   expression levels due to the changing activation levels of phosphorylated STAT3."  (*Id.* ¶ 44.)

11   However, he fails to elaborate that STAT3 affects multiple signaling pathways independent of

12   PAX2.  Dr. Pestell's analysis focuses on STAT3's effect on the expression of PAX2, but he also

13   recognizes that multiple signaling pathways can modify PAX2 expression.  (*Id.* ¶¶ 40-47.)  As Dr.

14   Weiner explained in his opening expert report, cellular signaling networks are extremely complex

15   and interconnected, like a "hairball" of densely interwoven signaling pathways.  (Weiner Jan. 27,

16   2017 Rpt. ¶¶ 33-34, 57.)  Dr. Pestell's contention that there is a causal chain between STAT3

17   activation, administration of Kadcyla, STAT3 inhibition, and PAX2 inhibition is both unproven

18   and an oversimplification of how signaling pathways work.

19        92.    Dr. Pestell presents no evidence to ascertain with any scientific certainty in what

20   percent of patients treated with Kadcyla there is in fact PAX2 inhibition.  Given the lack of

21   clinical data, he concludes that approximately 50% of the patients treated with Kadcyla would

22   have an inhibited expression of PAX2 and thus infringe the claims of the '534 patent.  (Pestell

23   Rpt. ¶ 57.)  It should be noted that neither Phigenix nor Dr. Pestell has provided any data

24   suggesting that even if the administration of Kadcyla results in PAX2 inhibition in 50% of treated

25   patients, that there is any correlation in any manner between the administration of Kadcyla and

26   the therapeutic response of the patients to Kadcyla.

27

28

**D.     The '534 Patent Does Not Describe Foundational Technology**

93.     The '534 patent does not describe any foundational technology.  PAX2 is not a validated target for oncology drugs.  The '534 patent does not describe a specific diagnostic or therapeutic product.  Phigenix, to the best of my knowledge, has not validated the PAX2 target for either diagnostic or therapeutic applications and the patent does not disclose any unique products for licensing.  In addition, the Phigenix patent covers only one signaling pathway.  With oncology therapy, many signaling pathways may be involved in the therapeutic response to treatment, and a license to just one of many potential pathways is of de minimis value.

**E.     The '534 Patent Does Not Teach Genentech How To Make, Use or Improve Kadcyla**

94.     From a licensee's perspective, the '534 patent does not claim any specific product or a method of using that product.  Nor does it teach anything about how Kadcyla actually works to treat cancer.  Accordingly, the it makes little contribution to the body of knowledge that supports Kadcyla.

95.     The '534 patent does not claim any of the components of the Kadcyla molecule.  Genentech licensed the DM1 and the MCC thiolinker technologies from ImmunoGen.  The Genentech-ImmunoGen license agreement provided Genentech with the ability to develop and commercialize Kadcyla.

96.     Dr. Wyse acknowledges that "Phigenix did not have a tested product to fully demonstrate the utility and advantages of the patented technology."  (Wyse Feb. 17, 2017 Rpt. ¶ 98.)  Phigenix has also admitted that:

- Prior to January 1, 2003, anti-HER2 breast cancer antibodies conjugated with maytansinoids via a disulfide bridge had been tested in breast cancer cells.  (PHI Response to RFA No. 282.)

- Trastuzumab conjugated to DM1 had been disclosed prior to January 1, 2003.  (*Id.* at RFA No. 277.)

- Dr. Donald did not invent trastuzumab, DM1, trastuzumab conjugated with DM1, or trastuzumab conjugated with DM1 via an SMCC linker.  (*Id.* at RFA Nos. 284-287.)

- The '534 patent does not disclose any examples of the inhibition of PAX2 or the enhancement of DEFB1 expression in breast tumor cells that Phigenix had actually

1    performed as of the date the application for the '534 patent was filed.  (*Id.* at RFA No.

2    299.)

3        97.    Thus, the parties to the hypothetical negotiation would likely see the '534 patent as

4    incidental to Kadcyla's development and market value.

5    **F.    Genentech Could Not Market the Alleged Advantage of the '534 Patent**

6        98.    Genentech has no legal way to market or promote the inhibition of PAX2 in its

7    marketing of Kadcyla.  PAX2 inhibition is not a recognized validated mechanism of action for a

8    breast cancer therapeutic.  Phigenix has no clinical or other human data showing that Kadcyla (or

9    any other therapeutic) inhibits PAX2 in breast cancer patients, nor that such inhibition leads to a

10    therapeutic effect.  (PHI Response to RFA Nos. 292, 293, 295, 296.)  To validate and prove these

11    theories would cost millions of dollars and there are no guarantees of regulatory approval.

12        99.    Furthermore, Phigenix has offered no evidence suggesting that Genentech could

13    expand Kadcyla's market successfully establishing to the FDA that Kadcyla inhibits PAX2.

14    Generally, pharmaceutical companies undertake clinical studies for an approved product to

15    provide additional or expanded indications (that is, to permit new or broader uses) or to support

16    some other marketing claim such as reduced side effects or performance compared to a

17    competitor.  Phigenix has not shown why proving that Kadcyla inhibits PAX2 would provide

18    Genentech with any marketing advantage.

19        100.    In short, Genentech would unlikely be able to market PAX2 inhibition under a

20    license from Phigenix, because (a) Phigenix concedes that PAX2 is not inhibited in all Kadcyla

21    recipients; (b) no clinical / human studies show the inhibition of PAX2 resulting from Kadcyla

22    treatment; and (c) Phigenix has offered no link between PAX2 inhibition and any benefit or

23    clinical result from Kadcyla treatment.

24    **G.    Agreeing to Pay More than a Nominal Royalty for the '534 Patent Would
          Raise Significant Concerns About Setting a Precedent**

25

26        101.    Phigenix's contention that Genentech should pay a royalty for the triggering of a

27    STAT3-PAX2 signaling pathway in some Kadcyla patients would raise significant concerns for

28    Genentech because of the risk that unknown patents on other signaling pathways could be

1   asserted against Kadcyla.  As Dr. Donald admits, Kadcyla's DM1 likely causes a host of effects

2   beyond just PAX2 inhibition (which I assume to occur with Kadcyla for the purposes of this

3   report):

> Q:  When the DM1 metabolite disrupts microtubules, does that have other effects
> besides inhibiting STAT3?
> A: I think the -- the consequence of disrupting microtubules and ultimately -- or --
> or also involving inhibition of STAT3 is going to have consequences to the cell,
> which would be, for instance, a microtubule catastrophe here where -- where
> everything sort of collapses, whether it be eventual apoptosis, whether it be the
> cells not being able to -- to proceed through the cell cycle.
> So -- so there are a number of things that happen beyond just the inhibition of
> STAT3 or may be a result of the inhibition of STAT3, as we talked about.

10  (Donald Aug. 4, 2015 Dep. Tr. at 135:24-136:13.)

11          102.    Dr. Weiner visually describes this complex knot of potential signaling effects as a

12  "hairball."  (Weiner Jan. 27, 2017 Rpt. ¶¶ 34, 57, 64.)  Many other signaling pathways exist,

13  which are triggered in some but not all patients.  A reasonable licensee would be concerned that

14  paying more than a nominal royalty for a license to the '534 patent could encourage other weak

15  claims.

16          **H.     Phigenix's Development and Licensing Efforts Do Not Show Significant Value
17                   Attributable to The '534 Patent**

18          103.    Since the time of its startup, Phigenix has raised minimal capital of approximately

19  $3 million to $4.5 million. (Donald Dec. 2, 2016 Dep. Tr. at 75:17-22, 180:6-14.)  Phigenix's

20  focus has been on intellectual property and patent filings, not in-house development; by August

21  2015, more than seven years after its founding, it had done no in-house development work.

22  (Donald Aug. 4, 2015 Dep. Tr. at 14:15-15:22.)

23          104.    In assessing a reasonable royalty rate, one consideration is what others in an arm's

24  length negotiation would be willing to pay for the license.  Phigenix's inability to obtain

25  significant interest from any party to license its intellectual property supports only a de minimis

26  value on the '534 patent given its very preliminary stage of development.  To make a diagnostic

27  and a therapeutic drug from the '534 patent would require millions of dollars of high risk

28

1    investment to develop and validate Phigenix's theory clinically, obtain FDA approval, and

2    commercially launch these products.  While Phigenix stated in 2013 that it had presented

3    information about its business to over 30 pharmaceutical companies, to date not one has taken a

4    license to the '534 patent.[22]

5           105.    Phigenix's inability to obtain sufficient capital from the investment community to

6    develop its intellectual property to encompass real products for development further supports my

7    assessment of the low value of the '534 patent at this early stage of development.  In 2013,

8    Phigenix projected its capital needs to be $10.1 million through 2016; however, it appears that

9    Phigenix has been limited in its ability to raise capital beyond approximately $3 million to $4.5

10   million in total.  (Compare Phigenix Dec. 10, 2013 Executive Summary at PHIG00009863 with

11   Donald Dec. 2, 2016 Dep. Tr. at 180:6-14.)

12          106.    MUSC licensed the '534 patent to Phigenix in February 2008 with clear

13   milestones for development.  Specifically, with respect to a therapeutic product, the MUSC-

14   Phigenix license agreement required, among other things, Phigenix to develop a high throughput

15   screen for identifying lead compounds within 4 years, complete animal studies for qualifying a

16   lead compound for clinical evaluation within 5 years, and submit an IND to initiate clinical trials

17   within 6 years.  (MUSC-FRD01810-1844 at Article IV.)  To achieve these milestones, Phigenix

18   would have required substantial capital investment.  Based on Dr. Donald's deposition, Phigenix

19   has not completed any of the work required to achieve these milestones to date, requiring

20   amendments to the milestone dates. Phigenix's inability to secure the funding for these studies,

21   and its inability to meet these targets, demonstrates that the value of Phigenix's concepts at their

22   current stage is de minimis.  (Donald Dec. 2, 2016 Dep. Tr. at 220:17-225:25.)

23          107.    It is also interesting to note that to the best of my knowledge, the established

24   biotechnology companies such as Roche/Genentech with a robust oncology product development

25   pipeline do not have any clinical stage development programs in place specifically targeting

26   inhibition of PAX2 as a therapeutic target.  As of March 28, 2017, there were no studies reported

27

28          [22] Phigenix Dec. 10, 2013 Executive Summary at PHIG00009863.

on clinicaltrials.gov referencing "PAX2," "PAX-2," "Paired Box 2," or "Paired box gene 2."）
(*See* Ex. C, Search Results for "PAX2" or "PAX-2" or "paired box gene 2" or "paired box 2.")
Oncology has moved to well-characterized and validated targets such Programmed Death-1 (PD-1) and Programed Death Ligand-1 (PD L-1).[23]  Neither Phigenix nor anyone in the biotechnology community has validated PAX2 as a target for HER2-positive breast cancer nor performed many steps that would be necessary to validate PAX2 as a target, including reliably demonstrating  (1) that PAX2 is present in HER2-positive metastatic breast cancer cell lines, (2) that PAX2 expression has an effect on the proliferation of HER2-positive breast cancers, (3) that PAX2 inhibition is involved in Kadcyla or another compound's mechanism of action for treating HER2-positive breast cancer, or (4) that PAX2 is a molecular driver or related to the survival of HER2-positive breast cancer.[24]   This lack of validation of the PAX2 target by the biotechnology community diminishes the value of the '534 patent to a potential licensee.

**I.      The Parties Would Recognize that a Small Payment Would Provide Phigenix Meaningful Return on Investment**

108.    As discussed above, I consider the relative investment of the prospective licensee and licensor when I am negotiating a royalty.  In my experience, negotiators of life sciences licenses and collaboration agreements typically consider the relative investment of the parties to a negotiation to measure their respective contributions and to ensure that each party receives a reasonable and fair return on investment.

109.    Phigenix's investment in the '534 patent has been minimal.  The patent itself contains no working examples of PAX2 inhibition in breast cancer.  (PHI Response to RFA No. 299.)  Dr. Donald testified that the focus of his work at Phigenix was on patent prosecution, licensing, and solicitation of investment, not bench lab work or clinical trials.  (Donald Aug. 4,

---

[23] *See, e.g.*, Wainwright, D. et al. "Durable Therapeutic Efficacy Utilizing Combinatorial Blockade against IDO, CTLA-4, and PD-L1 in Mice with Brain Tumors," Clin. Cancer Res. 20 (20), 5290-5301 (2014); Kaiser, D. et al. "Reduced tumor-antigen density leads to PD-1/PD-L1-mediated impairment of partially exhausted CD8+ T cells," Eur. J. Immunol., 42: 662–671 (2012).

[24] Weiner Apr. 3, 2017 Rpt. ¶¶ 40-44, 50-72.

2015 Dep. Tr. at 14:1-15:22; Donald Dec. 2, 2016 Dep. Tr. at 76:18-79:13.)  It also paid little for the rights to the '534 patent.  Its total payments to date to MUSC under the MUSC license total $120,000 and it procured an assignment of all of the rights to the '534 patent at no cost that absolves it from further payment to MUSC related to that payment.  (Donald Dep. Exh. 17, 24, 36, 38; Donald Dec. 2, 2016 Dep. Tr. at 73:6-18, 175:8-179:24, 219:7-222:20, 223:23-226:14.)

110.   (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
(▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
(▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
(▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
(▮▮▮▮▮▮)

111.   Genentech's investment in Kadcyla thus far exceeds Phigenix's investment in all of its research on any treatment or diagnostic for any indication to date.  The royalty Dr. Wyse proposes would amount to a huge windfall for Phigenix for out of proportion to its level of investment.

## IX.   THE GENENTECH-IMMUNOGEN LICENSE

### A.   Overview: The Genentech-ImmunoGen License Is the Key License for the Development of Kadcyla

112.   Genentech entered into an exclusive license agreement with ImmunoGen on May 2, 2000 that was directly related to the development and commercialization of Kadcyla.   The exclusive nature of the agreement provided Genentech with worldwide rights to develop and commercialize an anti-HER2 maytansinoid antibody conjugate and obtain a fair return on its investment through market exclusivity in that field.  This market exclusivity is a critical part of the Genentech-ImmunoGen license agreement, and the value of this exclusivity is reflected in the milestone and royalty payments that Genentech and ImmunoGen negotiated as part of the agreement.

**B. ImmunoGen Granted Genentech A Broad License for Patents and Know-How**

113. As Genentech was primarily responsible for development and commercialization, it required and received a broad license to ImmunoGen's technology, know-how, and intellectual property. Specifically, the license included an exclusive license to any and all patents, technology, data and know-how held by ImmunoGen necessary or useful for the development, manufacture, use or sale of any product that is a conjugate of an Anti-HER2 Antibody with any MAY Compound. (Genentech-ImmunoGen Agreement (GENE-00856333-90) at 1.32, 1.33, 1.34, 1.49, 2.1(a).) Thus the Genentech-ImmunoGen License included patent rights protecting a very specific product class, as well as know-how as to the ability to make the antibody drug conjugate.

**C. ImmunoGen Had Further Supply and Assistance Responsibilities**

114. Genentech and ImmunoGen structured the license as a co-development agreement with a Joint Process Development Committee overseeing the ADC development and commercialization of the contemplated ADC. (*Id.* at 3.4.) The agreement contained requirements for ImmunoGen to provide the DM1 for preclinical and clinical studies. (*Id.* at 3.5, 3.6.) Both Genentech and ImmunoGen had clearly defined roles and responsibilities throughout the development.

**D. The Agreement Provided for Royalty Payments That Adjusted for Market Conditions**

115. The ImmunoGen-Genentech license provided for tiered royalties ranging from 1% to 5% depending on various market conditions. During the period when Genentech was exclusively on the market in a particular country, royalty payments would range from 3% to 5% based on Kadcyla's annual sales. (*Id.* at 4.2.1.) But once Genentech loses exclusivity in its product class for a particular market, the royalty rate steps down to 1% during the period where Kadcyla is competing against another market entrant.

# X.    THE LICENSES & TECHNOLOGIES COMPARED BY DR. WYSE

## A.    The Genentech-Regeneron License is Not Comparable to the Issues in this Case

116.    Dr. Wyse's description of the Genentech-Regeneron license for Zaltrap is at best incomplete.  Relevant details omitted from his description show that this license is not comparable to the outcome of a hypothetical negotiation between Genentech and Phigenix.

### 1.    The Genentech-Regeneron License is a Worldwide Multi-Patent License Providing Complete Freedom to Operate for Zaltrap

117.    Pursuant to the license, Genentech granted a "non-exclusive, worldwide license under the Licensed Patents for the Term of this Agreement … in the Field and in the Territory." (Wyse Ex. 1080 at 2.01.)  The Territory is "the entire world."  (*Id.* at 1.21.)  The "Field" covers all uses for Zaltrap (aflibercept) excluding ocular uses.  (*Id.* at 1.09, 1.13.)  "Licensed Patents" includes a list of 13 U.S. patents and applications, and 20 more around the world.  (*Id.* at Exhibit C.)

118.    "Licensed Patents" under this Genentech-Regeneron license include U.S. Patent Nos. 5,952,199 and 6,100,071 (which expired on May 7, 2016), and cover vascular endothelial growth factor (VEGF) inhibitors and methods for their production; and U.S. Patent No. 7,771,721, which expired on May 7, 2016 and covers methods of inhibiting VEGF protein. VEGF is a well-characterized target and several VEGF inhibitors are in development.[25]  VEGF plays a role in promoting endothelial cell proliferation and angiogenesis (formation of vessels from pre-existing blood vessels), which are components of a variety of diseases and disorders, including tumor growth and metastasis.

