# Exhibit 2

```
                                                    Page 1
 1              UNITED STATES DISTRICT COURT

 2      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

 3   ----------------------------------------------------------

 4   PHIGENIX, INC.,

 5                      Plaintiff,

 6      vs.                    Case No. 15-01238 BLF-NMC

 7   GENENTECH, INC.,

 8                      Defendant.

 9   ----------------------------------------------------------

10

11                  ***** CONFIDENTIAL *****

12

13                  VIDEOTAPED DEPOSITION OF

14                  MARK S. ROBBINS, PH.D., J.D.

15

16   DATE:     June 1, 2017

17   TIME:     8:57 AM

18   PLACE:    Dorsey & Whitney LLP

19             50 South Sixth Street, Suite 1500

20             Minneapolis, Minnesota 55402

21

22   REPORTED BY:

23             Elizabeth J. Gangl

24             Registered Professional Reporter

25             Notary public, State of Minnesota
```

CONFIDENTIAL

Page 16

1    about licensing at this point in time.  I'm involved in

2    licensing to those patents but I'm just talking about the

3    patent prosecution aspects.

4        Q.   Okay.  So you're managing the prosecution for

5    Bullet Biotech; would that be fair?

6        A.   That would be fair.

7             MR. D'AMORE:  Object to form.  Just give me

8    a chance to object.

9             THE WITNESS:  Sure.

10       Q.   BY MR. ACKERMAN:  And I think you said, was it

11   Tansma?

12       A.   Tansna.  T-A-N-S-N-A.

13       Q.   And at Tansna, what are your responsibilities

14   with respect to patent law issues?

15       A.   Once again it's managing the patent prosecution

16   work.

17       Q.   And at Hennepin Life Sciences?

18       A.   Similarly I manage for Hennepin Life Sciences

19   their patent prosecution work.

20       Q.   And at Tapemark?

21       A.   Similarly with Tapemark.

22       Q.   Now of these companies that you mentioned, which

23   also involve patent licensing efforts?

24       A.   So Upsher-Smith had several patent licensing

25   efforts that I oversaw.  Bullet has been in licensing

CONFIDENTIAL

Page 17

1    patents so I oversee those efforts.  Hennepin Life

2    Sciences is just beginning now to try to out-license

3    patents plus the, we license patents from the University

4    of Minnesota, so I'm managing those activities, too.

5        Q.    Hennepin Life Sciences has licenses from the

6    University of Minnesota?

7        A.    It does.

8        Q.    So that would be in-licensing to Hennepin?

9        A.    Correct.  And Bullet has licenses from Stanford.

10              MR. D'AMORE:  I'm just going to caution the

11   witness that if you tread onto anything that is not

12   public but confidential, let me know, we'll go slowly, we

13   can designate the transcript confidential.  I'll trust

14   you to keep an eye out for that.

15              THE WITNESS:  Yes.

16        Q.   BY MR. ACKERMAN:  So you had some licensing work

17   at Upsher-Smith, at Bullet and at Hennepin.  Others?

18        A.    That's to my recollection all I can recall at

19   this moment.

20        Q.    So you have a degree in, a Ph.D. in science and

21   a law degree, correct?

22        A.    That's correct.

23        Q.    Do you have any degrees in accounting?

24        A.    I do not.

25        Q.    Do you have any degrees in finance?

1   to testify in terms of whether or not there was any

2   block, limitation to generic entry into the market.

3        Q.   So it didn't have to do with damages-related

4   issues, correct?

5                  MR. D'AMORE:  Object to the form.

6                  THE WITNESS:  It had to do with antitrust

7   issues and whether or not there was a limitation on the

8   ability to, for generic entry into the marketplace.

9        Q.   BY MR. ACKERMAN:  In paragraph 7 to your report

10  you refer to having negotiated over a dozen licenses for

11  pharmaceutical patents or products.  We talked a little

12  bit about your patent licensing, but of the dozen

13  licenses that you're referring to in paragraph 7, how

14  many of those licenses were on behalf of a patent owner?

15       A.   I believe probably two or three where Upsher was

16  the patent owner and we out-licensed.

17       Q.   And do you recall who was the licensee in those

18  two cases?

19       A.   One of the licensees was Kos Pharmaceuticals,

20  K-O-S, Pharmaceuticals.  It's now Abbott.

21       Q.   And do you recall if the license with Kos

22  Pharmaceuticals was an exclusive license or a

23  non-exclusive license?

24       A.   It was initially a non-exclusive license is my

25  recall.

CONFIDENTIAL

**Page 21**

1          Q.    And you said initially.   Did it transform into

2     an exclusive license or some other arrangement?

3          A.    My recall is that at some point in time we

4     possibly provided them with an exclusive license.   I'm

5     not a hundred percent certain of that at this time.

6          Q.    Do you recall what the royalty rate was on the

7     non-exclusive license?

8          A.    I do not.

9          Q.    Do you recall how the rate changed when the

10    agreement transformed into possibly exclusive?

