# Exhibit 1

1              IN THE UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF CALIFORNIA

2

3      PHIGENIX, INC.,                    )

                                          )

4                    Plaintiff,           )

                                          ) CASE NO.

5              vs.                        )

                                          ) C 15-01238 BLF

6      GENENTECH, INC.,                   )

                                          )

7                    Defendant.           )

8

9                         - - -

10              VIDEOTAPED DEPOSITION OF

11           CARLTON DEWITT DONALD, PH.D.

12

                    December 2, 2016

13

                       8:32 a.m.

14

15                    Suite 1400

                1075 Peachtree Street, NE

16                  Atlanta, Georgia

17

18          Pamela L. Porter, RPR, CCR-B-2160

19                       - - -

20

21

22

23

24

25

                                        Page 1

```
 1                 (Reporter disclosure made pursuant to
 2         Article 10.B of the Rules and Regulations of the
 3         Board of Court Reporting of the Judicial Council
 4         of Georgia.)
 5                 THE VIDEOGRAPHER:  We are on the record
 6         and the time is approximately 8:32 a.m., and
 7         this is the beginning of the video deposition
 8         Dr. Carlton Donald.
 9                 Will counsel present identify themselves
10         and who they represent.
11                 MR. JACOBS:  Michael Jacobs, Morrison &
12         Foerster for Genentech.  With me is Matt
13         Chivvis, Dr. Greg Dressler, and David Wildman.
14                 MR. ACKERMAN:  Paul Ackerman of Andrews,
15         Kurth, Kenyon on behalf of Phigenix and the
16         witness.
17                 THE VIDEOGRAPHER:  Thank you, Counsel.
18         Will the court reporter please swear in the
19         witness.
20                 CARLTON DEWITT DONALD, PH.D.,
21  having been first duly sworn, was examined and
22  testified as follows:
23                      CROSS-EXAMINATION
24  BY MR. JACOBS:
25         Q.   Good morning, Dr. Donald.
```

Page 6

1      Q.    And around the 2011 time period what is

2    your -- what are you actually spending time on

3    day-to-day?  Are you -- well, what are you spending

4    time on?

5      A.    Everything from fundraising efforts,

6    presenting the technology to potential investors,

7    working with the potential companies and designing

8    experiments that we would do for the validation

9    studies, any type of internal recordkeeping, I did

10   those things.

11           I generated reports that were either to

12   shareholders or to FRD.  I did all of those things

13   during that period.

14      Q.    Did you have any other sources of

15   income -- did you or your wife have any sources of

16   income other than Phigenix at any point between your

17   departure from MUSC and the present day?

18      A.    My wife did, not myself.

19      Q.    What is her source?

20      A.    My wife --

21           MR. ACKERMAN:  Objection.  You can answer.

22           THE WITNESS:  Thank you.  She actually is

23           an event planner, and she has a degree in

24           interior design as well as finance.  So she, in

25           addition to working with me at Phigenix on the

Page 79

```
 1                THE VIDEOGRAPHER:  Off the record at 1:38.
 2                (Deposition in recess, 1:39 p.m. to
 3        1:46 p.m.)
 4                THE VIDEOGRAPHER:  Back on the record at
 5        1:46.
 6        Q.     (By Mr. Jacobs)  We talked about
 7   fundraising you did through some point in 2011.  After
 8   that point, did you do additional fundraising?
 9        A.     Yes.
10        Q.     How much did you raise after that?
11        A.     I can -- the first round of fundraising
12   was just over $3 million.  Since then, maybe another
13   million and a half.  But numbers may not be perfect,
14   but that's pretty close.
15        Q.     We discussed earlier an offering circular
16   you used for the initial round of fundraising?
17        A.     Yes.
18        Q.     Did you create additional or modified
19   versions of that original circular?
20        A.     Yes.
21        Q.     How many versions of fundraising offering
22   documents have you created?
23        A.     I think it's two distinct ones that we
24   prepared.
25        Q.     Are you funding -- is that fundraising the
```

Page 180

1    source of funds for the litigation?

2         A.    Some, mostly, yeah.

3         Q.    What are the other sources of funding?

4         A.    Some moneys that I put in myself.

5         Q.    Is the law firm handling this case on a

6    contingency arrangement?

