1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

    PHIGENIX, INC.,                    )  C-15-01238 BLF
5                                      )
                    PLAINTIFF,         )  SAN JOSE, CALIFORNIA
6                                      )
              VS.                      )  MARCH 8, 2018
7                                      )
    GENENTECH, INC.,                   )  PAGES 1-45
8                                      )
                    DEFENDANT.         )
9    _____  )

10

11              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE BETH LABSON FREEMAN
12               UNITED STATES DISTRICT JUDGE

13

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:      FISH & RICHARDSON
                             BY:  AHMED J. DAVIS
16                           901 15TH STREET N.W., 7TH FLOOR
                             WASHINGTON, D.C.  20005
17
                             BY:  MATTHEW C. BERNTSEN
18                           ONE MARINA PARK DRIVE
                             BOSTON, MASSACHUSETTS  02210
19

20   FOR THE DEFENDANT:      MORRISON & FOERSTER
                             BY:  MICHAEL A. JACOBS
21                                CHRISTOPHER J. KENDALL
                             425 MARKET STREET
22                           SAN FRANCISCO, CALIFORNIA  94105

23   OFFICIAL COURT REPORTER:     LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
24

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

```
 1    SAN JOSE, CALIFORNIA                    MARCH 8, 2018

 2                  P R O C E E D I N G S

 3       (COURT CONVENED AT 9:03 A.M.)

 4            THE COURT:  OKAY.  LET'S CALL OUR NEXT CASE.

 5            THE CLERK:  CALLING CASE 15-1238, PHIGENIX VERSUS

 6    GENENTECH.

 7          COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

 8            MR. JACOBS:  GOOD MORNING, YOUR HONOR.

 9        MICHAEL JACOBS FROM MORRISON & FOERSTER.  WITH ME IS

10    JAMIE KENDALL.  WE'RE HERE FOR GENENTECH.

11            THE COURT:  GOOD MORNING, MR. JACOBS.

12            MR. DAVIS:  GOOD MORNING, YOUR HONOR.  IT'S A

13    PLEASURE TO MEET YOU.

14        MY NAME IS AHMED DAVIS.  I HAVE WITH ME MY COLLEAGUE,

15    MATTHEW BERNTSEN.  WE'RE FROM THE FIRM OF FISH & RICHARDSON,

16    AND WE'RE HERE ON BEHALF OF PHIGENIX AND ON BEHALF OF

17    DR. DONALD IN HIS CAPACITY AS THE FOUNDER AND CEO OF PHIGENIX.

18            THE COURT:  MR. DAVIS, WELCOME.

19            MR. DAVIS:  THANK YOU.

20            THE COURT:  YOU COME IN AFTER A LOT OF WATER HAS

21    PASSED UNDER THIS BRIDGE.

22            MR. DAVIS:  INDEED.

23            THE COURT:  ALL RIGHT.  MR. JACOBS, YOU'RE TAKING UP

24    YOUR NORMAL SPOT, AND WELCOME BACK.

25          WELL, I GUESS I CAN SAY WE KNEW THIS DAY WAS COMING,
```

1    DIDN'T WE?

2              MR. JACOBS:  WE DID, YOUR HONOR.

3              THE COURT:  YOU TOLD ME THAT FROM DAY ONE, AND THEN

4    YOU TOLD IT TO ME EARLY AND OFTEN.

5         SO HERE WE ARE, AND OF COURSE IT'S NEVER EASY FOR A COURT

6    TO ACTUALLY CROSS THE THRESHOLD OF AN EXCEPTIONAL CASE.  THAT'S

7    THE WHOLE POINT.  IT'S CERTAINLY NOT CLEAR AND CONVINCING

8    EVIDENCE.  WE'RE LOOKING AT WHAT IS EXCEPTIONAL HERE.

9         AND LET ME TELL YOU, BEFORE YOU START YOUR ARGUMENT -- AND

10   I'M REALLY INTERESTED IN YOUR COMMENTS -- I AM CONSIDERING

11   FINDING THE CASE EXCEPTIONAL, BUT ONLY AT THE POINT WHERE THE

12   INFRINGEMENT CONTENTION MORPHED INTO SOMETHING THAT WAS

13   UNDISCLOSED UNTIL THE OPPOSITION FOR SUMMARY -- UNTIL I GUESS

14   THE DEPOSITION OF THE EXPERT.  PESTELL, IS THAT HIS NAME?

15             MR. JACOBS:  PESTELL, YES.

16             THE COURT:  PESTELL, AND THAT WAS LONG AFTER YOUR

17   OPPORTUNITY TO DEVELOP YOUR CASE BASED ON THAT CONTENTION.

18        OF COURSE THAT HAS EXTRAORDINARY IMPLICATIONS FOR THE FEES

19   THAT YOUR CLIENT HAS HAD TO PAY.  IN FACT, IT WOULD PROBABLY

20   CUT OUT ABOUT 90 PERCENT OF THE FEES YOU'RE REQUESTING, AND I'M

21   AWARE OF THAT.  YOU'VE GIVEN ME A HIGH LEVEL DECLARATION

22   SUMMARIZING THE FEES, WHICH ACTUALLY WAS VERY HELPFUL TO ME,

23   ALTHOUGH I KNOW YOU'LL BRIEF IT DIFFERENTLY WHEN YOU'RE

24   ACTUALLY REQUESTING THE AMOUNT IF YOU GET TO THAT STAGE.

25             MR. JACOBS:  YES.

```
1            THE COURT:  BUT IT WAS HELPFUL.

2        SO I GUESS THAT'S THE DIVIDING LINE THAT I DON'T FIND

3    DIFFICULT IN THIS CASE.

4        AND I'M -- BUT I -- YOU KNOW, WE TALKED, FROM THE RULE 11

5    MOTION FORWARD, ABOUT THE FAILURE TO ADEQUATELY CONDUCT A

6    PRE-SUIT INVESTIGATION, INCLUDING THE TESTING, AND, YOU KNOW, I

7    TAKE THOSE EARLY MOTIONS AS MAYBE A -- AS CERTAINLY A GOOD

8    FAITH REQUEST FOR THE RELIEF REQUESTED, BUT ALSO AN ATTEMPT TO

9    EDUCATE THE JUDGE ABOUT THE SERIOUS CONCERNS THAT A PARTY MIGHT

10   HAVE ALONG THE WAY, WHICH, OF COURSE, YOU HAVE DONE.

11       SO I JUST -- I'M GOING TO LEAVE IT AT THAT.  LET ME HEAR

12   FROM YOU, THEN MR. DAVIS WILL RESPOND.

13            MR. JACOBS:  SURE.

14            THE COURT:  THEN WE'LL GET TO THE ISSUE OF JOINDER OF

15   DR. DONALD SEPARATELY, IF I COULD.

16            MR. JACOBS:  TERRIFIC, YOUR HONOR.  THANK YOU.  THANK

17    YOU FOR THE INDICATION OF A POSSIBLE DIVIDING LINE.

18        THERE IS A KIND OF ORIGINAL ERROR HERE THAT LED TO THE

19   DEVELOPMENTS THAT YOUR HONOR IDENTIFIED AS A POSSIBLE DIVIDING

20   LINE, AND THE ORIGINAL ERROR IS AN ERROR OF THOUGHT, AN ERROR

21   OF CONSIDERATION, AN ERROR OF DELIBERATION.

22        ANY PATENT LITIGATOR LOOKING AT THAT PATENT WOULD HAVE

23   SEEN WHERE THIS WAS GOING TO GO.  AND WE KNOW THAT SOMETHING

24   HAPPENED IN THAT PRE-FILING INQUIRY PHASE BECAUSE PHIGENIX HAS

25   TWICE NOW PUNTED ON THE QUESTION, WHAT DID THEY ACTUALLY DO?
```

