**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| PHIGENIX, INC., | Case No. 15-cv-01238-BLF |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR AWARD OF ATTORNEY FEES AGAINST DR. DONALD AND DETERMINATION OF FEE AMOUNT** |
| GENENTECH INC, | |
| Defendant, | |
| v. | [Re: ECF 451] |
| CARLTON DEWITT DONALD, | |
| Third Party Defendant. | |

Before the Court is Defendant Genentech Inc.'s ("Genentech") motion for award of attorney fees against third-party Defendant Dr. Carlton DeWitt Donald ("Dr. Donald") and for determination of the amount of reasonable fees owed to Genentech, pursuant to the Court's order granting fees against Plaintiff Phigenix, Inc. ("Phigenix") ("Fees Order", ECF 442). Mot., ECF 451. For the reasons that follow, the Court finds that Genentech is not entitled to fees from Dr. Donald and that Genentech is entitled to $1,756,764.49 in fees from Phigenix. The motion is thus GRANTED IN PART AND DENIED IN PART.

## I. BACKGROUND

The Court provided a detailed factual background of this case in its Fees Order from August 13, 2018. *Phigenix, Inc. v. Genentech, Inc.*, No. 15-CV-01238-BLF, 2018 WL 3845998, at *1–*3 (N.D. Cal. Aug. 13, 2018) (discussing history of this litigation). Because many of those facts are relevant to resolving a portion of the instant motion, the Court recounts them again here, and then discusses the relevant details of the Fees Order.

### A.     Factual and Procedural Background

Phigenix is a pharmaceutical and biomedical research company founded in 2007 by Dr. Donald, who is a named inventor on numerous issued patents and pending patent applications, including U.S. Patent No. 8,080,534 ("the '534 patent"). First Am. Compl. ("FAC") ¶¶ 1, 9, ECF 21. The '534 patent is titled "Targeting PAX2 for the Treatment of Breast Cancer." Ex. A to FAC ("'534 patent"), ECF 21-1. Phigenix brought this action against Genentech alleging infringement of the '534 patent based on Genentech's drug Kadcyla, a drug targeting a type of metastatic breast cancer. *See generally* FAC.

#### 1.     Genentech and Kadcyla

In 1998, Genentech obtained FDA approval of Herceptin (trastuzumab)[1] for the treatment of HER2+ breast cancer. Weiner Expert Report in Supp. of Mot. for Summ. J. ¶¶ 39, 120, ECF 349-1. At that time, Herceptin also received approval as a "first-line treatment in combination with the taxane paclitaxel." *Id.* ¶ 120. According to Genentech, it then began working on a next-generation treatment: conjugates of Herceptin (trastuzumab) and the maytansinoid DM1, which were disclosed in a Genentech patent application that published in 2001 ("'244 application," ECF 37-6). ECF 400 at 2. Those conjugates work with the precise molecule that eventually would be approved as Kadcyla. *Id.*

#### 2.     Phigenix Contacts Genentech

In 2013, the FDA approved Kadcyla. Ex. 3 to Kreeger Decl. in Supp. of Mot. for Summ. J. ("Kadcyla Label"), ECF 348-3. The approved indication was for patients previously treated with Herceptin and a taxane. *Id.* at 1. Thereafter, in June 2013, Phigenix sent multiple letters signed by Dr. Donald to Genentech about securing "patent protection" for Kadcyla by offering to negotiate a license for Phigenix's patent portfolio. Exs. A and B to Schwartz Decl. in Supp. of Mot. to Dismiss, ECF 37-4, 37-5. Dr. Donald included a diagram hypothesizing that trastuzumab-DM1 conjugates affect a signal pathway, resulting in the inhibition of PAX2 in breast cancer cells. Dr. Donald asserted that this infringed Phigenix's patent. *See* Ex. B to Schwartz Decl. in Supp. of Mot. to Dismiss; Ex. 3 to Ackerman Decl. in Opp'n to Mot. for Sanctions, ECF 215-3.

---

[1] Herceptin is the tradename for the trastuzumab antibody. ECF 391 at 5 n.1.

In September 2013, Genentech declined the offer and stated that its '244 application discloses "trastuzumab-DM1 conjugates . . . for the treatment of breast cancer" and was published more than four years before the priority date of the earliest-filed application in Phigenix's patent portfolio.  Ex. D to Schwartz Decl. in Supp. of Mot. to Dismiss, ECF No. 37-7.  In November 2013, Genentech sent an email letter to Phigenix stating that if Phigenix's patent claims cover "direct or indirect inhibition of PAX2 for the treatment of cancer," they would be inherently anticipated by the '244 application.  Ex. F to Schwartz Decl. in Supp. of Mot. to Dismiss, ECF 37-9.

### 3.  This Litigation

On January 31, 2014, Phigenix initiated its suit against Genentech in the United States District Court for the Northern District of Georgia.  ECF 1.  The Northern District of Georgia granted Genentech's motion to transfer the action to this District.  ECF 66.

In June 2014, Genentech told Phigenix that the complaint warrants Rule 11 sanctions; Phigenix disagreed.  Mot. for Sanctions at 5, ECF 198; Opp'n to Mot. for Sanctions, ECF 214.  On May 10, 2016, Genentech filed its motion for sanctions under Rule 11.  ECF 198.  The parties submitted supplemental briefing after Phigenix provided results on its testing of Kadcyla.  On October 31, 2016, this Court found that Phigenix had "properly relied on scientific, peer-reviewed articles to formulate its infringement theory" and that Genentech had not demonstrated how Phigenix's complaint was "baseless."  Sanctions Order at 7, ECF 290.  The parties' briefing on Phigenix's test results did not compel a different conclusion.  *Id.*  In declining to take a deep dive into the scientific articles submitted, the Court noted that weighing the value of different experimental studies without the aid of experts would not assist the Court in deciding the sanctions motion.  *Id.*  Furthermore, the Court found that Genentech had not shown that the '244 application inherently anticipates the '534 patent for the purpose of the sanctions motion.  *Id.* at 11.  Nevertheless, the Court recognized the "potentially significant weaknesses in Phigenix's theory of infringement."  *Id.*  As such, this Court allowed Genentech to request Rule 11 sanctions or extraordinary case fees under § 285 in the event that Genentech obtained judgment in its favor.  *Id.* at 11–12.

On September 22, 2016, Genentech filed its first motion for summary judgment. First Mot. for Summ. J., ECF 257. The parties disputed whether the '534 patent was entitled to the October 14, 2005 priority date. The '534 patent is a continuation-in-part of U.S. Application No. 12/090,191 ("'191 application"), which is a national stage entry of WO 2007/047512 ("PCT application"). Exs. 2, 3 to Chivvis Decl. in Supp. of First Mot. for Summ J., ECF 258-2, 258-3. The PCT application claims priority to U.S. Provisional Application No. 60/726,921, filed on October 14, 2005 (the "2005 provisional application"). Exs. 3, 4 to Chivvis Decl., ECF 258-3, 258-4. On February 24, 2017, the Court found that no reasonable trier of fact would find adequate written description support in the 2005 provisional application for the asserted claims. First Summ. J. Order 12–19, ECF 327. As such, Phigenix lost the 2005 priority date for the asserted '534 patent.

The Court further addressed Genentech's argument that the asserted claims are anticipated by the use of Kadcyla in clinical trials, which were made public in 2007. *See id.* at 23–24. Phigenix asserted that there was a factual dispute as to whether the public use necessarily met the claim limitations. *Id.* The Court agreed that there was a genuine issue of material fact as to whether Kadcyla's public use in 2007 anticipated the asserted claims. *Id.* at 24. The Court noted that one of the documents submitted by Genentech states that "[i]n addition to Trastuzumab, all patients with objective responses had previously been treated with paclitaxel, docetaxel, and/or vinorelbine." *Id.* (citing Ex. C to Girish Decl., ECF 259-3; Ex. G to Girish Decl. at 27, ECF 259-7). While paclitaxel and docetaxel are taxanes, vinorelbine is not. *Id.* Given the disjunctive in the list of "paclitaxel, docetaxel, and/or vinorelbine," the Court found that it was possible that the patients of the clinical trials received vinorelbine but not either of the two taxanes. *Id.* On this basis, the Court ruled that there was enough evidence for the trier of fact to find that the public use and the asserted infringing methods are not identical. *Id.*

Thereafter, Genentech filed a second motion for summary judgment of non-infringement and invalidity on June 9, 2017. Second Mot. for Summ. J., ECF 347. During a May 23, 2017 deposition, Phigenix's expert Dr. Richard Pestell testified that his infringement opinion was limited to patients who had previously been treated with Herceptin and a taxane and *nothing else*.