119.    In addition, the license included a "non-exclusive license under the Genentech Technology Patents" as necessary "to practice the license granted to each Licensee in

---

[25] *See, e.g.,* Vachhani P. et al., "VEGF Inhibitors in Renal Cell Carcinoma,"  Hematology & Oncol.  14,1016-1028 (2016); He, Kuifeng et al., "The effect of anti-VEGF drugs (bevacizumab and aflibercept) on the survival of patients with metastatic colorectal cancer (mCRC)," Onco Targets Ther. 5, 59–65 (2012); Clarke JM, "Targeted inhibition of VEGF Receptor-2: An update on Ramucirumab," Expert Opin Biol Ther. 13(8), 1187–1196 (2013).

1  Section 2.01."  (Wyse Ex. 1080 at 2.02.)  The "Genentech Technology Patents" includes all other

2  patents owned or co-owned by Genentech, with certain exclusions.  (*Id.* at 1.11.)  Through these

3  grants, the Genentech-Regeneron License provides a much more substantial grant of rights than

4  the '534 patent.

5      **2.**   ***Dr. Wyse's Recitation of the Royalty Rate is Incorrect and Misleading***

6     120.  In his report, Dr. Wyse states that "[t]he royalties are [sic] for net sales are  4% for

7  sales between $400 million and $1 billion ($1,000 million) and 6.5% for sales in excess of

8  $1 billion ($1,000 million)."  (Wyse Feb. 17, 2017 Rpt. ¶ 64.)  This does not accurately or

9  completely describe the royalty arrangement under the Genentech-Regeneron license agreement.

10     121.  First, Dr. Wyse incorrectly reports the royalty rate for the $400 million to $1

11  billion tier – it is 4.5%, not 4%.  (Wyse Ex. 1080 at 3.02.)[26]

12     122.  Second, Dr. Wyse ignores the fact that even though the license is world-wide, the

13  tiers above are based on U.S. sales and manufacturing only:  "Licensees shall pay to Genentech

14  the following royalties as a percentage of total cumulative Net Sales of Licensed Product (i) sold

15  in the U.S. during the Royalty Term (regardless of where such Licensed Product is made) and

16  (ii) made in the U.S. but sold outside of the U.S. during the Royalty Term."  (Wyse Ex. 1080 at

17  3.02.)

18     123.  Third, Dr. Wyse omits the royalty terms below $400 million.  According to section

19  3.01, there are **no** royalties paid for sales below $400 million.  Instead, the agreement provides for

20  a one-time "Sales Milestone" paid once, after "total cumulative Net Sales of Licensed Product

21  reach two hundred million U.S. dollars."  (*Id.* at 3.01.)  The milestone payment is $19,000,000.

22     124.  As the License explains:  "No milestone payment shall be owed unless total

23  cumulative Net Sales of Licensed Product reach two hundred million U.S. dollars ($200,000,000)

24  during the Royalty Term."  (*Id.*)  "Net Sales" are limited to "[t]he gross amounts invoiced for

25

26

27     [26] Dr. Wyse correctly reports the figure in his Exhibit 1053, but that schedule does not

28  include the tiers at which the royalties are paid.

sales of all Licensed Product sold in the U.S. and all Licensed Product made in the U.S. and sold anywhere in the Territory….."  (*Id.* at 1.16(1).)

125.   Fourth, Dr. Wyse does not report the "Royalty Term."  While the "Term" of the license extends to the expiration date of the last to expire Licensed Patent or Genentech Technology Patent (*id.* at 7.01), the "Royalty Term" means "the period commencing on the date of the First Commercial Sale and ending on May 7, 2016" (*id.* at 1.19).

126.   In other words, royalties under this agreement would be paid as follows:

- Zero royalties until Net Sales reach $200 million.

- At $200 million, $19,000,000 would be paid to Genentech

- No further payments are due unless and until Net Sales reach $400 million during the Royalty Term.

- Thereafter, royalties during the Royalty Term are paid at the following rates:

    o  4.5% of Net Sales between $400 million and $1 billion; and

    o  6.5% of Net Sales above $1 billion.

- After the Royalty Term, and subject to all payments being made and other terms fulfilled, "the licenses under Sections 2.01 and 2.02 and any sublicense(s) granted in accordance with Section 2.04 shall become fully paid-up and royalty free for the remainder of the Term."  (*Id.* at 7.01.)

127.   Zaltrap received approval in the U.S. in August 2012 and received approval in the EU in February 2013.  Based on my reviews of Net Sales of Zaltrap reported by Sanofi, cumulative sales of Zaltrap were €289 million through 2016.  (*See* Sanofi 2013 20-F at 24; Sanofi 2014 20-F at 22; Sanofi 2015 20-F at 23; Sanofi 2016 20-F at 23; 2017 6-K at 4.) Thus, assuming all of these $300 million sales count as "Net Sales" under the agreement, at most Regeneron and Sanofi would have paid $19,000,000 for a fully paid-up royalty for perpetual world-wide freedom to operate from Genentech's patent portfolio as applied to Zaltrap.

**B.**     **The Genentech-Celtrix License is Not Comparable to a Hypothetical License in this Case**

128.    Dr. Wyse's description of the Genentech-Celtrix license is also incomplete and incorrect.  Relevant details omitted from his description show that this license is not comparable to the outcome of a hypothetical negotiation between Genentech and Phigenix.

**1.**     *Dr. Wyse Misunderstands the Genentech-Celtrix License*

129.    Dr. Wyse asserts that Genentech entered into a non-exclusive licensing agreement with Celtrix under which Genentech granted Celtrix rights in the TGF-beta and TGF-beta receptor field, for royalty rates of between 5% to 10% depending on the field of use.  (Wyse Feb. 17, 2017 Rpt. ¶ 66, citing Wyse Ex. 1088 at 3.1.)  Unlike PAX2, TGF-beta is a well-characterized target.[27]

130.    Dr. Wyse's summary on Exhibit 1053 reveals a significant misunderstanding.  He characterizes the Celtrix license as a "method" license from Genentech to Celtrix and incorrectly cites U.S. Patent No. 4,843,063 (Wyse Ex. 1097) as evidence of this.   However, the '063 patent (which claims a method of treatment using TGF-beta) was licensed from Celtrix to Genentech "[a]s additional consideration for the granting of licenses by Genentech."  (Wyse Ex. 1088 at 5.0.)  Dr. Wyse does not establish that Genentech was interested in further development of the technology of the '063 patent.

131.    To the contrary, the Genentech-Celtrix license provides for a license from Genentech to Celtrix of a set of listed patents (not provided by Dr. Wyse) plus "any other patents owned or licensed by Genentech as of the Effective Date … which are necessary to make, use or sell TGF-beta 2, TGF-beta Heterodimer or the TGF-beta Receptor pursuant to the licenses granted by Genentech herein."  (*Id*. at 1.10.)

132.    Genentech has several patents relevant to the manufacture of TGF-beta using recombinant techniques.  The "Genentech Patents" licensed to Celtrix include those listed on

---

[27] *See, e.g.,* Neuzillet C. et al., "Targeting the TGFβ pathway for cancer therapy. Pharmacology & Therapeutics" 147, 22–31 (2015).

"Exhibit A" to the Genentech-Celtrix License.  These include patents covering polypeptides based on TGF-beta sequences (e.g., U.S. Patent No. 5,061,786), methods of treatment using TGF-beta (e.g., U.S. Patent Nos 5,135,915 and 5,158,934), and methods of producing recombinant TGF-beta (e.g., U.S. Patent No. 4,886,747, issued on December 12, 1989).  (*See* Ex. D, Genentech-Celtrix License at Exhibit A.)

133.    Accordingly, far from being a license to a single method patent as Dr. Wyse's report and its Exhibit 1053 suggest, the Genentech-Celtrix license granted a portfolio license to Genentech's technology relating to the manufacture of recombinant TGF-beta.  It is not comparable to the license offered by Phigenix to Genentech in a hypothetical negotiation.

**C.    The Immune Response Corp. / Urogen License Is Not Comparable to a Hypothetical License in this Case**

134.    Dr. Wyse points to the 1997 license between Immune Response Corp. (IRC) and Urogen (Wyse Ex. 1082) as a potentially comparable license.  However, the nature of the technology and the relationship of the parties in that license are in fact very different from the hypothetical license negotiations between Phigenix and Genentech.

**1.    *U.S. 6,051,218 Claims a Specific Method of Treatment***

135.    The patent licensed to UroGen under the IRC-UroGen license, U.S. Patent No. 6,051,218 ("'218 patent"), claims a specific method of treating a tumor by administering a cytokine that stimulates a patient's immune response against the tumor and causes increased susceptibility to radiation.  The patent has two claims.  Claim 1 is exemplary:

A method of inhibiting the growth of a tumor in a mammal, comprising

(a) administering a tumor cell expressing interleukin-3 to said mammal, wherein expression of interleukin-3 stimulates an immune response against the tumor and wherein said tumor has increased radiation susceptibility, wherein said tumor cell has at least one antigen in common with said tumor; and

(b) treating said tumor with radiation, wherein the growth of said tumor is inhibited.

136.    In addition, the '218 patent contained a detailed controlled in vivo proof of concept study showing that expressions of IL-3 at the site of a tumor enhances radiosensitivity. (Wyse Ex. 1096 ('218 patent) at 14:26-16:15.)

### 2.    *Exclusivity Over the Claimed Method Would be Essential for the Licensee*

137.    Unlike the '534 patent, the '218 patent's claimed method claims a specific, readily identifiable agent to be administered – a tumor cell expressing IL-3. This is a form of targeted gene therapy. At the time, methods for modifying the tumor cells to express IL-3 were known in the art. (Wyse Ex. 1096 ('218 patent) at 6:1-67 (discussing several publications disclosing modifications of tumor cells to express cytokines).) The '218 patent's discovery was that these modified tumor cells could be administered to patients to increase the cancer's radiosensitivity and stimulate an immune response to the cancer. The field of the IRC-UroGen license was urogenital tumors (excluding ovarian diseases). Thus, Urogen would have a right against any competitive treatment that involved administering tumor cells producing IL-3 to treat cancers in that field. Under the license, IRC also provided Urogen with its IL-3 transfected cell line, and agreed to ensure that this cell line was certified for use in human clinical trials—at IRC's expense. (Wyse Ex. 1082 at 3.5.)

138.    The clarity and certainty of this grant sharply contrasts with the coverage of the '534 patent. First, the '218 patent claims a specific therapeutic composition – a tumor cell producing IL-3. The '534 patent claims a composition only by its effect. Second, potential infringers of the '218 patent are readily ascertainable. Marketing a therapy involving administering tumor cells expressing IL-3 to improve radiosensitivity would give rise to infringement. But the '534 patent provides no way to ascertain infringement other than testing every possible breast cancer therapy for PAX2 inhibition or DEFB1 enhancement. As the report of Dr. Dressler shows, such tests are full of uncertainty.[28]

---

[28] *See* Dressler April 3, 2017 Rpt. ¶¶ 79-103.

**D.** **The Genentech-Connetics License is Not Comparable to a Hypothetical License Between Phigenix and Genentech**

139. Dr. Wyse's description of the Genentech-Connetics license (Wyse Ex. 1081) is also incomplete and incorrect. Relevant details omitted from his description show that this license is not comparable to the outcome of a hypothetical negotiation between Genentech and Phigenix.

1. *The Genentech-Connetics License is for an Approved and Marketed Product*

140. The Genentech-Connetics License relates to Genentech's interferon gamma-1b product, known as Actimmune. Genentech received approval for Actimmune in 1991 for the management of chronic granulomatous disease.[29] In 1998, Genentech granted Connetics a license to the U.S. marketing rights for the product, and development and commercialization rights for other indications.[30] Notably, Genentech would continue to manufacture the product for Connetics; the License Agreement notes a separate Supply Agreement not mentioned by Dr. Wyse.[31] In other words, this agreement is part of a comprehensive outlicensing arrangement where Connetics takes over the marketing and future development of an existing, approved product.

2. *The Genentech-Connetics License Provides an Extensive Assignment of Marketing, Commercialization and Intellectual Property Rights*

141. Consistent with that scope, the Genentech-Connetics license does not just transfer intellectual property, but also the Product License Application, Establishment License Application, and Investigational New Drug Application for Actimmune, so that Genentech can exit the business of marketing and developing the product. (Wyse Ex. 1081 at 2.5(d), (e), (f), (g).)

---

[29] Business Wire, May 11, 1998, "Connetics and Genentech Expand ACTIMMUNE Marketing and Product Development Collaboration."

[30] *Id.*, Wyse Ex. 1081 at 2.1.

[31] Wyse Ex. 1081 at 1.5.

142.   The intellectual property that Genentech licensed to Connetics is correspondingly broad.  The licensed "Genentech Patent Rights" includes a range of patents relating to recombinant DNA technology, methods of production, and methods of treatment for a variety of conditions.  For example, U.S. Patent Nos. 5,200,177 and 5,112,605 cover methods of treating severe allergic disorders with gamma interferons; U.S. Patent No. 5,582,824 is directed to recombinant human interferons, and methods of antitumor and antitumor treatment through the use of recombinant DNA technology; and U.S. Patent Nos. 5,690,925 and 5,096,705 are directed to methods of producing recombinant gamma and human interferons.  Genentech also provides the substantial know-how it developed during clinical testing:

> 1.16 "Genentech Knowhow" shall mean all proprietary information, methods, processes, techniques and data that are in the possession or control of Genentech on the Effective Date or thereafter during the term of this Agreement, that Genentech is free to license or sublicense, that have not been publicly disclosed, and that are specific and reasonably necessary for the use, sale, offer for sale or importation of Interferon Gamma in the Field of Use in the Territory, but shall not include information regarding the manufacture of Interferon Gamma.

(Wyse Ex. 1081.)

### 3. *The Royalty Rates Connetics Paid to Genentech Would be Intended to Compensate Genentech for Its Substantial Investment in the Product*

143.   Dr. Wyse appears to suggest that the royalty rates paid by Connetics are in some way relevant to the hypothetical Phigenix-Genentech license, although this agreement does not appear on his summary chart.  (Compare Wyse Feb. 17, 2017 Rpt. ¶63 with Wyse Ex. 1053.)  In view of the completely different nature of the Genentech-Connetics agreement, the royalty rates paid by Connetics are not at all applicable.

144.   Connetics would pay a large 45% royalty for sales up to $3.7 million.  (Wyse Ex. 1087; Wyse February 17, 2017 Rpt. at ¶63.)  This makes sense as a threshold, as $3.7 million was what Genentech was able to sell without Connetics marketing or investment.[32]  The 10% royalty for sales above $3.7 million is reasonable in view of the substantial investment Genentech had already made in the product, and the know-how it was providing.  Indeed, the Genentech-Connetics agreement provides that these rates would be reduced by 50% after patent expiration to reflect the contribution of Genentech's know-how.  (*Id*. at 8.3(c).)  Thus, the effective royalty rate

---

[32] Business Wire, May 11, 1998, *supra*.

1  for the extensive patent rights offered to Connetics, for CDG and any other indication Connetics

2  might develop, was 5%.  Given that a much broader set of composition, method of treatment, and

3  method of manufacture patents were covered by this license, it shows that Dr. Wyse's proposed

4  rate of 5% for a single, non-enabling method of treatment patent is excessive.

5  **E.     The City of Hope License Covers Foundational Antibody Technology**

6  145.    The City of Hope license (GENE-00870339-66) is directed to foundational

7  antibody technologies that Genentech developed with the nonprofit research organization, City of

8  Hope, in the 1980s.  The well-known City of Hope patents, known as the "Cabilly Patents," claim

9  crucial methods of producing antibodies and antibody fragments, and thus, have been widely

10  licensed to developers and manufacturers of humanized antibodies.  Two of the Cabilly patents

11  City of Hope licensed to Genentech are U.S. Patent No. 6,331,415 ("Cabilly II") and U.S. Patent

12  No. 7,923,221 ("Cabilly III").  As one author noted, "[m]uch has been written about the history of

13  the Cabilly patents, which cover key steps of therapeutic antibody production."[33]  Moreover,

14  "[b]ecause Cabilly II protects a crucial step in the state-of-the art production of therapeutic

15  antibodies, major antibody drug makers such as Abbott, Johnson and Johnson, ImClone and

16  MedImmune have acquired licenses to it."

17  146.    ██████████████████████████████████████████

18  ███████████████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████████████████

20  ██████████████████████████████████████████████████████████

21  ██████████████████████████████████████████████████████████

22  ███████████████████████████████████████████████████████████████████

23  ███████████████████████████

24

25

26

27  [33] Ulrich Storz et al., "The Cabilly Patents: Status Quo and Relevance for Antibody
Companies," Landes Bioscience, 4:2, 274-280 (2012).

28

F.      **The PDL License Covers Foundational Antibody Technology**

147.    Unlike the '534 patent, the patents PDL licensed to Genentech also cover foundational humanized antibody technologies that have allowed Genentech and other companies to develop, manufacture, and use a range of humanized antibodies for the treatment of cancer and immunologic diseases.  (*See* PDL HER2 License Agreement, GENE-00870418-31.)  The PDL patents, known as the "Queen Patents," include U.S. Patent No. 5,585,089, which relates to "the combination of recombinant DNA and monoclonal antibody technologies for developing novel therapeutic agents,"[34] and U.S. Patent No. 5,693,762, which is directed to methods for producing, and compositions of, humanized immunoglobulins.  Genentech's licenses on the Queen patents have allowed Genentech to manufacture and sell a range of humanized antibody cancer treatments (e.g., Avastin, Herceptin, Kadcyla and Perjeta) and the antibody asthma drug Xolair.[35]

148.    The PDL License has been amended a number of times.  In 2013, Genentech appears to have paid a royalty of between 1 and 2.5% depending on sales volume.  Commencing in about August 2013, Genentech agreed to pay a fixed royalty of 2.125% of net sales.  (GNE 00870564-681 (PDL Settlement Agreement); GNE 00870682-703 (PDL Royalty Statements).)