11         A.    I do not.

12         Q.    You indicated that there might have been two or

13    three besides Kos Pharmaceuticals.   What other

14    out-licensing products do you recall?

15         A.    There was one with, I believe, Qualitest

16    Pharmaceuticals.

17         Q.    Quality Test?

18         A.    Qualitest.   Q-U-A-L-I-T-E-S-T.

19         Q.    And was the license agreement with Qualitest an

20    exclusive or non-exclusive license?

21         A.    That was exclusive for that field.

22         Q.    And do you recall the royalty rate?

23         A.    I do not.

24         Q.    So you identified two or three.   Was there a

25    third license that you recall from Upsher out-licensing?

CONFIDENTIAL

Page 22

1    A.    I can't recall specific but there very well
2  could have been some other small ones.
3    Q.    So there would be nine or ten licenses that you
4  negotiated on behalf of licensees in-licensing?
5    A.    Most of them were in-licensing, correct.
6    Q.    And I believe you indicated that Bullet Biotech
7  had in-license patents from Stanford?
8    A.    That's correct.
9    Q.    Is that included among the ten or so in-license
10 negotiations that you're referring to?
11    A.    That's one, but there's more than, yes, it's
12 going to be more than ten, but that's one.
13    Q.    For the in-licensing activity that you recall,
14 how many of those negotiations took place at
15 Upsher-Smith?
16    A.    I believe it's someplace around seven or eight.
17    Q.    And of those seven or eight in-licensing
18 projects that you recall, how many of those were, were
19 with competitors of Upsher-Smith?
20    A.    I have to go through them individually to know
21 that.  Probably three.  Three or four.
22    Q.    About half?
23    A.    Probably about half.
24    Q.    And what were the nature of the part of the
25 licensors on the other half?

CONFIDENTIAL

Page 23

1      A.      They were more early-stage development licenses

2    that the company had technology that we were going to

3    develop into new drugs.

4      Q.      For the three or four licenses that you

5    in-licensed at Upsher-Smith, do you recall the royalty

6    rates that Upsher-Smith agreed to pay?

7      A.      I do not.

8      Q.      Do you have an approximate range?

9              MR. D'AMORE:   Object to the form.

10             THE WITNESS:   I can't recall.

11     Q.      BY MR. ACKERMAN:   On the three to four

12   Upsher-Smith licenses that you characterized as

13   early-stage development, do you recall the royalty rates

14   on any of those?

15     A.      I do not.

16     Q.      Now I believe you indicated that you've been

17   also involved in licensing in the university setting.

18   For Bullet Biotech, were you involved in the negotiations

19   between Bullet Biotech and Stanford?

20     A.      I was involved not on the initial founding

21   license but on subsequent amendments to the license.

22     Q.      The license agreement between Bullet and

23   Stanford, is that exclusive or non-exclusive?

24     A.      That's exclusive for the field.

25     Q.      Does Bullet have royalty obligations to Stanford

CONFIDENTIAL

Page 24

1    under that license?

2        A.    I believe so.

3        Q.    Do you recall what the rate is?

4        A.    I do not.

5        Q.    I believe you also indicated that Hennepin Life

6    Sciences has in-licensed patents from the University of

7    Minnesota, is that correct?

8        A.    That's correct.

9        Q.    Were you involved in those negotiations?

10       A.    I was not involved in the initial founding

11   license negotiation, but there's been several amendments

12   since then that I've been actively negotiating.

13       Q.    And is the current license between Hennepin and

14   the University of Minnesota exclusive or non-exclusive?

15       A.    It's exclusive.

16       Q.    And do you recall if there's a royalty rate

17   obligation from Hennepin to the University?

18       A.    Once again, I can't recall.

19       Q.    In the dozen licenses that you refer to in

20   paragraph 7 that you were involved in negotiating, do you

21   recall any that had a royalty rate of less than .5%?

22                MR. D'AMORE:   Object to the form.

23                THE WITNESS:   Can you repeat the question?

24       Q.    BY MR. ACKERMAN:   Sure.   Of the dozen licenses

25   that you're referring to in paragraph 7 that you were

CONFIDENTIAL

Page 25

1    involved in negotiating, do you recall any that included

2    a royalty rate of less than half a percent?

3        A.   Yes, sir.

4        Q.   And which licenses are those?

5        A.   The licenses through TriStata -- TriStrata.

6        Q.   TriStrata?   Okay.

7        A.   TriStrata.

8        Q.   Yep.

9        A.   And the license with, or the acquisition of the

10   patent from Victor Herbert.

11       Q.   And I believe those were, both of those were

12   fully paid up with no ongoing royalty?

13       A.   That is correct.

14       Q.   We'll look at those in a few seconds.  So you're

15   not aware of any license that you negotiated for an

16   ongoing royalty that had a rate of less than half a

17   percent?