7              MR. ACKERMAN:  Objection.  Instruct the

8         witness not to answer.

9         Q.    (By Mr. Jacobs)  Is the law firm investing

10   resources in the case on its own dime?

11             MR. ACKERMAN:  Instruct the witness not to

12        answer.

13        Q.    (By Mr. Jacobs)  Are you going to follow

14   counsel's instruction?

15        A.    Yes.

16        Q.    Returning to the patent that's buried in

17   the stack.  If you look at Example 2, that's the --

18   starting on Column 30.

19        A.    Okay.

20        Q.    Is the content of Example 2 drawn from

21   the -- one of the Bose references we were discussing

22   earlier?

23             Exhibit -- do we have Exhibit 9 in front

24   of you from your deposition earlier, or -- I think

25   it's the one before that.  I think it's your previous

Page 181

1          THE WITNESS:  No.

2      Q.    (By Mr. Jacobs)  Why not?

3      A.    I just didn't.  I hadn't seen this paper

4  until probably, I guess, maybe a year ago.  But I

5  didn't study it.

6      Q.    So --

7      A.    In 2013.

8      Q.    What research did you do into the

9  mechanism of action of Kadcyla when you were

10  corresponding with Genentech in 2013?

11      A.    That's in -- in general conversations that

12  I had with other scientists that we work -- on the

13  scientific advisory board on mechanism of action.  I

14  can't give you a detailed, step-by-step approach that

15  we took.

16      Q.    Did you participate in the analysis that

17  was conducted with the law firm that led to the filing

18  of the lawsuit?

19          MR. ACKERMAN:  Objection.  You can answer

20      yes or no, but don't disclose the contents of

21      communications with counsel.

22          THE WITNESS:  Yes.  Yes.

23      Q.    (By Mr. Jacobs)  And what was your

24  contribution to the conclusion that there was a basis

25  for filing the lawsuit?

                                        Page 211

1            MR. ACKERMAN:   Again, you can answer to

2       the extent you can answer without disclosing

3       communications with counsel.

4            THE WITNESS:   I can't disclose the basis.

5       Q.    (By Mr. Jacobs)   Because of that

6  instruction?

7       A.    Yes.   Because it was communication between

8  attorney/client.

9       Q.    You did study this before Dr. Reginato's

10  deposition; correct?

11            MR. ACKERMAN:   Objection.

12            THE WITNESS:   Yes.   Sorry.   I read parts

13       of this maybe about a year ago.

14       Q.    (By Mr. Jacobs)   And you noted that when

15  Genentech was doing the work that led to its

16  development of Kadcyla, it chose certain cell lines to

17  study; correct?

18       A.    I see, yes.

19       Q.    And do you have any explanation for --

20  well, let me back up.

21            In Dr. Reginato's work, did he show

22  efficient PAX2 inhibition in any of the cell lines

23  that Genentech studied in -- as represented in the

24  Phillips paper?

25       A.    I don't --

Veritext Legal Solutions
866 299-5127

```
 1                 C E R T I F I C A T E
 2    STATE OF GEORGIA:
 3    COUNTY OF FULTON:
 4
              I hereby certify that the foregoing
 5    transcript was taken down, as stated in the
      caption, and the colloquies, questions, and
 6    answers were reduced to typewriting under my
      direction; that the transcript is a true and
 7    correct record of the evidence given upon said
      proceeding.
 8            I further certify that I am not a relative
      or employee or attorney of any party, nor am I
 9    financially interested in the outcome of this
      action.
10            I have no relationship of interest in this
      matter which would disqualify me from
11    maintaining my obligation of impartiality in
      compliance with the Code of Professional Ethics.
12            I have no direct contract with any party
      in this action and my compensation is based
13    solely on the terms of my subcontractor
      agreement.
14            Nothing in the arrangements made for this
15    proceeding impacts my absolute commitment to
16    serve all parties as an impartial officer of the
      court.
17            This, the 8th day of December, 2016.
18
19                        PAMELA L. PORTER, CCR-B-2160
20
21
22
23
24
25

                                          Page  253
```