1    WHAT DID THEY KNOW AND WHEN DID THEY KNOW IT?

2         SO I INFER FROM THAT, AND I URGE THAT YOU INFER FROM THAT,

3    NOT JUST THAT THERE'S AN ABSENCE HERE, BUT IN THE CONTEXT OF A

4    285 MOTION, A MOTION FOR EXCEPTIONAL CASE WHERE YOUR HONOR HAS

5    ALREADY CALLED THEM TO TASK FOR NOT COMING FORWARD WITH

6    EVIDENCE OF THEIR PRE-FILING INQUIRY, THAT IT'S NOT JUST THE

7    ABSENCE OF AN INQUIRY, BUT THAT THERE'S SOMETHING MORE THAT

8    WENT ON AT THAT EARLY STAGE.

9         AND MAYBE IT'S AS SIMPLE AS, YOU KNOW, WE DON'T REALLY

10   NEED TO LOOK AT VALIDITY BECAUSE WE HAVE THE PRESUMPTION OF

11   VALIDITY.

12        AND WE HAVE -- WE IDENTIFIED FOR YOUR HONOR CASES THAT SAY

13   THAT'S JUST NOT RIGHT.  IF THERE'S A VALIDITY ISSUE THAT'S

14   JUMPING OUT AT YOU, YOU DO HAVE TO LOOK AT VALIDITY.

15        AND THIS VALIDITY ISSUE JUMPED OUT AT THEM.  IT JUMPED OUT

16   AT THEM WHEN YOU LOOK AT THE FACE OF THE PATENT.  IT JUMPED OUT

17   AT THEM WHEN WE WROTE THEM A LETTER AND SAID, "BUT YOU CAN'T

18   HAVE THIS BOTH WAYS."

19        AND WHAT WE GOT BACK -- IT'S INTERESTING TO LOOK BACK ON

20   THE VARIOUS POSITIONS THAT PHIGENIX TOOK, BECAUSE THE POSITION

21   THEY TOOK THEN WAS TO UN -- TO IGNORE THE LAST 20 YEARS OF CASE

22   LAW ON INHERENCY AND TO SAY, "WELL, WE DIDN'T RECOGNIZE, OR THE

23   PRIOR ART DIDN'T RECOGNIZE THAT PAX2 WAS INHIBITED BY THESE

24   TREATMENTS.  GENENTECH DIDN'T RECOGNIZE AND, THEREFORE,

25   GENENTECH'S OWN '244 APPLICATION CAN'T BE PRIOR ART."

1        THAT WAS JUST FALSE UNDER THE LAW.  IT WAS NOT GOOD LAW TO

2    SAY THAT YOU HAVE TO RECOGNIZE.  THE FEDERAL CIRCUIT HAS SAID

3    OVER AND OVER AGAIN THAT YOU DON'T HAVE TO RECOGNIZE.

4        AND THEN THEY FOUGHT THE IDEA THAT THAT WHICH INFRINGES IF

5    LATER IN TIME NECESSARILY ANTICIPATES, AND IF THERE -- IF THERE

6    WAS EDUCATION GOING ON, YOUR HONOR, IT WAS US TRYING TO CONVEY

7    TO YOU HOW SOLID THE LAW WAS ON THOSE TWO ISSUES, ON YOU DON'T

8    NEED TO RECOGNIZE, AND THERE -- AND THAT WHICH INFRINGES IF

9    LATER IN TIME ANTICIPATES IF EARLIER IN TIME.

10       SO THERE WAS THIS ORIGINAL FAILURE, A FAILURE TO PLOT A

11    STRATEGY THAT WOULD GET TO INFRINGEMENT AND AVOID INVALIDITY.

12       AND THEN THERE WAS THIS, THIS REALLY STRANGE FAILURE, THIS

13    FAILURE TO TEST OR TO TEST EARLY, AND I WANT TO BE -- I WANT TO

14    BE PRECISE ABOUT THIS.

15       THEY NEVER ASKED FOR KADCYLA.  WE'VE DEMONSTRATED THAT.

16    THEY'VE SAID OVER AND OVER AGAIN, DONALD HIMSELF SAID -- AND

17    YOU MAY RECALL THIS FROM SOME OF OUR EARLIER BRIEFING -- DONALD

18    HIMSELF SAID, "IN ORDER TO KNOW, YOU HAVE TO TEST."

19       I'VE BEEN THINKING ABOUT ALL THE PATENT CASES THAT I KNOW

20    HAVE BEEN BEFORE YOUR HONOR AND HOW THIS STANDS OUT AS

21    EXCEPTIONAL BECAUSE I BET IN YOUR MIND, THEY ALL KIND OF JUMP

22    OUT IN SOME WAY.  THEY'RE LARGE.  THEY LOOM LARGE.

23       BUT IN THIS KIND OF CASE, THIS IS A SCIENCE CASE.  IT IS

24    KNOWN HOW TO KNOW TO, AS WE USED TO SAY, A REASONABLE DEGREE OF

25    SCIENTIFIC CERTAINTY WHETHER KADCYLA INHIBITS PAX2.  THAT IS A

1    TESTABLE PROPOSITION USING PROPER SCIENTIFIC TECHNIQUES.

2         AND EVEN IF, LET'S GIVE -- LET'S BE SUPER CHARITABLE AND

3    SAY THAT WHAT THEY WERE DOING IN A PROPER PRE-FILING INQUIRY

4    WAS DOING EVERYTHING THEY COULD POSSIBLY HAVE DONE SHORT OF

5    OBTAINING KADCYLA AND TESTING IT.

6         NOW, LET ME STEP BACK FOR A MINUTE.  WE DON'T EVEN -- WE

7    DON'T HAVE THAT, BECAUSE WE HAVE NO DECLARATION FROM AN EXPERT

8    SAYING, "I LOOKED AT WALKER, FOR EXAMPLE --"

9         THE COURT:  UM-HUM.

10        MR. JACOBS:  "-- AND I CONCLUDED THIS WAS A

11   MERITORIOUS THEORY."

12        WE DON'T HAVE DILIGENCE UP TO AND OBTAINING KADCYLA.

13        BUT LET'S ASSUME --

14        THE COURT:  WELL, AND I WILL SAY THAT THE WHOLE

15   WALKER EPISODE WAS BEYOND BIZARRE IN MY VIEW WHEN THE AUTHOR

16   COMES IN AND SAYS, "YOU CAN'T QUOTE ME LIKE THAT."  IT'S LIKE

17   THAT OLD WOODY ALLEN MOVIE WITH MARSHAL MCLUHAN STEPPING INTO

18   THE SET.

19        BUT ANYWAY --

20        MR. JACOBS:  A FAVORITE SCENE, YOUR HONOR.

21        YES, THAT'S AN EXAMPLE OF THE EXCEPTIONALITY OF THEIR

22   FAILURE.

23        BUT LET'S BE SUPER CHARITABLE.  LET'S BE CHARITABLE AND

24   SAY THEY DID ALL THIS WORK, BUT THEY COULDN'T GET KADCYLA.  AND

25   LET'S SAY THEY SAID TO US, "IT WOULD HAVE BEEN FUTILE TO ASK

1    FOR IT.  WE KNOW GENENTECH WOULDN'T HAVE GIVEN IT TO US."

2         BUT THE RIGHT THING TO DO THEN IS TO FILE A MOTION FOR

3    EARLY DISCOVERY OR TO WRITE US A LETTER AFTER FILING THE

4    COMPLAINT AND SAY, "WE'VE DONE EVERYTHING WE CAN DO, BUT WE

5    REALLY NEED KADCYLA AND WE REALLY NEED TO TEST IT BECAUSE WE

6    NEED TO ESTABLISH WHETHER PAX2 IS INHIBITED BY KADCYLA."

7         SO THAT'S A NOBLE PROPOSITION.  THERE'S A WAY, THERE'S A

8    TECHNIQUE IN OUR PROCESS FOR DOING THAT SORT OF THING.

9         THEY DIDN'T DO THAT.

10        THERE'S ALSO -- THERE'S ANOTHER ASPECT OF THIS, WHICH IS

11   BASIC SCIENCE AND KNOWABLE, AND THAT'S NOT JUST WHETHER KADCYLA

12   INHIBITS PAX2, BUT WHETHER IT DIFFERENTIALLY INHIBITS PAX2

13   BASED ON THE PRETREATMENT REGIMEN, THEIR ULTIMATE THEORY.

14        THEY NEVER TESTED THE TWO LEGS OF THEIR -- OF WHAT WOULD

15   HAVE BEEN THEIR ULTIMATE THEORY.  THEY NEVER SAID -- THEY NEVER

16   SHOWED THAT KADCYLA DIFFERENTIALLY INHIBITS PAX2 DEPENDING ON

17   THE PRETREATMENT REGIMEN.  THEY JUST DID TESTING OF THE

18   PRETREATED SUBSTANCES.

19        SO THERE ARE TWO BASIC THINGS THAT ARE KNOWABLE

20   SCIENTIFICALLY, AND THEY DIDN'T DO THAT SCIENCE.  AND IT'S NOT

21   LIKE THEY'RE NOT SCIENTISTS.  DR. DONALD IS A SCIENTIST.

22   DR. DONALD SAID YOU HAVE TO TEST.

23        SO THEN THEY FINALLY PRODUCED TESTING, AND IN THE RULE 11

24   STAGE, WE WEREN'T -- WE HADN'T TAKEN THE DEPOSITIONS YET, WE

25   WERE KIND OF JUST DEALING WITH, OKAY, THEY'VE GOT TESTING NOW,

1    WHERE ARE WE ON RULE 11?

2              THE COURT:  UM-HUM.

3              MR. JACOBS:  BUT THEN WE REALLY DIVE DEEP AND FIGURE

4    OUT WHAT THEY'VE DONE AND WE TAKE THE DEPOSITIONS.

5              YOUR HONOR, THERE'S A WAY TO DO SCIENTIFIC TESTS.  YOU USE

6    POSITIVE CONTROLS.  YOU USE NEGATIVE CONTROLS.  AND IT IS

7    UNDISPUTED THAT THEY DID NOT USE POSITIVE CONTROLS.  NOT ONLY

8    DID THEY NOT USE POSITIVE CONTROLS, THEY DIDN'T USE POSITIVE

9    CONTROLS IN A CIRCUMSTANCE IN -- IN CIRCUMSTANCES IN WHICH, BY

10   THEIR OWN ADMISSION, THESE ARE VERY FAINT SIGNALS THAT EVEN

11   THEIR EXPERT IS GETTING.

12             SO RECALL, FOR EXAMPLE, ON THE PCR EXPERIMENT, THEY HAVE

13   TO -- IT'S LIKE ONE OF MY FAVORITE MOVIE SCENES, "SPINAL TAP,"

14   WHERE THEY TURN THE VOLUME UP TO 11.  THEY TURN THE PCR MACHINE

15   UP TO ITS MAXIMUM AMPLIFICATION AND THEN THEY GET A TINY, TINY

16   SIGNAL.  AND THEIR OWN EXPERT ACKNOWLEDGES THAT WHEN YOU TURN

17   THE KNOB THAT FAR, YOU HAVE TO BE WORRIED THAT YOU'RE GETTING A

18   SPURIOUS SIGNAL AND YOU'RE NOT ACTUALLY GETTING AMPLIFICATION.

19             SO WE KNOW HOW TO TEST AND WE KNOW HOW TO TEST PROPERLY.

20   I -- I THINK I'M LIKE YOU IN THIS.  MY SCIENCE DIDN'T GO BEYOND

21   HUMAN BIO IN COLLEGE.  BUT IF THERE'S ONE THING THAT GOT

22   DRUMMED INTO US, IT'S USING PROPER CONTROLS.

23             THE COURT:  YEAH.

24             MR. JACOBS:  AND SO TO COME FORWARD WHEN THEY DID,

25   FINALLY, WITH TESTS THAT DON'T USE PROPER CONTROLS, IT'S

1    JUST -- IT HAS TO BE TRACEABLE TO THAT ORIGINAL ERROR, THE

2    ORIGINAL ERROR NOT TO DO A PROPER PRE-FILING INQUIRY, BECAUSE

3    HAD THEY DONE A PROPER PRE-FILING INQUIRY, WE WOULD NOT, WE

4    SUBMIT, HAVE FOUND OURSELVES IN THE SITUATION AT THE DIVIDING

5    LINE THAT YOUR HONOR HAS IDENTIFIED, THE DIVIDING LINE WHERE

6    THEY'VE NOW DECIDED TO NARROW THEIR CASE.

7         THERE ARE A COUPLE OF OTHER MILESTONES THAT I THINK ARE

8    WORTH NOTING ALONG THE WAY AS ONE THINKS ABOUT POSSIBLE BREAK

9    POINTS.

10        AGAIN, TRYING TO GIVE THEM THE BEST POSSIBLE CASE HERE,

11   MAYBE THEY SAID, "YOU KNOW, WE REALLY DIDN'T DO MUCH VALIDITY

12   ANALYSIS PRE-FILING BECAUSE WE CAN RELY ON THE PRESUMPTION OF

13   VALIDITY AND GENENTECH HAS AN OBLIGATION TO SHOW INVALIDITY BY

14   CLEAR AND CONVINCING EVIDENCE."

15        THE CASE LAW DOESN'T SUPPORT THAT, AS I INDICATED EARLIER.

16   THE CASE LAW SAYS, YOU KNOW, IF THERE'S A VALIDITY ISSUE THAT

17   JUMPED -- I THINK SYNTHESIZING THE CASE LAW, IF THERE'S A

18   VALIDITY ISSUE PRESENTED TO YOU OR THAT JUMPS OUT AT YOU, YOU

19   DO HAVE A DUTY.

20        AND BY THE WAY, THE RECENT CASE THAT WE SUBMITTED IN OUR

21   STATEMENT OF RECENT DECISION IS RIGHT ON, RIGHT?  I MEAN, IT'S

22   ACTUALLY PRETTY TOUGH ON PLAINTIFFS.  "YOU SHOULD HAVE KNOWN

23   THAT YOUR CLAIMS WOULD HAVE BEEN UNPATENTABLE UNDER SECTION

24   101, AND YOU SHOULD HAVE NOT PURSUED YOUR CASE AFTER THAT."

25        I THINK OUR CASE IS MORE EXTREME IN THE "WHAT THEY SHOULD

1        HAVE KNOWN" ASPECT OF THIS.

2               BUT WHEN YOUR HONOR GRANTED SUMMARY JUDGMENT ON THE

3        PRIORITY DATE, THAT'S A SOMEWHAT EARLIER DIVIDING LINE --

4               THE COURT:  IT IS.

5               MR. JACOBS:  -- THAN THE ONE YOU HAVE IDENTIFIED.

6               THE COURT:  YES.

7               MR. JACOBS:  ONCE THEY LOSE THE PRIORITY DATE, THEN

8        THERE'S A REALLY INTERESTING THING THAT HAPPENED, AND WE HAD

9        BACK AND FORTH WITH YOUR HONOR, SO IN A SENSE, I'M GOING TO

10       SLIGHTLY RELITIGATE SOMETHING.

11              SO RECALL THAT YOUR HONOR SAID, NO, THEY DON'T GET THE

12       2005 PRIORITY DATE.