*Id.* at 5 (citing Ex. 2 to Kreeger Decl. at 51:5–12, 53:20–25, 53:14–19, ECF 348-2). According to Genentech, only in an email dated May 31, 2017, did Phigenix restrict its infringement theory to apply to patients who had previously received trastuzumab and a taxane "and nothing else." Second Mot. for Summ. J. 10 (citing Ex. 6 to Kreeger Decl. in Supp. of Second Summ. J. ("2017 Email"), ECF 348-6). Genentech moved to strike Dr. Pestell's "new" infringement opinion.

On August 18, 2017, the Court granted in part Genentech's second motion for summary judgment. Second Summ. J. Order, ECF 391. The Court noted that "Phigenix only narrowed its infringement theory in response to the Court's [first] summary judgment order finding that the '534 patent was not entitled to an earlier priority date." *Id.* at 16. But Phigenix neither moved to amend its infringement contentions nor notified Genentech of the new infringement theory. *Id.* As such, the Court sustained Genentech's objection and struck Dr. Pestell's infringement opinion. *Id.* Without evidence of infringement, the Court granted summary judgment of no infringement. *Id.* In addition, the Court granted summary judgment of no induced infringement for lack of specific intent due to the absence of evidence of Genentech's intent to induce infringement as to the narrow patient subpopulation who previously received "trastuzumab and a taxane and nothing else" under Phigenix's newly disclosed infringement theory. *Id.* at 9–14. Accordingly, the Court entered judgment in favor of Genentech and against Phigenix. Judgment, ECF 396.

### B.    The Previous Fees Order

After judgment, Genentech moved the Court to join Dr. Donald under Federal Rule of Civil Procedure 19 (ECF 398) and for an exceptional case finding under 35 U.S.C. § 285 and an award of attorney fees against Dr. Donald and Phigenix (ECF 400).

The Court first held that it could not impose fees against Dr. Donald because he had not been given an opportunity to oppose the motion. Fees Order at 8. So the Court denied Genentech's request for fees against Dr. Donald without prejudice to Genentech's reasserting the argument in the instant fees motion.

The Court next held that "there came a point in this case when Phigenix's continued prosecution of the case became 'exceptional'": when Phigenix changed its theory of infringement seemingly to skirt the holdings in the Court's first summary judgment order. The Court first noted

that Phigenix was "on notice about issues concerning potential anticipation of the '534 patent by prior art" before the lawsuit began and that Phigenix was continually reminded throughout the litigation of the weaknesses of its infringement theory, including in the Court's sanctions order. *Id.* at 9–10. Though these facts alone were insufficient to find the case exceptional, the Court held that the "tipping point" at which Phigenix's actions made the case exceptional was after the Court determined that Phigenix could not maintain its 2005 priority date, and yet Phigenix "unreasonabl[y] determin[ed] to forge ahead with prolonged litigation when it had no tenable theory of infringement." *Id.* at 10–11. Instead of conceding defeat, Phigenix narrowed its infringement theory in response to the Court's order but failed to amend its infringement contentions or notify Genentech of the change, instead electing to disclose its new theory in a deposition after the close of fact discovery. *See id.* at 11. The Court found that "Phigenix unreasonably manipulated its theories to postpone defeat" based on anticipation of the '534 patent, evincing "gamesmanship" that warranted an exceptional case finding. *Id.* Moreover, additional facts supported the Court's holding, including that Phigenix's infringement theory defied common sense, that Phigenix chose to submit IPR petitions on Kadcyla-related patents that it was not accused of infringing, and that Phigenix's testing of Kadcyla was unreliable. *See id.* at 12–13 (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). Given these facts, the Court concluded that "Genentech is entitled to reasonable attorneys' fees accrued since the issuance of the First Summary Judgment Order on February 24, 2017." *Id.* at 13.

As to joinder, the Court held that joinder of Dr. Donald was both necessary and feasible under Federal Rule of Civil Procedure 19(a)(1). The Court first held that Dr. Donald's joinder was necessary because the evidence indicated that Phigenix did not have the financial resources to provide full relief to Genentech. *Id.* at 18–20. The Court also held that Genentech was not attempting to join Dr. Donald by "piercing the corporate veil," but instead aimed to join him because of his own conduct. *Id.* at 19. The evidence "support[ed] Genentech's position that Dr. Donald had control over this litigation" because "[h]e alone holds more than 50% ownership of Phigenix," and the evidence showed that Dr. Donald's wife "is the only other employee of Phigenix." *Id.* at 20–21 (citing Ex. 1 to Chivvis Decl. in Supp. of Mot. for Joinder at 237:15–22,

ECF 399-1; Ex. A to Jacobs Decl. in Supp. of Mot. for Sanctions at 11:16–22, ECF 199-1). The Court rejected Phigenix's contention that its five-person Board of Directors voted to initiate the litigation because Phigenix did not provide any evidence of this fact or of the fact that anyone else directed the litigation. *See id.* at 21. The Court then held that joinder was feasible because the Court has personal jurisdiction over Dr. Donald due to his actions in this district. *See id.* at 22–27.

After the Court issued its Fees Order, Genentech filed this motion, renewing its attempt to hold Dr. Donald jointly and severally liable for fees and seeking a determination by the Court of reasonable attorneys' fees.

## II.    LIABILITY OF DR. DONALD

Genentech argues that the Court should hold Dr. Donald liable on two theories: (1) Dr. Donald was individually responsible for Phigenix's exceptional conduct in the case, Mot. at 3–5; and (2) Dr. Donald is liable because he is Phigenix's alter ego, Mot. at 5–7. The Court discusses each theory in turn.[2]

### A.    Genentech Has Not Shown that Dr. Donald Was Responsible for Phigenix's Exceptional Conduct

The Court first discusses the relevant case law and then analyzes the parties' competing evidence.

#### 1.  Relevant Law

A court may hold an individual liable under 35 U.S.C § 285 where it finds that the individual's "personal conduct was the dominant cause" or "the driving force" making the case exceptional. *Iris Connex, LLC v. Dell, Inc.*, 235 F. Supp. 3d 826, 843–44, 852 (E.D. Tex. 2017); *see also Ohio Cellular Products Corp. v. Adams USA, Inc.*, 175 F.3d 1343, 1349–50 & n.6 (Fed. Cir. 1999). This rule reflects "a more general and uncontroversial principle: that the corporate form cannot be used as a shield to insulate officers and parent corporations against liability for their own tortious conduct or tortious conduct they control." *Iris Connex*, 235 F. Supp. 3d at 844.

---

[2] Genentech also argues that the Court has afforded Dr. Donald Due Process by allowing him to oppose the motion to hold him liable for attorneys' fees. Mot. at 8. Dr. Donald does not argue to the contrary. *See generally* Donald Opp. Decl. The Court agrees that Dr. Donald's Due Process rights have been satisfied. *Cf. Nelson v. Adams USA, Inc.*, 529 U.S. 460, 463 (2000).

7

The Federal Circuit elaborated on this rule in *Machinery Corp. of America v. Gullfiber AB*, 774 F.2d 467 (Fed. Cir. 1985). In that case, the Federal Circuit remanded for the district court to apply the correct legal standard to determine whether the case was exceptional. *See id.* at 473. The court also addressed the defendant's argument that its agent could not be held liable for any fees awarded. The court recognized that it had previously held that "an individual may be assessed fees under § 285 if his conduct supports a finding that the case is exceptional." *Id.* at 475. As such, the Court held that the agent "may be assessed fees individually," but "only if the district court finds that [the plaintiff] has proved by clear and convincing evidence that his actions were in fact tortious or were undertaken in a personal capacity and not as agent of [the defendant]." *Id.*

The Federal Circuit again addressed the issue in *Ohio Cellular*.[3] There, the Federal Circuit affirmed the district court's imposition of individual liability on third-party defendant Nelson, the president and sole stockholder of Ohio Cellular. 175 F.3d at 1345, 1350. The district court had held that the case was exceptional under § 285 because Ohio Cellular had committed inequitable conduct when Nelson withheld material prior art during a patent prosecution. *Id.* Importantly, the court noted that there was no evidence "that the attorney who prosecuted the application was aware of the undisclosed material prior art. Instead, it appears that Nelson withheld the prior art from his attorney and thus from the Patent Office." *Id.* at 1345 n.3. Because Nelson was an inventor on the relevant patent, was the president and sole shareholder of Ohio Cellular, was intimately involved in the patent's prosecution, and "was the sole basis" for the inequitable conduct, the district court held that Nelson could be held individually liable. *Id.* at 1346, 1348.