## XI.    CONCLUSION

149.    I have been asked to consider various evidence, data, and other facts relating to a hypothetical arms-length negotiation between Phigenix and Genentech, in view of my industry and licensing experience.  I have assumed that the parties to the hypothetical negotiation would agree that the '534 patent is valid and infringed in a subset of patients receiving Kadcyla.

150.    As discussed above, I have provided my assessment of several issues that would be important to the hypothetical negotiators, including the state of the science regarding HER2-positive breast cancer and Kadcyla, the lack of PAX2 validation as a target for breast cancer, the lack of any contribution of the concepts of the '534 patent to the development or efficacy of

---

[34] U.S. Patent No. 5,585,089, Field of the invention

[35] "Genentech, Roche Settle with PDL BioPharma Over Licensing," Law 360, February 14, 2014, https://www.law360.com/articles/506592/genentech-roche-settle-with-pdl-biopharma-over-licensing

Kadcyla, Phigenix's minimal investment compared to Genentech, Genentech's strong patent coverage for Kadcyla, the weaknesses in the '534 patent, the return on investment to each party resulting from a license, Phigenix's lack of research and development, Phigenix's unsuccessful licensing efforts, and the scope of the Genentech-Immunogen license as compared to what would be offered by Phigenix.  I have also considered the agreements that Dr. Wyse considers relevant comparables to the hypothetical license.  Based on my review of the facts in light of my experience, I believe that: (a) the hypothetical license would not be exclusive; (b) the royalty rates cited by Dr. Wyse are not comparable to the hypothetical license; and (c) the outcome of the negotiations would not be a royalty anywhere close to that proposed by Dr. Wyse.  Rather, I believe that a reasonable royalty rate for the '534 patent would be significantly less than 0.5% of net sales of Kadcyla for a non-exclusive license.

Dated: April 3, 2017

Mark Robbins

# Exhibit A

# Mark S. Robbins Ph.D, J.D.

● MSROBBINS@KODIAKSTRATEGIES.COM   ■ 2875 DEER RUN TRAIL, ORONO, MN 55356
■ (952) 215-5146

## SUMMARY

Pharmaceutical/Biotech Executive with 30+ years of broad based pharmaceutical and biotechnology experience and strong entrepreneurial drive. Therapeutic experience includes neurology, pain management, oncology, cardiology, endocrine/metabolic, women's health, dermatology, nuclear medicine, radiology, critical care and anesthesiology.  Serial entrepreneur with several start up biotech ventures. Developed and successfully implemented drug development programs leading to numerous successful NDA/BLA approvals and successful commercialization.

## WORK EXPERIENCE

**KODIAK STRATEGIC CONSULTANTS, LLC, Minneapolis, MN**

**President and CEO**
**November 2011-Present**
Provide strategic clinical, regulatory and business development consultation to a diverse group of pharmaceutical and biotech companies. Speaker at numerous regulatory scientific meetings including the Food and Drug Law Institute Annual meeting CBER Update 2013-2014.

**Major Accomplishments:**
- Developed a broad client base of pharmaceutical and biotech companies.
- Focused on therapeutic areas of oncology, CNS, cardiovascular, autoimmune and infectious diseases.
- Serve as President, CEO and Board Member for Tansna Therapeutics, a research stage CNS pharmaceutical company focused on refractory epilepsy and chronic pain.
- Serve as Chief Operating Officer and Corporate Secretary for Bullet Biotechnology a cancer immunotherapy development stage company.
- Board Member, Clipse Therapeutics, a start up CNS drug delivery company.
- Co-Founder, Tychon Bioscience, an oncology immunotherapy company.
- Serve as Head of Regulatory and Strategic Business Consultant for Hennepin Life Sciences, a clinical stage anti-infective development company.
- Serve as Regulatory and Strategic Business Consultant for GigaGen, a biotechnology oncology and autoimmune development stage company.
- Serve as VP, Quality and Regulatory Affairs for Tapemark, a leading transdermal and oral thin film drug delivery company.
- Provide due diligence and expert support to VC funds and law firms.
- Provided strategic direction and assistance in private equity and venture capital financing activities of various development stage companies.

**UPSHER-SMITH LABORATORIES, INC., Minneapolis, MN**
**1998-November 2011**

**Executive Vice President, Legal, Scientific and Technical Operations**
**Chief Scientific Officer and Corporate Secretary**
2006 – Nov. 2011
Promotion and new oversight responsibilities for Research and Development, Manufacturing Operations and the Supply Chain.

**Major accomplishments**:
- Negotiated with the FDA the regulatory strategy leading to the NDA approval of Fortical based on surrogate endpoints including the successful resolution of FDA legal concerns resulting from a Citizens Petition challenge to our approval.
- Provided strategic oversight in the clinical regulatory program resulting in the NDA approval for Divigel based on one US Phase 3 trial.
- Led the resolution of the legal challenge to the FDA approval of the ANDA Oxandrin based upon a Section 8 carve-out and successful resolution of patent litigation by Savient.
- Successfully negotiated with the FDA clinical and regulatory strategy for three neurological drugs in Phase 1-3 development.

**Vice President, Legal and Regulatory Affairs**
**General Counsel**
**1998-2006**
Responsible for strategic leadership and direct oversight of the Regulatory, Clinical, Quality and Legal groups.

**Major Accomplishments:**
- Directed the legal team in defeating the FTC challenge of our Paragraph IV settlement with Schering-Plough.  This case went up to the US Supreme Court (cert, denied) and is a landmark case in Paragraph IV settlements.
- Led the regulatory development plan and reviewed all submission for a novel antiviral agent that ultimately failed in Phase 2 clinical trials.
- Provided strategic oversight, reviewed all regulatory submissions and directly participated in FDA meetings leading to the approval of Fortical for the treatment of osteoporosis in post-menopausal women.
- Provided strategic oversight, reviewed all regulatory submissions and directly participated in FDA meetings leading to the approval of Divigel for the treatment of vasomotor symptoms in post-menopausal women.

**CERTUS INTERNATIONAL, INC., St. Louis, MO**

**President & Chief Operating Officer**
**1996-1998**
Certus was a start-up Contract Research Organization providing a full range of
Regulatory and Clinical services to the pharmaceutical and medical device industry. I
held overall responsibility for strategic planning, business development, staffing,
marketing, sales and profit/loss. In addition, I served as the primary regulatory agent for
several biotech and medical device companies.

**Major accomplishments:**
- Achieved an 80% increase in revenues and tripled the client base in fiscal 1997.
- Personally developed clinical regulatory strategies for 5 critical clients, serving as
  the FDA regulatory agent and directly negotiation with the FDA on
  clinical/regulatory development plans.
- Drafted clinical portions of regulatory submissions resulting in BLA approval of
  two radiolabeled monoclonal antibodies for diagnosis of venous thrombosis and
  acute appendicitis.
- Led regulatory development program and drafted clinical portions of regulatory
  submissions for two brachytherapy devices – MammoSite and GliaSite.
- Led clinical regulatory strategy and negotiations with the FDA enabling the initial
  clinical evaluation of a magnetically driven stereotaxis brain biopsy device.

**UPSHER-SMITH LABORATORIES, INC., Minneapolis, MN**

**Vice President, Scientific and Regulatory Affairs**
**1994-1996**
Joined Upsher-Smith as a career development opportunity to lead the Regulatory,
Clinical, Research and Development and Quality groups with two Phase 3 clinical
development programs ongoing.

**Major accomplishments:**
- Worked directly with the FDA to define guidance for demonstrating in vitro
  bioequivalency for a nonabsorbable resin leading to the successful approval of
  Prevalite, the only generic product to obtain an AB rating to two reference listed
  drugs.
- Implemented quality programs driving FDA compliance throughout our
  operations and establish an ongoing history of outstanding compliance and
  relationships with the Agency at both the headquarters and district level.
- Developed and negotiated the regulatory strategy with the FDA culminating in the
  orphan drug NDA approval of Diastat for acute repetitive seizures.
- Successfully negotiated the regulatory strategy leading to the NDA submission for
  Niacor SR, although this program was subsequently discontinued following my
  departure.

**MALLINCKRODT GROUP, INC. St. Louis, MO**
**1981 - 1994**

**Director, Medical Affairs Department**
**1993 -1994**

**Associate Director/Director of Clinical Research**
**1989– 1993**

**Executive Administrative Assistant, Office of the President**
**1988–1989**

**Research Manager, Pharmacology and Toxicology**
**1984–1988**

**Research Pharmacologist/Senior Research Pharmacologist**
**1981–1984**

**Major Accomplishments:**
- Developed and implemented regulatory strategy resulting in the first NDA approval for morphine sulfate injection for patient controlled analgesia.
- Developed compelling regulatory rational and obtained the only approval of an ultrasound contrast agent as a PMA medical device.
- Led Phase 2 and 3 clinical trials for cancer therapeutic drug treating bone metastases secondary to prostate and breast cancer.
- Provided the strategic oversight and implemented the regulatory strategies and drafted regulatory submissions leading to the worldwide approvals for Optiray, TechneScan MAG3, Ultratag PYP, and OctreoScan.
- Led successful response from DDMAC challenging off label promotion of Hexabrix by supplying compelling data supporting product promotional claims.
- Drove the regulatory strategies demonstrating substantial equivalence supporting 510 (k) approvals of Cardiology, Anesthesiology and Critical Care devices.
- Represented the Office of the President as part of the team charged with the decentralization of Mallinckrodt into three independent operating companies: Medical, Specialty Chemicals and Veterinary Medicine.
- Successfully negotiated the worldwide preclinical development strategy leading to the ultimate worldwide approval of Optiray, Optimark, Octreoscan, TechneScan MAG3 and Ultratag PYP.
- Successfully negotiated the preclinical regulatory strategy leading to ultimate approval of pre-filled power injector syringes containing various X-ray contrast agents.

**EDUCATION**

J.D., <u>magna cum laude</u>, St. Louis University School of Law, 1991.
(class rank 3 out of 241)

Ph.D., Pharmacology, University of Minnesota Medical School, 1980.

B.S., Biochemistry, University of California at Los Angeles, 1974.

**FELLOWSHIPS**

NIH USPHS Postdoctoral Fellow, Department of Anatomy, University of Minnesota
Medical School, 1979-1981

NIH USPHS Predoctoral Fellow, Department of Pharmacology, University of Minnesota
Medical School, 1974-1979

**PROFESSIONAL AFFILIATIONS**

American Society of Clinical Oncology (inactive)
Food and Drug Law Institute
Regulatory Affairs Professionals Society (inactive)
Minnesota State Bar Association
             Chair, Food and Drug Law Section, 2001
             Secretary, Food and Drug Law Section, 2002-2006

**LICENSURE AND CERTIFICATIONS**

Missouri Bar
Minnesota Bar
Regulatory Affairs Certification, 1994 (inactive)
Diplomate, American Board of Toxicology, 1984 (inactive)

**ACADEMIC APPOINTMENTS**

Adjunct Assistant Professor, University of Minnesota College of Pharmacy
1995 – 2014
Adjunct Associate Professor, University of Minnesota College of Pharmacy
2016-present
Adjunct Professor (Food and Drug Law), William Mitchell College of Law
2001- 2006

**COMMUNITY SERVICE**

Wishes and More, Board Member and Secretary
2003-present

Jewish Family and Children's Services of Minneapolis Board of Directors
2008 – present

BIBLIOGRAPHY

1.  Meyer, D. R.; el–Azhary, R.; Bierer, D. W.; Hanson, S. K.; Robbins, M. S. and
    Sparber, S. B. Behavioral tolerance and dependence after chronic administration of
    clonidine to the rat.  Pharmacol, Biochem. Behav. 7:227–231, 1977.

2.  Robbins, M. S.; Hughes, J. A.; Sparber, S. B. and Mannering, G. J.  Delayed
    teratogenic effect of methylmercury on hepatic cytochrome P–450 dependent
    monooxygenase systems of rats.  Life Science 22:287–293, 1978.

3.  Robbins, M. S.; Grouse, L. H.; Sorenson, R. L.; and Elde, R. P.  Effect of muscimol
    on glucose stimulated somatostatin and insulin release from the isolated perfused rat
    pancreas.  Diabetes 30:168–171, 1981.

4.  Robbins, M.S. and Mannering, G. J.  Effect of the interferon inducing agents,
    tilorone and polyriboinosinic acid–poly–ribocytidylic acid (PolyIC), on the hepatic
    monooxygenase systems of pregnant and fetal rats. Biochem. Pharmacol. 33:1213–
    1222, 1984.

5.  Robbins, M. S. and Mannering, G. J.  Effect of the interferon inducing agents,
    tilorone and polyriboinosinic acid–poly–ribocytidylic acid (IC), on the hepatic
    monooxygenase systems of the developing neonatal rat.  Biochem. Pharmacol.
    33:1223–1227, 1984.

6.  Robbins, M. S.; Sorenson, R. L.; Elde, R. P.; Schmechel, D. E. and Oertel, W. H.
    Gamma– aminobutyric acid (GABA) inhibition of somatostatin secretion from the
    isolated perfused rate pancreas and immunohistochemical localization of L–
    glutamate decarboxylase in the islet beta cell.  In:  Second International Symposium
    on Somatostatin, pp. 165–172, Raptis, S.; Rosenthal, J. and Gerich, J. E., eds.,
    Attemtpo Verlag Tuebingen GmbH, Germany, 1984.

7.  Dean, R. T.; Wester, D. W.; Nosco, D. L.; Adams, M. D.; Coveney, J. R.; Robbins,
    M. S.; McElvany, K. D. and DeJong, R.  Progress in the design, evaluation and
    development of Tc– 99m radiopharmaceuticals.  In:  Technetium in Chemistry and
    Nuclear Medicine Vol. 2, pp. 147–154, Deutsch, E.; Nicolini, M. and Wagner, H.
    N., eds., Verona:  Cortina Int'l Verona, 1986.

8.  Coveney, J. R. and Robbins, M. S.  Comparison of Tc–99m MAG3 kit with HPLC–
    purified Tc– 99m MAG3 and OIH in rats.  J. Nucl. Med. 28:1881–1887, 1987.

9.  Ralston, W. H.; Robbins, M. S.; Mosier, L. D.; Barco, S. J.; Adams, M. D.; and
    Hopkins, R. M.  The effect of sodium on the fibrillatory potential of ioversol.
    Invest. Radiol. 23:S140–S143, 1988.

10.   Ralston, W. H.; Robbins, M. S. and Coveney, J. R.  Hemodynamic effects of ioversol in the dog and the rat.  Invest. Radiology 24:S10–S15, 1989.

11.   Coveney, J. R. and Robbins, M. S.  Biodistribution and excretion of [I–125] ioversol in conscious dogs.  Invest. Radiology 24:S23–S27, 1989.

12.   Ralston, W. H.; Robbins, M. S.; Coveney, J. R.; and Blair, M.  Acute and subacute toxicity of ioversol in experimental animals.  Invest. Radiology 24:S2–S9, 1989.

13.   Ralston, W. H.; Robbins, M. S.; and James, P.  Reproductive, developmental and genetic toxicology of ioversol.  Invest. Radiology 24:S16–S22, 1989.

14.   Patrick, S. T.; Glowniak, J. V.; Turner, F. E.; Robbins, M. S and Wolfangel, R. G. Comparison of in vitro RBC labeling with the Ultratag RBC kit versus in vivo labeling.  J. Nucl. Med. 32:242– 244, 1991.

15.   Wester, D. W.; Coveney, J. R.; Nosco, D. L.; Robbins, M. S and Dean, R. T. Synthesis, characterization and myocardial uptake of cationic bis(arene)technetium (I) complexes.  J. Med. Chem. 34:3284–3290, 1991.

16.   Coleman, R. E.; Robbins, M. S.; and Siegel, B. A.  The future of PET in clinical medicine and the impact of drug regulation.  Sem. Nucl. Med., XXII:193–201, 1992.

17.   Preclinical Characterization of Recombinant Human Tissue Kallikrein-1 as a Novel Treatment for Type 2 Diabetes Mellitus  Kolodka, T.A, Charles, M.L., Raghavan , A,  Radichev, I.A., Amatya, C., Ellefson, J., Savinov,  A.Y., Nag,  A.. Williams, M.S., Robbins, M.S. PLOS ONE; DOI: 10.1371/journal.pone.0103981, August 6, 2014.

18.   Autoimmune Diabetes Is Suppressed by Treatment with Recombinant Human Tissue Kallikrein-1 Maneva-Radicheva, L., Amatya, C.,  Parker, C., Ellefson, J., Radichev, I., Raghavan, A., Charles, M.L. Williams, M.S., Robbins, M.S, Savinov, A.Y. PLOS ONE; DOI: 10.1371/journal.pone.0107213. September 26, 2014.

19.   Pharmacological effects of recombinant human tissue kallikrein on bradykinin B 2 receptors Charest-Morin, X, Raghavan, A., Charles, M.L., Kolodka, T., Bouthillier, J., Jean,  M. Robbins, M.S., Marceau, F. Pharma Res Per, 3(2), e00119, doi: 10.1002/prp2.119, 2015.

20.   The isolated human umbilical vein as a bioassay for kinin-generating proteases: an in vitro model for therapeutic angioedema agents.  Jean, M.,  Raghavan, A., Charles, M.L., Robbins, M.S., Wagner, E. Rivard, G-E, Charest-Morin, X., Marceau, F.: Life Sciences, in press, May 2016.

**ABSTRACTS**

1.  Robbins, M. S.; Hughes, J. A.; Sparber, S. B. and Mannering G. J.  Delayed teratogenic effect of methylmercury on the hepatic cytochrome P–450 dependent monooxygenase system of rats.  Fed. Proc. 36:404, 1977.