18       A.   I am not.

19       Q.   Now the dozen licenses that you refer to in

20   paragraph 7 in connection with this matter, did you

21   produce any of those licenses to counsel for Genentech?

22       A.   I did not.

23       Q.   And they were not produced to Phigenix in this

24   matter, correct, to the best of your knowledge?

25       A.   To the best of my knowledge.  I do not have

CONFIDENTIAL

Page 26

1    copies of those.

2        Q.    And for the majority you don't recall the

3    royalty rates, correct?

4        A.    I do not.

5        Q.    Of the dozen licenses that you negotiated or

6    that you referred to in paragraph 7 as ones that you

7    participated in negotiating, how many of those would you

8    consider to be adversarial licenses?

9        A.    Two.

10       Q.    And that would be TriStrata and the Herbert

11   acquisition?

12       A.    Yes, sir.

13       Q.    In the case of the Kos Pharma license, how did

14   Upsher-Smith come to approach Kos or how did the parties

15   become engaged in negotiations?

16       A.    I don't recall specifics.  What I can tell you

17   is we were both very aware of each other.  We were

18   developing similar products.  We had some patent

19   technology, they had some patent technology, and so we

20   wanted to have, it made sense to do a cross-license of

21   that technology.  I don't remember who made initial

22   contact.

23       Q.    So Kos was a cross-license?

24       A.    My recall was it was.

25       Q.    And both Kos and Upsher-Smith had products on

CONFIDENTIAL

1    the market at the time of the cross-license relevant to

2    the patents?

3        A.    I do not believe that's correct.

4        Q.    Okay.  Did either party?

5        A.    I do not believe that's correct.

6        Q.    Okay.  Did either party have products on the

7    market relative to the patents that were being

8    cross-licensed?

9        A.    Upsher-Smith had a product on the market.

10       Q.    And Kos did not?

11       A.    Kos did not.  To my recall at the time.

12       Q.    In the context of Qualitest, did Qualitest have

13   a product on the market at the time of the negotiations

14   with Upsher-Smith?

15       A.    Qualitest had many products on the market at the

16   time of the negotiations with Upsher-Smith.

17       Q.    And were any of those products relevant to the

18   patents that were being licensed by Upsher-Smith?

19       A.    They were not.

20       Q.    Starting in paragraph 13 you've got a discussion

21   of "Overview of Pharmaceutical Development and

22   Licensing."  In paragraph 13 you refer to a Tufts Center

23   study and cite that study for the estimated cost per

24   approved new drug at $2.558 billion, of which 1.395

25   billion is out-of-pocket costs.  What are you referring

CONFIDENTIAL

1   amount of risk is still disproportional on the marketer.

2        Q.   I would like to move forward to the section that

3   starts on paragraph 26 of your report on "Adversarial

4   Licensing."

5        A.   Paragraph 26?

6        Q.   Yes.

7        A.   Yes, sir.

8        Q.   And can you explain what you mean by adversarial

9   licensing?

10       A.   Adversarial licensing in my mind is a license of

11   a patent that you procure, similar to the TriStrata

12   patent, because there's a patent there that the product

13   infringes upon that adds no value to the product.  It's

14   strictly something that I have to license but it doesn't

15   let me make any more claims off the product, doesn't let

16   me expand the market, doesn't give me any competitive

17   advantage in the marketplace.  Essentially it's like a

18   tax on the product.  I pay it.  It's a tax because

19   there's no perceived thing I can do for exploiting it for

20   increased valuation.

21       Q.   I believe we may have touched on this earlier,

22   but in your experience how many adversarial licensing

23   situations have you personally been involved in?

24       A.   Two that I recall.

25       Q.   Those are the two that you mentioned earlier in

CONFIDENTIAL

**Page 52**

1   connection with your work at Upsher-Smith?

2        A.   Yes, sir.

3        Q.   If you could take a look at paragraph 26 for me?

4   Just let me know when you've had an opportunity to review

5   that.

6        A.   (Examining document.)  Yes, sir.

7        Q.   What are the, what's the basis for the opinions

8   that you're setting forth in paragraph 26?

9        A.   My experience on those licenses and from

10  discussions with patent counsel on other situations.  You

11  know, I consider these almost like patent troll types of

12  licenses from what I've read over the years.

13       Q.   So your opinions in 26 are based on the two

14  adversarial licenses you've mentioned, and you indicate

15  that there was also discussions with patent counsel?

16       A.   Patent counsel and general types of discussions

17  in going to CLE programs where they've talked about

18  adversarial licenses and patent trolls.

19       Q.   So this is a general understanding that you

20  picked up.  Can you identify any specific CLE or article

21  that you're referring to?

22       A.   I can when I, when I hear it.  So there are more

23  specific CLEs; I just can't remember them.

24       Q.   How many licenses -- I'm sorry, let me rephrase

25  this.  In total, how many adversarial licensing

CONFIDENTIAL

Page 53

1    agreements have you seen?