13              THEN THERE WAS THE 2008 CASE --

14              THE COURT:  RIGHT.

15              MR. JACOBS:  -- AND THE 2010 CASE.  AND BECAUSE, AS

16       YOUR HONOR NOTED AT THE TIME, WE DID NOT WANT TO CREATE FACT

17       DISPUTES WITH EXPERTS, WE SUBMIT A RED LINE OF THE 2008 CASE --

18              THE COURT:  UM-HUM.

19              MR. JACOBS:  -- SAYING, "LOOK, THERE'S NO NEW

20       SUBSTANCE HERE THAT GOES TO THE QUESTION OF SUPPORT FOR BREAST

21       CANCER CLAIMS."

22              AND YOUR HONOR SAID -- AND THEY SAID, IN THEIR OPPOSITION,

23       THAT THERE IS A FACT DISPUTE HERE.  AND YOUR HONOR HELD US TO A

24       BURDEN AND SAID, "YOU DIDN'T REALLY SHOW THAT THERE'S NO FACT

25       DISPUTE AND THEY'VE SAID -- IMPLIEDLY SAID, THEY HAVEN'T

1    CONCEDED IT -- THEY SAY THERE'S A FACT DISPUTE."

2         AND THEN IN DENYING US SUMMARY JUDGMENT ON THE KADCYLA

3    CLINICAL TRIALS, YOUR HONOR POINTED TO THE PRE-2008 TRIALS AND

4    SAID, "THEY'RE NOT IDENTICAL TO THE LABEL, AND SO YOU HAVEN'T

5    SHOWN ME THAT THAT WHICH INFRINGES IF LATER IN TIME ANTICIPATES

6    IF EARLIER IN TIME, THAT THAT STANDARD IS MET."

7         SO BY CREATING A FACT DISPUTE AROUND WHETHER THE 2008 CASE

8    WAS ENTITLED PRIORITY, BY URGING THAT FACT DISPUTE, THEY --

9    THEY COST US SEVERAL MORE MONTHS OF LITIGATION.

10        AND THEN WHAT HAPPENS?  IT TURNS OUT THAT THEY CONCEDE

11   THAT THERE IS NO PRIORITY BACK TO 2008 FOR THE ISSUED CLAIMS.

12   THEIR OWN EXPERT SAYS, NO, 2010.  THEIR OWN EXPERT SAYS 2010.

13        THEY MADE NO ARGUMENT EVER THAT 2008 WAS THE APPLICABLE

14   PRIORITY DATE.  ALL THEY DID IN OPPOSING OUR SUMMARY JUDGMENT

15   MOTION IS SAY THERE'S A FACT DISPUTE ABOUT THIS.

16        THERE WASN'T A FACT DISPUTE ABOUT IT.  AND HAD THERE BEEN

17   NO FACT DISPUTE, I CAN'T REPLAY YOUR --

18           THE COURT:  I ACTUALLY THINK THE RULING WAS A LITTLE

19    DIFFERENT, AND I DETERMINED THAT YOU DIDN'T MEET YOUR MOVING

20    BURDEN, WHICH IS DIFFERENT THAN THE PLAINTIFF COMING FORWARD

21    WITH EVIDENCE SUPPORTING A FACTUAL DISPUTE.

22        SO I DO TAKE A LITTLE ISSUE WITH WHAT I -- I DIDN'T READ

23    IT THIS MORNING, BUT I'M ACTUALLY PRETTY CERTAIN THAT I DREW

24    THE DISTINCTION THAT YOU DIDN'T MEET YOUR MOVING BURDEN, YOU

25    DIDN'T HAVE EXPERTS SUPPORTING WHAT YOU WERE TELLING ME, AND

1   THAT I -- SO YOU DIDN'T -- SO I THINK THAT WAS THE DISTINCTION

2   THERE.

3           MR. JACOBS:  YOU'RE ABSOLUTELY RIGHT.  THAT'S WHAT I

4   INTENDED TO CONVEY.

5           THE COURT:  OKAY.

6           MR. JACOBS:  BUT IF THEY HAD SAID, "WE AGREE WE ARE

7   ONLY ENTITLED TO A 2010 PRIORITY DATE," THE PRIORITY DATE OF

8   THE ACTUAL ISSUED PATENT, THEN THERE WOULD NOT HAVE BEEN THAT

9   INTERVENING QUESTION AT ALL.

10          THE COURT:  OKAY.

11          MR. JACOBS:  AND SO TO SAY -- SO TO NOT CONCEDE THE

12  POINT AND TO IN FACT ARGUE THAT OUR CLINICAL TRIALS THAT ARE

13  RELEVANT WERE DIFFERENT THAN THE FINAL CLINICAL TRIALS BECAUSE

14  THEY'RE EXCLUDING THE EMILIA TRIAL, THE LAST TRIAL, THEY TOOK A

15  POSITION THAT WAS EXCEPTIONAL IN THE FACE OF THEIR LATER

16  ABANDONMENT OF IT.

17          AND SO WE END UP WITH ANOTHER WHOLE -- JUST AN ENORMOUS

18  EXPENSE, ACTUALLY, ALL THE EXPERTS AND ALL THE WORK THAT HAD TO

19  BE DONE TO THEN PROVE WHAT WE SORT OF DECIDED NOT TO TRY.

20          THE COURT:  UM-HUM.

21          MR. JACOBS:  SO THAT'S ANOTHER REALLY IMPORTANT -- TO

22  US ANOTHER REALLY IMPORTANT BENCHMARK.  THE DENIAL OF THE

23  PRIORITY DATE AND THE DENIAL OF THE REST OF OUR -- THE DENIAL

24  OF THE REST OF OUR SUMMARY JUDGMENT MOTION BECAUSE THEY DIDN'T

25  CONCEDE SOMETHING THEY WOULD LATER CONCEDE.

```
 1              THE COURT:  WELL, THAT'S AN INTERESTING POINT.  SO --

 2    AND, OF COURSE, I THINK THE CASE LAW WELL SUPPORTS THE COURT

 3    LOOKING AT DIFFERENT ASPECTS OF THE CASE TO DETERMINE WHEN THE

 4    CONDUCT MIGHT HAVE CROSSED THE LINE.

 5              MR. JACOBS:  EXACTLY.

 6              THE COURT:  YEAH.

 7              MR. JACOBS:  THERE IS THEN ONE MORE, ONE MORE

 8    POSSIBLE DIVIDING LINE --

 9              THE COURT:  UH-HUH.

10              MR. JACOBS:  -- WHICH IS THE RESPONSE TO THE RULE 11

11    MOTION AND THE -- AND THE TESTING RESULTS THAT THEY ADDUCED AT

12    THE LAST MOMENT AS THAT PROCESS WAS UNWINDING.

13         SO YOUR HONOR'S OPINION WAS VERY CAREFULLY WORDED ON

14    RULE 11.  YOUR HONOR SAID IT'S NOT BASELESS, AND YOU -- YOU

15    REALLY -- YOU LANDED ON THAT WORD, "BASELESS."  THERE'S SOME --

16    WHEN I WAS TRYING TO PLAY IN MY MIND THE MEANING OF THE WORD,

17    WELL, NOT BASELESS MEANS THERE'S SOME BASIS, AND YOUR HONOR'S

18    RULE 11 RULING SAID, "THERE IS SOME BASIS FOR THIS, BUT I HAVE

19    VERY SERIOUS CONCERNS."

20              THE COURT:  I GUESS IT WAS A NOTCH ABOVE FRIVOLOUS.

21              MR. JACOBS:  IT WAS A -- YOU KNOW, HONESTLY, YOUR

22    HONOR, IN THE MOMENT, WE INTERPRETED IT AS, "I REALLY THINK

23    THIS CASE HAS VERY SERIOUS FLAWS," AND YOUR HONOR HAD SIGNALLED

24    THIS ALONG THE WAY, "BUT I DON'T WANT TO TAKE THEM OUT OF THE

25    CASE ON A RULE 11 MOTION."
```

```
1              THE COURT:  UM-HUM.
2              MR. JACOBS:  THAT'S NOT THE PLACE TO ADJUDICATE THE
3       MERITS.
4              THE COURT:  YEAH.  AND, WELL, THE TESTING WAS GOING
5       TO HAPPEN.
6              MR. JACOBS:  EXACTLY.
7              THE COURT:  AT THAT POINT, I WAS PROMISED THERE WOULD
8       BE TESTING AND I ASKED TO WAIT BECAUSE I'D HATE TO DISMISS A
9       CASE AND THEN FIND THAT THE TESTING SHOWED EXACTLY WHAT WAS
10      ALLEGED.
11             MR. JACOBS:  SO THEN WE GET THE TESTING, AND THIS IS
12      JUST ANOTHER MOMENT IN TIME.
13             THE COURT:  UM-HUM, YEAH.
14             MR. JACOBS:  AND IF THE BEST -- IF I'M COUNSEL FOR A
15      LITIGANT AND I KNOW HOW TO TEST AND I KNOW THAT I SHOULD USE
16      PROPER CONTROLS, I KNOW THAT IF I'M MAKING A DIFFERENTIAL
17      POINT, I.E., KADCYLA WITH, UNDER A CERTAIN PRETREATMENT
18      REGIMEN, IS DIFFERENT THAN KADCYLA WITHOUT THAT PRETREATMENT
19      REGIMEN, THAT I HAVE TO TEST BOTH; THAT I HAVE TO USE POSITIVE
20      CONTROLS AND NEGATIVE CONTROLS; AND I GET -- AND I DON'T DO
21      THAT AND I GET SUCH, EVEN BY MY OWN EXPERT'S RECKONING, SUCH A
22      FAINT SIGNAL, THAT'S EXCEPTIONAL.
23          AT THAT MOMENT, WHEN THEY SAW HOW FAINT THE SIGNAL WAS,
24      EVEN BY THEIR OWN EXPERT'S RECKONING, AND DID NOT HAVE
25      CONTROLS, THAT'S A MOMENT WHEN YOU SAY TO YOURSELF, "WE'VE GOT
```

```
1      TO BAIL ON THIS CASE.  WE DO NOT HAVE PROPER SCIENTIFIC

2      EVIDENCE TO GO FORWARD.  WE THOUGHT IT.  WE THOUGHT WALKER

3      SUPPORTED IT.  WE HAD THIS HYPOTHESIS.  WHEN WE ACTUALLY DID

4      THE TESTING, IT DIDN'T PROVE THE HYPOTHESIS BECAUSE THE TESTING

5      WAS SO POORLY DONE AND HAD SUCH A WEAK RESULT."

6          SO IN ANSWER TO -- JUST SORT OF TIEING THIS ALL UP.  WE

7      THINK THIS STARTS WITH THE FAILURE OF PRE-FILING INVESTIGATION,

8      THAT HAD THEY REALLY THOUGHT THROUGH, "WHERE ARE WE GOING WITH

9      THIS INDIRECT INHIBITION" -- INDIRECT INHIBITION OF PAX2 COULD

10     BE ANYTHING.

11         AS YOUR HONOR SO VIVIDLY POINTED OUT AT ONE OF OUR

12     HEARINGS, "IF I STAND ON MY HEAD AND DRINK MILK AND IT

13     INHIBITS" -- IT WAS BRILLIANT.

14         BUT IT ILLUSTRATED THE BREADTH OF THE CLAIM, BUT THAT

15     BREADTH HAS INVALIDITY CONSEQUENCES AND THEY NEVER RECKONED

16     WITH THAT.

17             THE COURT:  UM-HUM.

18             MR. JACOBS:  THEY NEVER RECKONED WITH THAT.

19         AND THEN EVERYTHING THAT FOLLOWS FLOWS FROM THE FAILURE OF

20     A PROPER PRE-FILING INQUIRY.

21         SO THAT'S WHY WE THINK THERE'S AN ORIGINAL ERROR HERE AND

22     WHY WE THINK WE SHOULD GO ALL THE WAY BACK.  I'VE HIGHLIGHTED

23     SOME OTHER POSSIBLE POINTS OF DELINEATION.

24             THE COURT:  THANK YOU, MR. JACOBS.

25             MR. DAVIS, THIS CASE DOES HAVE A TORTURED HISTORY.  I'M
```