The Federal Circuit agreed. The Federal Circuit emphasized that Nelson's own conduct underpinned the exceptional case holding and that, "as president and sole shareholder of Ohio Cellular[,] Nelson could control and did control litigation decisions made on behalf of Ohio

---

[3] The Supreme Court reversed *Ohio Cellular* on other grounds. The district court erred by adding the individual defendant and simultaneously amending the judgment to impose liability against him for attorneys' fees without giving him an opportunity to challenge that imposition. *Nelson*, 529 U.S. at 471–72. No such problem exists here because the Court has given Dr. Donald the opportunity to defend himself.

Cellular." *Id.* at 1349–50; *see also Hughes v. Novi Am., Inc.*, 724 F.2d 122, 126 (Fed. Cir. 1984) (upholding award of fees against the plaintiff patent inventor based on his "personal conduct during the trial," including false interrogatory responses and awareness that the defendant had not infringed, as well as his individual fraud in procuring the patents).

Recently, the Eastern District of Texas issued a comprehensive opinion on the matter in *Iris Connex*. In that case, individual-plaintiff Yates was the sole owner of the plaintiff-corporation Iris Connex's parent corporation. 235 F. Supp. 3d 826, 833–34. The Court found that Iris Connex had no assets except the patent, no working capital, and no employees and was formed by Yates solely to enforce the patent. *Id.* at 840. From this the court concluded that Mr. Yates had created Iris Connex as "the first level of two shell corporations which were intended to shield the real actor, Mr. Brian Yates, from personal liability." *Id.* at 833; *see also id.* at 851. After holding that the case was exceptional because the plaintiffs had filed suit with an infringement theory that was wholly unsupportable, the court held that Mr. Yates could be held individually liable. "From start to finish," it said, "Mr. Yates ha[d] been the driving force behind th[e] litigation," such that "[e]very reason for th[e] Court's exceptional case finding emanate[d] from Mr. Yates." *Id.* at 852.

Specifically, "Mr. Yates conceived and then carried out each step leading up to the filing of th[e] meritless lawsuit," including negotiating a license before either creating Iris Connex or consulting an attorney. *Id.* Mr. Yates was also solely responsible for forcing Iris Connex to file the lawsuits, such that the court found "[i]t is hard . . . to understate the importance of Mr. Yates' direct and personal control through pre-suit process of finding and acquiring the '950 patent, as Iris Connex had no other purpose than to enforce its only asset." *Id.* at 852–53. Mr. Yates also "independently performed pre-suit diligence" and "personally controlled the events occurring toward the end of th[e] lawsuit," including personally calculating the damages model for settlement purposes. *Id.* at 853. "Ultimately," the Court concluded, "the interposing of an 'Iris Connex' between the real actor [Yates] and an exceptional case" would encourage frivolous lawsuits and thus be contrary to § 285's purpose. *Id.* at 846.

### 2. Parties' Evidence

Genentech argues that under this law, Dr. Donald should be held personally liable because

United States District Court
Northern District of California

"Dr. Donald acted as the driving force behind Phigenix's litigation strategy from the start." Mot. at 3. Specifically, Genentech points to the following facts to support this contention,[4] *id.* at 3–4:

    (1) Dr. Donald holds more than 50% ownership of Phigenix; *see* 12/2/2016 Donald Depo. at 237:15–22, ECF 399-1;

    (2) Dr. Donald's wife is the only other employee of Phigenix; *see* 8/4/2015 Donald Depo. 11:16–22, ECF 199-1;

    (3) Before the litigation began, Dr. Donald "developed Phigenix's infringement theories and directly communicated them to Genentech," *see* ECF 37-4 (6/10/2013 Dr. Donald Letter to Genentech offering to negotiate licensing of Phigenix's patents); ECF 37-5 (6/17/2013 Dr. Donald Letter to Genentech offering to negotiate licensing of Phigenix's patents and including pathway diagram); 8/4/2015 Donald Depo. at 118:17–119:13, ECF 399-2.

    (4) Dr. Donald "raised money to fund the litigation and contributed his own," *see* 12/2/2016 Donald Depo. at 180:25–181:4, ECF 399-1; 12/2/2016 Donald Depo. at 79:1–10, 180:6–9, 180:25–181:2, ECF 425-2;

    (5) Dr. Donald "personally attended court hearings and depositions in this lawsuit, holding himself out as Phigenix's sole representative," *see, e.g.*, ECF 228 at 3:14 (Claims Constr. Hearing Tr.).

According to Genentech, these facts make clear that Dr. Donald "was, and is, the party ultimately responsible for the conduct that the Court found exceptional," including authorizing the case without pre-suit testing and, in the face of potentially anticipating prior art, filing IPRs and proceeding with the case after the Court's first summary judgment order on February 24, 2017. Mot. at 4.

---

[4] Though Genentech heavily references the Court's previous Fees Order to support its arguments, in that Order the Court considered only the joinder of Dr. Donald and expressly declined to rule on Dr. Donald's liability because he had not yet had the opportunity to defend himself. As such, the Court considers only evidence cited and arguments raised in Genentech's instant motion.

Dr. Donald[5] submitted a declaration in opposition to Genentech's motion.[6] Donald Opp., ECF 460. He presents the following counter-testimony and evidence to oppose Genentech's positions:

(1) Dr. Donald avers that Phigenix has over one hundred shareholders and has gone through multiple rounds of fundraising. He states and submits documentation showing that he is one of five members of Phigenix's Board of Directors and that "the Board, by majority vote, made the decision to file the lawsuit in this case." Donald Opp. Decl. ¶¶ 7, 12 & Ex. 9.

(2) Dr. Donald submits a 2013 Executive Summary showing at least two organizational leaders who were not also Directors of the Board. *Id.* ¶ 9 & Ex. 3.

(3) Dr. Donald states that he sent Genentech a diagram of how KADCYLA worked not as an infringement theory, but instead to teach Genentech's General Counsel the scientific mechanisms at issue. *Id.* ¶¶ 5, 15 & Exs. 8–9. He avers that his attorneys developed all of the legal theories at issue in the case, not him. *Id.* Specifically, as to the 2017 narrowing of the infringement theory, he testifies that he did not have any reason to change the infringement contentions because he believed that Genentech's understanding of Phigenix's infringement theory was the same as Phigenix's and because he understood Phigenix to have been able to keep its '534 patent priority date. *Id.* ¶¶ 28–36. He also submits an email exchange with his counsel in which his counsel sent him a draft response to Genentech's accusation that Phigenix had narrowed its theory of infringement, and Dr. Donald responded "I agree with the points that you've raised in the draft response" and pointed out relevant statements by Genentech's counsel at a court hearing. *Id.* ¶ 38, Ex. 20. He also states that he has never communicated with Dr. Pestell. *Id.* ¶ 39.

---

[5] On November 26, 2018, before the deadline to oppose the instant motion, Dr. Donald's attorneys withdrew as his counsel. ECF 456. Dr. Donald filed his opposition to the instant motion *pro se*. Phigenix does not oppose this portion of Genentech's motion.
[6] On the day of Genentech's reply deadline, Dr. Donald submitted an additional, untimely declaration in opposition. ECF 463. Because the declaration does not contain evidence necessary for or relevant to resolution of the instant motion, the Court does not consider it.

(4) Dr. Donald testifies that Phigenix authorized and sold 3,000,000 shares between 2007 and 2013 to support pre-suit activities, showing that his raising money for the company was not for the purposes of litigation. *Id.* ¶ 9. He also submits documentation that his provision of money to Phigenix was merely a loan. *Id.* ¶ 11 & Exs. 4–6.

### 3. Analysis

On the evidence presented, Genentech has not met its burden of demonstrating that Dr. Donald should be liable for attorneys' fees. The overarching theme in the relevant case law is that courts hold individuals liable when it is clear that the individual's independent actions were exceptional. Nothing about Dr. Donald's actions here constitute exceptional conduct or malfeasance. Unlike in *Ohio Cellular* and *Iris Connex*, Dr. Donald is not the sole shareholder of, and thus sole authority over, Phigenix. Though he owns more than 50% of the shares, he provides evidence showing that a majority vote of the Board was required to initiate this litigation. And, as discussed more below, Phigenix is not merely a shell corporation that Dr. Donald has exploited to his own benefit—Phigenix was raising money and selling shares long before this lawsuit was ever initiated. *Contra Iris Connex*, 235 F. Supp. 3d at 833.