2:  Robbins, M. S. and Mannering, G. J.  Temporal aspects of the depressant effect of poly ri–rC on the hepatic mixed function oxidase systems during maturation in the rat.  Pharmacologist 20:200, 1978.

3.  Robbins, M. S. and Mannering, G. J.  Effects of the interferon inducing agent, tilorone, on hepatic mixed function oxidase systems in pregnant and fetal rats.  Fed. Proc. 38:437, 1979.

4.  Robbins, M. S. and Mannering, G. J.  Effects of phenobarbital, 3– methylcholanthrene, poly rl– rC and tilorone on hepatic P–450 hemoproteins of weanling and adult rats.  Pharmacologist 21:223, 1979.

5.  Robbins, M. S.; Sorenson, R. L.; Elde, R. P.; Schmechel, D. E. and Oertel, W. H.  Gamma– aminobutyric acid (GABA) inhibition of somatostatin secretion from the isolated perfused rat pancreas and immunohistochemical localization of L– glutamate decarboxylase in the islet beta cell.  Second International Symposium on Somatostatin, Athens, Greece, 145, 1981.

6.  Robbins, M. S.; Harris, J. A.; Hopkins, R. M.; and Adams, M. D.  Urinary excretion of lactate dehydrogenase and alkaline phosphatase in the rat following sodium fluoride administration.  Pharmacologist 24:146, 1982.

7.  Robbins, M. S.; Adams, M. D.; Hopkins, R. M.; and Hoey, G. B.  Comparative biodistribution and excretion of MnCl2 and MnEDTA in the rat.  Pharmacologist 25:233, 1983.

8.  Adams, M. D.; Robbins, M. S.; Hopkins, R. M.; and Hoey, G. B.  Renal effects of ioxaglic acid – preclinical studies.  Invest. Radiol. 19:S123,   1984.

9.  Adams, M. D.; Dean, R. T.; Godat, J. F.; Hoey, G. B.; Hopkins, R. M.; Lin, Y.; Rizzolo, R. R.; Robbins, M. S.; and Valenti, A.  Preclinical studies with       MP– 328: A potential nonionic myelographic and anglourographic contrast agent.  Invest. Radiol. 19:S135, 1984.

10.  Hoey, G. B.; Adams, M. D.; Robbins, M. S.; Dean, R. T.; White, D. W.; Rizzolo, R. R.; Monzyk, M. A.; Bosworth, M. E.; and Wolf, G. L.  Factors in the design of NMR imaging agents.  Invest. Radiol. 19:S150, 1984.

11.   Robbins, M. S. and Adams, M. D.  Myocardial Kinetics of hexakis (trimethyphosphite) technetium–99m(l) chloride (Tc–TMP) in rats, rabbits, dogs, cats and pigs.  J. Nucl. Med. 25:P15, 1984.

12.   Dean, R. T.; Adams, M. D.; Miller, F. W.; Robbins, M. S.; Wester, D. W.; and White, D. H.  Synthesis, characterization and identification of the hexakis (trimethylphosphite) [Tc–99m] technetium(l) cation as a myocardial imaging agent. J. Nucl. Med. 25:P15, 1984.

13.   Robbins, M. S.; Adams, M. D.; Anderson, H. A.; Dean, R. T,; and White, D. H. Myocardial uptake of radioiodine–labeled 15–(4–iodophenyl)–9– methylpentadecanoic acid in laboratory animals.  J. Nucl. Med. 26:P124, 1985.

14.   Coveney, J. R. and Robbins, M. S.  Biodistribution of radiomercury in rabbits and efficacy of dimercaptopropanesulfonic acid (DMPS) and dimercaprol (BAL) to reduce tracer–level kidney burden of radiomercury in rats.  Fed. Proc. 45:440, 1986.

15.   Ralston, W. H.; Robbins, M. S.; Mosier, L. D.; Valenti, A.; Barco, S. J.; and Adams, M. D.  Comparative arrhythmogenicity of MP–328 and diatrizoate during coronary angiography in the dog.  Pharmacologist 28:217, 1986.

16.   Coveney, J. R. and Robbins, M. S.  Biological characterization of Tc–99m mercaptoacetylglycylglycylglycine (MAG3) kit for renal function.  J. Nucl. Med. 28:732, 1987.

17.   Mosier, L. D.; Joist, J. H.; Chance, D.; Adams, M. D.; Ralston, W. H.; and Robbins, M. S.  In Vitro effects of ionic and nonionic contrast media on coagulation, platelet function and fibrinolysis.  Radiology 165 (P.) Supplement:62, 1987.

18.   Pilcher, G. D.; Coveney, J. R.; Nosco, D. L.; and Robbins, M. S.  Probenecid inhibition of Tc– 99m MAG3 and o–iodohippurate (OIH) uptake by rat kidney slices.  J. Nucl. Med. 29:908, 1988.

19.   Coveney, J. R. and Robbins, M. S.  Effects of urinary pH upon Tc–99m MAG3 renograms in the rat.  J. Nucl. Med. 29:906, 1988.

20.   Nosco, D. L.; Coveney, J. R.; Pipes, D. W.; and Robbins, M. S.  Chemistry of Tc– MAG3 and derivatives; synthesis, characterization, reactivity and biodistribution of these complexes.  J. Nucl. Med. 29:801, 1988.

# Exhibit B

References Considered

**Patent Documents:**
1. U.S. Patent No. 8,080,534
2. U.S. Patent No. 5,693,761
3. U.S. Patent No. 8,337,856
4. U.S. Patent No. 7,575,748
5. U.S. Patent No. 4,425,437
6. U.S. Patent No. 4,431,739
7. U.S. Patent No. 4,511,502
8. U.S. Patent No. 4,511,503
9. U.S. Patent No. 4,512,922
10. U.S. Patent No. 4,518,526
11. U.S. Patent No. 4,563,424
12. U.S. Patent No. 4,599,197
13. U.S. Patent No. 4,620,948
14. U.S. Patent No. 4,704,362
15. U.S. Patent No. 5,108,919
16. U.S. Patent No. 5,108,989
17. U.S. Patent No. 5,118,791
18. U.S. Patent No. 5,156,968
19. U.S. Patent No. 5,168,051

**Court Opinion:**
1. *Upsher-Smith Labs. v. PamLab LLC*, 412 F.3d 1319 (2005)

**Statutes**:
1. 35 U.S.C. § 154(a)(2)

**Court Filings:**
1. Claim Construction Order, dated August 8, 2016
2. Federal Circuit Decision, Phigenix v. Immunogen (Fed. Cir. 2016-1544), dated January 9, 2017
3. Phigenix Response to Immunogen's Motion to Dismiss (Fed. Cir. 2016-1544), dated March 14, 2016
4. Genentech's Opposition to Phigenix's Motion for Judgment on the Pleadings or in the Alternative to Strike Genentech's Sixth Affirmative Defense, dated September 17, 2015
5. Order Granting in Part and Denying in Part Motion for Summary Judgment, dated February 24, 2017
6. Declaration of Sarah Walker, Ph.D., dated April 7, 2016

**Depositions:**
1. Transcript and Exhibits to the August 4, 2015 Deposition of Dr. Carlton Dewitt Donald, Ph.D.
2. Transcript and Exhibits to the December 2, 2016 Deposition of Dr. Carlton Dewitt Donald, Ph.D.

3. Transcript and Exhibits to the December 20, 2016 Deposition of Tim Schwartz

**Discovery Materials:**

1. Genentech First Amended RFA (Set Two) to Phigenix, dated March 10, 2016
2. Phigenix Responses to Set One of Genentech's Requests for Admission, dated June 12, 2015
3. Phigenix Responses to Set Two of Genentech's Requests for Admission, dated February 8, 2016
4. Phigenix Responses to Amended Set Two of Genentech's Requests for Admission, dated March 21, 2016
5. Phigenix Responses to Set Three of Genentech's Requests for Admission, dated April 11, 2016
6. Phigenix Amended Responses to Set Three of Genentech's Requests for Admission, dated June 16, 2016
7. Phigenix Responses to Set Four of Genentech's Requests for Admission, dated December 16, 2016
8. Phigenix Objections and Responses to Genentech's First Set of Interrogatories related to Claim Construction, dated March 9, 2015
9. Phigenix Objections and Responses to Genentech's First Set of Interrogatories related to General Discovery, dated April 16, 2015
10. Phigenix Objections and Responses to Genentech's Second Set of Interrogatories, dated June 12, 2015
11. Phigenix Supplemental Responses to First Set of Interrogatories Nos. 1-6, dated June 12, 2015
12. Phigenix Responses to Genentech's Third Set of Interrogatories, dated December 16, 2016

**Expert Reports:**

1. Expert Report of Joseph W. Wyse, and related exhibits, dated February 17, 2017
2. Expert Report of Dr. Louis Weiner Regarding Invalidity of U.S. Patent 8,080,534, and related exhibits, dated January 27, 2017
3. Expert Report of Dr. Gregory Dressler Regarding Invalidity of U.S. Patent 8,080,534, and related exhibits, dated January 27, 2017
4. Expert Report of Dr. Richard Pestell, M.D., Ph.D., and related exhibits, dated January 27, 2017
5. Rebuttal Expert Report of Dr. Gregory Dressler Regarding Noninfringement, dated April 2, 2017
6. Expert Report of Dr. Joel S. Parker Regarding PAX2 Expression in HER2+ Breast Cancer, dated April 3, 2017
7. Expert Report of Dr. Louis Weiner Regarding Noninfringement of U.S. Patent 8,080,534, dated April 3, 2017

**Publications:**

1. Alkner, S et al., "The role of AIB1 and PAX2 in primary breast cancer: validation of AIB1 as a negative prognostic factor," Annals of Oncology 24:1244-1253 (2013)

2. Ju, X et al. "Akt1 governs breast cancer progression *in vivo*," Proc. Nat'l Acad. Sci. USA 104(18), 7438-7443 (2007)
3. Thomas Jefferson University, "Scientists Identify Protein Key To Breast Cancer Spread, Potential New Drug Target." ScienceDaily. ScienceDaily, 11 April 2007, available at https://www sciencedai Iv com/releases/2007/04/070409181641 htm

**Miscellaneous:**
1. License Agreement between Celtrix Pharmaceuticals and Genentech, Inc., dated April 1, 1993
2. Guidance for Industry; S7A Safety Pharmacology Studies for Human Pharmaceuticals, available at https://www.fda.gov/downloads/drugs/guidances/ucm074959.pdf
3. Heelan, B. "Strategies for Working with Global Regulatory Agenices" PAREXEL, available at https://www.parexel.com/files/2414/7457/6185/PRXL_Strategies_for_Working_with_G RAs_ARTICLE.pdf
4. Roche Development Pipeline, available at http://www.roche.com/dam/jcr:f576d025-feb5-4630-9c3f-599370cc8b06/en/irp160721-annex.pdf

**Documents Produced:**

| Beginning Bates No. | Ending Bates No. | Beginning Bates No. | Ending Bates No. |
| --- | --- | --- | --- |
| GENE-00002991 | GENE-00003000 | GENE-00869138 | GENE-00869138 |
| GENE-00003034 | GENE-00003044 | GENE-00869139 | GENE-00869230 |
| GENE-00003130 | GENE-00003151 | GENE-00869231 | GENE-00869326 |
| GENE-00856222 | GENE-00856228 | GENE-00869380 | GENE-00869391 |
| GENE-00856229 | GENE-00856233 | GENE-00869420 | GENE-00869427 |
| GENE-00856234 | GENE-00856238 | GENE-00869510 | GENE-00869525 |
| GENE-00856239 | GENE-00856240 | GENE-00869702 | GENE-00869710 |
| GENE-00856241 | GENE-00856246 | GENE-00869932 | GENE-00869949 |
| GENE-00856247 | GENE-00856249 | GENE-00870241 | GENE-00870242 |
| GENE-00856250 | GENE-00856250 | GENE-00870244 | GENE-00870246 |
| GENE-00856251 | GENE-00856252 | GENE-00870247 | GENE-00870249 |
| GENE-00856333 | GENE-00856390 | GENE-00870250 | GENE-00870252 |
| GENE-00868430 | GENE-00868438 | GENE-00870253 | GENE-00870255 |
| GENE-00868439 | GENE-00868439 | GENE-00870256 | GENE-00870258 |
| GENE-00868448 | GENE-00868448 | GENE-00870259 | GENE-00870261 |
| GENE-00868456 | GENE-00868463 | GENE-00870262 | GENE-00870264 |
| GENE-00868464 | GENE-00868471 | GENE-00870265 | GENE-00870267 |
| GENE-00868472 | GENE-00868478 | GENE-00870268 | GENE-00870270 |
| GENE-00868479 | GENE-00868479 | GENE-00870271 | GENE-00870273 |
| GENE-00868812 | GENE-00868964 | GENE-00870274 | GENE-00870276 |
| GENE-00869136 | GENE-00869136 | GENE-00870277 | GENE-00870279 |
| GENE-00869137 | GENE-00869137 | GENE-00870280 | GENE-00870282 |

| Beginning Bates No. | Ending Bates No. | Beginning Bates No. | Ending Bates No. |
|---|---|---|---|
| GENE-00870283 | GENE-00870285 | GENE-00871746 | GENE-00871759 |
| GENE-00870286 | GENE-00870320 | GENE-00871760 | GENE-00871784 |
| GENE-00870321 | GENE-00870338 | GENE-00871785 | GENE-00871792 |
| GENE-00870339 | GENE-00870366 | GENE-00871793 | GENE-00871815 |
| GENE-00870367 | GENE-00870368 | GENE-00871816 | GENE-00871816 |
| GENE-00870369 | GENE-00870417 | GENE-00871817 | GENE-00871826 |
| GENE-00870418 | GENE-00870431 | GENE-00871827 | GENE-00871843 |
| GENE-00870432 | GENE-00870434 | GENE-00871844 | GENE-00871850 |
| GENE-00870435 | GENE-00870520 | GENE-00871851 | GENE-00871863 |
| GENE-00870521 | GENE-00870524 | GENE-00871864 | GENE-00871915 |
| GENE-00870525 | GENE-00870530 | GENE-00871916 | GENE-00871966 |
| GENE-00870531 | GENE-00870563 | GENE-00871967 | GENE-00872015 |
| GENE-00870564 | GENE-00870681 | GENE-00872016 | GENE-00872182 |
| GENE-00870682 | GENE-00870682 | GENE-00872183 | GENE-00872351 |
| GENE-00870683 | GENE-00870683 | GENE-00872356 | GENE-00872365 |
| GENE-00870684 | GENE-00870684 | GENE-00872366 | GENE-00872388 |
| GENE-00870685 | GENE-00870685 | GENE-00872389 | GENE-00872419 |
| GENE-00870686 | GENE-00870687 | GENE-00872420 | GENE-00872437 |
| GENE-00870688 | GENE-00870689 | GENE-00872438 | GENE-00872454 |
| GENE-00870690 | GENE-00870691 | GENE-00872455 | GENE-00872546 |
| GENE-00870692 | GENE-00870693 | GENE-00872547 | GENE-00872572 |
| GENE-00870694 | GENE-00870695 | GENE-00872573 | GENE-00872600 |
| GENE-00870696 | GENE-00870697 | GENE-00872601 | GENE-00872614 |
| GENE-00870698 | GENE-00870699 | GENE-00872693 | GENE-00872703 |
| GENE-00870700 | GENE-00870701 | GENE-00872874 | GENE-00872914 |
| GENE-00870702 | GENE-00870703 | GENE-00873081 | GENE-00873095 |
| GENE-00870777 | GENE-00870778 | GENE-00873096 | GENE-00873123 |
| GENE-00870779 | GENE-00870782 | GENE-00873164 | GENE-00873229 |
| GENE-00870783 | GENE-00870791 | GENE-00873230 | GENE-00873297 |
| GENE-00871330 | GENE-00871345 | GENE-00873336 | GENE-00873357 |
| GENE-00871346 | GENE-00871347 | GENE-00873358 | GENE-00873370 |
| GENE-00871348 | GENE-00871486 | GENE-00873371 | GENE-00873376 |
| GENE-00871487 | GENE-00871625 | GENE-00873377 | GENE-00873377 |
| GENE-00871626 | GENE-00871632 | GENE-00873378 | GENE-00873779 |
| GENE-00871633 | GENE-00871661 | GENE-00873780 | GENE-00874211 |
| GENE-00871662 | GENE-00871682 | GENE-00874212 | GENE-00874622 |
| GENE-00871683 | GENE-00871711 | GENE-00874623 | GENE-00875044 |
| GENE-00871712 | GENE-00871719 | GENE-00875045 | GENE-00875419 |
| GENE-00871720 | GENE-00871734 | GENE-00875420 | GENE-00875451 |
| GENE-00871735 | GENE-00871745 | GENE-00875452 | GENE-00875461 |

sf-3755513

| Beginning Bates No. | Ending Bates No. |
|---|---|
| GENE-00875462 | GENE-00875464 |
| GENE-00875471 | GENE-00875472 |
| GENE-00875475 | GENE-00875476 |
| GENE-00875525 | GENE-00875531 |
| GENE-00875575 | GENE-00875598 |
| GENE-00875607 | GENE-00875614 |
| GENE-00875615 | GENE-00875623 |
| GENE-00875650 | GENE-00875659 |
| PHIG00005304 | PHIG00005306 |
| PHIG00005307 | PHIG00005341 |
| PHIG00007621 | PHIG00007633 |
| PHIG00007714 | PHIG00007720 |
| PHIG00007721 | PHIG00007738 |
| PHIG00007739 | PHIG00007756 |
| PHIG00007757 | PHIG00007759 |
| PHIG00007760 | PHIG00007760 |
| PHIG00007761 | PHIG00007762 |
| PHIG00007763 | PHIG00007765 |
| PHIG00007766 | PHIG00007769 |
| PHIG00007770 | PHIG00007775 |
| PHIG00007776 | PHIG00007781 |
| PHIG00007782 | PHIG00007787 |
| PHIG00007788 | PHIG00007798 |
| PHIG00007799 | PHIG00007799 |
| PHIG00007800 | PHIG00007811 |
| PHIG00007812 | PHIG00007812 |
| PHIG00007813 | PHIG00007824 |
| PHIG00007825 | PHIG00007830 |
| PHIG00008098 | PHIG00008099 |
| PHIG00008100 | PHIG00008100 |
| PHIG00008101 | PHIG00008135 |
| PHIG00008136 | PHIG00008143 |
| PHIG00008253 | PHIG00008259 |
| PHIG00008260 | PHIG00008277 |
| PHIG00008278 | PHIG00008295 |
| PHIG00008296 | PHIG00008298 |
| PHIG00008299 | PHIG00008299 |
| PHIG00008300 | PHIG00008301 |
| PHIG00008302 | PHIG00008304 |
| PHIG00009610 | PHIG00009610 |

| Beginning Bates No. | Ending Bates No. |
|---|---|
| PHIG00009611 | PHIG00009611 |
| PHIG00009612 | PHIG00009612 |
| PHIG00009613 | PHIG00009614 |
| PHIG00009615 | PHIG00009616 |
| PHIG00009617 | PHIG00009623 |
| PHIG00009624 | PHIG00009624 |
| PHIG00009626 | PHIG00009644 |
| PHIG00009645 | PHIG00009663 |
| PHIG00009664 | PHIG00009683 |
| PHIG00009684 | PHIG00009690 |
| PHIG00009691 | PHIG00009696 |
| PHIG00009697 | PHIG00009701 |
| PHIG00009702 | PHIG00009707 |
| PHIG00009708 | PHIG00009708 |
| PHIG00009709 | PHIG00009721 |
| PHIG00009722 | PHIG00009733 |
| PHIG00009734 | PHIG00009734 |
| PHIG00009735 | PHIG00009735 |
| PHIG00009736 | PHIG00009736 |
| PHIG00009737 | PHIG00009737 |
| PHIG00009738 | PHIG00009739 |
| PHIG00009740 | PHIG00009740 |
| PHIG00009741 | PHIG00009757 |
| PHIG00009758 | PHIG00009766 |
| PHIG00009767 | PHIG00009789 |
| PHIG00009790 | PHIG00009844 |
| PHIG00009845 | PHIG00009901 |
| PHIG00009902 | PHIG00009911 |
| PHIG00009912 | PHIG00009934 |
| PHIG00009935 | PHIG00009946 |
| PHIG00009947 | PHIG00009953 |
| PHIG00009954 | PHIG00009990 |
| PHIG00009991 | PHIG00010027 |