2        A.    The total?

3        Q.    Hm-hmm.

4        A.    I believe two.

5        Q.    Other than those two agreements, are you aware

6    of the royalty rate paid in any other license that was

7    negotiated as a, quote-unquote, adversarial licensing

8    situation?

9                    MR. D'AMORE:   Object to the form of the

10   question.

11                   THE WITNESS:   Not that I recall.

12       Q.    BY MR. ACKERMAN:   Are you aware of any license

13   negotiated in the context of adversarial licensing that

14   you can identify that was an exclusive license?

15       A.    We acquired the Victor Herbert patent as a

16   resolution of that.

17       Q.    Hm-hmm.

18       A.    We thought that there were some strategic

19   advantage for us acquiring that patent versus just doing

20   a license of it.   So that would be considered exclusive

21   because we did acquire it.

22       Q.    So, for example, in this sentence that starts on

23   page 7 of, I mean line 7 of page 10 where you indicate

24   "Typically, patent owners assert these patents against a

25   company after the company has commercialized its

CONFIDENTIAL

Page 55

1    seeking a non-exclusive license from multiple parties?

2                    MR. D'AMORE:  Object to the form.

3                    THE WITNESS:  That can frequently be the

4    case is my understanding.

5        Q.   BY MR. ACKERMAN:  Spanning lines 16 through 18,

6    you indicate that "In other cases, a licensee may take an

7    exclusive license [to] buy the patent, where the licensor

8    wishes to exit the business and where the patent may have

9    some value to the licensee/acquirer if asserted against

10   others."  Now what is the basis for that statement?

11       A.   That was the Victor Herbert situation where

12   there was some strategic value for us.  Dr. Herbert was

13   an older gentleman and, you know, he would have preferred

14   just having the payment upfront.  At that point in time

15   we thought that having that patent would be valuable and

16   possibly a cross-license.

17       Q.   So let's discuss the two adversarial licenses

18   that you're familiar with.  I would like to start with

19   the TriStrata one first.  Now you indicate that, you

20   don't refer to it by name, but looking at paragraph 28 in

21   your report, is that paragraph referring to the TriStrata

22   license?

23       A.   Yes, sir.

24       Q.   Were you aware of how many companies had taken a

25   license with TriStrata at the time you had taken a

Page 56

1    license?

2         A.    No, I'm not.

3         Q.    How many patents did TriStrata have that it was

4    licensing?

5         A.    That we licensed?

6         Q.    Hm-hmm.

7         A.    One.

8         Q.    And --

9         A.    My recall is one.

10        Q.    How many claims were in that patent?

11        A.    I don't recall.

12        Q.    Do you recall, you indicate that there was a

13   nominal upfront payment with no continuing royalty for a

14   non-exclusive license.  What was the amount of the

15   nominal upfront payment?

16        A.    You know, I don't recall the amount.  It was in

17   the very low six figures, but I don't remember the

18   amount.

19        Q.    How much patent term is left on the patenting

20   license?

21        A.    I don't recall.

22        Q.    The product that you were marketing was an

23   AmLactin moisturizer?

24        A.    Yes, sir.

25        Q.    What were annual sales of AmLactin at the time

CONFIDENTIAL

**Page 57**

1   you took the license?

2       A.   I don't recall.   Probably someplace in the 15 to

3   $20 million a year level.

4       Q.   And do you recall the profit margins on the

5   product?

6       A.   No, I don't.

7       Q.   At the time of entering the license agreement

8   with TriStrata, did you undertake any diligence to

9   determine if the patent being licensed was valid?

10      A.   Say that again?

11      Q.   At the time you, Upsher-Smith, took the license

12  from TriStrata, had you performed any due diligence to

13  determine if the TriStrata patent was valid?

14      A.   We did minimal due diligence on that.

15      Q.   And what did you conclude?

16      A.   I don't know.

17           MR. D'AMORE:   Just -- okay.

18      Q.   BY MR. ACKERMAN:   And did you do any analysis to

19  determine whether the AmLactin product infringed any

20  claim of the TriStrata patent?

21      A.   We did some analysis.

22      Q.   And what did you conclude?

23           MR. D'AMORE:   I just want to caution the

24  witness to be wary of attorney-client privilege issues.

25           THE WITNESS:   I can't answer that question.

**Page 58**

1    Q.   BY MR. ACKERMAN:   So we don't know the view on

2  infringement and there was no conclusion on validity?

3    A.   No, that's not what I testified.

4    Q.   Right.   You're unable, because of privilege, to

5  indicate your position on infringement?

6    A.   Correct.

7    Q.   And for validity, you indicated that you hadn't

8  reached a conclusion, correct?

9    A.   I think I said I don't really recall.

10    Q.   Okay.   In reaching the agreement with TriStrata,

11  did Upsher-Smith assume that the patent was both valid

12  and infringed?