1    SURE YOU'VE LEARNED IT SINCE YOUR -- IN FACT, I WELCOME YOUR

2    FRESH LOOK AT THE CASE, AND NOTHING I SAY IS -- REFLECTS ON THE

3    QUALITY OF YOUR WORK BECAUSE THIS IS NOT ABOUT YOUR WORK.

4            MR. DAVIS:  THANK YOU, YOUR HONOR, AND GOOD MORNING

5     AGAIN.

6        I DO WANT TO ADDRESS THE CONTEXT THAT WE NOW FIND

7    OURSELVES IN AND SOME OF THE COMMENTS THAT MR. JACOBS MADE.

8        OBVIOUSLY I DID HAVE AN OPPORTUNITY TO GO THROUGH MANY OF

9    THE PLEADINGS AND THE TRANSCRIPTS AND IT IS CERTAINLY TRUE

10   THAT, AS COUNSEL COMING IN SORT OF AFTER THE DUST HAS SETTLED,

11   THERE WERE COMMENTS THAT YOUR HONOR MADE THAT GAVE ME PAUSE, TO

12   SAY THE LEAST.

13       BUT AT THE SAME TIME, YOUR HONOR QUOTED A MOVIE, AS DID MY

14   COLLEAGUE, MR. JACOBS.  I THINK I NEED TO JOIN THE FRAY AND

15   QUOTE "THE PRINCESS BRIDE" AND SAY THAT HE CONTINUES TO USE THE

16   WORD "EXCEPTIONAL," BUT I DO NOT THINK THAT WORD MEANS WHAT HE

17   THINKS IT MEANS.

18       JUST FOR CONTEXT, ALL OF THE CASES THAT BOTH SIDES HAVE

19   CITED, AND IN FACT, ALMOST ALL OF THE CASES OF WHICH I AM AWARE

20   IN WHICH THERE HAS BEEN A FINDING OF POST-OCTANE EXCEPTIONALITY

21   UNDER 285 ARE NOT BIOTECH CASES.  THEY'RE NOT BIO PHARMA CASES

22   IN THE CLASSIC SENSE.

23       AND THAT'S BECAUSE THESE TYPE OF CASES GENERALLY FALL INTO

24   A DIFFERENT CATEGORY.  THIS IS NOT A CASE --

25            THE COURT:  NOT BECAUSE OCTANE SUGGESTS THAT, THOUGH?

```
 1              MR. DAVIS:  CORRECT.  CORRECT.

 2          BUT THIS IS SPECIFICALLY AS IT RELATES TO PRE-SUIT TESTING

 3      AND INVESTIGATION.

 4          THIS IS NOT THE KIND OF CASE THAT YOU SEE IN YUFA OR IN

 5      KILOPASS OR IN OTHERS WHERE ONE CAN WALK INTO A BEST BUY, FOR

 6      EXAMPLE, AND BUY A COMPUTER OFF THE SHELF --

 7              THE COURT:  UM-HUM.

 8              MR. DAVIS:  -- AND REMOVE THE MOTHERBOARD AND DO YOUR

 9      TESTING.

10              THE COURT:  UM-HUM.

11              MR. DAVIS:  AND I THINK THAT IT'S IMPORTANT TO

12      NOTE -- AND BOTH SIDES HAVE SAID THIS IN THEIR BRIEFING AND

13      YOUR HONOR IS AWARE -- THAT THE FEDERAL CIRCUIT HAS SAID THAT

14      TESTING ISN'T EVEN NECESSARY OR REQUIRED IN THOSE INSTANCES.

15          WHAT A PARTY NEEDS TO DO IN THE PRE-SUIT PHASE IS A

16      REASONABLE INVESTIGATION UNDER THE CIRCUMSTANCES.

17          AND, AGAIN, WE WEREN'T INVOLVED, BUT AS I GO BACK READING

18      OVER THE RECORD, PART OF THE REASON THAT YOUR HONOR DENIED THE

19      RULE 11 MOTION, AS I UNDERSTAND IT, IS BECAUSE THERE WAS, AT

20      THE TIME, ARTICLES THAT WERE POINTED TO THAT SUBSTANTIATED THE

21      CLAIM AT THAT POINT IN TIME.

22          AND I UNDERSTAND THAT --

23              THE COURT:  WELL, THE WALKER EXPERIENCE WAS A LITTLE

24      DIFFERENT, BUT --

25              MR. DAVIS:  I UNDERSTAND THAT WAS DIFFERENT.
```

1        THE COURT:  I MEAN, SHE -- SHE EXPRESSLY STATED,

2    "YOU'VE TAKEN MY WORK OUT OF CONTEXT AND YOU CAN'T CITE ME FOR

3    THE PROPOSITIONS YOU'RE RELYING ON."

4        MR. DAVIS:  NOW --

5        THE COURT:  AND SO THAT -- THAT WOULD SAY NOTHING

6    ABOUT THE GOOD FAITH IN ADVANCE OF CITING WALKER.

7        BUT AFTER THAT WAS MADE CLEAR TO PHIGENIX, AGAIN, WE'RE --

8    I'M LOOKING AT POINTS IN THE LITIGATION WHERE THE RED FLAGS

9    WERE SO SIGNIFICANT, AND I THINK BY MY OPENING COMMENTS, YOU

10   CAN UNDERSTAND THAT I'M -- I'M NOT LOOKING NECESSARILY TO GO

11   BACK TO DAY ONE IN THIS CASE.

12       I STARTED AT A VERY HIGH BAR FOR MR. JACOBS, BASICALLY

13   CUTTING THE LEGS OUT FROM UNDER HIS CHANCE OF RECOVERY.  HE'S

14   WALKED IT BACK QUITE A BIT.

15       BUT HE HAS VERY HELPFULLY SHOWN ME SOME OTHER POINTS IN

16   THE LITIGATION WHERE WE ARE POST-FILING AND THEN WE GET TO

17   THE -- WHAT YOU LEARNED ABOUT WALKER AND HOW IT WOULD BE

18   UNREASONABLE TO RELY ON WALKER IN FRONT OF A JURY WHEN

19   MS. WALKER, OR DR. WALKER HERSELF IS GOING TO COME TO COURT AND

20   SAY "YOU'VE MISQUOTED ME."  THAT WOULD BE PREPOSTEROUS.

21       BUT THEN THE QUALITY OF THE TESTING THAT TOOK -- IT REALLY

22   TOOK A LONG TIME.  I SEEM TO RECALL MONTHS AND MONTHS OF

23   EXTENSIONS.  AND I WAITED BECAUSE I -- OBVIOUSLY CASES SHOULD

24   BE TRIED ON THE MERITS AND I DID NOT WANT TO BE LEFT IN A

25   SITUATION WHERE YOU HAD TO SEEK RELIEF FROM JUDGMENT BECAUSE OF

1    NEW EVIDENCE, AND SO I GAVE YOU ALL THE TIME THAT PHIGENIX

2    ASKED FOR.

3         SO NOW LET'S TALK ABOUT, IS MR. JACOBS WRONG THAT -- WITH

4    THE -- HE CLAIMED IN THE MOTION FOR SUMMARY JUDGMENT, AND AGAIN

5    IN THESE PAPERS, THAT THE TESTING WOULD NEVER HAVE BEEN

6    ADMITTED BEFORE A JURY, IT WAS SO FLAWED.  SO LET'S TALK ABOUT

7    THAT AS WELL.

8         MR. DAVIS:  SURE.  AND LET ME PREFACE THIS -- AS YOUR

9    HONOR KNOWS, I AM COMING INTO THIS AFTER THE FACT.

10        THE COURT:  OH, NO, I UNDERSTAND.  AND AS I SAY, I

11   REALLY APPRECIATE THE FRESH LOOK THAT YOU CAN TAKE, AND I DON'T

12   HAVE TO WORRY -- I MAY BE UNHAPPY WITH HOW THE CASE PROGRESSED,

13   BUT I'M NOT UNHAPPY WITH ANYTHING YOU'VE DONE.

14        MR. DAVIS:  THANK YOU, YOUR HONOR.  HOPEFULLY I'LL

15   KEEP IT THAT WAY.

16        THE COURT:  I'M SURE YOU WILL.

17        MR. DAVIS:  BUT LET ME TIE ONE LITTLE STRING UP

18   REGARDING THE BEGINNING OF THE TESTING --

19        THE COURT:  SURE.

20        MR. DAVIS:  -- BECAUSE I DO THINK IT'S IMPORTANT.

21        MR. JACOBS, BOTH HERE AND IN THE BRIEF, TALKED ABOUT WHAT

22   REASONABLE AND EXPERIENCED, COMPETENT PATENT COUNSEL MIGHT DO,

23   AND HE USED THE PHRASE THAT THE RIGHT THING TO DO WAS FOR

24   PHIGENIX'S COUNSEL TO ASK FOR KADCYLA TO DO THE TESTING AT THAT

25   EARLY STAGE.

1          THE COURT:  UM-HUM, YEAH.

2          MR. DAVIS:  RESPECTFULLY, WE WOULD DISAGREE WITH

3     THAT.  IF ANYTHING, IT -- AND I DON'T KNOW THE CIRCUMSTANCES

4     BECAUSE I WASN'T THERE, BUT IT WOULD HAVE BEEN JUST AS EASY --

5     AND I WANT TO SUGGEST EVEN MORE SO -- FOR THEM TO HAVE HANDED

6     OVER THE PRODUCT FOR THE TESTING AT THAT STAGE.

7          AND, IN FACT, WHILE I'M DRAWING A BLANK RIGHT NOW ON THE

8     NAME OF THE FEDERAL CIRCUIT CASE, THERE IS A FEDERAL CIRCUIT

9     CASE FROM THE MID TO LATE 1990S IN WHICH THE FEDERAL CIRCUIT

10    SAID -- THIS IS PRE-OCTANE -- THAT A FINDING OF EXCEPTIONALITY

11    MAY WELL BE SUPPORTED WHEN THE PARTY ACCUSED OF INFRINGEMENT

12    TURNS OVER THE PRODUCT TO THE PARTY ALLEGING INFRINGEMENT AND

13    EITHER THEY DON'T TAKE IT OR THEY DON'T DO WHAT THEY COULD DO

14    WITH IT.

15         HERE WE HAVE A DRUG THAT IS ONLY AVAILABLE BY

16    PRESCRIPTION.

17         THE COURT:  OKAY.  SO IF YOU GET OVER THAT HURDLE,

18    AND I THINK THAT'S A REASONABLE RESPONSE, AND THEN YOU DID

19    CONDUCT THE TESTING.

20         MR. DAVIS:  THAT'S RIGHT.

21         AND MY UNDERSTANDING -- AND I BELIEVE THAT THERE WERE ALSO

22    DAUBERT MOTIONS THAT HAD BEEN FILED AND WERE PENDING WHEN YOUR

23    HONOR GRANTED THE SUMMARY JUDGMENT MOTION -- IS THAT WHILE

24    THERE WERE CERTAINLY STATEMENTS MADE BY DR. PESTELL FOR WHICH I

25    WOULD SAY, TAKING A FRESH LOOK COMING INTO THIS CASE, HE MIGHT

1    HAVE BEEN SUBJECT TO A RATHER STRONG CROSS-EXAMINATION BASED ON

2    WHAT I'VE SEEN, I DID NOT SEE ANY EVIDENCE IN THE RECORD WHERE

3    HE SAID, "THIS TESTING SIMPLY WON'T FLY" SPECIFICALLY AS A

4    BASIS FOR ESTABLISHING INFRINGEMENT.

5         WHAT I UNDERSTOOD FROM THE RECORD WAS THAT WHAT

6    DR. PESTELL SAID WAS THAT WAS DATA THAT HE WOULDN'T PUBLISH,

7    WHICH, AT LEAST TO ME, IS A DIFFERENT STANDARD.  THERE IS A

8    VERY BIG DIFFERENCE IN MY VIEW, RESPECTFULLY, BETWEEN WHETHER A

9    SCIENTIST WRITING A JOURNAL ARTICLE IN A PEER REVIEWED JOURNAL

10   WOULD PUBLISH AN ARTICLE --

11        THE COURT:  "I WOULDN'T PUT MY NAME ON IT FOR MY

12   PEERS TO SEE" IS A PRETTY GOOD INDICATION OF "I DON'T STAND BY

13   IT."  THAT -- I'M STRUGGLING WITH THAT, AND -- NOW, THE WAY THE

14   PAPERS WERE FILED, THE DAUBERT MOTION WAS FILED AS A STANDALONE

15   AND NOT A -- NOT NECESSARY FOR ME TO DECIDE IN ORDER TO GRANT

16   SUMMARY JUDGMENT, SO I DID.  I BELIEVE THAT'S WHY I DIDN'T

17   DECIDE IT.

18        MR. DAVIS:  I UNDERSTAND.

19        I GUESS THE ONLY THING THAT I WOULD SAY IN RESPONSE TO

20   THAT, YOUR HONOR, I DO UNDERSTAND, AND THINKING THROUGH THIS

21   FOR THE FIRST TIME, I IMAGINED THAT THE COURT MIGHT SAY

22   SOMETHING ALONG THOSE LINES AND MY RESPONSE WOULD BE THAT THE

23   BURDEN OF PROOF TO ESTABLISH INFRINGEMENT IN THIS COURT IS A

24   PREPONDERANCE.

25        THE COURT:  UM-HUM.

1        MR. DAVIS:  AND I'M NOT AWARE OF ANY SCIENTIST WHO

2   MIGHT THINK OF THAT BEING A STANDARD FOR A PEER REVIEWED

3   JOURNAL.  THAT'S THE BEST I CAN SAY ABOUT THAT.

4        THE COURT:  SURE.

5        MR. DAVIS:  HAVING SAID ALL THAT, I DO AGREE WITH

6   YOUR HONOR THAT THE LAW IS CLEAR THAT YOU CAN FIND A DIVIDING

7   LINE AND CREATE A BRIGHT LINE.

8        CERTAINLY WHILE OUR CLIENT DISAGREES WITH THE WAY THIS

9   CASE TURNED OUT --

10        THE COURT:  UM-HUM, SURE.

11        MR. DAVIS:  -- AND, IN FACT, THAT IT WAS ZEALOUSLY

12   ADVOCATED AND THEY ENDED UP ON THE WRONG END OF THAT ADVOCACY,

13   I THINK THAT IF THE COURT WERE TO DRAW A LINE ANYWHERE, I DO

14   THINK THAT IT IS WHERE YOUR HONOR ORIGINALLY SUGGESTED THE LINE

15   SHOULD BE DRAWN, AND IF MY TIMELINE IS RIGHT, I THINK THAT

16   THAT'S IN FEBRUARY OF 2017.

17        IT IS -- IN THE BRIEFING THERE IS DISCUSSION ABOUT

18   CHANGING OR SURPRISE -- I THINK COUNSEL USED THE WORD

19   "SURPRISE" INFRINGEMENT THEORIES.