Likewise, though he may have acted at times without the Board's vote, such as by sending letters to Genentech regarding negotiating licenses, he did so in consultation with attorneys, who he avers spearheaded all legal aspects of such discussions and the litigation thereafter. *Cf. Ohio Cellular*, 175 F.3d at 1345 n.3; *Iris Connex*, 235 F. Supp. 3d at 852. Thus, unlike *Iris Connex*, there is no evidence that he was forcing Phigenix to take these actions without any input. Indeed, there is no evidence to demonstrate that Dr. Donald's actions were outside the bounds of an agent working on behalf of the company. *See Machinery Corp.*, 774 F.2d at 475. For example, with respect to the "tipping point" of the exceptional conduct in this case—the narrowing of the infringement theory—it appears that Dr. Donald's role was limited to client representative and that Phigenix's attorneys and Dr. Pestell independently determined that the infringement theory should be narrowed and then looked to Dr. Donald for confirmation via email. Dr. Donald never spoke to Dr. Pestell before his deposition testimony narrowing the theory. Dr. Donald's appearance at hearings is fully consistent with this role. It would set a dangerous and extraordinary precedent if

the Court were to hold that majority ownership and serving as a company's liaison to outside counsel alone were sufficient to establish individual liability.

Because the Court cannot say that Dr. Donald was the driving force behind the exceptional conduct in this case, it holds that he is not liable for any attorneys' fees awarded under § 285 on the theory of individual liability.

## B. Genentech Has Not Shown that Dr. Donald Is Phigenix's Alter Ego

Genentech next argues that the Court should hold Dr. Donald liable because he is an alter ego of Phigenix. Mot. at 5–7. The Court first discusses the relevant law, and then the evidence here.

### 1. Relevant Law

A court may also hold an individual officer liable under an alter ego theory. California law governs the alter-ego question here. *See In re Schwarzkopf,* 626 F.3d 1032, 1038 (9th Cir. 2010); *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1295 (Fed. Cir. 2007) ("Since the alter ego issue is not unique to patent law, we apply the law of the regional circuit."). "California recognizes alter ego liability where two conditions are met: First, where 'there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased;' and, second, where 'adherence to the fiction of the separate existence of the corporation would . . . sanction a fraud or promote injustice.'" *In re Schwarzkopf*, 626 F.3d at 1038 (quoting *Wood v. Elling Corp.*, 20 Cal. 3d 353, 365 (1977)). Factors suggesting an alter ego relationship include '[c]ommingling of funds and other assets [and] failure to segregate funds of the separate entities . . .; the treatment by an individual of the assets of the corporation as his own . . .; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities . . .; [and] the diversion [of assets from a corporation by or to a] stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets . . . between entities so as to concentrate the assets in one and the liabilities in another.'" *Id.* (quoting *Associated Vendors, Inc. v. Oakland Meat Co., Inc.*, 210 Cal. App. 2d 825, 838–40 (1962) (alterations and omissions in original)). Other factors include "failure to maintain minutes or adequate corporate records," "domination and control," "the use of a corporation as a mere shell,

instrumentality or conduit for a single venture or the business of an individual or another corporation," and "the failure to adequately capitalize a corporation." *Associated Vendors*, 210 Cal. App. 2d. at 838–40.

### 2. Parties' Evidence

Genentech argues that both the unity of interest and injustice elements are satisfied here. As to the unity of interest, Genentech cites the following assertions and facts in support of its argument that Dr. Donald and Phigenix have a unity of interest:

(1) Dr. Donald commingled funds with Phigenix. Genentech recognizes that Dr. Donald avers that he loaned this money to Phigenix before the litigation and then paid himself back with Phigenix assets, Mot. at 6, but Genentech argues that Dr. Donald did not sufficiently document this loan. *See* 12/2/2016 Donald Depo. at 180:25–181:4; Donald Decl. in Opp. to Joinder Mot. ¶ 7, ECF 415-4;

(2) Dr. Donald exerted dominion and control because he was the CEO and majority shareholder, in charge of running the company and interacting with counsel, and because his wife was the only other employee at the time and does not appear to have had decision-making authority. See 8/4/2015 Donald Depo. 11:16–22; 12/2/2016 Donald Depo. at 237:15–22.

(3) Dr. Donald has provided no evidence that the company maintains minutes or adequate corporate records;

(4) Phigenix is a mere shell for the single venture of "exploiting [Dr. Donald's] patents." Dr. Donald is the assignor and sole named inventor for all of Phigenix's patents, *see* ECF 137-11; ECF No. 37-4, and Phigenix has not made any products, conducted any in-house research, or partnered with any other companies, *see* 8/4/2015 Donald Depo. 14:1–15:22; 12/2/2016 Donald Depo. at 234:4–235:23. And as of 2014, Phigenix's sole purpose was to assert its patents—its only real assets—for potential revenue. Donald Decl. ¶ 4, ECF 415-4.

(5) Phigenix is not adequately capitalized, as evidenced by its failure to pay attorneys' fees and costs for over a year. ECF 346 at 1–2; ECF No. 346-2 ¶¶ 4–7. And Phigenix has

not provided evidence of its assets to refute this contention.

Genentech also argues that injustice will result if Dr. Donald is not found to be Phigenix's alter ego because Phigenix does not have sufficient income or liquid assets to pay Genentech and because Dr. Donald is a bad actor who had control over the litigation. Mot. at 7.

Dr. Donald presents evidence and testimony to counter many of these assertions:

(1) Dr. Donald admits that he made a loan to Phigenix in 2013, but he now submits documentation of the loan, including a promissory note, Board minutes approving the loan, and a Phigenix Balance Sheet reflecting the loan. Donald Opp. Decl. ¶ 11 & Exs. 4–6. Dr. Donald avers that he does not commingle his funds with Phigenix's; since its inception in 2007, Phigenix has had its own business account and an independent accountant, and Dr. Donald has never mixed his personal funds with those of Phigenix. *Id.* ¶ 10.

(2) Dr. Donald states that "no corporate decision has been made based on [his] ownership" or based on his "majority shareholder vote." *Id.* ¶ 16. Moreover, he testifies that his wife, as Vice-President and COO, has participated in all decisionmaking for Phigenix. *Id.* ¶ 13. He also testifies that Dr. James P. Brown has been involved in the company since 2010 as a consultant and strategist. *Id.* ¶ 14; *see also id.* ¶ 16 (stating that Phigenix used other strategists and consultants over time).

(3) Dr. Donald submits various corporate records, including Board of Directors meeting minutes. *Id.* ¶¶ 11–12, 17 & Exs. 5, 7–8.

(4) Dr. Donald testifies that Phigenix has always had a focus on research and development, as shown in a 2013 Phigenix Executive Summary, though it did not have the funds to pursue these tasks early on. *Id.* ¶¶ 8–9, 18–19, 24–26 & Exs. 3, 10 at 14–15. He also states that Phigenix entered into a license agreement with Medical University of South Carolina Foundation for Research Development to develop its intellectual property. *Id.* ¶¶ 21–23.

(5) Dr. Donald avers that the fee dispute with Phigenix's previous counsel, Andrews Kurth, LLP, was the result of Andrews Kurth's merger with another firm and its

subsequent desire to re-negotiate its contract with Phigenix, which led to a disagreement about how the work would proceed, which in turn led to billing disputes. *Id.* ¶¶ 3, 27.  Dr. Donald also testifies that Phigenix was able to pay its experts in this litigation.  *Id.* ¶ 27.

### 3.  Analysis

On these facts, and those set forth in the previous section, it is clear the Dr. Donald is not Phigenix's alter ego.  He now provides evidence that he does not commingle his assets with Phigenix's, that his loan to Phigenix was properly documented and made through the appropriate processes, and that Phigenix used proper recordkeeping, including documenting its Board meetings with minutes.  He also demonstrates that he does not exert sufficient control over the company, as evidenced by the Board's involvement in the decision to file this litigation and his wife's decisionmaking authority.  Likewise, he shows through Phigenix documents that Phigenix is not merely a shell corporation with the limited goal of asserting patents.  Instead, it raised money and created strategic goals from its inception targeted at research and development, which led to at least one license agreement for such work.  Finally, though he does not submit any documentation showing Phigenix's current assets and he admitted at the hearing that Phigenix could not pay the full fee award here, he testifies that the attorneys' fees dispute with his former attorneys was not due to Phigenix's inability to pay, but rather to a negotiating dispute between Phigenix and its attorneys.  Genentech has not provided any other evidence that Phigenix has not been and is not now adequately capitalized.