# Exhibit C

# ClinicalTrials.gov

A service of the U.S. National Institutes of Health

**Try our beta test site**

---

**no studies found for:**    "PAX2" or "PAX-2" or "paired box gene 2" or "paired box 2"

**Modify this search** | How to Use Search Results

---

| List | By Topic | On Map | Search Details |

---

Found no studies with search of:  "PAX2" or "PAX-2" or "paired box gene 2" or "paired box 2"

**Modify this search**

**Recognized Terms and Synonyms:**

PAX2:   0 studies
    Paired Box Transcription Factor 2
    paired box 2
    paired box gene 2

paired box gene 2:   0 studies
    PAX2 gene
    paired box 2

paired box 2:   0 studies
    PAX2 gene
    paired box gene 2

# Exhibit D

CONFIDENTIAL TREATMENT REQUESTED

**EXHIBIT _10.33_**

 denotes confidential
information for which
confidentiality treatment
is requested

## License Agreement

This Agreement is entered into effective as of April 1, 1993 ("Effective Date") between Celtrix Pharmaceuticals, Inc., a Delaware corporation, with its principal offices at 3055 Patrick Henry Drive, Santa Clara, California 95054-1815, ("Celtrix") and Genentech, Inc., a Delaware corporation, with its principal offices at 460 Point San Bruno Boulevard, South San Francisco, California 94080-4990 ("Genentech"):

Genentech has certain patent rights relating to TGF-beta and the TGF-beta receptor that Celtrix desires to license from Genentech, and Genentech is willing to grant such licenses to Celtrix.  Celtrix has certain patent rights relating to TGF-beta that Genentech wishes to license from Celtrix, and Celtrix is willing to grant such licenses to Genentech.  Concurrently with entering into this Agreement, Genentech will purchase from Celtrix under a separate Stock Purchase Agreement, shares of Celtrix common stock having a fair market value of $4.0 million.  Therefore, Genentech and Celtrix agree as follows:

1.0 _Definitions_.  As used in this Agreement, the following words will have the following meanings:

1.1 "_Celtrix Common Stock_" shall mean shares of that class of Celtrix stock referred to in Celtrix's Certificate of Incorporation as common stock.

1.2 "_Celtrix    Licensed    Product_" shall    mean    any pharmaceutical formulation or product or method or system which contains the protein TGF-beta 2, TGF-beta Heterodimer or TGF-beta Receptor and which, but for the licenses granted hereunder, would infringe a Valid Claim of a Genentech Patent in the country in which such formulation, product, method or system is made, used or

Lcex359.sgj                    1

000050

CONFIDENTIAL TREATMENT REQUESTED

sold.   Specifically excluded from this definition shall be gene therapy or similar biological techniques aimed at establishing endogenous TGF-beta 2, TGF-beta Heterodimer or TGF-beta Receptor production.  "Endogenous" for purposes of this Agreement shall mean that the protein or product is produced in the person for whom it is intended to have its therapeutic effect.

1.3   "Celtrix Net Sales" shall mean the gross invoice sales price charged by Celtrix or its sublicensees hereunder for all Celtrix Licensed Products in arm's length sales to third parties (excluding sales for clinical trial purposes), after deduction of the following items, to the extent that such items were incurred during such calendar quarter with respect to sales of Celtrix Licensed Products hereunder regardless of the calendar quarter in which such sales were made, are included in the price charged, and do not exceed reasonable and customary amounts in the market in which such sale occurred:

(i)  trade and quantity discounts or rebates;

(ii) credits or allowances given or made for rejection or return of and for uncollectible amounts on previously sold Celtrix Licensed Products or for retroactive price reductions;

(iii) any tax or government charge (other than an income tax) levied on the sale, transportation or delivery of a Celtrix Licensed Product and borne by the seller thereof; and

(iv) any charges for freight or insurance in a CIF (cost, insurance, freight) sale.

1.4   "Celtrix Patents" shall mean the reissue of U.S. Patent 4,843,063 comprising any patent that issues from reissue application USSN 07/664,766 filed March 5, 1991.

000051

CONFIDENTIAL TREATMENT REQUESTED

1.5 "Closing" shall mean the closing, to be held on April 2, 1993, of the purchase and sale of Celtrix Common Stock to Genentech under the Stock Purchase Agreement.

1.6 "Closing Price" shall mean the price, as reported in the Wall Street Journal, on the applicable exchange or in over-the-counter market at the close of trading on that day.

1.7 "Combination Product" shall mean any pharmaceutical formulation or method or system for use in humans which contains (i) TGF-beta, TGF-beta 2, TGF-beta Heterodimer or TGF-beta Receptor and (ii) at least one other ingredient or substance which is also Therapeutically Active. "Therapeutically Active" shall mean biologically active but shall not include diluent, vehicles or specific adjuvants or any other ingredient or substance which does not have any, or has only incidental, therapeutic properties when present alone and is included to aid or enhance the activity of TGF-beta, TGF-beta 2, TGF-beta Heterodimer or TGF-beta Receptor.

1.8 "Genentech Licensed Product" shall mean any pharmaceutical formulation or product or method or system which contains the protein TGF-beta and which, but for the licenses granted hereunder, would infringe a Valid Claim of a Celtrix Patent in the country in which such formulation, method or system is made, used or sold. Specifically excluded from this definition shall be gene therapy or similar biological techniques aimed at establishing endogenous TGF-beta production.

1.9 "Genentech Net Sales" shall mean the gross invoice sales price charged by Genentech or its sublicensees hereunder for all Genentech Licensed Products in arm's length sales to third parties (excluding sales for clinical trial purposes), after deduction of the following items, to the extent that such items were incurred during such calendar quarter with respect to sales of Genentech Licensed Products hereunder regardless of the calendar

Lcex359.sgj                          3

CONFIDENTIAL TREATMENT REQUESTED

quarter in which such sales were made, are included in the price charged, and do not exceed reasonable and customary amounts in the market in which such sale occurred:

(i)  trade and quantity discounts or rebates;

(ii) credits or allowances given or made for rejection or return of and for uncollectible amounts on previously sold Genentech Licensed Products or for retroactive price reductions;

(iii) any tax or government charge (other than an income tax) levied on the sale, transportation or delivery of a Genentech Licensed Product and borne by the seller thereof; and

(iv) any charges for freight or insurance in a CIF (cost, insurance, freight) sale.

1.10 "Genentech Patents" shall mean those patents listed on Exhibit A hereto and any other patents owned or licensed by Genentech as of the Effective Date (to the extent Genentech is permitted to grant sublicenses to Celtrix and to the extent Celtrix agrees to pay to the licensor, royalties or licensing fees that arise out of, and as a result of, the sublicense granted hereunder) which are necessary to make, use or sell TGF-beta 2, TGF-beta Heterodimer or the TGF-beta Receptor pursuant to the licenses granted by Genentech herein.

1.11 "Licensed Product" shall mean either a Genentech Licensed Product or Celtrix Licensed Product, as appropriate.

1.12 "Major Market Country" shall include the United States, Canada, United Kingdom, Germany, France, Italy, Spain, Japan and Australia.

Lcex359.sgj                              4

000053

CONFIDENTIAL TREATMENT REQUESTED

1.13 "Net Sales" shall mean either Celtrix Net Sales or Genentech Net Sales, as appropriate.

1.14 "Party" shall mean, when used in the singular, either Celtrix or Genentech, as appropriate, and "Parties" shall mean Celtrix and Genentech.

1.15 "Phase I/II Clinical Trial" shall mean a controlled study in humans of the safety and efficacy of a Celtrix Licensed Product for a particular indication or indications in subjects having the disease or condition under investigation and which is sufficient in both the number of subjects evaluated and design to permit a reasonable decision as to whether to undertake a clinical trial designed to be sufficient to serve as the basis for regulatory approval of the sale of that Celtrix Licensed Product (e.g., sufficient to support the approval of a Product License Application by the U.S. Food and Drug Administration).

1.16 "PHS Patents" shall mean those patents licensed by Genentech from the Public Health Service ("PHS") pursuant to a License Agreement between the PHS and Genentech dated March 2, 1993 (the "PHS License Agreement").

1.17 "Stock Purchase Agreement" shall mean that agreement between Celtrix and Genentech for the sale to Genentech of shares of Celtrix Common Stock having an aggregate market value of $4.0 million.

1.18 "TGF-beta" shall mean any protein which is a member of that class of proteins designated as TGF-beta or transforming growth factor-beta (but excluding TGF-beta 2 or TGF-beta Heterodimer), and/or (i) fragments, fusions or precursors of the foregoing, and/or (ii) any derivative protein which results from making deletions, substitutions and/or additions of one or more amino acids to the structure of a TGF-beta (but excluding TGF-beta

Lcex359.sgj                          5

000054

CONFIDENTIAL TREATMENT REQUESTED

2 or TGF-beta Heterodimer), provided that such derivative protein is more similar in structure to the TGF-beta from which it was derived than it is to TGF-beta 2 or TGF-beta Heterodimer and provided that the primary biological activity of the derivative protein is substantially the same as the primary biological activity of the TGF-beta from which it was derived.

1.19 "TGF-beta 2" shall mean a protein comprising the amino acid sequence set forth on Exhibit B hereto, and/or (i) fragments, fusions or precursors of the foregoing, and/or (ii) any derivative protein which results from making deletions, substitutions or additions of one or more amino acids to the structure identified on Exhibit B, provided that such derivative protein is more similar in structure to the protein identified on Exhibit B than it is to the structure of any other TGF-beta and provided that the primary biological activity of the derivative protein is substantially the same as the primary biological activity of the protein set forth on Exhibit B.

1.20 "TGF-beta Heterodimer" shall mean the TGF-beta 2.3 heterodimer generally described on Exhibit B.

1.21 "TGF-beta Receptor" shall mean a protein, including a lipoprotein or glycoprotein, that interacts with TGF-beta so as to modulate its activity and that binds TGF-beta with high affinity (Kd 1000nM or less).  Such TGF-beta Receptor may be cell associated or in soluble form.

1.22 "Valid Claim" shall mean a subsisting claim of an issued and unexpired patent that has not been held invalid, unpatentable or unenforceable by a decision of a governmental body or court of competent jurisdiction, that is unappealable or unappealed within the time allowed for appeal, and that has not been rendered unenforceable through disclaimer or otherwise.

000055

CONFIDENTIAL TREATMENT REQUESTED

2.0  License Fee.  In consideration of the licenses under the Genentech Patents granted in Sections 3.0 and 6.0 below, Celtrix will pay Genentech in cash the nonrefundable sum of $4.0 million at the Closing.

3.0  Licenses to Celtrix Under Genentech Patents.  Effective commencing upon the Closing, Genentech grants to Celtrix the following licenses, expressly limited as stated, under the Genentech Patents, and Celtrix agrees to observe all stated limitations in the licenses:

3.1  Ophthalmological  Uses.  Genentech  grants  a nonexclusive, worldwide license to Celtrix to make, have made, use and sell TGF-beta 2 and TGF-beta Heterodimer as part of a Celtrix Licensed Product solely for the treatment or prophylaxis of diseases and conditions of the eye ("Ophthalmological Uses"). Celtrix may grant sublicenses under this license only to one other party in any country for each indication of an Ophthalmological Use at any one time.  Celtrix shall pay Genentech a royalty ███████ Net  Sales  of  all  Celtrix  Licensed  Products  sold  for Ophthalmological Uses.

3.2  Local Dermal Wound Healing Use.

(a)  Genentech  grants  to  Celtrix  an  exclusive, worldwide license to make, have made, use and sell TGF-beta 2 and a nonexclusive, worldwide license to make, have made, use and sell TGF-beta Heterodimer, in either case as part of a Celtrix Licensed Product solely for the local treatment or prophylaxis of wounds, diseases or conditions primarily affecting the dermis, including, without limitation, chronic and acute wounds and burns ("Local Dermal Uses").  Except as set forth below, Celtrix may grant one sublicense under this license only to one other party in any country for all indications of Local Dermal Use at any one time. Celtrix shall pay Genentech a royalty ███████ Net Sales of all

Lcex359.sgj                    7

000056

CONFIDENTIAL TREATMENT REQUESTED

Celtrix Licensed Products sold for Local Dermal Uses (excluding from Net Sales the actual cost of the portion of any such product consisting of a collagen delivery matrix).

(b) Celtrix shall have an option ("Royalty Reduction Option"), exercisable once at any time on or before December 31, 1995 that the average Closing Price of Celtrix Common Stock has been ███████████████████████████ for the ten (10) consecutive trading days preceding the exercise of the Royalty Reduction Option, ███████████████████████████████████████ to Genentech and receive one of the following reductions of royalties payable on Net Sales of Celtrix Licensed Products sold for Local Dermal Uses:

(i) If at the time of the exercise of the Royalty Reduction Option, the average Closing Price of Celtrix Common Stock has been █████████████████████████████████ for the ten (10) consecutive trading days preceding the exercise of the Royalty Reduction Option, the royalty rate for Net Sales of Celtrix Licensed Products for Local Dermal Uses shall thereafter be █████████ ██████████████████

(ii) If at the time of the exercise of the Royalty Reduction Option, the average Closing Price of Celtrix Common Stock has been ███████████████████ for the ten (10) consecutive trading days preceding the exercise of the Royalty Reduction Option, the royalty rate for Net Sales of Celtrix Licensed Products for Local Dermal Uses shall thereafter be ████████████████████

If Celtrix decides to exercise the Royalty Reduction Option, it shall promptly provide written notice of such to Genentech and within ten (10) days of the date of exercise issue and deliver to Genentech ████████████████████████████████████████ █████████████████████████████████████████████████

000057

CONFIDENTIAL TREATMENT REQUESTED



### 3.3   Systemic, Local or Regional Administration.

(a)   Subject to Genentech's rights hereunder, Genentech grants a nonexclusive, worldwide license to Celtrix to make, have made, use and sell TGF-beta 2 and TGF-beta Heterodimer as part of a Celtrix Licensed Product (i) for systemic administration for the treatment or prophylaxis of autoimmune diseases or conditions ("Autoimmune Use"), osteoporosis ("Osteoporosis Use"), and soft tissue wound healing (other than the healing of soft tissue wounds caused principally by vascular ischemia or reperfusion injury) ("Wound Healing Uses") and for bone marrow and stem cell protection allowing high dose cytotoxic chemotherapy in cancer patients ("Chemotherapy Use"), and (ii) for systemic or local or regional administration for direct anti-proliferative effects on solid cancerous tumors and lymphomas ("Cancer Use") and for the treatment or prophylaxis of prostatic hypertrophy ("Prostate Use") (collectively these six Uses are referred to as "Systemic Uses"). Celtrix may grant one sublicense under this license only to one other party in any country for each Systemic Use at any one time. Celtrix shall pay Genentech a royalty ▮▮▮▮▮▮ all Net Sales of Celtrix Licensed Products sold for Systemic Uses except for those sold as part of a codevelopment arrangement with Genentech concluded pursuant to Sections 3.3(b) and 3.3(c).