13    A.   Yes, sir.

14    Q.   Now you've mentioned a number of times the

15  Herbert patent, and that had relation to a product,

16  Folgard RX?

17    A.   Yes, sir.

18    Q.   And you indicated that Dr. Herbert was an older

19  gentleman at the time of these negotiations?

20    A.   Yes, sir.

21    Q.   Did Dr. Herbert have a product on the market?

22    A.   No, sir.

23    Q.   Approximately how old was Dr. Herbert?

24    A.   I can't recall.   80?   75?

25    Q.   And you indicate that Dr. Herbert contacted

CONFIDENTIAL

Page 59

1    Upsher-Smith and claimed that Folgard RX was infringing

2    the claims of his patent?

3        A.    That is correct.

4        Q.    Did Dr. Herbert come to you with a proposal at

5    the point of that initial contact?

6        A.    I don't recall.

7        Q.    I believe you indicated that, earlier testimony,

8    that Dr. Herbert actually preferred an upfront payment,

9    correct?

10       A.    Correct.  Well, I think, I think that he was

11   amenable to an upfront payment.  His health wasn't that

12   great at that point in time.  I think he was very

13   amenable to an upfront.

14       Q.    Do you recall how much patent term was left in

15   the Herbert patent that was being offered at the time?

16       A.    I do not recall.

17       Q.    And you indicate that you acquired Dr. Herbert's

18   patent for a nominal upfront payment and no ongoing

19   royalties.  What was the amount of that nominal upfront

20   payment?

21       A.    I don't recall.  To the best of my recollection,

22   it was someplace in the low six figure or less, but I

23   don't recall.

24       Q.    And what's the basis for that?

25       A.    Just general recollection.

CONFIDENTIAL

Page 60

1    Q.    And when you say low six figure, what are you --

2    A.    Hundred thousand, someplace in that range.

3    Q.    But you actually do not recall sitting here

4    today?

5    A.    I do not.

6    Q.    And in the case of the Herbert transaction, you

7    didn't receive a non-exclusive license; you acquired an

8    assignment of Dr. Herbert's patents, is that correct?

9    A.    That's correct.

10   Q.    And in paragraph 29 you indicate that you

11   "considered an ongoing royalty for a patent with no

12   ongoing commercial benefit to be commercially

13   unreasonable."

14           MR. D'AMORE:  I'm sorry, where are you?

15           MR. ACKERMAN:  I'm sorry.

16   Q.    BY MR. ACKERMAN:  I'm on paragraph 29, lines 1

17   through 3 of page 11?

18   A.    Yes.

19   Q.    So at the time of the transaction, you

20   considered the Herbert patent to have no ongoing

21   commercial benefit?

22   A.    Correct.

23   Q.    I thought you indicated earlier that you believe

24   that it had strategic benefit to Upsher-Smith.

25   A.    Strategic, not commercial benefit.

CONFIDENTIAL

Page 61

1     Q.    What's the difference?

2     A.    Strategic was it was an asset that we thought we

3  might be able to cross-license to somebody else

4  potentially.  It wasn't going to increase the revenues of

5  the product that it was covering.  We thought

6  strategically it was maybe something that having assigned

7  to us would be a benefit.

8     Q.    At the time of the transaction with Dr. Herbert,

9  had Pamlab already inserted infringement against

10  Upsher-Smith on the Folgard RX product?

11    A.    I do not believe so.

12    Q.    Were you aware of discussions with Pamlab over

13  potential infringement?

14    A.    Repeat that question?

15    Q.    Sure.  At the time of the transaction with

16  Dr. Herbert, had Upsher-Smith already been in discussions

17  with Pamlab regarding Pamlab's allegations of

18  infringement?

19    A.    I can't recall the timing.

20    Q.    Now Upsher-Smith ultimately asserted the Herbert

21  patent in litigation, correct?

22    A.    I believe that's correct.

23    Q.    And at the time of the assertion, did

24  Upsher-Smith believe that that patent was valid?

25    A.    We did.

1          MR. D'AMORE:  Okay.

2      Q.   BY MR. ACKERMAN:  And do you believe that it was

3  infringed by Pamlab?

4      A.   We did.

5      Q.   And yet despite believing that this patent that

6  you acquired was both valid and infringed, you believe it

7  only had strategic benefit and not commercial benefit to

8  Upsher-Smith?

9      A.   Correct.

10     Q.   Was Pamlab selling a competing product against

11 Folgard RX?

12     A.   I don't recall if they had a competing product.

13 They very well could have.  They had a patent that we had

14 interest in.

15     Q.   And if Upsher-Smith had prevailed in the

16 litigation, would it have been able to have enjoined

17 Pamlab from selling the competing product?

18          MR. D'AMORE:  Object to the form of the

19 question.  Calls for speculation.

20          THE WITNESS:  I don't know.

21     Q.   BY MR. ACKERMAN:  If it had, would that have

22 conferred a commercial benefit on Upsher-Smith?

23          MR. D'AMORE:  Object to the form of the

24 question.  Calls for speculation, improper hypothetical.