20        AND, AGAIN, HUING TO THE WORD "EXCEPTIONAL," I THINK THAT

21   IT IS NOT UNCOMMON IN PATENT CASES TO SEE PARTIES NARROW THEIR

22   CLAIM CONSTRUCTION -- EXCUSE ME, NOT THEIR CLAIM

23   CONSTRUCTION -- NARROW THEIR INFRINGEMENT CONTENTIONS AS THE

24   CASE MOVES ALONG AND AS THE COURT MAKES CERTAIN RULINGS.

25        AND ONE OF THE THINGS THAT MADE THE KILOPASS CASE

1    DIFFERENT, WHICH THEY RELY ON AND SAY THAT IT'S HIGHLY

2    ANALOGOUS, ONE OF THE THINGS THAT MADE KILOPASS DIFFERENT WAS

3    THAT IN THAT CASE, THE PARTY WAS LITIGATING IN BOTH DISTRICT

4    COURT AND BEFORE THE PTAB, AND THEY TOOK POSITIONS IN THOSE TWO

5    SETTINGS THAT WERE DIAMETRICALLY OPPOSED, SO THAT WAS WHERE

6    PART OF THE PROBLEM LAY IN THAT INSTANCE.

7            THE COURT:  WHAT ABOUT MR. JACOBS' ARGUMENT THAT IN

8    THE EARLIER SUMMARY JUDGMENT WHEN I FOUND THAT THE 2005

9    PRIORITY DATE COULD NOT STAND AND DEFERRED -- FINDING -- AND

10   THEN FOUND THE 2008 HAD NOT BEEN SUBSTANTIATED, HE THEN ARGUES,

11   "BUT PHIGENIX THEN ABANDONED ANY ARGUMENT ON THE 2008 AND THAT,

12   IN FACT, IT'S REASONABLE TO INFER THAT PHIGENIX KNEW IT WAS

13   NEVER GOING FORWARD ON 2008 AND, THEREFORE, THE KADCYLA TESTING

14   WAS GOING TO BE THE CLEAR SUPPORT FOR THE ANTICIPATION

15   ARGUMENT."

16           MR. DAVIS:  I HEARD MR. JACOBS MAKE THAT ARGUMENT AND

17   I DO AGREE WITH YOUR HONOR -- AND I THINK HE DID AS WELL --

18   THAT YOUR HONOR, IN DENYING THEIR MOTION IN PART, REALLY DID

19   SAY THAT IT WAS, IT WAS THEIR BURDEN AND THEY DIDN'T

20   DEMONSTRATE THOSE FACTS.

21           THE COURT:  YEAH.

22           MR. DAVIS:  AND I THINK THAT THERE'S A DISTINCTION, A

23   REASONABLE DISTINCTION THAT CAN BE DRAWN BETWEEN A PARTY

24   DISAVOWING A PARTICULAR DATE IN THE PRIORITY CHAIN AND AN

25   EXPERT IN AN EXPERT REPORT OR ANY DEPOSITION SAYING, "FOR

1    PURPOSES OF THE OPINION THAT I HAVE STATED, YOU KNOW, IN THIS

2    EXPERT REPORT, FOR EXAMPLE, I AM ASSUMING THAT THE 2010 DATE IS

3    THE APPROPRIATE DATE."

4            THE COURT:  HMM.

5            MR. DAVIS:  AGAIN, LOOKING AT THIS AT THIS TIME, I

6    DID NOT READ THAT AS A DISAVOWAL.  I THOUGHT THAT WAS A VERY

7    STRONG WORD.

8            THE COURT:  I'M SURE IT WAS INTENDED TO BE.

9            MR. DAVIS:  YEAH.

10           SO, YOUR HONOR, AT THE END OF THE DAY, YOU KNOW, FRANKLY

11   AND IN CANDOR, COMING IN AND LOOKING AT THIS, THIS WAS AN

12   EXTREMELY CHALLENGING CASE.

13           THE COURT:  YEAH.

14           MR. DAVIS:  AND OUR CLIENT HAD AN UPHILL BATTLE --

15   THERE'S NO DOUBT ABOUT THAT -- AND THERE'S AN APPEAL AND OUR

16   CLIENT, QUITE FRANKLY, HAS AN UPHILL BATTLE.

17           BUT THE STATUTE FOR ATTORNEYS' FEES UNDER THE PATENT ACT

18   AND OCTANE FITNESS ARE NOT MEANT TO PRESCRIBE THE ACTIONS OF

19   PLAINTIFFS WHO BELIEVE THEY'VE BEEN WRONGED SIMPLY BECAUSE THEY

20   HAVE AN UPHILL BATTLE, SIMPLY BECAUSE THEY HAVE A CHALLENGE.

21           THE COURT:  AND IN THE FEW CASES WHERE I'VE BEEN

22   ASKED TO MAKE THIS RULING, I HAVE NOT FOUND EXCEPTIONAL.  I --

23   I LOOK VERY CAREFULLY AT THE DIVIDING LINE BETWEEN ZEALOUS

24   ADVOCACY AND EXCEPTIONALITY.

25           I AGREE WITH YOU COMPLETELY, MR. DAVIS.  IT MAKES IT A

```
 1    HARD DECISION, AND IT SHOULD BE A HARD DECISION FOR A COURT.

 2    EVEN UNDER OCTANE FITNESS, I THINK IT IS -- I MEAN, YOU KNOW,

 3    WE'RE -- THIS IS NOT LAKE WOEBEGONE, SO WE'RE NOT ALL

 4    EXCEPTIONAL HERE, AND SO I AGREE WITH YOU, AND I AM -- I THINK

 5    IT'S PRETTY CLEAR FROM EVERYTHING YOU'VE TOLD ME TODAY AND

 6    EVERYTHING I KNOW ABOUT THE CASE THAT THERE IS SOME POINT IN

 7    THIS CONTINUUM OF THIS LITIGATION THAT I WILL MARK AS WHEN THE

 8    CASE CROSSED THE THRESHOLD, AND I -- I'M GOING TO LOOK AT THE

 9    VARIOUS POINTS THAT MR. JACOBS OUTLINES.  I'M UNLIKELY TO ROLL

10    IT BACK TO THE FILING OF THE CASE.

11         AND I THINK YOU MAKE VERY GOOD POINTS.  I THINK I WAS

12    ALWAYS NERVOUS ABOUT THE -- CUTTING THE CASE OFF AT THAT POINT

13    AND I'M NOT INCLINED TO CHANGE MY VIEW.

14         I AM -- I'M VERY CONCERNED ABOUT THE TESTING ISSUE.

15              MR. DAVIS:  I UNDERSTAND.

16              THE COURT:  AND -- AND SO THAT IS A VERY POSSIBLE

17    TIME.  AND I'M -- I'M CONCERNED ABOUT THE TIME IMMEDIATELY

18    AFTER I ISSUED MY FIRST SUMMARY JUDGMENT RULING, WHICH WAS ONLY

19    A PARTIAL VICTORY AND DIDN'T END THE CASE AS GENENTECH HAD

20    HOPED.

21         BUT, AGAIN, IT WAS SENDING A CLEAR RULING TO PHIGENIX

22    ABOUT WHAT IT WOULD HAVE TO DO AND, I MEAN, I -- MR. JACOBS

23    HAS -- OR I SHOULD SAY GENENTECH HAS -- HE IS THEIR ATTORNEY

24    DOING WHAT THEY'RE ASKING -- GENENTECH HAS BEEN EXTRAORDINARILY

25    AGGRESSIVE IN FIGHTING THIS CASE, AND THAT'S THEIR RIGHT.
```

```
 1              AND SO I HAVE BETTER RECALL OF THIS CASE THAN I DO OF MOST

 2    OF MY CASES BECAUSE YOU'VE BEEN BEFORE ME SO MANY TIMES AND THE

 3    FACTS ARE A LITTLE BIT DIFFERENT THAN MOST OF THE CASES I HAVE.

 4              BUT WHAT MR. JACOBS POINTS OUT TODAY, AND I THINK IS

 5    UNMISTAKABLE, IS THAT EVEN DURING THE, THE LICENSING

 6    DISCUSSIONS, GENENTECH HAS PUT PHIGENIX ON CLEAR NOTICE OF ALL

 7    OF THESE ISSUES FROM, FROM WELL BEFORE THE CASE WAS FILED.

 8              AND SO THERE WAS NO DEVELOPMENT OF GENENTECH'S STRATEGY

 9    THAT THEN PHIGENIX HAD TO GRAPPLE WITH, BECAUSE I WOULDN'T

10    PRESUME THAT YOU SHOULD ANTICIPATE HOW THEY WILL LITIGATE THEIR

11    CASE.

12              BUT THIS IS ONE OF THOSE CIRCUMSTANCES WHERE I THINK

13    GENENTECH WAS MORE THAN CLEAR ABOUT THE STRENGTH OF THE

14    ARGUMENTS THEY BELIEVED THAT THEY HAD, AND THAT -- I MEAN, THAT

15    IS CERTAINLY PART OF THIS NEW CASE THAT MR. JACOBS HAS PROVIDED

16    TO ME ON JUST THAT ISSUE.

17              SO THAT'S WHAT I'M GOING TO BE LOOKING AT.

18              MR. DAVIS:  I HEAR WHAT YOUR HONOR IS SAYING.

19         IF I COULD JUST MAKE ONE FINAL POINT?

20              THE COURT:  YES, OF COURSE.

21              MR. DAVIS:  IT TURNS OUT OUR FIRM ACTUALLY WAS

22    COUNSEL ON THE WINNING SIDE OF THAT CASE THAT WAS JUST

23    SUBMITTED.

24              THE COURT:  WELL, YOU'RE ON THE WINNING SIDE IN A LOT

25    OF CASES.
```