Ultimately, Genentech cannot carry its burden to demonstrate that Dr. Donald is Phigenix's alter ego, and thus that he can be held personally liable under that theory.

Because Genentech has not demonstrated that Dr. Donald can be held personally liable under any theory, the Court holds that Dr. Donald is not jointly and severally liable for the fees awarded here.  Genentech's motion on this issue is DENIED.

## III.  REASONABLE ATTORNEYS' FEES DETERMINATION

### A.  Legal Standard

The award of attorney fees under 35 U.S.C. § 285 must be reasonable.  The Supreme Court

16

has said that "[t]he 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). There is thus "a 'strong presumption' that the lodestar represents the 'reasonable' fee." *Id.* (citation omitted). Ascertaining what constitutes a "reasonable" fee requires determining "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564 (1986). "This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Id.* (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). Supreme Court "case law construing what is a 'reasonable' fee applies uniformly to all" federal fee shifting statutes that permit the award of reasonable fees. *Dague*, 505 U.S. at 562.

"In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210–11 (9th Cir. 1986), *amended on other grounds by* 808 F.2d 1373 (9th Cir.1987) (citing *Blum v. Stenson*, 465 U.S. 886, 895 n.11); *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1349 (Fed. Cir. 2008) (holding that "to determine an award of attorneys' fees, a court in general should use the forum rate in the lodestar calculation").

In determining a reasonable amount of time spent, the Court should only award fees based on "the number of hours reasonably expended on the litigation" and exclude "hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 433–34. "There is no precise rule or formula for making these determinations." *Id.* at 436. "The court necessarily has discretion in making this equitable judgment." *Id.* at 437. Federal Circuit precedent controls the calculation of attorneys' fees in patent cases. *Bywaters v. United States*, 670 F.3d 1221, 1227–28 (Fed. Cir. 2012) ("we have consistently applied our law to claims for attorneys' fees under section 285 of the Patent Act because section 285 relates to an area of substantive law within our exclusive jurisdiction"). However, district courts have "'considerable discretion' in determining the amount of reasonable attorney fees under § 285." *Homeland Housewares, LLC v. Sorensen Research*, 581 F. App'x 877, 881 (Fed. Cir. 2014) (internal citations omitted).

The party seeking fees bears the initial burden of establishing the hours expended litigating the case and must provide detailed time records documenting the tasks completed and the amount of time spent. *Hensley*, 461 U.S. at 434; *Welch v. Met. Life Ins. Co.*, 480 F.3d 942, 945–46 (9th Cir. 2007). "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 433. The district court may also exclude any hours that are excessive, redundant, or otherwise unnecessary. *Id.* at 434. However, the party seeking fees need not provide comprehensive documentation to prevail. *Id.* at 437 & n.12.

## B. Discussion

In its previous Fees Order, the Court held that "Genentech is entitled to reasonable attorneys' fees accrued since the issuance of the First Summary Judgment Order on February 24, 2017." Fees Order at 10. Since that date, Genentech has incurred $2,559,601.67 fees defending this action. Chivvis Decl. ISO Fees Mot. ¶ 4, ECF 451-1. Genentech requests $2,267,004.72 of these fees, representing a discount of $292,596.95. *Id.* This total includes approximately 4,000 hours of work expended over 25 months. Genentech does not request fees for more than 20 non-lead-attorney timekeepers who billed fewer than 500 hours on the matter. *Id.* ¶¶ 9, 47–89. Genentech seeks to recover fees for 11 timekeepers, including 7 partners and 4 associates. *Id.* ¶¶ 10–46. Genentech documents that since February 24, 2017 the case involved extensive expert discovery, a motion for summary judgment, *Daubert* motions, the original fees motion, the joinder motion, the present motion, appellate filings, and various administrative tasks. *Id.* ¶¶ 5–7. In this case, Genentech faced an estimated damage award of more than $100 million and prospective injunctive relief. *Id.* ¶ 3.

Phigenix argues that Genentech's requested fees are unreasonable for the following reasons: (1) Genentech does not submit sufficient evidence to support its request; (2) Genentech did not bill a reasonable number hours on its fees and joinder motions, trial preparations, discovery, or internal meetings; (3) Genentech's fees request does not relate to the way in which Genentech actually prevailed in the case; and (4) Genentech's fees should be reduced for block billing.

The Court first addresses the reasonableness of the hourly rates requested for the attorneys

18

and then discusses each of Phigenix's arguments in turn.

### 1. Reasonableness of Hourly Rate

In establishing the reasonable hourly rate, the Court may take into account, among other factors, (1) the novelty and complexity of the issues; (2) the special skill and experience of counsel; (3) the quality of representation; and (4) the results obtained. *Cabrales v. Cnty. of Los Angeles,* 864 F.2d 1454, 1464 (9th Cir. 1988) (citation omitted).

Genentech sets forth specific effective discounted average billing rates for each of its 11 attorneys, as well as those attorneys' relevant experience. *See* Chivvis Decl. ¶¶ 10–46. The highest partner billing rate is $909.76 per hour for Michael A. Jacobs, co-chair of Morrison & Foerester's Intellectual Property Group, who has been practicing since at least 1984. *Id.* ¶¶ 10–12. The highest associate billing rate is $459.96 for Christopher J. ("Jaime") Kendall, who graduated from law school in 2013 and began work at Morrison & Foerester in 2015 after clerking in the District of Delaware. Each of the other partners' and associates' rates are within a few hundred dollars of these two highest rates. "In intellectual property cases, federal courts routinely rely on the American Intellectual Property Law Association ("AIPLA") economic survey results published every other year." *Int'l Intellectual Mgmt. Corp. v. Lee Yunn Enters.*, 2009 WL 9137315, at *3 (citing *Mathis v. Spears*, 857 F.2d 749, 754 (Fed. Cir. 1988)). The 2017 AIPLA indicates that the mean billing rate for partners at private firms in the San Francisco area was $634 in 2016, the third quartile (75%) was $798, and the 90th percentile was $1,022. Chivvis Decl., Ex. C. The mean billing rate for associates was $476 in 2016 and the third quartile (75%) was $529. These rates are comparable to those Genentech requests here.

Phigenix does not dispute the reasonableness of these rates. Given the reputation of the law firm, the qualifications and responsibilities of these particular attorneys, the complexity of this case, and the results obtained, the Court finds these rates to be "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum,* 465 U.S. at 896 n.11.

### 2. Lack of Evidence

Phigenix first argues that Genentech's submissions do no provide sufficient documentation

and evidence to the Court to support Genentech's fees request.  Phigenix Opp. at 1–3, ECF 458-4.

In its Fees Order, the Court directed Genentech to submit a chart summarizing the number of hours spent by each timekeeper on certain categories of tasks (*e.g.*, discovery, motion for summary judgment, motion for fees, etc.).  Fees Order at 28–29.  The Court also ordered Genentech to produce its billing records to Phigenix, so Phigenix could review the reasonableness of the request.  *See id.* at 29.  Genentech complied with this Order.  *See generally* Chivvis Decl. & Ex. 1, ECF 451-2.  These charts provide the Court with a bird's-eye view of the time expended and a depiction of the staging of the case that is impossible to glean from chronological timesheets.

As such, the Court finds that Genentech has provided all that the Court requires to determine the reasonableness of the fee request.  First, the timekeepers' experiences and hourly rates are described in detail, as are both general and specific tasks that each timekeeper performed.  *See id.* ¶¶ 10–46.  Second, Genentech sets forth the number of hours each of its timekeepers spent per category of task, as requested by the Court, and also provides additional details as to what types of tasks each category captures.  *See* Chivvis Decl., Ex. 1.  With the exception of the discovery category, as discussed further below, these categories are sufficiently demarcated and specific to allow the Court to determine with specificity whether the timekeepers spent reasonable time on these task.  Given the specificity of the categories, this evidence is all the Court requires to determine if the number of hours spent by each timekeeper on each category of task is reasonable.  To the extent that there were any discrepancies between the chart and the timesheets, the Court has ensured that Phigenix had a full opportunity to review the underlying timesheets and draw the details to the Court's attention, as it has done.