(b)   In December of each year appropriate Celtrix personnel will prepare and deliver to Genentech a written report summarizing in reasonable detail, subject to the confidentiality provisions set forth in Section 8.0, below, all material preclinical and clinical data which Celtrix has developed or has had developed for Systemic Uses. Upon completion of a Phase I/II Clinical Trial for any Systemic Use, Celtrix shall provide to

000058

CONFIDENTIAL TREATMENT REQUESTED

Genentech in writing all material information with respect to the conduct and results of such Clinical Trial. If Celtrix decides to enter into a license or other arrangement with a third party in which that third party will receive rights with respect to marketing or selling a Celtrix Licensed Product for a Systemic Use in a Major Market Country, Celtrix shall provide written notice of such to Genentech. At the earlier of such time as (i) Celtrix has completed and provided in writing to Genentech all material information with respect to the conduct and results of a Phase I/II Clinical Trial for a Systemic Use, or (ii) Celtrix notifies Genentech in writing that it has determined to enter into a license or other arrangement with a third party in which that third party will receive rights with respect to marketing or selling a Celtrix Licensed Product for a Systemic Use in a Major Market Country and provides Genentech all important information and data developed by Celtrix relating to the rights to be licensed, Genentech shall have the option to negotiate in good faith with Celtrix an agreement for the codevelopment of Celtrix Licensed Products for that relevant Systemic Use in all (in the case of (i) above) or the involved (in the case of (ii) above) Major Market Countries (the "Right of First Discussion"), Genentech shall notify Celtrix whether it desires to enter into such discussions ▓▓▓▓▓▓▓▓▓▓ after its receipt of notice from Celtrix under (i) or (ii) above.

(c)   Genentech shall ▓▓▓▓▓▓▓▓▓▓▓ from the day it exercises its Right of First Discussion as set forth in Section 3.3(b) above to discuss exclusively and in good faith with Celtrix an agreement for the codevelopment of Celtrix Licensed Products for the relevant Systemic Use (i) for all Major Market Countries in the event the CoDevelopment Option arises as a result of the completion of a Phase I/II Clinical Trial for that Systemic Use or (ii) only for the Major Market Countries for which Celtrix has determined to enter into an arrangement with a third party. During ▓▓▓▓▓▓▓▓▓▓▓▓▓ Genentech shall deliver to Celtrix a specific written proposal on all material business topics related to such codevelopment (including any payments to be made to

000059

CONFIDENTIAL TREATMENT REQUESTED

Celtrix), which shall be subject to the confidentiality provisions in Section 8.0 below. If after good faith negotiations the Parties do not conclude an agreement ████████████████████████ or any mutually agreeable extension thereof, Celtrix shall have no further obligation to negotiate exclusively with Genentech or to disclose preclinical or clinical information to Genentech for that Systemic Use. However, Celtrix shall continue to discuss such codevelopment with Genentech ████████████████████████████ ██████ if Genentech desires to do so on a nonexclusive basis and shall not enter into an arrangement with a third party before the expiration of ████████████████████████ or thereafter on terms less favorable, when viewed in the aggregate, to Celtrix than those last offered to Celtrix by Genentech, as determined by a good faith, written opinion of the investment banking firm advised Celtrix in the transaction. If the Right of First Discussion arose because Celtrix determined to enter in an arrangement with a third party, and Celtrix does not enter into such an arrangement within ████████████████ of the initial notification of Genentech by Celtrix, Celtrix shall notify Genentech of such, and Genentech shall again have a Right of First Discussion ██████████████████ from the date of such notice, to exclusively discuss a codevelopment agreement with Celtrix for the relevant Systemic Use in the relevant Major Market Countries. Celtrix shall again disclose to Genentech at each inception of such discussions all relevant preclinical and clinical data relating to such Systemic Use.

3.4  Research, Diagnostic and Veterinary Uses. Genentech grants a nonexclusive, worldwide, license to Celtrix to make, have made, use and sell TGF-beta 2 and TGF-beta Heterodimer as part of a Celtrix Licensed Product solely for research, diagnostic reagents or veterinary uses ("Research, Diagnostic and Veterinary Uses"). Celtrix may grant sublicenses under this license only to one other party in any country for each indication of a Research, Diagnostic and Veterinary Use at any one time. Celtrix will pay Genentech a

Lcex359.sgj                    11

CONFIDENTIAL TREATMENT REQUESTED

royalty          Net Sales of Celtrix Licensed Products (i) which
are sold solely for Research, Diagnostic and Veterinary Uses and
(ii) to the extent that such Net Sales in any calendar year exceed
$250,000 and in that case royalties shall be payable on all Net
Sales in that calendar year of Celtrix Licensed Products which are
sold solely for Research, Diagnostic and Veterinary uses.

   3.5  TGF-beta Receptor. Genentech grants a nonexclusive,
worldwide license to Celtrix to make, have made, use and sell TGF-
beta Receptor as a part of a Celtrix Licensed Product solely for
the treatment or prophylaxis of disease ("TGF-beta Receptor Uses")
or solely to be used as part of a process used to identify
compounds useful in the treatment or prophylaxis of disease ("TGF-
beta Receptor Process"). Celtrix may grant one sublicense under
this license only to one other party in any country for each
indication or research application at any one time. Celtrix will
pay Genentech a royalty on Net Sales of Celtrix Licensed Products
sold for TGF- beta Receptor Uses or developed using the TGF-beta
Receptor Process. Such royalty shall be       Net Sales where Net
Sales of Celtrix Licensed Products covered by the license granted
under this Section 3.4 do not exceed
of Net Sales to the extent Net Sales of Celtrix Licensed Products
covered by the license granted under this Section 3.4 exceed

   4.0  Sublicense Option to Celtrix Under PHS Patents.
Effective commencing upon the Closing, Genentech grants to Celtrix
an option to acquire a nonexclusive, nonsublicenseable sublicense
under the PHS Patents to make, have made, use and sell TGF-beta 2
or TGF-beta Heterodimer as part of a Celtrix Licensed Product only
for Ophthalmological Uses, Local Dermal Uses and Systemic Uses.
The option set forth in the preceding sentence may only be
exercised once, whether it is exercised for all Uses or for any
particular Use or Uses. Upon notice from Celtrix that it is
considering in good faith the exercise of such option, Genentech

Lcex359.sgj          12

CO:··    ·'·:EATMENT REQUESTED

shall provide a copy of the PHS License Agreement to Celtrix for
the sole purpose of evaluating whether to exercise such option, and
Celtrix shall have sixty (60) days after receipt of the PHS License
Agreement to decide whether to exercise such option.   If Celtrix
exercises such option (which it may do at any time during the term
of this Agreement upon written notice to Genentech), Celtrix shall
be responsible for, and the sublicense granted hereunder shall be
subject to its performance with respect to TGF-beta 2 or TGF-beta
Heterodimer, of those obligations set forth in the PHS License
Agreement relating to Licensed Products, including the performance
of those obligations set forth in Article VIII of the PHS License
Agreement and the payment to Genentech of those royalty obligations
set forth in Paragraph 4.3 of the· PHS License Agreement.    If
Celtrix exercises such option, pursuant to Paragraph 2.4 of the PHS
License Agreement, Celtrix agrees that the obligations to PHS of
Paragraphs 3.1, 3.2, 5.1, 6.2, 11.2 and 11.3 of the PHS License
Agreement shall be binding upon Celtrix as if it were a party to
the PHS License Agreement.  Celtrix acknowledges that the grant of
this sublicense will be subject to the approval of the PHS pursuant
to Paragraph 2.4 of the PHS License Agreement.

    5.0  Licenses to Genentech.  As additional consideration for
the granting of the licenses under Sections 3.0 and 6.0 by
Genentech, effective commencing upon the Closing, Celtrix grants a
nonexclusive, worldwide license to Genentech under the Celtrix
Patents to make, have made, use and sell TGF-beta as part of a
Genentech Licensed Product for any use.   Genentech may grant
sublicenses under this license only to one other party in any
country for a particular use at any one time.  Genentech will pay
Celtrix a royalty ███████████ Net Sales of Genentech Licensed
Products.

000062

CONFIDENTIAL TREATMENT REQUESTED

## 6.0   Future Patents.

6.1   Genentech Patents.  If after the Effective Date and
prior to December 31, 2002, Genentech is granted a patent or issued
a notice of allowance with respect to a patent application in any
country (i) in which the licenses granted above to Celtrix with
respect to TGF-beta 2 or TGF-beta Heterodimer for Ophthalmological
Uses, Local Dermal Uses, Systemic Uses or Research, Diagnostic and
Veterinary Uses or (ii) in which the licenses granted above to
Celtrix with respect to TGF-beta Receptor for TGF-beta Receptor
Uses or the TGF-beta Receptor Process, could not be practiced in
that country without infringing such patent, Celtrix shall
automatically receive a royalty-free, nonexclusive license for such
Use or Process in such country.  If after the Effective Date and
prior to December 31, 2002, Genentech is granted a license by a
third party under a patent of that party in any country (iii) in
which the licenses granted above to Celtrix with respect to TGF-
beta 2 or TGF-beta Heterodimer for Ophthalmological Uses, Local
Dermal Uses, Systemic Uses or Research, Diagnostic and Veterinary
Uses (but not including any future license to Genentech from the
Public Health Service) or (iv) in which the licenses granted above
to Celtrix with respect to TGF-beta Receptor for TGF-beta Receptor
Uses or the TGF-beta Receptor Process, could not be practiced in
that country without infringing such third party patent, Genentech
shall grant Celtrix a sublicense under such license for such Uses
or Process to the fullest extent it is permitted to do so under the
terms of such license, provided that Celtrix agrees to pay and does
pay any applicable royalties, licensing fees and the like required
by such license to Genentech and otherwise agrees to all
appropriate terms of such license.  Except as set forth above, no
license, express or implied, is granted under any other Genentech
patent.

6.2   Celtrix Patents.  If after the Effective Date and prior
to December 31, 2002, Celtrix is granted a patent or issued a

Lcex359.sgj                          14

CONFIDENTIAL TREATMENT REQUESTED

notice of allowance with respect to a patent application in any
country (i) in which the license granted above to Genentech with
respect to TGF-beta for any use in that country could not be
practiced without infringing such patent or (ii) with respect to
TGF-beta Receptor for TGF-beta Receptor Uses or the TGF-beta
Receptor Process, Genentech shall automatically receive a royalty-
free, nonexclusive license for such use or Process in such country.
If after the Effective Date and prior to December 31, 2002, Celtrix
is granted a license by a third party under a patent of that party
in any country (iii) in which the license granted to Genentech with
respect to TGF-beta for any use could not be practiced without
infringing such patent or (iv) with respect to TGF-beta Receptor
for TGF-beta Receptor Uses or the TGF-beta Receptor Process,
Celtrix shall grant Genentech a sublicense under such license for
such use or Process, to the fullest extent it is permitted to do so
under the terms of such license, provided that Genentech agrees to
pay and does pay any applicable royalties, licensing fees and the
like required by such license to Celtrix and otherwise agrees to
all appropriate terms of such license.  Except as set forth above,
no license, express or implied, is granted under any other Celtrix
patent.

7.0  Royalty Payments.

     7.1  Payment Dates.  Royalties payable hereunder shall be
paid within forty five (45) days of the end of each calendar
quarter for Net Sales for that calendar quarter.  Such payment
shall be accompanied by a statement showing the amount of each
Licensed Product sold in each country, the Net Sales of each
Licensed Product in that country's currency in each country in
which Net Sales occurred, the royalties payable in local currency,
the applicable exchange rate as set forth in Section 7.3 below for
that currency, and the royalties payable in U.S. Dollars.

000064

7.2  Records and Accounting.  A Party shall keep and
require its sublicensees to keep complete and accurate records of
the latest three (3) calendar years of Net Sales with respect to
which a royalty is payable under this Agreement.   The Party
receiving royalties shall have the right at its own expense to have
an independent, certified public accountant, reasonably acceptable
to the Party paying royalties, review the paying Party's records
upon reasonable notice and during reasonable business hours for the
purpose of verifying the payments provided for in this Agreement.
This right may not be exercised more than once for any calendar
year with respect to the records of the paying Party and each of
its sublicensees.   Should such review lead to the discovery of a
underreporting of royalties due hereunder of greater than five
percent (5%), the Party underreporting such royalties, in addition
to promptly paying the unpaid royalties, shall pay the full cost
and expense of such review.

7.3  Currency of Payments.  All payments under this
Agreement shall be made in United States Dollars by wire transfer
(or such other reasonable means as the receiving Party may direct)
to such bank account as the receiving Party may designate from time
to time.   If a wire transfer is to be made, the remitting Party
shall provide notice at least five (5) days prior to the date of
transfer of the amount of payment and the date it is to be made.
Such notice should be given to the Treasurer of the receiving Party
at the address set forth at the beginning of this Agreement or such
other address as the receiving Party may subsequently direct.   Any
payments due hereunder on sales outside of the United States shall
first be calculated in the currency in which sales took place and
then converted to United States Dollars at the average of the rate
published in the Wall Street Journal for the last business day of
each of the three (3) months of the calendar quarter for which
royalties are payable.   If by law, regulation or fiscal policy of
a particular country, remittance of royalties in United States
Dollars is restricted or forbidden, notice thereof will be promptly

CONFIDENTIAL TREATMENT REQUESTED

given to the receiving Party, and payment of the royalty shall be made by the deposit thereof in local currency to the credit of the receiving Party in a recognized banking institution designated by the receiving Party.  When in any country the law or regulations prohibit both the transmittal and deposit of royalties on sales in such a country, royalty payments shall be suspended for as long as such a prohibition is in effect and as soon as such prohibition ceases to be in effect, all royalties which the paying Party would have been under obligation to transmit or deposit but for the prohibition, shall forthwith be deposited or transmitted promptly to the extent allowable.

7.4   Combination Product Net Sales.   In determining the Net Sales of Combination Products, Net Sales shall first be calculated in accordance with the definition of Net Sales and then multiplied by the percentage value of the Licensed Product contained in the Combination Product, such percentage value being the quotient obtained by dividing the current market price of the Licensed Product by the sum of the separate current market price of the Licensed Product and other ingredients which are Therapeutically Active contained in the Combination Product.   The current market price of each Therapeutically Active ingredient and of the Licensed Product shall be for a quantity comparable to that contained in the Combination Product and of the same class, purity and potency.   When no current market price is available for a Therapeutically Active ingredient or Licensed Product in a Combination Product, the Parties shall calculate a hypothetical market price for such ingredient or Licensed Product, allocating the same proportions of costs, overhead and profit as are then allocated to all similar substances then being made and marketed by the Party marketing the Combination Product and having an ascertainable market price.

8.0   Confidentiality.   In the course of performance of this Agreement, one Party may disclose to the other or receive written

000066

CONFIDENTIAL TREATMENT REQUESTED

information from the other relating to the subject matter of this Agreement which information, if so identified in writing either pursuant to this Section 8.0 or otherwise upon disclosure, shall be considered to be the disclosing Party's Confidential Information. Each Party agrees that it will take the same steps to protect the confidentiality of the other Party's Confidential Information as it takes to protect its own proprietary and confidential information. Each Party shall protect and keep confidential and shall not use, publish or otherwise disclose to any third party, except as permitted by this Agreement or with the other Party's written consent, the other Party's Confidential Information for a period of five (5) years from the date of termination of this Agreement. For the purposes of this Agreement, Confidential Information shall not include such information that:

(i) was known to the receiving Party at the time of disclosure;

(ii) was generally available to the public or was otherwise part of the public domain at the time of disclosure or became generally available to the public or otherwise part of the public domain after disclosure other than through any act or omission of the receiving Party in breach of this Agreement;

(iii) became known to the receiving Party after disclosure from a source that had a lawful right to disclose such information to others; or

(iv) is required to be disclosed by the receiving Party to comply with applicable laws, to defend or prosecute litigation or to comply with governmental regulations, provided that the receiving Party provides prior written notice of such disclosure to the other Party and takes reasonable and lawful actions to avoid and/or minimize the degree of such disclosure.

Lcex359.sgj                              18

CONFIDENTIAL TREATMENT REQUESTED

9.0  Default; Bankruptcy; Survival.

9.1  Default.  Failure by either Party (the "defaulting
Party") to comply with any of the material obligations contained in
this Agreement shall entitle the other Party (the "nondefaulting
Party") to give the defaulting Party notice specifying the nature
of the default and requiring it to cure such default.   If such
default is not cured within the sixty (60) day period after the
receipt of such notice, the nondefaulting Party shall be entitled,
except as otherwise specifically provided in this Agreement and
without prejudice to any of its other rights conferred on it by
this Agreement, to terminate all or part of this Agreement or the
licenses granted herein.

9.2  Termination for Bankruptcy or Insolvency.   Either
Party may, in addition to any other remedies available to it by law
or in equity, terminate this Agreement, in whole or in part as the
terminating Party may determine, by written notice to the other
Party in the event the other Party shall have become insolvent or
bankrupt, or shall have made an assignment for the benefit of its
creditors, or there shall have been appointed a trustee or receiver
for the other Party or for all or a substantial part of its
property, or any case or proceeding shall have been commenced or
other action taken by or against the other Party in bankruptcy or
seeking reorganization, liquidation, dissolution, winding-up,
arrangement, composition or readjustment of its debts or any other
relief under any bankruptcy, insolvency, reorganization or other
similar act or law of any jurisdiction now or hereafter in effect,
or there shall have been issued a warrant of attachment, execution,
distraint or similar process against any substantial part of the
property of the other Party, and any such event shall have
continued  for  sixty  (60)  days  undismissed,  unbonded  and
undischarged; except that the terminating Party shall retain the
rights granted to it as a licensee under Section 365(n) of the

000068

CONFIDENTIAL TREATMENT REQUESTED

United States Bankruptcy Code in case of the bankruptcy, insolvency or winding-up of the other Party.

9.3 <u>Survival of Provisions</u>. The obligations of the Parties under Section 8 shall survive any termination of this Agreement.

10.0 <u>General Provisions</u>.