25          THE WITNESS:  I don't believe that was the,

CONFIDENTIAL

Page 63

1   our objective.

2       Q.   BY MR. ACKERMAN:   What was your objective in

3   suing another company for patent infringement then?

4       A.   This was a, I can't remember the details of it,

5   but this was a case that probably never should have

6   happened.  By mishaps in communication it ended up going

7   into litigation.

8               MR. ACKERMAN:   We're about to run out of

9   tape so why don't we take a break.

10              VIDEOGRAPHER:   We are going off the record.

11  The time now is 10:42.

12              (Short break taken.)

13              VIDEOGRAPHER:   We are back on the record.

14  This is the beginning of tape 2 of the continuing

15  deposition of Mark Robbins, Ph.D.  The time now is 10:49.

16  BY MR. ACKERMAN:

17      Q.   Dr. Robbins, what was your involvement, what was

18  your level of involvement in the TriStrata deal?

19      A.   I was directly involved with the discussions.

20      Q.   And what steps, if any, did you do to determine

21  what value Upsher-Smith should pay for the license

22  agreement with TriStrata?

23      A.   We did a valuation in terms of what, if any,

24  value the license had to us from a commercial standpoint.

25  We looked to see what impact the license had on the

1    profitability of the product we were selling, the

2    AmLactin.  Based upon that assessment, we determined what

3    we thought would be a reasonable level to resolve the

4    issue.

5        Q.    Now are these analyses that you performed or did

6    somebody else in your group perform those?

7        A.    Somebody else within the company performed it,

8    not necessarily my group.

9        Q.    And in the case of the purchase of the Herbert

10   patent, what was your involvement in that transaction?

11       A.    Essentially similar.

12       Q.    And what steps, if any, did Upsher-Smith do to

13   evaluate the appropriate value that it should pay for the

14   Herbert patent?

15       A.    Very similar type of assessment that we talked

16   about with the AmLactin for the TriStrata.

17       Q.    How much value did Upsher-Smith put on obtaining

18   exclusive rights to the Herbert patent?

19             MR. D'AMORE:  Object to the form of the

20   question.

21             THE WITNESS:  Not a huge value.  In that

22   marketplace for the, this was the Folgard RX product,

23   there was constant new competitors entering and leaving

24   the market.  This is a highly competitive marketplace.

25   It wasn't a marketplace that we gained any real

CONFIDENTIAL

Page 65

1    exclusivity value.  Like I said, the main interest was

2    more from a strategic standpoint; that we thought that

3    might be a benefit.

4        Q.   BY MR. ACKERMAN:  And from a strategic

5    standpoint of either asserting the patent or

6    cross-licensing, did Upsher-Smith acquire exclusive

7    rights or ownership of the patent to obtain those

8    strategic goals?

9        A.   We needed it for the cross-licensing.

10       Q.   Do you recall how much Dr. Herbert first asked

11   for the sale of the patent?

12       A.   I do not.

13       Q.   In the context of the TriStrata agreement, do

14   you recall what TriStrata's initial offer was on the

15   licensing agreement?

16       A.   I do not.

17       Q.   Now the term "adversarial licensing," is that a

18   term that Dr. Spilker uses in his "Guide to Drug

19   Development"?

20       A.   I don't recall.

21       Q.   If we could turn to Exhibit 2, the Spilker

22   publication, page 1097.

23       A.   Yes, sir.

24       Q.   There is a section that he describes, it's a

25   paragraph, "Development Options for a Small Company with

```
 1        Q.    BY MR. ACKERMAN:   What's that?
 2        A.    I never talked to him about this separately.
 3        Q.    And are you aware of any article or publication
 4   of Dr. Spilker where he criticizes the so-called
 5   adversarial licensing model?
 6               MR. D'AMORE:   Object to the form of the
 7   question.
 8               THE WITNESS:   So Model D I do not consider
 9   an adversarial licensing model.
10        Q.    BY MR. ACKERMAN:   Okay.
11        A.    Was that your question?
12        Q.    Well, my new question is:   Are you aware of any
13   publication where Dr. Spilker uses the term "adversarial
14   licensing" or criticizes it as a model?
15        A.    I'd have to see that to refresh my recollection.
16   At the top of my head, I do not have that information.
17   But for the record --
18        Q.    You don't believe that --
19        A.    -- this is not what I would call an adversarial
20   licensing model.
21        Q.    I believe I asked this about some of the
22   university licenses, but the two agreements that you
23   referred to as, in the context of your experience with
24   adversarial licenses, the Herbert acquisition and the
25   TriStrata, neither of those agreements were provided to
```

CONFIDENTIAL

Page 70

1   counsel for Genentech, correct?

2         A.    Correct.

3         Q.    And to the best of your knowledge, those

4   agreements were not produced to Phigenix, correct?

5         A.    Correct.  I do not have copies of those

6   agreements.

7         Q.    And sitting here today, you didn't have a

8   specific recollection of the actual amounts paid?