1            MR. DAVIS:  THE ONE THING I WOULD NOTICE IS THAT IN

2      THAT CASE, THAT'S A POST-ALICE CASE --

3            THE COURT:  YES.

4            MR. DAVIS:  -- IN WHICH THE FEDERAL CIRCUIT SAYS THIS

5      IS AN AREA OF THE LAW THAT HAS BEEN IN FLUX.

6            THE COURT:  OKAY.

7            MR. DAVIS:  BUT THIS IS A CIRCUMSTANCE IN WHICH IT

8      WAS SO CLEAR, IT WAS SO OBVIOUS, IT WAS SO APPARENT --

9            THE COURT:  YES, THAT IS WHAT THEY SAY.  I AGREE WITH

10     YOU.

11           MR. DAVIS:  AND I DON'T SEE THIS AS THAT CASE.

12           THE COURT:  OKAY.  ALL RIGHT.

13           MR. DAVIS:  THANK YOU FOR YOUR TIME, YOUR HONOR.

14        AND TO THE --

15           THE COURT:  AND NOW WE NEED TO TALK ABOUT WHAT MAY BE

16     THE MOST IMPORTANT PART OF THIS, AND THAT IS WHETHER I'M GOING

17     TO JOIN DR. DONALD, SO LET ME START WITH YOU, MR. DAVIS.

18           MR. DAVIS:  WELL, RESPECTFULLY, YOUR HONOR, BEFORE

19     YOU DO THAT, MY COLLEAGUE, MR. BERNTSEN, IS GOING TO BE UP FOR

20     THAT ISSUE.

21           THE COURT:  OKAY, THAT'S GOOD.  YOU'RE OFF THE HOOK

22     THEN.

23           MR. DAVIS:  YES, FOR NOW.

24           THE COURT:  ALL RIGHT.

25        MR. BERNTSEN.

1          MR. BERNTSEN:  THANK YOU, YOUR HONOR.

2          THE COURT:  SO I, OF COURSE, START WITH LOOKING AT

3    THIS IS BEING AN EMPTY VICTORY FOR GENENTECH AND, IN FACT, YOU

4    WOULD HAND -- PHIGENIX ITSELF WOULD HAND OVER AN EMPTY BAG IF I

5    AWARDED ATTORNEYS' FEES.  THAT'S A CONCERNING CIRCUMSTANCE.

6          SO I -- I WILL TELL YOU THAT THERE WAS -- THE DECLARATIONS

7    FILED, ESPECIALLY BY DR. DONALD, LAID OUT ALL OF THE ISSUES I'D

8    WANT TO KNOW ABOUT AND DIDN'T DELIVER ANY SUBSTANCE TO ME.

9          I MEAN, TO TELL ME THERE ARE 100 SHAREHOLDERS IS FINE, BUT

10   DO THEY COLLECTIVELY OWN 2 PERCENT OF THE COMPANY?  I DON'T

11   BELIEVE YOU TOLD ME THAT.  TO TELL ME THAT THERE ARE FIVE BOARD

12   MEMBERS WHO HAVE EQUAL VOTES, BUT NOT TO TELL ME IF THERE WERE

13   ANY VOTES TAKEN IN REGARD TO THIS LITIGATION, I -- YOU KNOW, TO

14   GIVE ME A BARE BONES CORPORATE STRUCTURE TELLS ME THAT MAYBE

15   THIS REALLY IS A SHELL CORPORATION AND YOU'VE COMPLIED WITH THE

16   REQUIREMENTS UNDER THE LAWS OF INCORPORATION OF HAVING A BOARD

17   AND ALL OF THAT.  BUT I DON'T ACTUALLY SEE ANY EVIDENCE OF

18   CORPORATE STRUCTURE THAT IS HONORED IN THIS CASE.

19          MR. BERNTSEN:  THANK YOU FOR YOUR CONCERN, YOUR

20   HONOR.

21          FOR THE RECORD, MATT BERNTSEN WITH FISH & RICHARDSON.  I

22   DON'T KNOW THAT I STOOD UP AND SAID HELLO ON MY WAY UP HERE.

23          SO I WANT TO ADDRESS THE CONCERN, AND MY RECOLLECTION IS

24   THAT AS OF THE TIME OF ONE OF HIS DEPOSITIONS, DR. DONALD WAS A

25   MAJORITY SHARE -- PARDON ME -- MAJORITY SHAREHOLDER, BUT DID

1    NOT INDICATE EXACTLY WHAT PERCENTAGE HE OWNS.

2         OF COURSE, I WOULD IMAGINE, WITH A RELATIVELY SMALL

3    COMPANY LIKE PHIGENIX -- I DON'T HAVE THIS INFORMATION AT MY

4    FINGERTIPS -- THAT TO HAVE 100 SHAREHOLDERS, IT WOULD NOT MAKE

5    SENSE FOR AN INDIVIDUAL SHAREHOLDER TO OWN A MINUSCULE

6    FRACTION.

7         WITH RESPECT TO YOUR DOCTOR -- SORRY.

8         WITH RESPECT TO YOUR HONOR'S CONCERNS WITH RESPECT TO THE

9    BOARD, DR. DONALD DID INDICATE IN HIS DECLARATION THAT THERE

10   ARE FIVE SEATS.  HE HOLDS ONE.

11             THE COURT:  UM-HUM.

12             MR. BERNTSEN:  AND THAT EVERY MAJOR DECISION IN THIS

13   CASE, INCLUDING THE DECISION TO FILE A SUIT, WAS MADE BY A

14   MAJORITY OF THE BOARD.

15         SO IN THAT RESPECT, THIS IS NOT A COMPANY THAT IS MERELY

16   AN ALTER EGO OF DR. DONALD.  THIS IS A COMPANY THAT HAS A BOARD

17   THAT HAS FIVE MEMBERS, OF WHICH HE IS ONE, AND OBVIOUSLY THEY

18   HAVE DISCUSSIONS AND THEY COLLECTIVELY --

19             THE COURT:  THAT'S NOT OBVIOUS TO ME AT ALL IF I

20   DON'T SEE CORPORATE MINUTES.  I DON'T -- YOU KNOW, I'M NOT

21   PREPARED TO DRAW AN INFERENCE LIKE THAT.  WHEN YOU HAD -- I

22   MEAN, I SEE THESE DECLARATIONS ALL THE TIME.  THIS IS PRETTY

23   STANDARD TO GIVE ME SOME FURTHER INFORMATION.  IF THERE'S SOME

24   REASON TO SEAL THE MINUTES FROM THE PUBLIC, YOU COULD HAVE

25   ALWAYS ASKED FOR THAT.

1          BUT I HAVE TO SAY, I WAS REALLY LOOKING MORE AT WHAT

2     WASN'T THERE THAN WHAT WAS.  AND IT, UNFORTUNATELY, FOLLOWS THE

3     PATTERN THAT MR. JACOBS BRINGS OUT OF TWICE DECLINING TO

4     PROVIDE THE COURT WITH ANY INFORMATION ON THE PRE-SUIT

5     INVESTIGATION.

6          NOW, I RESPECT THE WORK PRODUCT AND ATTORNEY-CLIENT

7     PRIVILEGE, AND SO IT WAS CLEARLY DR. DONALD'S CHOICE, AS I

8     THINK I POINTED OUT IN PROBABLY THE RULE 11 MOTION.

9          YOU KNOW, IT -- IT DOES FOLLOW A LITTLE BIT OF A PATTERN

10    OF GIVING ME SOME HIGH LEVEL CONCLUSORY STATEMENTS THAT DON'T

11    DELIVER THE FACTS THAT I'D NEED TO REALLY BE CONFIDENT THAT

12    I'VE BEEN GIVEN EVIDENCE.

13          MR. BERNTSEN:  ON THAT FRONT, I UNDERSTAND YOUR

14    HONOR'S CONCERN, AND CERTAINLY IF YOUR HONOR WOULD LIKE

15    ADDITIONAL EVIDENCE, WE'LL PERFECTLY HAPPY TO GO BACK --

16          THE COURT:  NO, I DON'T LIKE TO HAVE ADDITIONAL

17    EVIDENCE.  THIS IS YOUR OBLIGATION TO ESTABLISH.

18          MR. DAVIS:  I UNDERSTAND THAT.

19          THE COURT:  AND SO, NO, I -- TYPICALLY YOU DON'T GET

20    TO COME TO COURT AND FIND OUT WHAT'S MISSING AND THEN SUPPLY

21    IT.

22          SO LET'S TALK ABOUT PERSONAL JURISDICTION, AND IF THERE'S

23    ANYTHING ELSE ON THIS ISSUE, I'M GLAD TO HEAR FROM YOU ON IT.

24          MR. BERNTSEN:  WELL, I MEAN, THE ONE POINT THAT I

25    WOULD LIKE TO RAISE IS THAT MR. JACOBS INDICATED HIS BELIEF

1    THAT ANY PATENT LITIGATOR WOULD HAVE SEEN THE ISSUES IN THIS

2    CASE RELATIVELY EARLY ON, AND AS MR. JACOBS ALSO INDICATED,

3    DR. DONALD IS NOT A PATENT LITIGATOR, HE'S A SCIENTIST.

4         SO TO THE EXTENT THAT WE'RE CONCERNED WITH RULE 11 OR --

5              THE COURT:  SO THAT'S INTERESTING.  WHAT DO YOU MEAN,

6    HE'S NOT A PATENT LITIGATOR?  YOU MEAN HE'S NOT TRAINED AS AN

7    ATTORNEY?

8              MR. BERNTSEN:  I MEAN HE'S NOT TRAINED AS AN

9    ATTORNEY.  I MEAN THAT DR. DONALD'S --

10             THE COURT:  OKAY.  THAT'S A FAIR STATEMENT.

11        BECAUSE WHEN YOU HAVE A COMPANY WHOSE SOLE ASSET IS A

12   PATENT AND YOU HAVE NO PRODUCT THAT PRACTICES THE PATENT, I

13   WOULD SAY DR. DONALD MAY BE A PATENT LITIGATOR IN THE SENSE OF

14   A PARTY.  BUT HE'S CLEARLY NOT TRAINED AS AN ATTORNEY.

15             MR. BERNTSEN:  AND I SEE YOUR HONOR'S DISTINCTION.

16        AND I THINK THE -- THE CLEAR DISTINCTION TO MAKE HERE IS

17   THAT GENENTECH SPENDS A SIGNIFICANT AMOUNT OF TIME IN ITS

18   BRIEFING ANALOGIZING THE FACTS OF THIS CASE TO THE FACTS OF THE

19   IRIS CONNEX CASE THAT CAME OUT OF THE EASTERN DISTRICT OF

20   TEXAS.

21             THE COURT:  WELL, THAT HAD DIFFERENT FACTS.  IT IS AN

22   EXTRAORDINARY CASE.

23             MR. BERNTSEN:  I WILL NOT BORE YOUR HONOR WITH

24   RUNNING THROUGH THE DIFFERENCES THEN.  IT SOUNDS LIKE YOU ARE

25   WELL VERSED WITH IT.

1        THE COURT:  WELL, WE CAN START WITH THE FACT THAT

2    PHIGENIX WASN'T INCORPORATED A FEW MOMENTS BEFORE THE CASE WAS

3    FILED AND GO ON FROM THERE, I SUPPOSE.

4        MR. BERNTSEN:  AND, INDEED, IT STARTED BY DOING

5    RESEARCH AND SEEKING PATENTS ON THAT RESEARCH.

6        THE COURT:  I DON'T THINK IT'S IRRELEVANT, THE

7    IRIS CONNEX CASE, BUT I WOULD AGREE THAT IT WAS AN

8    EXTRAORDINARY CIRCUMSTANCE.

9        MR. BERNTSEN:  INDEED.  INDEED.

10       I BELIEVE JUDGE GILSTRAP, WHO, AS YOUR HONOR IS AWARE,

11   SEES MANY, MANY PATENT CASES, COMMENTED TOWARD THE END OF THE

12   OPINION THAT IF ANY CASE IS EXCEPTIONAL, IT IS THAT PARTICULAR

13   CASE.

14       THE COURT:  YEAH.

15       MR. BERNTSEN:  SO WITH RESPECT TO PERSONAL

16   JURISDICTION, THERE ARE A NUMBER OF QUESTIONS, AS YOUR HONOR IS

17   WELL AWARE.  I WANT TO JUST NOTE THAT THE SUPREME COURT IN THE

18   NELSON CASE HAS INDICATED THAT ONE PERSON CORPORATIONS ARE

19   AUTHORIZED BY LAW AND SHOULD NOT EASILY BE, OR LIGHTLY BE

20   LABELED A SHAM, AND I THINK THAT'S IN MANY WAYS THE QUESTION

21   THAT'S BEFORE THE COURT AT THE MOMENT.

22       THE COURT:  UM-HUM.

23       MR. BERNTSEN:  SO GENENTECH IS ASKING THE COURT TO

24   SIDESTEP CORPORATE FORMALITIES AND HOLD LIABLE A CORPORATE

25   EXECUTIVE FOR DOING HIS JOB, AND THIS IS A CORPORATE EXECUTIVE