This information and evidence distinguishes this case from many of those Phigenix cites in support of its argument, *see* Phigenix Opp. at 1–3 (citing cases).  *See, e.g.*, *Junker v. Eddings*, 396 F.3d 1359, 1366 (Fed. Cir. 2005) (missing, in part, "documentation of attorney hourly billing rates in the community for the particular type of work involved [and] the attorney's particular skills and experience"); *Norris v. Sysco Corp.*, 191 F.3d 1043, 1047 (9th Cir. 1999) (upholding fee award despite fact that "attorney kept exceedingly poor records" and gave "miserable presentation" of

evidence because district court had spent the time to "analyze, parse, categorize, evaluate and allocate" the hours); *Minor v. Christie's, Inc.*, No. C 08-05445 WHA, 2011 WL 902235, at *15 (N.D. Cal. Jan. 29, 2011), *report and recommendation adopted*, No. C 08-05445-WHA, 2011 WL 902033 (N.D. Cal. Mar. 14, 2011) (rejecting fee requests where descriptions were vague and overly broad).

As such, the Court finds that Genentech has provided sufficient evidence to support its request.

### 3. Reasonableness of Hours Expended

The Court now turns to the parties' evidence and arguments directed to the major tasks Genentech performed and will determine whether any reduction of hours by category is appropriate. As the Ninth Circuit noted, there are two means by which a court may determine whether the number of hours is "reasonable." *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013). First, a court may conduct either an "hour-by-hour analysis of the fee request" and exclude those hours for which it would be unreasonable to compensate the prevailing party. *Id.* at 1203 (citing *Gates v. Deukmejian,* 987 F.2d 1392, 1399 (9th Cir. 1992)). Second, "when faced with a massive fee application the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical means of [excluding non-compensable hours] from a fee application." *Id.* (citation omitted). The Ninth Circuit has held that it makes no difference in terms of the final amount to be awarded whether the court applies the percentage cut to the number of hours claimed, or to the lodestar figure. *Id.* Consistent with this principle, the Court proceeds to analyze whether an across-the-board percentage cut should be applied to any category. Phigenix requests that the Court reduce the total fee award by at least $466,118.89 or 860.46 hours. Phigenix Opp. at 3.

### a. Motions for Joinder and Fees

Genentech requests $330,695.82 for 611.40 hours spent on its "First Motion for Fees, Motion for Joinder, and Second Motion for Fees (Including Review of Invoices and Lodestar Analysis)." Chivvis Decl. ¶ 5 & Ex. 1. Four partners spent 34.80, 53.10, 158.20, and 1.20 hours respectively on the motions, and three associates spent 231.90, 59.60, and 72.60 hours respectively

on the motions.  Phigenix argues that these hours are excessive and duplicative for overstaffing.  Phigenix Opp. at 3–4.  As such, it proposes a 50% reduction in the total request, or $165,347.91 for 305.7 hours.  Phigenix has failed to describe any specific excess or redundancy in Genentech's billing.  Other than expressing generalized outrage at the number of hours and attorneys devoted to preparing the fees and joinder motions, Phigenix has not provided the Court with any substantive argument pinpointing excessive or redundant effort to support its proposed slashing of 50% of the fees.  By the same token, Genentech does not substantively address this argument on reply, arguing only that Phigenix's actions in this case are the but-for cause of Genentech's need to move for fees.  *See* Reply at 4, ECF 464.  It does not specifically argue that the fees it requests are "reasonable," as is necessary under 35 U.S.C. § 285.

"[F]ees on fees are deemed 'excludable'" and "no award of fees is 'automatic.'"  *Therasense, Inc. v. Becton, Dickinson & Co.*, 745 F.3d 513, 518 (Fed. Cir. 2014) (quoting *Thompson v. Gomez*, 45 F.3d 1365, 1368 (9th Cir. 1995)); *Rosenfeld v. U.S. Dep't of Justice*, 903 F. Supp. 2d 859, 879 (N.D. Cal. 2012) (reducing fees for fees by 30% because they were "unreasonable and inflated").  However, based on the Court's extensive familiarity with the complexity of the issues presented and the quality of the briefing and presentation of the issues, the Court does not find that a 50% reduction is warranted.  That said, the fees in this category are excessive both due to the total hours expended and the disproportionate number of senior attorney hours devoted to the tasks.

The Court approves the hours expended by Mr. Jacobs (34.80) as a modest amount of time spent by the lead attorney in the case.  Given the substantial hours spent by the three associates assigned to these motions (364.10), the Court will reduce the remaining hours spent by senior attorneys.  Mr. Kreeger's hours (53.10) will be reduced by 15 hours, and Mr. Chivvis's hours (158.20) will be reduced by 60 hours.  In the Court's view, this allotment sufficiently compensates Genentech for supervisory and editing work on the capable efforts of highly qualified associates.

Thus, the lodestar for this category will be reduced by $49,541.85[7], for a total amount

_____

[7] All reduced amounts in this order are calculated by multiplying the number of hours reduced for each attorney multiplied by the attorney's discounted average billing rate as reflected in the

owed to Genentech of $281,153.97[8].

### b. Trial Preparation and Mock Trial

Genentech requests $192,600.48 for 377.10 hours spent on "Trial Preparation (Including Mock)." Chivvis Decl. ¶ 5 & Ex. 1. Phigenix submits certain of Genentech's billing records showing that Genentech began preparing for trial in June 2017, including preparing for and holding a mock trial. Opp., Ex. 4, ECF 458-10. Earlier that same month Genentech filed its second motion for summary judgment, on which it ultimately prevailed. *See* ECF 347. Trial in this case was set for November 27, 2017, ECF 236. Phigenix argues that given that trial was almost five months away and that Genentech had moved for summary judgment, Genentech's time spent on trial preparation, including the mock trial, is unreasonable. Phigenix Opp. at 4–5. As such, it proposes a 50% reduction in the total request, or $96,300.24 for 188.55 hours.

Genentech does not substantively address this argument on reply, arguing only that Phigenix's actions in this case are the but-for cause of Genentech's need to prepare for trial and that trial was "fast approaching." *See* Reply at 4, ECF 464. It does not specifically argue that the fees it requests are "reasonable," as is necessary under 35 U.S.C. § 285.

Again, Phigenix provides no reasoned analysis to support this reduction. Although Phigenix suggests that a "significant" portion of time was spent on mock trials, it fails to quantify the number of hours. It only directs the Court to Exhibit 4, a July 2017 invoice, which reflects that associate attorney Kendall devoted 5 hours to mock trial preparation—hardly a "significant" amount of time.

Having reviewed the timing of the trial preparation, the pendency of the significant summary judgment issues, and the scope of the trial if the dispositive motion had failed, the Court finds that the hours expended by the associate attorneys was excessive. Mr. Kendall's hours (213.70) will be reduced by 50 hours and Dr. Zaharia's hours (38.50) will be reduced by 15 hours. The partner-level hours (combined 114.30) are not excessive and will be allowed. The Court is

---

Chivvis Declaration, ECF 451-1. Here, the reduced amount is 15 hours x $741.43 (Kreeger) + 60 hours x $640.34 (Chivvis) = $49,541.85

[8] $330,695.82 – $49,541.85 = $281,153.97.

1   not persuaded that the time was spent too early in the case. Most attorneys serve many clients

2   simultaneously and lack the luxury of devoting full time to any single client on a case. Thus, early

3   trial preparation is often all that is possible.

4       On this basis the lodestar will be reduced by $27,811.35[9] for a total of $164,789.13[10] due

5   to Genentech.

6               c.  **Discovery**

7       Genentech requests $790,543.38 for 1413.50 hours spent on "Discovery (Including

8   Preparation for and Taking/Defending Depositions of Expert Witnesses Bell, Dressler, Ertel,

9   Pestell, Robbins, Weiner, and Wyse." Chivvis Decl. ¶ 5 & Ex. 1. Four partners spent 28.80,

10  253.10, 58.40, and 282.00 respectively on discovery, and three associates spent 8.10, 425.30, and

11  357.80 hours respectively on discovery. *Id.* This discovery was limited to expert witnesses, as the

12  fact discovery period had ended. Phigenix objects to this request because the evidence submitted

13  in support is not sufficiently detailed, so the Court cannot determine whether the fees are

14  excessive, duplicative, or irrelevant. Phigenix Opp. at 5–6. Moreover, Phigenix argues that the

15  division of labor between senior- and junior-level attorneys is unreasonable. *Id.* at 5.