10.1 <u>Notices</u>. All notices which may be required pursuant to this Agreement (i) shall be in writing, (ii) shall be addressed, in the case of Genentech (except as otherwise specified herein), to the Corporate Secretary at the address set forth at the beginning of this Agreement, and in the case of Celtrix to the President at the address set forth at the beginning of this Agreement, (or to such other person or address as either Party may so designate from time to time), (iii) shall be mailed, postage-prepaid, by registered mail or certified mail, return receipt requested, or transmitted by courier for hand delivery or by telegram and (iv) shall be deemed to have been given on the date of receipt if sent by mail or on the date of delivery if transmitted by courier or telegram.

10.2 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

10.3 <u>Entire Agreement</u>. This Agreement is the entire Agreement between the Parties regarding the subject matter hereof, and there are no prior written or oral promises or representations not incorporated herein. No amendment or modification of the terms of this Agreement shall be binding on either Party unless reduced to writing and signed by an authorized officer of the Party to be bound.

000069

CONFIDENTIAL TREATMENT REQUESTED

10.4   <u>Binding Effect</u>.   This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.  This Agreement shall not be assignable by either Party without the other's prior written consent except to a successor to all or substantially all of a Party's business by merger, sale of assets, sale of stock or otherwise.

10.5   <u>Waiver</u>.   The waiver by a Party hereto of any breach of or default under any of the provisions of this Agreement or the failure of a Party to enforce any of the provisions of this Agreement or to exercise any right thereunder shall not be construed as a waiver of any other breach or default or as a waiver of any such rights or provisions hereunder.

10.6   <u>Severability</u>.   If any part of this Agreement shall be invalid or unenforceable under applicable law, such part shall be ineffective only to the extent of such invalidity or unenforceability, without in any way affecting the remaining parts of this Agreement.  In addition, the part that is ineffective shall be reformed in such a manner as to as nearly approximate the intent of the Parties as possible.

10.7   <u>Publicity</u>.   Genentech and Celtrix shall not issue any public statement concerning the transactions contemplated by this Agreement or the Stock Purchase Agreement without the other party's reasonable prior written consent; <u>provided, however,</u> that either party may disclose the transaction or the terms hereof or thereof from time to time without the other party's approval (i) if such approval has been requested and not received and such party concludes (after consulting with counsel) that it is required by law to disclose the transaction or the terms thereof or (ii) to the extent that similar disclosure has been previously approved pursuant to this Section 10.7.

000070

CONFIDENTIAL TREATMENT REQUESTED

10.8   <u>No Partnership</u>.   Nothing in this Agreement is intended or shall be deemed to constitute a partnership, agency, employer-employee or joint venture relationship between the Parties.   No Party shall incur any debts or make any commitments for the other.

10.9   <u>Counterparts</u>.   This Agreement may be executed in counterparts, and each such counterpart shall be deemed an original for all purposes.

10.10   <u>Patent Representations</u>.   Neither Party makes any representation or warranty to the other Party concerning the validity or absence of third party infringement of any Genentech Patent or Celtrix Patent licensed hereunder.

GENENTECH, INC.                    CELTRIX PHARMACEUTICALS, INC.

By:_____            By: _Linda M'Nanan_

Title:_____            Title:___ VP ∹ CFO___

10.8   <u>No Partnership</u>.   Nothing in this Agreement is intended or shall be deemed to constitute a partnership, agency, employer-employee or joint venture relationship between the Parties.   No Party shall incur any debts or make any commitments for the other.

10.9   <u>Counterparts</u>.   This Agreement may be executed in counterparts, and each such counterpart shall be deemed an original for all purposes.

10.10   <u>Patent Representations</u>.   Neither Party makes any representation or warranty to the other Party concerning the validity or absence of third party infringement of any Genentech Patent or Celtrix Patent licensed hereunder.

GENENTECH, INC.                          CELTRIX PHARMACEUTICALS, INC.

By: _____            By: _____

Title: _____            Title: _____

000072

CONFIDENTIAL TREATMENT REQUESTED

## Exhibit A

Genentech Patents

US 4704362
US 4425437
US 4563424
US 4431739

US 4518526
US 4512922
US 4511502
US 4511503
US 4620948
US 4599197

US 4886747
US 5108989
US 5158934
US 5168051

US 5108919
US 5156968
US 5061786
US 5118791
US 5135915

000073

CONFI    ' TREATMENT RE:

## Exhibit B

### TGF-beta 2

### and

### TGF-beta 2.3 Heterodimer

000074

CONFIDENTIAL TREATMENT REQUESTED

## Exhibit C

### TGF-beta Receptor

000075

CONFIDENTIAL TREATMENT REQUESTED

TGF-β2 cDNA

```
      -467  CCCCCTCCCGTCAGTTCCCCAGCTCCCAGCCCCGCGACCTTTTCATCTCTTCCCTTTTGGCCGCAGGAGCC  -397

            CACTTCACATCCCCCACTCCCGACCCGAGACTCACACACTCGAACTCCACTTCCTCCTCTTAAATTTATTTCTACTTAATAGCCACTCGTCTCTTTTTT  -298

            CCCCATCTCATTGCTCCAACAATTTTTTCTTCTTACTCGCCAAAGTCACCCTTCCCTCTCGCCGGTCCCGTATTAAEATTTCCACTTTTCGAACTACTG  -199

            CCCTTTTCTTTTTAAACCAATTCAAGCAGGATACCTTTTTCTGTTCGGCATTGACTAGATTGTTTGCAAAAGTTTCCCATCAAAAACAACAACAACAAA  -100

            AAACCAAACAACTCTCCTTCATCTATACTTTCAGAATTGTTCATTTCTTTTTTTATTCTCACTTTTAAAAACAACTTTTTTTCCACTTTTTTAAAAA    -1

            20
    MET His Tyr Cys Val Leu Ser Ala Phe Leu Ile Leu His Leu Val Thr Val Ala Leu Leu Thr Cys Ser
    ATG CAC TAC TCT CTC CTC AGC TCT TTT CTG ATC ATC CAT CTG GTC ACC GTC GCC CTC AGC CTG TCT ACC TGC AGC    75

            35                                         45
    Thr Leu Asp Met Asp Gln Phe Met Arg Arg Arg·Ile Glu Ala Ile Arg Gly Gln Ile Leu Ser Lys Leu Lys Leu
    ACA CTC GAT ATG GAC CAG TTC ATG CGC AAG ACG ATC GAA GGC ATC CCC GCG CAG ATC CTC ACC AAG CTG AAG CTC   150

                    60                      70
    Thr Ser Pro Pro Glu Asp Tyr Pro Glu Pro Glu Glu Val Pro Pro Glu Val Ile Ser Ile Tyr Asn Ser Thr Arg
    ACC AGT CCC CCA GAA GAC TAT CCT GAG CCG GAG GAA GTC CCC CCC GAA GTC ATT TCC ATC TAC AAC AGC ACC AGG   225

            85                                        95
    Asp Leu Leu Gln Glu Lys Ala Ser Arg Arg Ala Ala Ala Cys Glu Arg Glu Arg Ser Asp Glu Glu Tyr Tyr Ala
    GAC TTG CTC CAG GAG AAG GCC AGC AGG AGG GCG GCC GCC TCC GAG AGG GAG AGG TCC GAC GAA GAG TAC TAC GCC   300

                    110                     120
    Lys Glu Val Tyr Lys Ile Asp Met Pro Pro Phe Phe Pro Ser Glu Thr Val Cys Pro Val Val Thr Thr Pro Ser
    AAG GAG GTT TAC AAA ATA GAC ATG CCG CCC TTC TTC CCC TCC GAA ACT GTC TGC CCA GTT CTT ACA ACA CCC TCT   375

            135                     145
    Gly Ser Val Gly Ser Leu Cys Ser Arg Gln Ser Gln Val Leu Cys Gly Tyr Leu Asp Ala Ile Pro Pro Thr Phe
    GGC TCA GTC GGC AGC TTG TCC TCC ACA CAG TCC CAG GTC TCT GGC TAC CTT GAT GCC ATC CCC CCC ACT TTC   450

                160                     170
    Tyr Arg Pro Tyr Phe Arg Ile Val Ile Ser Arg Val Leu Arg Val Arg Leu Gln Asn Pro Lys Ala Arg Val Pro Glu Gln Arg Ile Glu Leu Tyr Gln Ile Leu
    TAC AGA CCC TAC TTC AGA ATT CTT CGA GTT CTC GCA GTC AAC AAT GCT TCC AAT TTG GTC AAA GCA
    GAG TTC AGA GTC TTT CCT TTG CAG AAC CCA AAA GCC AGA GTC CCT CAA CAA CGG ATT GAG CTA TAT CAG ATT CTC   600

            210                     220
    Lys Ser Lys Asn Leu Thr Ser Pro Thr Gln Arg Tyr Ile Asp Ser Lys Val Val Lys Thr Arg Ala Glu Gly Glu
    AAG TCC AAA AAT TTA ACA TCT ACA AGA CGC TAC ATC GAC AGC AAA GTT GTC AAA ACA ACA ACA AGA GCA GAA GGC GAA   675

            225                     245
    Trp Leu Ser Phe Asp Val Thr Asp Ala Val His Glu Trp Leu His His Lys Asp Arg Asn Leu Gly Phe Lys Ile
    TGG CTC TCC TTC GAT GTA ACT GAT GCT GTT CAT GAA TGG CTT CAC CAT AAA GAC AGG AAC CTG GGA TTT AAA ATA   750

                    260                  270
    Ser Leu His Cys Pro Cys Cys Thr Phe Val Pro Ser Asn Asn Tyr Ile Ile Pro Asn Lys Ser Glu Glu Leu Glu
    AGC TTA CAC TGT CCC TGC TGC ACT TTT GTA CCA TCT AAT AAT TAC ATC ATC CCA AAT AAA AGT GAA GAA CTA GAA   825

            285                     295
    Ala Arg Phe Ala Gly Ile Asp Gly Thr Ser Thr Tyr Thr Ser Gly Asp Gln Lys Thr Ile Lys Ser Thr Arg Lys
    GCA AGA TTT GCA GGT ATT GAT GGC ACC ACC TCA ACA TAT ACC ACT GCT GAT CAA AAG ACA ATA AAG TCC ACT AGG AAA   900

                    310                  320
    Lys Asn Ser Gly Lys Thr Pro His Leu Leu Leu Met Leu Leu Pro Ser Tyr Arg Leu Glu Ser Gln Gln Thr Asn
    AAA AAC AGT GGG AAC ACC CCA CAT CTC CTG CTA ATG TTA TTC CCC TCC TAC AGA CTT GAG TCA CAA CAG ACC AAC   975

                            345
    Arg Arg Lys Lys Arg | Ala Leu Asp Ala Ala Tyr Cys Phe Arg Asn Val Gln Asp Asn Cys Cys Leu Arg Pro Leu
    CGC CGC AAG AAG CGT | GCT TTG GAT GCC GCC TAT TGC TTT ACA AAT GTC CAG GAT AAT TGC TGC CTA CGT CCA CTT   1050

            360                         370
    Tyr Ile Asp Phe Lys Arg Asp Leu Gly Trp Lys Trp Ile His Glu Pro Lys Gly Tyr Asn Ala Asn Phe Cys Ala
    TAC ATT GAT TTC AAG AGG GAT CTA GGG TGG AAA TGG ATA CAC GAA CCC AAA GGG TAC AAT GCC AAC TTC TGT GCT   1125

            385                         395
    Gly Ala Cys Pro Tyr Leu Trp Ser Ser Asp Thr Gln His Ser Arg Val Leu Ser Leu Tyr Asn Thr Ile Asn Pro
    GGA GCA TGC CCG TAT TTA TGG AGT TCA GAC ACT CAG CAC AGC AGG GTC CTG AGC TTA TAT AAT ACC ATA AAT CCA   1200

                    410                     420
    Glu Ala Ser Ala Ser Pro Cys Cys Val Ser Gln Asp Leu Glu Pro Leu Thr Ile Leu Tyr Tyr Ile Gly Lys Thr
    GAA GCA AGT GCT TCT CCT TGC TGC GTG TCC CAA GAT TTA GAA CCT CTA ACC ATT CTC TAC TAC ATT GGC AAA ACA   1275

                            435               442
    Pro Lys Ile Glu Gln Leu Ser Asn Met Ile Val Lys Ser Cys Lys Cys Ser |***
    CCC AAG ATT GAA CAG CTT TCT AAT ATG ATT GTA AAG TCT TGC AAA TGC AGC |TAA  AATTCTTCGAAAACTCGCCAACACCAAA   1356

            ATGCACAATGATCATCATGATAATGATCATGATCACGACCACAACGATCATCCTTCCTAACAAGAAAACATAAGCACCCTTGCTTCATCACTCTTAAAAAATTTTT   1456

            CAAAACCCCTACTAGTTCACACACATTTTGCAACTTTGTCTTCTGTTCTGTTTAAAACTGCCATCTGACACAAAAAACTTCAAGCGCCTTATTCTACATTTC   1556

            CTACTTTCTAACTCACAGACAACAAGAAGCAAATTTTTTTTAAACAAAAAATAAACACTCGGAACAATTTATTACTCTTTAATTATGTCAACAACCACA   1656

            ACAACAACAACAACAACAAGAACAAACACCAAAATCCCATTAAGTCGAGTTCCTCTACGTACCCTTCCTATCCCCGGCCTCACTTCATTTTTCTGTATTCCTATC   1756

            CAATACCCACCCTTCCCATTCTTAGTCTTACAGTTAACACTCACTTATTTATTCGTCGTTACTATATAATCAACGTTTCATTCCCCTTCCAAAATAAAA   1856

            CACCTCTATAAAGTCCACACCAAATACTTTCCCACGAAACTCATCCGCATCGCTTAAGCGAACTTCAAACTCAAACCCAGCCAGAAAAAAACAGCTCATATTAAT   1956

            CGGATCAAAACCCAACTCAGTTATTAATATCACCGACGAAACTCTCCATTAACATAAAGACCCTCAAAACACATCGTTATCATCCACCTCGCTAAGCAAGCT   2056

            TCTTCTAACGTCCAAAAACTAAAAACACTCTTTAATAAAACAAACTTTCAGTCAG(poly A)   2111
```

000076

CONFIDENTIAL TREATMENT REQUESTED

# Bovine TGF-ß2.3 N-Terminal Sequence

Ala-leu-Asp-Ala-Ala-Tyr-Xxx$^1$-Phe-Arg-Asn
                   Thr   Asn

Val-Gln-Asp-Asn-Xxx$^1$-Xxx$^1$-Leu-Arg-Pro-Leu
Leu Glu Glu                      Val

Tyr-Ile-Asp-Phe-Lys-Arg-Asp-Leu-Gly-Xxx$^2$
                   Arg Gln

Lys-Trp-Ile-His-Glu-Pro-Lys-Gly-Tyr-Asn
         Val                        Tyr

Ala-Asn-Phe-Xxx$^2$-Ala-Gly-Ala-Xxx$^2$-Xxx$^3$-Tyr
              Ser         Pro          Pro

Leu-Trp-Ser-Ser-Asp-Thr-Xxx$^5$-Xxx$^6$-Xxx$^7$
Tyr Xxx$^4$ Arg  Tyr         Ala
         Leu                 Gly
         Thr                 Ile
                             Leu
                             Pro
                             Tyr
                             Val

| Xxx$^1$=Cys | Xxx$^4$=Arg | Xxx$^7$=Ser |
|-------------|-------------|-------------|
| Xxx$^2$=Trp | Xxx$^5$=Gln/Thr | |
| Xxx$^3$=Pro | Xxx$^6$=His | |

000077

CONFIDENTIAL TREATMENT REQUESTED

EXHIBIT _10.34

# REGISTRATION RIGHTS AGREEMENT

### Dated as of April 1, 1993

### Between

### Celtrix Pharmaceuticals, Inc.

### and

### Genentech, Inc.

# TABLE OF CONTENTS

**Page**

1. Demand Registration.....................................1
      (a)
       Demand Registration..............................1
      (b)
       Obligations of Celtrix...........................2
      (c)
       Expenses.........................................3
2. "Piggyback" Rights...................................3
      (a)
       Notice of Registration...........................3
      (b)
       Inclusion of Additional Shares...................3
      (c)
       Underwriting.....................................4
3. Indemnification......................................5
      (a)
       Indemnification by Celtrix.......................5
      (b)
       Indemnification by Genentech.....................5
      (c)
       Notice of Claims.................................6
      (d)
       Contribution.....................................7
4. Rule 144 Reporting...................................7
5. Notices.............................................7
6. Captions and Headings...............................8
7. Entire Agreement; Amendments........................8
8. Governing Law.......................................8
9. Assignability.......................................8
10.
     Severability.....................................8
11.
     Counterparts.....................................8

11. Counterparts...............................................8

**000080**

## REGISTRATION RIGHTS AGREEMENT

THIS REGISTRATION RIGHTS AGREEMENT ("Agreement") is entered into as of this 1st day of April, 1993, between Celtrix Pharmaceuticals, Inc., a Delaware corporation ("Celtrix"), and Genentech, Inc., a Delaware corporation ("Genentech").