9         A.    That's correct.

10        Q.    In the case of the Herbert acquisition, were

11  there any back-end payments if there was successful

12  assertion of the Herbert patent?

13        A.    From what I recall, no, there were not.

14        Q.    Looking at paragraph 30 of your report, you

15  indicate that, "In my experience, determining a

16  reasonable payment for adversarially-asserted patents

17  with no commercial benefit to the licensee involves a

18  look at the relative risks borne by the licensee relative

19  to the investment by the licensor in the intellectual

20  property."  In the context of this paragraph, is your

21  experience limited to the two cases of adversarial

22  license we just discussed?

23        A.    And like I said, from what I've read about

24  patent trolling and those aspects of it but, yes.

25        Q.    In the case of the TriStrata agreement, did you

CONFIDENTIAL

**Page 71**

1    have any information on the investment by the licensor in

2    the intellectual property?

3         A.    Just a general feeling.

4         Q.    But no numerical or quantitative data?

5         A.    Their investment was the cost of procuring the

6    patent.  There was no research work that was associated

7    with that.

8         Q.    And how did you reach that conclusion?

9         A.    From what the company's existence was and what

10   they had, what their -- there was just a patent.

11        Q.    But you didn't have any access to their

12   accounting records, for example?

13        A.    I did not.

14        Q.    And they didn't provide any reports on what

15   their actual investments may have been, correct?

16        A.    Correct.

17        Q.    So you were able to assess Upsher-Smith's risks

18   but you really weren't able to assess, with any accuracy,

19   the investments by the licensor in that case?

20             MR. D'AMORE:  Object to the form of the

21   question.  Misstates testimony.

22             THE WITNESS:  And I was going to say I'm

23   not sure that's exactly what I said.  We did look at what

24   reasonable costs we would have associated with having

25   that, and I said they were, to the most part, within the

CONFIDENTIAL

Page 72

1   range of what patent prosecution costs would be.

2       Q.   BY MR. ACKERMAN:   And that was your assumption,

3   but at the time you actually didn't have data on that,

4   correct?

5       A.   I did not have any hard core financial data on

6   that.

7       Q.   And would that also be true in the case of the

8   Herbert patent?

9               MR. D'AMORE:   Object to the form.

10              THE WITNESS:   Dr. Herbert had done a little

11  bit more experimentation.   Not a lot.   He was an expert

12  in his career over folic acids, so his career was

13  invested in folic acid.   The actual what was in the

14  patent part was, was relatively a small amount, it was

15  primarily the patent fees, and that we did do some

16  discussions with his attorney.

17      Q.   BY MR. ACKERMAN:   On the level of investment

18  that he made?

19      A.   Pardon me?

20      Q.   On Dr. Herbert's level of investment?

21      A.   In general.

22      Q.   And approximately what amount of investment by

23  Dr. Herbert were you basing your calculations on?

24      A.   It was a relatively small dollar amount.   I

25  don't remember the exact number.

1    June 2016.

2        Q.   I would like to discuss a little bit your

3    Section X where you're discussing the licensing and

4    technologies compared by Dr. Wyse.   Now in Section X you

5    discuss a number of licensing agreements that were

6    discussed in Dr. Wyse's report, and throughout the day we

7    discussed two other agreements that you thought were

8    relevant.   Did you look at any other agreements besides

9    the ones raised in Dr. Wyse's report and the two

10   adversarial license agreements that we discussed earlier

11   today in framing your opinions about the royalty rate to

12   be paid as a result of a hypothetical negotiation?

13               MR. D'AMORE:   Object to the form.

14               THE WITNESS:   So the only agreements I

15   looked at in this case were the agreements I believe

16   cited by Dr. Wyse.

17       Q.   BY MR. ACKERMAN:   Okay.

18       A.   I did not look at those adversarial agreements

19   because I don't have copies of them.

20       Q.   So you looked at the agreements that Dr. Wyse

21   looked at and in general find they're not comparable to

22   the hypothetical negotiation, correct?

23               MR. D'AMORE:   Object to the form.

24               THE WITNESS:   I don't think any of these

25   agreements have any similarity to the situation.

CONFIDENTIAL

Page 176

1                    REPORTER'S CERTIFICATE
2     STATE OF MINNESOTA )
                         ) ss.
3     COUNTY OF CARVER   )
4
           I hereby certify that I reported the videotaped
5     deposition of MARK S. ROBBINS, PH.D., J.D. on the 1st day
      of June, 2017, in Minneapolis, Minnesota, and that the
6     witness was by me first duly sworn to tell the truth;
7          That the testimony was transcribed by me and is a
      true record of the testimony of the witness;
8
           That the cost of the original has been charged to
9     the party who noticed the deposition, and that all
      parties who ordered copies have been charged at the same
10    rate for such copies;
11         That I am not a relative or employee or attorney or
      counsel of any of the parties, or a relative or employee
12    of such attorney or counsel;
13         That I am not financially interested in the action
      and have no contract with the parties, attorneys, or
14    persons with an interest in the action that affects or
      has a substantial tendency to affect my impartiality;
15
           That the right to read and sign the deposition by
16    the witness was reserved;
17
           WITNESS MY HAND AND SEAL THIS 13th day of June, 2017.
18
19
20
21
22    Elizabeth J. Gangl
23
24         Elizabeth J. Gangl
           Notary Public, Carver County, Minnesota
25         My commission expires 01/31/2020