1      WHO, IN FACT, IS VERY DIFFERENT THAN THE IRIS CONNEX CASE, IS A

2      SCIENTIST AND IS ATTEMPTING TO SEEK A PATENT LICENSE FOR A

3      PATENT BASED ON HIS RESEARCH SO THAT HE CAN CONTINUE THAT

4      RESEARCH.

5            THE COURT:  BUT SHOULDN'T I BE CONCERNED WHEN A

6      CORPORATION IS FORMED, ITS SOLE ASSET IS THE PATENT

7      PORTFOLIO -- AND I DON'T KNOW WHETHER THERE'S MORE THAN ONE

8      PATENT, BUT THAT'S WHAT I WAS LOOKING AT HERE -- AND THEN IT

9      GOES INTO COURT, COSTING COMPANIES HERE OVER $5 MILLION TO

10     DEFEND A CASE THAT WAS ULTIMATELY NOT ABLE TO GO FORWARD, AND

11     HAVE NO RESPONSIBILITY FOR PAYING FOR THAT CIRCUMSTANCE OF THE

12     CASE.

13         I -- YOU KNOW, THE DETERRENT EFFECT OF THE FINDING OF

14     EXCEPTIONALITY IS AN IMPORTANT PART OF THE LAW, AND SO IF I --

15     YES, YOU'RE RIGHT THAT A SINGLE PERSON CORPORATION IS ALLOWED,

16     AND I CERTAINLY RESPECT THE CORPORATE BOUNDARIES.

17           BUT I'M REALLY TROUBLED IN THIS CASE.  I THINK IT'S A -- I

18     MEAN, I'M -- I HAVEN'T DECIDED THAT I'M GOING TO DO IT.  I --

19     BUT I'M REALLY WRESTLING WITH IT.

20           MR. BERNTSEN:  I UNDERSTAND YOUR HONOR'S CONCERNS AND

21     THANK YOU FOR MAKING THOSE CLEAR.

22         I MEAN, I THINK THERE ARE A NUMBER OF ISSUES, MOST OF

23     WHICH ARE -- ALL OF WHICH ARE TOUCHED ON IN THE BRIEFING BY THE

24     PARTIES.

25           THE COURT:  UM-HUM.

1           MR. BERNTSEN:  ONE QUESTION, AS YOU'VE INDICATED, IS

2    WHETHER OR NOT THIS WOULD BE A HOLLOW VICTORY FOR GENENTECH --

3           THE COURT:  YEAH.

4           MR. BERNTSEN:  -- AND WHETHER OR NOT DR. DONALD IS

5    HIMSELF NECESSARY, AND THE EVIDENCE AT BAR IS THAT THIS IS NOT

6    A PURELY UNFUNDED CORPORATION, SUCH AS IN IRIS CONNEX; THAT

7    THEY HAVE SOME ACCOUNTS, THAT DR. DONALD HAS HIMSELF NEVER

8    WRITTEN A CHECK TO A LAW FIRM; AND IF MEMORY SERVES, THE SINGLE

9    FINANCIAL INVESTMENT THAT HAS BEEN MENTIONED BY GENENTECH OF

10   HIM IN THIS CASE IS A LOAN FOR, I BELIEVE, $1300 BACK IN 2013

11   THAT WAS PAID BACK VERY QUICKLY.

12       SO WE'RE NOT DEALING WITH A TRULY INSOLVENT CORPORATION

13   HERE.

14       BUT --

15          THE COURT:  NOW, IT'S NOT UNCOMMON, AT THE END OF

16   PATENT LITIGATION, FOR THE DEFENSE OR THE -- THE DEFENSE THAT

17   LOSES TO DECLARE BANKRUPTCY, ENDING WITH THE SAME RESULT.  I

18   RECOGNIZE THAT.

19          MR. BERNTSEN:  THAT DOES HAPPEN.

20          THE COURT:  IT DOES HAPPEN.

21          MR. BERNTSEN:  AND THAT HAS BEEN TOUCHED ON IN SOME

22   OF THE CASES THAT WERE RAISED BY THE PARTIES.

23       BUT, RESPECTFULLY, WE'RE NOT THERE, AT LEAST NOT YET.

24          THE COURT:  NOW, IT SEEMS TO ME THAT INITIATING

25   LITIGATION IN THIS JURISDICTION, AND BEFORE THAT, THE OUTREACH

1    TO GENENTECH HERE FOR THE LICENSING, AND PROBABLY THAT MOST

2    IMPORTANTLY, WOULD PROVIDE PERSONAL JURISDICTION, THAT THERE

3    WAS -- THERE WERE CLEAR CONTACTS WITH THE -- WITH THIS

4    JURISDICTION FOR PERSONAL JURISDICTION.

5           MR. BERNTSEN:  THERE WERE PRE-SUIT CONTACTS WITH THIS

6    JURISDICTION, I AGREE, YOUR HONOR.

7           THE COURT:  OKAY.

8           MR. BERNTSEN:  IT'S WORTH CLARIFYING, MY

9    UNDERSTANDING OF THE RECORD IS THAT THE SUIT WAS ACTUALLY FILED

10   IN GEORGIA ORIGINALLY AND THEN IT WAS TRANSFERRED HERE.

11          THE COURT:  RIGHT.

12          MR. BERNTSEN:  AND SO IT'S OUR POSITION THAT WHATEVER

13   CONTACTS DR. DONALD HAD WITH THIS JURISDICTION AS A RESULT OF

14   THE LITIGATION WAS DUE TO BEING DRAGGED HERE BY GENENTECH.

15          THE COURT:  OKAY.

16          MR. BERNTSEN:  THAT WASN'T HIS CHOICE.  THAT WASN'T

17   VOLUNTARY.

18          THE COURT:  WELL, IT'S THE LAW, SO --

19       (LAUGHTER.)

20          MR. BERNTSEN:  INDEED.  INDEED.

21          THE COURT:  ALL RIGHT.

22          MR. BERNTSEN:  SO, I MEAN, I THINK THAT'S AN

23   IMPORTANT DISTINCTION TO MAKE.

24       AND TO THE EXTENT THAT HIS CONTACT'S HERE IN A PHYSICAL

25   SENSE DURING THE LITIGATION, MY UNDERSTANDING IS THAT THEY WERE

1    LIMITED TO ATTENDING HEARINGS IN THIS COURTROOM.

2         THE COURT:  THAT'S CERTAINLY THE ONLY TIME I COULD

3    HAVE SEEN HIM, BUT I DON'T KNOW WHAT ELSE THERE MIGHT HAVE

4    BEEN.

5         MR. BERNTSEN:  I'M CERTAINLY NOT AWARE OF ANYTHING IN

6    THE PAPERS THAT GENENTECH POINTS TO --

7         THE COURT:  I DON'T THINK THEY POINT TO ANYTHING

8    ELSE.

9         MR. BERNTSEN:  AND I'M SURE GENENTECH WILL CORRECT ME

10   IF THAT'S NOT THE CASE.

11        THE COURT:  ALL RIGHT.

12        MR. BERNTSEN:  SO I THINK MINIMUM CONTACTS ARE A BIG

13   ISSUE HERE, AND I'M NOT SURE THAT THE PRE-SUIT CONTACTS RISE TO

14   THE LEVEL OF GIVING PERSONAL JURISDICTION.

15        I KNOW THERE'S THE DAINIPPON CASE THAT IS CITED BY, I

16   BELIEVE, BOTH PARTIES THAT DISCUSSES, I BELIEVE IN A SLIGHTLY

17   DIFFERENT CONTEXT, WHETHER OR NOT LICENSING DISCUSSIONS RISE TO

18   THE LEVEL OF PERSONAL JURISDICTION, OR CREATING SUFFICIENT

19   CONTACT FOR PERSONAL JURISDICTION IN THE CASE -- IN THE STATE

20   OF CALIFORNIA, AND THAT CASE AT LEAST FINDS THAT THEY DO NOT IN

21   AT LEAST THE CONTEXT THAT IT IS LOOKING AT.  SO I BELIEVE

22   THAT'S GOING TO BE VERY INFORMATIVE AS YOUR HONOR GOES THROUGH

23   HERE.

24        THERE ARE A NUMBER OF OTHER ISSUES THAT ARE RAISED IN THE

25   BRIEF THAT I THINK ARE WORTH AT LEAST CONSIDERING, SUCH AS THE

1    CASE IS CLOSED, AND SO WHETHER OR NOT BRINGING AN OUT OF STATE

2    PARTY TO DEAL WITH ANCILLARY LITIGATION TO PAY THE FEES, I

3    DON'T KNOW THAT THE LAW THAT'S CITED HITS DIRECTLY ON THAT

4    POINT AS TO WHETHER OR NOT THAT IS A BAR OR PERMISSIBLE, BUT IT

5    CERTAINLY RAISES QUESTIONS THAT WE THINK ARE CONCERNING.

6            THE COURT:  NOW, HE WOULD -- AS MR. JACOBS POINTS

7    OUT, DR. DONALD WOULD BE IN A POSITION TO FULLY LITIGATE AND BE

8    REPRESENTED ON THE ISSUE OF ATTORNEYS' FEES.

9            AND I HAVE NO DOUBT THAT HE WAS FULLY ENGAGED, MAYBE

10   EXCLUSIVELY ENGAGED, IN THIS LITIGATION FROM ITS INCEPTION, AND

11   THERE'S NOT A TRACE OF EVIDENCE THAT ANY OTHER HUMAN BEING HAD

12   ANYTHING TO DO WITH THIS CASE AT THE COMPANY -- AT PHIGENIX

13   ITSELF THAN DR. DONALD, AND YOU HAVE GIVEN ME ACTUALLY NO

14   EVIDENCE THAT THE BOARD MEMBERS ACTUALLY EVEN KNEW MUCH ABOUT

15   IT.

16           MR. BERNTSEN:  AND AS YOUR HONOR HAS OBSERVED, WE'RE

17   NEW TO THE CASE, SO UNFORTUNATELY, I'M NOT IN A POSITION TO

18   SPEAK TO THAT DIRECTLY.

19           THE COURT:  I APPRECIATE THAT, AND I -- YOU KNOW,

20   I -- I ALWAYS WELCOME YOUR FIRM HERE AND YOU HAVE --

21           MR. BERNTSEN:  THANK YOU.

22           THE COURT:  -- MANY CASES IN OUR DISTRICT, SO I HAVE

23   CONFIDENCE YOU'VE DONE EVERYTHING THAT COULD BE DONE GIVEN THAT

24   YOU'VE COME IN LATE.

25           MR. BERNTSEN:  THANK YOU, YOUR HONOR.

1          THE COURT:  ALL RIGHT.  THANK YOU.

2          MR. JACOBS, LET'S HAVE -- LET'S FINISH UP FOR A COUPLE OF

3     MINUTES.  I DON'T -- YOU KNOW, I ACTUALLY THINK THIS IS VERY

4     IMPORTANT AND ACTUALLY DIFFICULT.

5          WE SPENT A LOT OF TIME ON THE ATTORNEYS' FEES.  BUT I -- I

6     DO NEED TO BE CAREFUL THAT WE DON'T JUST BLAST THROUGH THE

7     CORPORATE STRUCTURE EVERY TIME IT LOOKS LIKE IT'S HARD TO GET

8     ATTORNEYS' FEES FROM THE COMPANY, SO I DO NEED TO BE SURE THAT

9     IF I AGREE WITH YOU, THAT I GET IT RIGHT.

10          MR. JACOBS:  YES, I HEAR YOUR HONOR, AND I THINK IT'S

11     A GOOD -- THE DIVIDING LINE HERE IS GOING TO BE IMPORTANT.

12          ON PERSONAL JURISDICTION, THE PROSECUTION -- THE CASES

13     THAT ARE SKEPTICAL OF LETTERS BEING SUFFICIENT ARE DECLARATORY

14     JUDGMENT CASES, AND THERE'S A HIGHLY PRUDENTIAL ASPECT TO

15     DECLARATORY JUDGMENT JURISDICTION.

16          HERE THE ISSUE IS WHETHER DONALD IS SUBJECT TO PERSONAL

17     JURISDICTION FOR -- DEPENDING ON -- FOR AN EXCEPTIONAL CASE

18     FINDING IN ATTORNEYS' FEES WHERE, BASED ON YOUR HONOR'S

19     DIRECTION SO FAR, IT IS THE CONTINUED PROSECUTION OF THE

20     LAWSUIT THAT IS THE GRAVAMEN OF THE EXCEPTIONALITY, AND

21     UNDOUBTEDLY, DONALD IS THE ACTOR THERE FOR PURPOSES OF

22     DIRECTING THE COMPANY.  HE IS THE CLIENT.

23          AND YOUR HONOR'S COMMENTS ARE WELL TAKEN, BUT I THINK I

24     WOULD TAKE THEM A LITTLE BIT FURTHER.

25          THE COURT:  I THOUGHT I WAS BEING EXTREME.  NOW

1      YOU'RE GOING TO GO FURTHER?

2          (LAUGHTER.)