16      At the hearing on the motion, the Court agreed with Phigenix that Genentech had not

17  submitted sufficient evidence to demonstrate that such a large request was reasonable. The Court

18  allowed Genentech to submit a supplemental declaration on the issue and allowed Phigenix the

19  opportunity to further oppose this supplemental evidence.

20      In its supplemental declaration, Genentech explains that its discovery category includes

21  preparation relating to eight expert witnesses and fifteen total expert reports. Chivvis Suppl. Decl.

22  ¶ 3, ECF 472. Eleven of these reports were submitted and many of the depositions were taken

23  after the February 24, 2017 cut off. *Id.* Genentech explains that the biotechnology in this case is

24  complicated, as were the invalidity, infringement, and damages issues. *Id.* ¶¶ 5–6. It also includes

25  a supplemental chart with further detail as to the tasks performed under the discovery umbrella,

26  and it includes additional information about each expert and the extent of the work Genentech

27

28  [9] 50 hours x $459.96 (Kendall) + 15 hours x $320.89 (Zaharia) = $27,811.35
    [10] $192,600.48 − $27,811.35 = $164,789.13

performed with respect to those experts. *Id.* ¶¶ 7–19 & Ex. A. The supplemental chart also breaks down the hours of work spent on each subcategory by each timekeeper.

Phigenix objects to Genentech's request on multiple grounds, asking the Court to reduce Genentech's request by $369,863.54. The Court discusses each of Phigenix's arguments in turn.

### 1. *Excessive Deposition Preparation*

Phigenix first argues that Genentech's request includes an unreasonable number of hours for excessive deposition preparation, including time spent preparing for and conducting mock depositions. Phigenix Suppl. Opp. at 1–2, ECF 474. Phigenix notes that two senior partners and an associate spent 4.5, 14, and 19.8 hours respectively preparing for and participating in mock depositions, representing unreasonable over-preparation. Phigenix requests that the Court strike this request entirely.

The Court agrees and will disallow 38.3 hours and reduce Genentech's fee request by $20,609.60—the total fees incurred in mock depositions. *See, e.g.*, *Wilcox v. Stratton Lumber, Inc.*, 921 F. Supp. 837, 847 (D. Me. 1996).

Phigenix next argues that Genentech requests too much in fees for preparation for and attendance at its own experts' depositions. Genentech seeks $143,308.44 in fees for 246.63 hours spent on these depositions. *See* Chivvis Suppl. Decl. ¶ 7. Because the depositions lasted approximately 26.1 hours in total, Phigenix calculates that Genentech spent an average of $5,490.74 per hour of deposition, which it claims is unreasonable. Phigenix asks the Court to reduce these fees by 50% or $71,654.22. Phigenix Suppl. Opp. at 2.

The Court agrees with Phigenix that this amount is excessive, and in reviewing Genentech's supplemental chart, the Court also finds that partners billed disproportionately as compared to associates. However, the Court holds that only a 25%[11] reduction is warranted. Taking into account the $20,609.60 already reduced, the Court reduces Genentech's request by $30,674.71[12]. *See Chang v. Cty. of Santa Clara*, No. 5:15-CV-02502-RMW, 2016 WL 6162460,

---

[11] The parties do not object to consideration of an across the board percentage reduction in this category, and it is not feasible for the Court to select which hours were excessive.

[12] ($143,308.44 − $20,609.60) x .25 = $30,674.71

at *9 (N.D. Cal. Oct. 24, 2016), *aff'd sub nom. Shiow-Huey Chang v. Cty. of Santa Clara*, 726 F. App'x 565 (9th Cir. 2018) (reducing fees award based in part on disproportionate amount of money for number of hours of depositions).

Finally, Phigenix argues that Genentech's request for hours expended on deposing Phigenix's experts is excessive. Genentech seeks $150,100.31 for 239.65 hours spent on three depositions. *See* Chivvis Suppl. Decl. ¶ 7. Phigenix notes, as an example, that Genentech seeks nearly $100,000 for 163.27 hours spent on a single deposition, ~80 hours of which were spent by the third-highest billing member of Genentech's team. *See* Phigenix Suppl. Opp. at 2 (citing ECF 472-1; *see* ECF 451-1 ¶¶ 9–30). Phigenix requests that the Court reduce this request by 50% or $75,050.16.

The Court agrees with Phigenix that this amount is excessive, and in reviewing Genentech's supplemental chart, the Court also finds that partners billed disproportionately as compared to associates. However, the Court holds that only a 25% reduction is warranted. As such, the Court reduces Genentech's request by $37,525.08.

In total, the Court reduces Genentech's discovery request with respect to depositions by $88,809.39.

### 2. *Duplicative Expert Efforts*

Phigenix next argues that Genentech unreasonably requests fees on experts who opine on the same issues. Phigenix Suppl. Opp. at 2–3. Phigenix notes that three of Genentech's experts opined on infringement, three on validity, and two on damages in a case with a single patent and three asserted claims. *Id.* As set forth above, Genentech requests $790,543.38 for 1413.50 hours spent on expert discovery. Phigenix argues that especially in light of Genentech's argument that this case was meritless, the Court should reduce Genentech's entire expert fees request by 25% or $155,807.35.[13] Dr. Donald also submits a supplemental declaration in opposition to Genentech's supplemental declaration targeted at challenging "the legitimacy of Genentech's expert reports," in

---

[13] It is not clear to the Court what number Phigenix is using to represent Genentech's entire expert fee request. 25% of $790,543.38 is $197,635.85, not $155,807.35. But because the Court denies this request, this discrepancy is immaterial.

which he discusses various alleged flaws that he identified in the expert reports. *See, e.g.*, Donald Suppl. Decl. ¶ 21, ECF 475.

The Court holds that deduction on this ground would be improper. The Court cannot substitute its judgment with Genentech's as to which experts would be required in the case. As Genentech's supplemental declaration sets forth in detail, this case was incredibly important to Genentech (both as to retroactive and prospective relief), the issues were complicated (and often made more so by Phigenix), the technology is complicated, and each expert was assigned to opine on specific subject matters. Chivvis Suppl. Decl. ¶¶ 3–6, 8–16. Given these facts, the Court cannot say that these experts were duplicative or excessive.

### 3. *Top-Heavy Billing*

Phigenix's last argument is that Genentech's counsel unreasonably allocated time between its partners and associates. Phigenix Suppl. Opp. at 3–4. Phigenix notes that even routine tasks, such as document review and outline preparation, were handled disproportionately by partners. Phigenix includes a chart showing that partners spent more (sometimes significantly more) hours on certain of these tasks than associates. *Id.* at 3. For example, Phigenix notes that two partners, who respectively have the second- and third-highest billing rates, were among the highest billers during discovery, billing 282 and 253.12 hours respectively. Phigenix points to specific billing records for these two partners demonstrating that the partners spent time preparing deposition outlines and reviewing transcripts, for which they billed 38.3 and 17.5 hours respectively. *Id.* at 4 (citing Ex. 1 at 8–10; Ex. 3 at 6–9, 11; Ex. 4 at 12; Ex. 5 at 13). Phigenix asks the Court to reduce the fee award by $46,742.21 because of this top-heavy billing.

Phigenix has failed to justify its blanket 10% reduction on top of other, similar reductions. Although the Court is sensitive to misallocation of resources by attorneys in the form of top-heavy billing, the Court is satisfied that other reductions imposed in this order account for any such billing here. Moreover, Genentech has already discounted its fees request by $292,596.95, including approximately 4,000 hours by more than 20 non-lead attorney timekeepers. Chivvis Decl. ¶ 4, 9, 47–89. Many of these hours no doubt were hours spent by more junior associates, such that the times Phigenix identifies do not precisely represent the ratio of senior to junior

27

attorney hours spent in the case writ large.  As such, the Court will not cut additional hours from Genentech's request based on top-heavy billing.

* * *

In sum, for all discovery-related challenges, the Court reduces Genentech's fees request by $88,809.39.  The Court thus awards Genentech $701,733.99 in discovery-related fees.