### WITNESSETH:

WHEREAS, Genentech intends to purchase a minority interest in Celtrix pursuant to the terms and conditions of a certain Common Stock Purchase Agreement dated as of March 17, 1993 (the "Purchase Agreement"); and

WHEREAS, the Purchase Agreement requires that Celtrix enter into this Agreement with Genentech;

NOW, THEREFORE, in consideration of the foregoing, the parties to this Agreement hereby agree as follows:

**1.**    **Demand Registration.**

(a)    Demand Registration. If, at any time on or after October 1, 1993, Genentech shall request Celtrix in writing to register under the Securities Act of 1933, as amended (the "Securities Act"), any shares of the Common Stock of Celtrix (the "Common Stock") purchased by Genentech pursuant to the Purchase Agreement (the shares of Common Stock subject to such request being herein referred to as the "Subject Stock"), Celtrix shall use its best efforts to cause the shares of Subject Stock specified in such request to be registered as soon as reasonably practicable so as to permit the sale thereof, and in connection therewith shall prepare and file a Form S-3 registration statement or such other form as is then available (or any successor form of registration statement to such Form S-3 or other available registration statement) with the Securities and Exchange Commission (the "SEC") under the Securities Act to effect such registration; provided, however, that each such request shall (i) specify the number of shares of Subject Stock intended to be offered and sold, which number of shares shall represent Subject Stock (A) that constitutes at least 50% of the Common Stock purchased by Genentech pursuant to the Purchase Agreement if such request is made on or prior to April 1, 1994 and (B) with an aggregate market value of at least $2,000,000, based on the average closing sale price of the Common Stock for the twenty days preceding the date prior to the date of Genentech's request, (ii) express the present intention of Genentech to offer or cause the offering of such shares of Subject Stock for distribution, (iii) describe the nature or method of the proposed offer and sale thereof, and (iv) contain the undertaking of Genentech to provide all such information and materials and take all such action as may be required in order to permit Celtrix to comply with all applicable requirements of the SEC and to obtain any desired acceleration of the effective date of such registration statement. Genentech shall give Celtrix written notice at least 90 calendar days prior to making a request for registration of Common Stock under this Agreement if

**000081**

such request is to be made on or prior to April 1, 1994 and at least 60 calendar days prior to making such a request for registration if such request is to be made after April 1, 1994 and on or prior to April 1, 1995. Notwithstanding the foregoing and Section 2 hereof, if Celtrix shall furnish to Genentech a certificate signed by a duly authorized officer of Celtrix stating that in the good faith judgment of the Board of Directors of Celtrix that it would not be in the best interest of Celtrix and its shareholders for such registration statement to be filed on or before the date filing would be required and it is therefore essential to defer the filing of such registration statement, Celtrix shall be entitled to postpone filing of the Registration Statement for a reasonable period of time, but not in excess of 90 calendar days. Genentech shall not be entitled to request more than one demand registration statement under this Agreement in any 12-month period or more than two such demand registrations in the aggregate.

(b)    Obligations of Celtrix.  Whenever Celtrix is required by the provisions of this Agreement to use its best efforts to effect the registration of any Common Stock under the Securities Act, Celtrix shall (i) prepare and, as soon as possible, file with the SEC a registration statement with respect to the shares of Subject Stock, and shall use its best efforts to cause such registration statement to become effective and to remain effective until the earlier of the sale of the shares of Subject Stock so registered or 180 days subsequent to the effective date of such registration; (ii) prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to make and to keep such registration statement effective and to comply with the provisions of the Securities Act with respect to the sale or other disposition of all securities proposed to be registered in such registration statement until the earlier of the sale of the shares of Subject Stock so registered or 180 days subsequent to the effective date of such registration statement, (iii) furnish to Genentech such number of copies of any prospectus (including any preliminary prospectus and any amended or supplemented prospectus), in conformity with the requirement of the Securities Act, as Genentech may reasonably request in order to effect the offering and sale of the shares of Subject Stock to be offered and sold, but only while Celtrix shall be required under the provisions hereof to cause the registration statement to remain current; (iv) use its commercially reasonable efforts to register or qualify the shares of Subject Stock covered by such registration statement under the securities or blue sky laws of such states as Genentech shall reasonably request, maintain any such registration or qualification current until the earlier of the sale of the shares of Subject Stock so registered or 180 days subsequent to the effective date of the registration statement, and do any and all other acts and things either necessary or advisable to enable Genentech to consummate the public sale or other disposition of the shares of Subject Stock in jurisdictions where Genentech desires to effect such sales or other disposition (but Celtrix shall not be required to take any action that would subject it to the general jurisdiction of the courts of any jurisdiction in which it is not so subject or to qualify as a foreign corporation in any jurisdiction where Celtrix is not so qualified); and (v) take all such other action either necessary or desirable to permit the shares of Subject Stock held by Genentech to be registered and disposed of in accordance with the method of disposition described herein. If requested, and provided that the underwriter or underwriters are reasonably satisfactory to Celtrix, Celtrix shall enter into an underwriting agreement with a nationally recognized investment banking firm or firms containing representations, warranties, indemnities and agreements then customarily included by an issuer in underwriting agreements with respect to secondary distributions. Celtrix shall not cause the

811.3                                   -2-

000082

registration under the Securities Act of any other shares of its Common Stock to become effective (other than registration of an employee stock plan, or registration in connection with any Rule 145 or similar transaction) during the effectiveness of a registration requested hereunder for an underwritten public offering if, in the judgment of the underwriter or underwriters, marketing factors would adversely affect the price of the Subject Stock. In connection with any offering of shares of Subject Stock registered pursuant to this Agreement, Celtrix shall (x) furnish Genentech, at Celtrix's expense, with unlegended certificates representing ownership of the shares of Subject Stock being sold in such denominations as Genentech shall request and (y) instruct the transfer agent and registrar of the Subject Stock to release any stop transfer orders with respect to the shares of Subject Stock being sold.

(c)     Inclusion of Additional Shares.  Celtrix shall take all actions it deems necessary or advisable in order to ensure that security holders of Celtrix, whether or not holding contractual registration rights, shall not have the right to exclude from any registration initiated pursuant to this Section 1 more than 2.0% of the shares of Celtrix Common Stock with respect to which Genentech has requested registration.

(d)     Expenses.  Celtrix shall pay all of the out-of-pocket expenses incurred by Celtrix in connection with (i) any registration statements that are initiated pursuant to Section 1 of this Agreement and (ii) the registration pursuant to Section 2 of this Agreement of shares of Common Stock held by Genentech, including, without limitation, all SEC and blue sky registration and filing fees, printing expenses, transfer agents' and registrars' fees, and the reasonable fees and disbursements of Celtrix's outside counsel and independent accountants; provided, however, Celtrix shall not be required to pay for any underwriter's discounts or commissions with respect to any shares sold by Genentech pursuant to Section 1 or Section 2.

2.     "Piggyback" Rights.

(a)     Notice of Registration.  If, at any time or from time to time after December 31, 1993, Celtrix shall determine to register any of its securities, either for its own account or the account of a security holder or holders, other than (i) a registration relating solely to employee benefit plans, or (ii) a registration relating solely to an SEC Rule 145 transaction, Celtrix will:

(i)     promptly give to Genentech written notice thereof; and

(ii)     include in such registration (and any related qualification under blue sky laws or other compliance), and in any underwriting involved therein, that number of shares of Common Stock held by Genentech as specified by Genentech in a written request, made within 15 days after receipt of such written notice from Celtrix.

(b)     Inclusion of Additional Shares.  Celtrix may include in any registration pursuant to this Section 2 securities held by third parties (including officers and employees of Celtrix), in amounts as determined by Celtrix's Board of Directors; provided, however, that the

number of such shares included in such registration shall not exceed 33% of the total number of shares to be included on behalf of Celtrix's security holders in such registration.

(c)     Underwriting.  If the registration of which Celtrix gives notice is for a registered public offering involving an underwriting, Celtrix shall so advise Genentech as a part of the written notice given pursuant to Section 2(a)(i).  In such event the right of Genentech to registration pursuant to this Section 2 shall be conditioned upon Genentech's participation in such underwriting and the inclusion of Genentech's Common Stock in the underwriting to the extent provided herein.  Genentech, together with Celtrix and the other holders, if any, distributing their securities through such underwriting, shall enter into an underwriting agreement in customary form with the managing underwriter selected for such underwriting by Celtrix.  Notwithstanding any other provision of this Section 2, if the managing underwriter determines that marketing factors require a limitation of the number of shares to be underwritten, the underwriter may limit the number of shares to be included in such registration and underwriting on behalf of Genentech and other selling security holders to an aggregate of not less than 15% of the total number of the securities to be registered in such registration and underwriting.  Celtrix shall so advise Genentech and the other holders distributing their securities through such underwriting, and the number of shares that may be included in the registration and underwriting shall be allocated among Genentech and other holders on the following basis:

(i)     shares held by any person or entity who does not have contractual registration rights shall first be excluded, with such reductions to be allocated as nearly as practicable among each holder in proportion to the number of shares that each such holder requests to be registered bears to the total number of shares all such holders request to be registered;

(ii)     if further reductions are required, such reductions shall be allocated as nearly as practicable among Genentech and each holder of registration rights in proportion to the number of shares that Genentech and each such holder of registration rights requests to be registered bears to the total number of shares that Genentech and all holders of registration rights request to be registered.

If Genentech or any other holder disapproves of the terms of any such underwriting, Genentech or such other holder may elect to withdraw therefrom by written notice to Celtrix and the managing underwriter.  Any securities excluded or withdrawn from such underwriting shall be withdrawn from such registration, and the securities so excluded or withdrawn shall not be transferred in a public distribution prior to 120 days after the effective date of the registration statement relating thereto.

(d)     Demand Registration Rights Exercised by Other Stockholders.  If the registration of which Celtrix gives notice pursuant to Section 2(a)(i) relates to the exercise of demand registration rights by another stockholder of Celtrix (the "Demanding Stockholder") and Celtrix, the Demanding Stockholder or the managing underwriter (in the event of a registered public offering involving an underwriting) determines that marketing factors require a limitation of the number of shares to be registered, Celtrix shall so advise Genentech and the other holders

000084

distributing securities through such registration (other than the Demanding Stockholder) and shares held by any person or entity (other than the Demanding Stockholder) may be excluded from such registration in whole or in part.

3.   **Indemnification.**

(a)   Indemnification by Celtrix.   In the case of any offering registered pursuant to this Agreement, Celtrix agrees to indemnify and hold Genentech, each of its officers and directors, each underwriter of shares of Subject Stock under such registration and each person who controls any of the foregoing within the meaning of Section 15 of the Securities Act harmless against any and all losses, claims, damages or liabilities to which they or any of them may become subject under the Securities Act or any other statute or common law or otherwise, and to reimburse them, from time to time upon request, for any legal or other expenses incurred by them in connection with investigating any claims and defending any actions, insofar as any such losses, claims, damages, liabilities or actions shall arise out of or shall be based upon (i) any untrue statement or alleged untrue statement of a material fact contained in the registration statement relating to the sale of such shares of Subject Stock, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (ii) any untrue statement or alleged untrue statement of a material fact contained in any preliminary prospectus (as amended or supplemented if Celtrix shall have filed with the SEC any amendment thereof or supplement thereto), if used prior to the effective date of such registration statement or contained in the prospectus (as amended or supplemented if Celtrix shall have filed with the SEC any amendment thereof or supplement thereto), if used within the period during which Celtrix shall be required to keep the registration statement to which such prospectus relates current pursuant to the terms of this Agreement, or the omission or alleged omission to state therein (if so used) a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; provided, however, that the indemnification agreement contained in this Section 3(a) shall not apply to such losses, claims, damages, liabilities or actions which shall arise from the sale of shares of Subject Stock to any person if such losses, claims, damages, liabilities or actions shall arise out of or shall be based upon any such untrue statement or alleged untrue statement, or any such omission or alleged omission, if such statement or omission shall have been (x) made in reliance upon and in conformity with information furnished in writing to Celtrix by Genentech or any such underwriter specifically for use in connection with the preparation of the registration statement or any preliminary prospectus or prospectus contained in the registration statement or any such amendment thereof or supplement thereto, or (y) made in any preliminary prospectus, and the prospectus contained in the registration statement as declared effective or in the form filed by Celtrix with the SEC pursuant to Rule 424 under the Securities Act shall have corrected such statement or omission and a copy of such prospectus shall not have been sent or given to such person at or prior to the confirmation of such sale to him.

(b)   Indemnification by Genentech.   In the case of each offering registered pursuant to this Agreement, Genentech agrees in the same manner and to the same extent as set forth in Section 3(a) of this Agreement severally to indemnify and hold harmless Celtrix and each person, if any, who controls Celtrix within the meaning of Section 15 of the Securities Act, its directors and

811.3                                                -5-

those officers of Celtrix who shall have signed any such registration statement with respect to any statement in or omission from such registration statement or any preliminary prospectus (as amended or as supplemented, if amended or supplemented as aforesaid) or prospectus contained in such registration statement (as amended or as supplemented, if amended or supplemented as aforesaid), if such statement or omission shall have been made in reliance upon and in conformity with information furnished in writing to Celtrix by Genentech or such underwriter specifically for use in connection with the preparation of such registration statement or any preliminary prospectus or prospectus contained in such registration statement or any preliminary prospectus or prospectus contained in such registration statement or any such amendment thereof or supplement thereto.

(c)     Notice of Claims. Each party indemnified under Section 3(a) or Section 3(b) of this Agreement shall, promptly after receipt of notice of the commencement of any action against such indemnified party in respect of which indemnity may be sought, notify the indemnifying party in writing of the commencement thereof. The omission of any indemnified party so to notify an indemnifying party of any such action shall not relieve the indemnifying party from any liability in respect of such action which it may have to such indemnified party on account of the indemnity agreement contained in Section 3(a) or Section 3(b) of this Agreement, unless the indemnifying party was prejudiced by such omission, and in no event shall relieve the indemnifying party from any other liability which it may have to such indemnified party. In case any such action shall be brought against any indemnified party and it shall notify an indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it may wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party, and, after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party under Section 3(a) or Section 3(b) of this Agreement for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation. Notwithstanding the above, however, if representation of one or more indemnified parties by the counsel retained by the indemnifying party would be inappropriate due to actual conflicting interests between such indemnified parties (the "Conflicting Indemnified Parties") and any other party represented by such counsel in such proceeding, then such Conflicting Indemnified Parties shall have the right to retain one separate counsel, chosen by a majority of the Conflicting Indemnified Parties, at the expense of the indemnifying party. No indemnifying party, (i) in the defense of any such claim or litigation, shall, except with the consent of each indemnified party, which consent shall not unreasonably be withheld, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation, or (ii) shall be liable for amounts paid in any settlement if such settlement is effected without the consent of the indemnifying party, which consent shall not be unreasonably withheld. Subject to the foregoing, the indemnifying party shall promptly advance all expenses incurred by the indemnified party in connection with the investigation and defense of any claim as to which indemnity may be sought pursuant to this Agreement after written request therefor (but no earlier than incurred) by the indemnified party to the indemnifying party. The indemnified party shall repay such amounts advanced if and to the extent

000086

that it is ultimately determined that the indemnified party is not entitled to indemnification or contribution under this Agreement.

        (d)     <u>Contribution</u>. If the indemnification provided for in this Section 3 is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any loss, liability, claim, damage or expense referred to therein, then the indemnifying party, in lieu of indemnifying such indemnified party thereunder, shall contribute to the amount paid or payable by such indemnified party as a result of such loss, liability, claim, damage or expense in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other in connection with the statements or omissions which resulted in such loss, liability, claim, damage or expense as well as any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

        **4.**     **<u>Rule 144 Reporting</u>.** So long as Genentech owns any unregistered Common Stock, Celtrix agrees to furnish to Genentech upon request a written statement as to Celtrix's compliance with the reporting requirements of Rule 144 promulgated under the Securities Act, and of the Securities Act and the Exchange Act, a copy of Celtrix's most recent annual or quarterly report and such other reports and documents of Celtrix as Genentech may reasonably request in order to avail itself of any rule or regulation of the SEC allowing Genentech to sell any such securities without registration under the Securities Act.

        **5.**     **<u>Notices and Dates</u>.** Any notice or other communication given under this Agreement shall be sufficient if in writing and sent by registered or certified mail, return receipt requested, postage prepaid, to a party at its address set forth below (or at such other address as shall be designated for such purpose by such party in a written notice to the other party hereto):

        (a)     if to Celtrix:

                3055 Patrick Henry Drive
                Santa Clara, CA 95052-8203
                Attention:  President

                with a copy to:

                Michael W. Hall, Esq.
                Venture Law Group
                2740 Sand Hill Road
                Menlo Park, CA  94025

        (b)     if to Genentech:

460 Point San Bruno Boulevard
South San Francisco, CA 94080
Attn: Corporate Secretary

All such notices and communications shall be effective when received by the addressee. In the event that any date provided for in this Agreement falls on a Saturday, Sunday or legal holiday, such date shall be deemed extended to the next business day.

6. **Captions and Headings.** The captions and headings used herein are for convenience and ease of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

7. **Entire Agreement; Amendment.** This Agreement, the Purchase Agreement and the other documents delivered pursuant hereto and thereto constitute the full and entire understanding and agreement between the parties with regard to the subject matter hereof and thereof and supersede all prior agreements and understandings among the parties relating to the subject matter hereof. Neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the party against which enforcement of any such amendment, waiver, discharge or termination is sought.

8. **Governing Law.** This Agreement shall be governed in all respects by the laws of the State of California as applied to contracts entered into solely between residents of, and to be performed entirely within, such state.

9. **Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement may not be assigned by a party without the prior written consent of the other party.

10. **Severability.** If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

11. **Counterparts.** This Agreement may be executed in counterparts, and each such counterpart shall be deemed an original for all purposes.

000088

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized officers as of the date aforesaid.

CELTRIX PHARMACEUTICALS, INC.

By:    _Sandra R. McNamara_

Name: Sandra R. McNamara

Title:   Vice President, Finance and
         Administration

GENENTECH, INC.

By:    _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized officers as of the date aforesaid.

CELTRIX PHARMACEUTICALS, INC.

By: _____

Name: Sandra R. McNamara

Title: Vice President, Finance and
       Administration

GENENTECH, INC.

By: _____

Name: _John P. McLoughlin_

Title: _VP & General Counsel_