CONFIDENTIAL

Page 177

1               ACKNOWLEDGMENT OF DEPONENT

2        I, MARK S. ROBBINS, PH.D., do hereby certify

3    that I have read the foregoing transcript of my

4    testimony taken on 6/1/17, and further certify

5    that it is a true and accurate record of my

6    testimony (with the exception of the corrections

7    listed below):

8    Page    Line                    Correction

9    ____|_____|_____|_____

10   ____|_____|     SEE ATTACHED    |_____

11   ____|_____|_____|_____

12   ____|_____|_____|_____

13   ____|_____|_____|_____

14   ____|_____|_____|_____

15   ____|_____|_____|_____

16   ____|_____|_____|_____

17   ____|_____|_____|_____

18   ____|_____|_____|_____

19   ____|_____|_____|_____

20   ____|_____|_____|_____

21   _____

                    MARK S. ROBBINS, PH.D.

22   SIGNED UNDER PENALTY OF PERJURY

     SUBSCRIBED AND SWORN TO BEFORE ME

23   THIS _____ DAY OF _____, 20___.

24

     _____      _____

25   (NOTARY PUBLIC)            MY COMMISSION EXPIRES:

# ERRATA SHEET
### *Phigenix, Inc. v. Genentech, Inc.*
### *C15-01238 BLF-NMC*

**DATE TAKEN:** June 1, 2017      **WITNESS NAME:** Mark S. Robbins, PH.D.

## *I wish to make the following changes for the following reasons:*

| PAGE | LINE | CHANGE FROM | CHANGE TO | REASON |
|------|------|-------------|-----------|--------|
| 7 | 17 | my report prepared | the report I prepared | Transcription error |
| 8 | 11 | .5% | 0.5% | Transcription error |
| 8 | 15 | .5% | 0.5% | Transcription error |
| 9 | 20 | rights of | rights to | Transcription error |
| 10 | 1 | evaluation | valuation | Transcription error |
| 10 | 2 | evaluation | valuation | Transcription error |
| 10 | 19 | required | acquired | Transcription error |
| 13 | 23 | evaluation | valuation | Transcription error |
| 15 | 7 | with Tapemark | with the Tapemark | Transcription error |
| 16 | 25 | in licensing | in-licensing | Misspelling |
| 16 | 2 | licensing to those | licensing those | Transcription error |
| 25 | 8 | Yep | Yes | Transcription error |
| 34 | 8 | aboard | onboard | Transcription error |
| 34 | 10 | validate. | validate our technology. | Clarification |
| 38 | 14 | can do it | can disclose it | Clarification |
| 40 | 22 | CO resident | CEO In Residence | Transcription error |
| 41 | 13 | is is | is | Transcription error |
| 73 | 25 | is is you | is.  You | Transcription error |
| 78 | 2 | plenty | plenty of | Transcription error |
| 78 | 5 | it infringes | infringes | Transcription error |
| 82 | 5 | huge. | substantial royalty. | Clarification |
| 84 | 25 | So | So it | Transcription error |
| 84 | 18 | biosimilar. | biosimilar act. | Clarification |
| 85 | 4 | rate of poor | rating for | Transcription error |
| 94 | 1 | amenable | applicable | Transcription error |
| 95 | 16 | mark -- | market -- | Transcription error |

1

| PAGE | LINE | CHANGE FROM | CHANGE TO | REASON |
|------|------|-------------|-----------|--------|
| 128 | 17 | that and | the | Transcription error |
| 131 | 18 | CO resident | CEO In Residence | Transcription error |
| 131 | 19 | the U | the University of Minnesota | Clarification |
| 136 | 25 | product's | patent's | Misspoke |
| 137 | 9 | and valid | and invalid | Transcription error |
| 144 | 22 | valid, it | valid, but it | Transcription error |
| 149 | 4 | Making | Taking | Misspelling |
| 149 | 18 | PAX2 breast | PAX2 in breast | Transcription error |
| 151 | 25 | Phigenix | Kadcyla | Transcription error |
| 169 | 1 | documentation. | documentation.  After looking at the documents I need to amend my calculation. The royalties paid to ImmunoGen through the second quarter of 2016 were $31,196,700. | Correction for accuracy |
| 169 | 16-17 | I believe that's correct.  I have to see Dr. Wyse's report. | The royalties paid to ImmunoGen through the second quarter of 2016 were $31,196,700. | Correction for accuracy |

WITNESS SIGNATURE

2