3              MR. JACOBS:  GIVEN A CHANCE, DR. DONALD COMES FORWARD

4      WITH NO EVIDENCE THAT THE COMPANY HAS ANY ASSETS THAT COULD

5      SATISFY A JUDGMENT, NO EVIDENCE THAT -- NO EVIDENCE THAT ANYONE

6      OTHER THAN HE WAS THE MOTIVE FORCE BEHIND THIS LITIGATION.

7          THE FACT THAT THEY OBSERVED CORPORATE FORMALITIES GOES TO

8      A DIFFERENT QUESTION.  THIS IS NOT ABOUT PIERCING THE CORPORATE

9      VEIL IN THE CONVENTIONAL BUSINESS LAW SENSE.

10         THIS IS ABOUT WHETHER DR. DONALD SHOULD BEAR SOME PERSONAL

11     EXPOSURE FOR DRIVING THIS LITIGATION UNDER THE CIRCUMSTANCES.

12         THAT BRINGS US TO THE NEXT THING HE HASN'T SHOWN -- AND I

13     THINK I'M JUST IN A WAY ECHOING YOUR EARLIER COMMENT --

14     DR. DONALD HAS NOT, WITH ADMISSIBLE EVIDENCE, SHOWN THAT

15     ANYBODY ELSE SHOULD BE HELD RESPONSIBLE.

16         HE SAYS THE LAWYERS CAME UP WITH THE INFRINGEMENT THEORY.

17         THE ACTUAL DEPOSITION QUESTIONING ON THIS IS IMPORTANT.

18     HE SAID, "I WORKED WITH THE LAWYERS ON THE INFRINGEMENT

19     THEORY."  AND THEN ASKED A FOLLOW-UP QUESTION, "WHO DID WHAT,"

20     HE WAS INSTRUCTED NOT TO ANSWER AND HE FOLLOWED THAT

21     INSTRUCTION.

22         IF THEY WANTED TO COME FORWARD AND SAY, "YOUR HONOR, WE

23     WANT TO CHANGE OUR MIND.  WE WANT TO WAIVE NOW, FOR PURPOSES OF

24     THIS RULE 19 QUESTION FOR DR. DONALD," THAT WOULD HAVE BEEN A

25     PROCEDURAL HURDLE TO OVERCOME IN LIGHT OF THAT PRIOR DEPOSITION

1     TESTIMONY.  BUT THEY DIDN'T DO THAT.

2          AND YOU'LL SEE IN THE RECORD, WE SENT THEM AN E-MAIL ABOUT

3     THIS.  AFTER WE GET THE DONALD DECLARATION, WE SAY, "ARE YOU

4     GUYS WAIVING?"  AND THEY SAY, "NO, WE'RE NOT WAIVING. "

5          SO ONCE AGAIN, THEY ARE HOIST ON THEIR PRIVILEGE PETARD

6     HERE, AND NO INFERENCE SHOULD BE DRAWN THAT DR. DONALD IS NOT

7     THE MOTIVE FORCE, NOT JUST IN TERMS OF THE DECISIONS TO PROCEED

8     WITH THE LITIGATION, BUT THE ACTUAL ANALYSIS THAT UNDERPINNED

9     IT.

10          AND THE LAST POINT IS THAT A LOT OF MY ARGUMENT ON THE 285

11     MOTION ITSELF TURNED ON THE SCIENCE, AND HE'S A SCIENTIST.

12          AND WE SAY THAT BAD FACTS MADE BAD LAW.  WHAT WE'RE HOPING

13     TO DO HERE -- AND YOUR HONOR SAID WE FOUGHT THIS AGGRESSIVELY.

14     IT -- FROM OUR END, IT FELT LIKE FRUSTRATION, THAT WE WERE

15     DEALING WITH THIS -- WITH JUNK SCIENCE.

16          AND WHAT WE'RE HOPING HERE IS THAT BAD SCIENCE MAKES GOOD

17     LAW.

18                THE COURT:  UM-HUM.

19                MR. JACOBS:  AND THAT YOU SHOULD -- DR. DONALD SHOULD

20     HAVE KNOWN BETTER.  HE HIMSELF TESTIFIED AT HIS DEPOSITION,

21     OVER AND OVER AGAIN, THAT TESTING IS NECESSARY TO UNDERSTAND

22     HOW THE PATHWAYS WORK INSIDE A CELL.  THAT IS HIS AREA OF

23     SUPPOSED EXPERTISE.

24                THE COURT:  UM-HUM.

25                MR. JACOBS:  AND THEN TO -- BUT TO -- BUT TO ATTEMPT

1    TO FOB OFF ON THE COURT THESE SCIENTIFIC EXPERIMENTS THAT WERE

2    MERITLESS, YES, HE SHOULD BE HELD RESPONSIBLE FOR THAT IN A

3    VERY -- IN SORT OF A VERY INDIVIDUALIZED WAY.

4         ONE LAST POINT.  IT ACTUALLY RELATES TO TWO ISSUES WE WERE

5    TALKING ABOUT, DR. DONALD'S EXPOSURE AND THE 285 ISSUE.

6         WE DON'T HAVE TO WIN A DAUBERT MOTION ON THE SCIENCE TO

7    WIN AN EXCEPTIONAL CASE FINDING.

8              THE COURT:  NO.

9              MR. JACOBS:  AND I THOUGHT THAT YOUR HONOR FRAMED THE

10   QUESTION APTLY IN THIS CONNECTION.  WE CAN IMAGINE WHAT THAT

11   TRIAL WOULD HAVE LOOKED LIKE.  IT WOULD HAVE BEEN -- I BELIEVE

12   IT WOULD HAVE BEEN A DEBACLE FOR THEM.

13         THANK YOU, YOUR HONOR.

14             THE COURT:  ALL RIGHT.  THANK YOU.

15         OKAY.  JUST TO WRAP UP, I -- THERE ARE A LOT OF ISSUES

16   HERE.  I'M GOING TO HAVE TO WORK THROUGH THEM.  IT WILL TAKE ME

17   A LITTLE TIME.  BUT SINCE THE CASE IS ON APPEAL, YOU'RE NOT IN

18   A HURRY ANYWAY, BECAUSE WHATEVER I DO, THERE'S NOTHING -- I

19   MEAN, YOU COULD FILE A FURTHER APPEAL, BUT YOU CAN ALWAYS DO

20   THAT.  SO IT'S NOT GOING TO BE IMMEDIATE .

21         IF I DETERMINE THAT ATTORNEYS' FEES ARE AWARDABLE, THEN,

22   MR. JACOBS, JUST SO THAT YOU KNOW, I AM GOING TO ASK THAT THE

23   INFORMATION BE PROVIDED IN A VERY SPECIFIC WAY SO THAT I CAN

24   SEE MAJOR TASKS PERFORMED IN THE LITIGATION AND TIMEKEEPERS FOR

25   EACH ONE.

1          MR. JACOBS:  OKAY.

2          THE COURT:  AND IT'S A CHART.  YOU HAVE TO GIVE ME

3     ALL OF THE OTHER INFORMATION.  BUT I CAN'T JUDGE REASONABLENESS

4     BY READING CHRONOLOGICAL TIME CHARTS, YOU KNOW, BY YOUR TEN OR

5     SO TIMEKEEPERS THAT YOU'RE SUBMITTING.

6          SO IT'S A -- AND LARGELY YOU WILL BE ABLE TO DIVIDE IT BY

7     TASK, BECAUSE I ONLY KNOW THE BIG CATEGORIES -- I GO THROUGH

8     THE DOCKET AND LOOK AT WHAT I SAW, BUT I MIGHT SAY DISCOVERY

9     AND YOU MIGHT WANT TO BREAK IT INTO FIVE SUBCATEGORIES, WHICH I

10    WELCOME.  BUT IT'S THAT KIND OF CHART ON THE TWO AXES OF

11    TIMEKEEPER AND TASK AND PUTTING THE TOTAL NUMBER OF HOURS THAT

12    I'LL BE LOOKING FOR, AND THEN I CAN WALK THROUGH IT THAT WAY

13    AND THAT ALLOWS ME TO SEE IF IT'S TOO PARTNER HEAVY, IF THERE

14    ARE TOO MANY PEOPLE.

15          I THINK YOU'VE EXCLUDED TIMEKEEPERS WITH LESS THAN 500

16    HOURS.

17          MR. JACOBS:  YES.

18          THE COURT:  SO I'M NOT GOING TO GET THE ASSOCIATE WHO

19    CAME IN AND SPENT A WEEKEND WORKING ON THE CASE AND THEN EXITED

20    FOREVER THAT I HAVE TO WORRY ABOUT, SO YOU MAKE THAT EASY FOR

21    ME.  THE FEES ARE SO HIGH THAT I APPRECIATE THAT.

22          SO THAT'S WHAT YOU'LL BE GETTING.  I JUST WANTED TO BE

23    ABLE TO DESCRIBE IT TO YOU AT THIS POINT.

24          OF COURSE, PHIGENIX MIGHT WIN ENTIRELY AND THEN THAT WILL

25    BE UNNECESSARY.

```
 1            THE OTHER THING THAT I REALLY HAVE TO RAISE AT THIS POINT,
 2     YOU'VE GOT THIS CASE ON APPEAL.  PROBABLY WHATEVER I DO ON THIS
 3     MOTION, IT'LL GO UP ON APPEAL AS WELL, AND AS WELL IT SHOULD.
 4            AND THERE'S A -- IT SEEMS LIKE THERE'S A LOT OF MONEY
 5     BEING SPENT TO CONTINUE TO LITIGATE THIS, AND I -- I IMAGINE
 6     THE FEDERAL CIRCUIT HAS AN ADR PROGRAM LIKE THE NINTH CIRCUIT
 7     DOES.
 8            ARE YOU ENGAGED IN THAT?
 9            MR. JACOBS:  WE HAVE NOT -- YOU'RE RIGHT, THEY HAVE A
10     MEDIATION PROGRAM IN THE FEDERAL CIRCUIT AND THIS CASE HAS NOT
11     BEEN ASSIGNED TO THAT PROGRAM.
12            THE COURT:  OKAY.  AND I WOULD ENCOURAGE YOU TO SEEK
13     TO MEDIATE THIS CASE LOCALLY AS WELL.  I -- YOU KNOW, I MEAN,
14     JUST THE AMOUNT OF TIME SPENT ON THIS MOTION IS EXTRAORDINARY,
15     AND I -- YOU KNOW, THERE'S A REALISTIC LEVEL OF RECOVERY THAT
16     GENENTECH COULD HOPE FOR, AND I DON'T KNOW WHAT THAT IS.
17            BUT EVEN IF YOU WIN ON THIS, I MEAN, I DON'T -- I DON'T
18     PRESUME THAT DR. DONALD IS AN INDEPENDENTLY WEALTHY BILLIONAIRE
19     WHO IS FUNDING THIS.
20            BUT, YOU KNOW, I DON'T KNOW IF THERE ARE OTHER -- IF THERE
21     ARE LITIGATION FUNDERS BEHIND HIM.  I HAVE NO ACCESS TO THAT.
22            I JUST REALLY THINK THAT THIS -- MAYBE THIS SHOULD BE
23     RESOLVED BETWEEN -- WITH COUNSEL REALLY HELPING THE PARTIES
24     COME TO A CESSATION OF THIS LITIGATION.
25            SO I URGE YOU TO CONSIDER A LOCAL MEDIATOR OR TO ENGAGE IN
```

1    THE FEDERAL CIRCUIT'S MEDIATION PROGRAM, WHICH I'M SURE IS

2    EXCELLENT, BUT WE'RE HERE AND THEY'RE THERE, SO --

3              MR. JACOBS:  RIGHT.

4              MR. DAVIS:  I'VE HEARD WHAT YOU'VE SAID, YOUR HONOR.

5              MR. JACOBS:  THANK YOU, YOUR HONOR.

6              MR. DAVIS:  THANK YOU.

7              THE COURT:  OKAY.  THANK YOU.

8         (THE PROCEEDINGS WERE CONCLUDED AT 10:02 A.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      LEE-ANNE SHORTRIDGE, CSR, CRR
17    CERTIFICATE NUMBER 9595

18         DATED:  MARCH 19, 2018

19

20

21

22

23

24

25