### 4. Internal Meetings and Calls

Genentech requests $27,339.61 for 51.30 hours spent on "Internal Meetings and Calls (Preparation and Attendance)."  Chivvis Decl. ¶ 5 & Ex. 2.  Phigenix asks the Court to reduce this amount by 25%, or $6,834.90 because the bills reflect that each attorney billed for his or her attendance at conferences, even though "good billing judgment" says that you should not bill for every attorney present on such calls.  Phigenix Opp. at 6 (quoting *Our Children's Earth Found. v. U.S. Envtl. Prot. Agency*, No. 13-CV-02857-JSW, 2016 WL 1165214, at *9 (N.D. Cal. Mar. 25, 2016)).  Phigenix points to two examples in which Genentech billed for four separate attorneys' attendance on conference calls.  Genentech does not respond to this request on reply.  *See generally* ECF 464.

The Court agrees with Phigenix that a 25% reduction is appropriate here.  *See Our Children's Earth Fund*, 2016 WL 1165214, at *9 (reducing requested fees by 25% for internal conferences); *S. Yuba River Citizens League & Friends of River v. Nat'l Marine Fisheries Serv.*, No. CIV. S-06-2845-LKK, 2012 WL 1038131, at *5 (E.D. Cal. Mar. 27, 2012), *aff'd* 581 F. App'x 693 (9th Cir. 2014) (reducing request by 20% in part because of billing for internal conferences).  As such, the Court reduces Genentech's request for internal meetings by 25%, or $6,834.90.  Genentech is entitled to $20,504.71 in fees for internal meetings.

### 5. Relationship of Fees to Issues on Which Genentech Prevailed

Phigenix next argues that Genentech should only be able to recover fees as to issues on which it ultimately succeeded.  Phigenix Opp. at 7–9 (citing cases).  Phigenix identifies three fee-request areas that require a reduction based on this argument: (1) Genentech's failed second motion for summary judgment theories; (2) Genentech's pending-appeal arguments; and (3) Genentech's unfiled Rule 41(b) motion.

As to the summary judgment motion, Phigenix argues that Genentech was only partially successful on the motion because the Court granted the motion only as to Genentech's infringement arguments, whereas it denied it as to Genentech's invalidity arguments. *See generally* ECF 391. According to Phigenix, this represents only partial success and thus the hours expended on the invalidity arguments should be stricken. Phigenix Opp. at 7 (citing cases). Likewise, Phigenix argues that Genentech's cross-appeal is premised on the same losing invalidity arguments. *Id.* at 7–8. Finally, Phigenix argues that Genentech should not get fees for a Rule 41(b) motion that it never filed. *Id.* at 9.

Genentech argues in reply that it merits all fees "expended defending against Phigenix's failed litigation strategy" because this case does not meet one of the two exceptions for failure to award full fees: (1) "where particular instances of litigation misconduct are the sole basis for awarding fees; or (2) the party seeking fees did not prevail on all asserted patent claims." Reply at 4 (citing *Gilead Scis., Inc. v. Merck & Co.*, No. 13-CV-04057-BLF, 2017 WL 3007071, at *5 (N.D. Cal. July 14, 2017)).

The Court ultimately agrees with Genentech, except as to the appeal. However, as an initial matter, this is a case in which litigation misconduct (*i.e.* Phigenix continuing to litigate unreasonably) led to the finding of exceptional conduct. As such, as the Court has already found (based on Genentech's arguments), exceptional fees were warranted for time spent only *after* the exceptional conduct began (*i.e.*, the date of the first summary judgment order). Because the entire litigation was not attributable to the exceptional conduct, the Court awarded only those fees resulting from the exceptional conduct. *See Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1553 (Fed. Cir. 1989). Because Genentech's work on the case after this date is necessarily the result of Phigenix's exceptional conduct, Genentech deserves reasonable fees for that work, including for its unfiled 41(b) motion and time spent briefing ultimately losing arguments.

Moreover, Genentech is the prevailing party in every sense of the term. At bottom, Phigenix argues that because Genentech lost on certain arguments at summary judgment, it did not fully "prevail" in the case. But Genentech is indisputably the prevailing party in this case as a

result of its successful summary judgment motion.  *See* Judgment, ECF 396 ("It is ordered and adjudged that judgment be entered in favor of Defendant Genentech, Inc. and against Plaintiff Phigenix, Inc.").  Though Genentech lost on one of its two defense theories (invalidity), it prevailed on the other (non-infringement).  Phigenix does not cite a single case in which a court declined to award a party fees for losing on an *argument*, as opposed to losing on a *claim*.  In many of Phigenix's cited cases, the party seeking fees lost on some claims and won on others, so the courts held that the parties could seek fees related only to the claims on which they won.  *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983); *Dang v. Cross*, 422 F.3d 800, 813 (9th Cir. 2005); *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1554 (Fed. Cir. 1989).  In the other cases Phigenix cites, the party seeking fees at the very least lost the motion for which fees were denied.  *See Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 315 F. Supp. 3d 977, 1020 (N.D. Ill. 2018) (declining to award fees for preliminary injunction motion lost on appeal); *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 264 F. Supp. 2d 753, 771 (S.D. Ind. 2003) (declining to award fees on failed motion to compel).  Here, Genentech neither lost on any claims nor lost the motion at issue.  As such, a fee reduction is not appropriate as to the 41(b) motion or the second summary judgment motion.  The Court notes that although it would be preferable for all involved if only winning arguments were submitted to the Court, that is not the nature of litigation. Genentech deserves compensation for all issues submitted to the Court in good faith.

However, the Court comes to a different conclusion with respect to the hours spent on appeal.  As the court in *Chamberlain* noted, "the Federal Circuit has taken issue with district courts awarding fees related to court-of-appeals proceedings."  315 F. Supp. 3d at 1020.  It is possible the Phigenix will win on appeal, abrogating Genentech's status as the prevailing party.  As such, the Court declines at this juncture to award Genentech fees related to the appeal.  *Cf. Kilopass Tech., Inc. v. Sidense Corp.*, 82 F. Supp. 3d 1154, 1172–73 (N.D. Cal. 2015) (awarding attorney fees for winning appeals).  This request is dismissed without prejudice to Genentech's moving again for fees on this basis if it succeeds on appeal.  As such, the Court reduces Genentech's total fee request by $337,242.74, or 481.10 hours, the amount it seeks for fees related

to its appeal.[14]

### 6. Block-Billing

Finally, Phigenix moves to reduce Genentech's fee request because Genentech's attorneys used block-billing, which Phigenix argues prohibits the Court from assessing the reasonableness of the time spent. Phigenix Opp. at 9–10. Phigenix points to a few examples, and ultimately requests that the Court reduce the total fee request for three separate attorneys by 20%, for a $163,575.58 reduction. Genentech argues that its entries are "task-billed," as required by Genentech, and that the purported block billing is instead a grouping of "subtasks," which are sufficiently detailed to inform the Court of the tasks completed during the billed time.

The Court agrees with Genentech that the purportedly block-billed entries are sufficiently detailed to allow the Court to assess the reasonableness of the time spent. While block-billing is less than ideal in providing a complete record to assess reasonableness, adequate descriptions can still make it acceptable. Such detailed information about the timekeeper's activities can be sufficient for the purpose of evaluating whether the total block-billed hours were reasonable as a whole. *E.g.*, Phigenix Opp., Ex. 3 (reciting descriptions from one of the block-billed entries: "Confer with team regarding attorney declaration supporting bill of costs," "analyze revised motion for attorney fees," "confer with team regarding same," "further research post-judgment joinder cases," "revise outline of Rule 19 joinder motion," and "confer with team regarding same."); *see also Stonebrae, L.P. v. Toll Bros.*, No. C-08-0221-EMC, 2011 WL 1334444, at *9 (N.D. Cal. Apr. 7, 2011), *aff'd*, 521 F. App'x 592 (9th Cir. 2013) (finding the description sufficient to allow for block-billed entries); *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB SHX, 2015 WL 1746484, at *25 (C.D. Cal. Mar. 24, 2015), *aff'd*, 847 F.3d 657 (9th Cir. 2017) (same). Accordingly, the Court finds that Genentech's entries are sufficiently clear and do not warrant a reduction in fees.

## IV. ORDER

For the foregoing reasons, Genentech's motion for reasonable attorneys' fees is

---

[14] Genentech also seeks $48,982.36 for other appellate motions or analysis, but Phigenix does not oppose this request.

GRANTED IN PART AND DENIED IN PART.  Genentech may recover reasonable attorneys' fees in the amount of $1,756,764.49 from Phigenix only.  Dr. Donald is not liable for these fees.

**IT IS SO ORDERED.**

Dated: June 7, 2019

_____
BETH LABSON FREEMAN
United States District Judge